**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD., ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., WEST REALM SHIRES INC., WEST REALM SHIRES SERVICES INC., CLIFTON BAY INVESTMENTS LLC, COTTONWOOD GROVE LTD, EUCLID WAY LTD, PAPER BIRD INC., FTX DIGITAL MARKETS, LTD.[2] | Adv. Pro. No. 24-_____ (___) |
| Plaintiffs, | |
| - against - | |
| BINANCE HOLDINGS LIMITED., BINANCE CAPITAL MANAGEMENT CO. LTD, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, CHANGPENG ZHAO, DINGHUA XIAO, SAMUEL WENJUN LIM, and DOES 1-1000 | |
| Defendants. | |

## COMPLAINT

Plaintiffs in the above-captioned adversary proceeding bring this complaint (the "**Complaint**") through the undersigned counsel and allege as follows:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in the above-captioned chapter 11 cases, a complete list of the Debtors' last four digits of their federal tax identification numbers is not provided herein, but may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] FTX Digital Markets Ltd. (in Official Liquidation) was incorporated in the Commonwealth of The Bahamas as an International Business Company, registered number 207269B.

## NATURE OF THE ACTION

1.	In one sense, the story of FTX is well known.  Once a rising star in the crypto universe, FTX collapsed under the weight of the many material errors committed by its founder, Sam Bankman-Fried ("**Bankman-Fried**"), and other FTX insiders, ultimately filing for bankruptcy protection in November 2022.  Less well known, however, is that Bankman-Fried's pervasive malfeasance began long before it was discovered.  Indeed, unbeknown to its customers and creditors, based on a proper accounting of its assets and liabilities, the debtors in these chapter 11 cases (the "**Debtors**") may have been insolvent from inception and certainly were balance-sheet insolvent by early 2021.  Because of its insolvency, the Debtor Plaintiff's July 2021 transfer of at least *$1.76 billion* worth of cryptocurrency to its equity holder Binance and certain Binance executives, in the form of a share repurchase, was a constructive fraudulent transfer based on a straightforward application of Section 548(a)(1)(B) of the Bankruptcy Code. Moreover, because the transfer was made in furtherance of Bankman-Fried's scheme described herein, it was also an intentional fraudulent transfer under Section 548(a)(1)(A) of the Bankruptcy Code.

2.	Binance (as defined herein), founded in 2017 by Changpeng Zhao is today the largest cryptocurrency exchange in the world by trading volume, with more than $100 trillion in all-time trade value.  While indisputably successful, Binance and Zhao achieved their success in large part due to their patent disregard for, and affirmative violations of, the laws of the United States.  In 2023, Binance pleaded guilty to failing to implement anti-money laundering and sanctions compliance policies, which, according to the United States Treasury Secretary, "allowed money to flow to terrorists, cybercriminals, and child abusers through its platform."  Zhao himself pleaded guilty to failure to implement anti-money laundering policies and was sentenced to four months in prison.

3.     Binance first acquired an equity stake in FTX in November 2019, when Bankman-Fried sold 20% of his newly-minted international crypto exchange—FTX.com— owned by FTX Trading (as defined herein), to what was then one of his largest competitors. Binance purchased its stake in FTX Trading with 1,002,739 of Binance's exchange token, BNB.  A little over a year later, Bankman-Fried expanded his cryptocurrency business into the United States, under the umbrella of a parent company called WRS (as defined herein).  In or about February 2020, Binance Executives acquired a 18.4% stake in WRS for just two dollars.

4.     As discussed in more detail herein, Binance exited its investment in FTX in 2021.  As Zhao would later remark, he decided to exit his position in FTX because of personal grievances he had against Bankman-Fried.  In July 2021, the parties negotiated a deal whereby FTX bought back Binance's and its executives' entire stakes in both FTX Trading and WRS. Pursuant to that deal, FTX's Alameda Research division directly funded the share repurchase with a combination of FTT (FTX's exchange token), BNB (Binance's exchange token), and BUSD (Binance's dollar-pegged stablecoin).  In the aggregate, those tokens had a fair market value of at least $1.76 billion.

5.     But Alameda was insolvent at the time of the share repurchase and could not afford to fund the transaction.  Indeed, as Bankman-Fried's second-in-command, Caroline Ellison, would later testify, she contemporaneously told Bankman-Fried "we don't really have the money for this, we'll have to borrow from FTX to do it."  According to Ellison's testimony, Alameda spent about *$1 billion of FTX Trading's capital received from depositors* to fund the repurchase.  Ellison further testified that Bankman-Fried dismissed her concerns about financial resources, telling her that, notwithstanding the need to use customer deposits, the repurchase was "really important, we have to get it done."  Indeed, as discussed below, one of the reasons Bankman-Fried viewed the transaction as "really important" was precisely because of his desire to conceal his companies' insolvency and send a false signal of strength to the

market. In connection with the share repurchase, Bankman-Fried was asked directly by a reporter whether Alameda funded the entire repurchase using its own assets, expressing surprise that Alameda could have done so given the purchase price and what was publicly known regarding Alameda's financial resources. In response, Bankman-Fried falsely stated: "The purchase was entirely from Alameda. Yeah, it had a good last year :P" (i.e., an emoji for a tongue sticking out). Of course, as is now known, Bankman-Fried's statement that the repurchase was "entirely" funded from Alameda was false, as it was largely funded by funds received as FTX customer deposits in furtherance of Bankman-Fried's deception.

6.     The need to borrow funds received as customer deposits held at FTX Trading was problematic for two reasons. First, Alameda's inability to fund the transaction using its own balance sheet was indicative of Alameda's insolvency. Second, and worse still, the use of funds from the trading platform to fund the repurchase left the platform in an even greater imbalance, which Bankman-Fried attempted to cover up in a pervasive fraud that infected virtually all aspects of FTX's business. Indeed, in large part due to such fraud, FTX Trading was also insolvent at the time of the Binance share repurchase, which closed on July 21, 2021. In other words, the FTX Trading shares acquired through the share repurchase were actually worthless based on a proper accounting of FTX Trading's assets and liabilities.

7.     Having divested himself of his equity stake in his rival FTX, Zhao then set out to destroy his now-unaffiliated competitor. As FTX grew, it became a clear threat to Binance's market dominance. Indeed, the period after the 2021 Share Repurchase (as defined herein) was marked by distrust and acrimony between the rival cryptocurrency businesses and their founders. In the end, Zhao's succeed-at-all-costs business ethos was not limited to facilitating money laundering. Beginning on November 6, 2022, Zhao sent a series of false, misleading, and fraudulent tweets that were maliciously calculated to destroy his rival FTX, with reckless disregard to the harm that FTX's customers and creditors would suffer. As set forth herein in

more detail, Zhao's false tweets triggered a predictable avalanche of withdrawals at FTX – the proverbial run on the bank that Zhao knew would cause FTX to collapse. To make matters worse, with FTX in freefall, Zhao sent additional false tweets calculated, in part, to prevent FTX from seeking and obtaining alternative financing to cauterize the run on the institution by customers deceived by the tweets. Collectively and individually, these false public statements destroyed value that would have otherwise been recoverable by FTX's stakeholders.

8.     Shortly after and based in part on Zhao's series of false tweets and lingering financial damage caused by the 2021 Share Repurchase, the Securities Commission of The Bahamas petitioned for the winding up of FTX DM (defined below) on November 10, 2022. On November 11 and November 14, 2022 (for purposes of this Complaint, collectively, the "**Petition Date**"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "**Court**") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. By this lawsuit, the Plaintiffs seek to recover, for the benefit of FTX's creditors, at least $1.76 billion that was fraudulently transferred to Binance and its executives at the FTX creditors' expense, as well as compensatory and punitive damages to be determined at trial.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this proceeding is proper under 28 U.S.C. § 1409. This action is a core proceeding within the meaning of 28 U.S.C. § 157(b) and an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

10.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the Court, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

11.     Plaintiff FTX Trading, Ltd. ("**FTX Trading**") is a corporation registered in Antigua and Barbuda. FTX Trading did business as "FTX.com," a global exchange that offered customers the ability to trade cryptocurrencies and related assets. As of the Petition Date, FTX Trading was 80% owned by Paper Bird Inc.

12.     Plaintiff FTX Digital Markets Ltd. ("**FTX DM**" and, together with the Debtors, "**FTX**") is a company incorporated in the Commonwealth of The Bahamas, acting through Brian C. Simms KC, Kevin G. Cambridge and Peter Greaves in their capacity as joint and several official liquidators of FTX DM (and in their capacity as joint and several provisional liquidators, where applicable).  On December 19, 2023, and as subsequently amended, FTX DM and the Debtors entered into a Global Settlement Agreement ("**GSA**") which, among other things, resolved a dispute regarding the ownership of certain assets and the allocation of recoveries therefrom.  Pursuant to the GSA, FTX DM's customers' recoveries are tied to the Debtors' customers' recoveries.  Thus, an increase in the Debtors' recoveries also increases FTX DM's customers' recoveries.

13.     Plaintiff Alameda Research Ltd. ("**Alameda Ltd.**") is a British Virgin Islands company limited by shares. It is a wholly owned subsidiary of Alameda LLC.

14.     Plaintiff Alameda Research LLC ("**Alameda LLC**") is a Delaware limited liability company that was as of the Petition Date 90% owned by Bankman-Fried and 10% owned by Gary Wang ("**Wang**").

15.     Plaintiff West Realm Shires, Inc. ("**WRS**" and, together with its subsidiaries, "**FTX U.S.**") is a Delaware corporation that was as of the Petition Date 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Nishad Singh ("**Singh**"), and 22.25% owned by other minority shareholders, including WRS employees and outside investors.

16.     Plaintiff West Realm Shires Services Inc. ("**WRSS**") doing business as "FTX US," is a Delaware corporation and a wholly owned subsidiary of Plaintiff WRS.

17.     Plaintiff Cottonwood Grove Ltd. ("**Cottonwood**") is a Hong Kong company limited by its shares and a subsidiary of Plaintiff Alameda LLC.

18.     Plaintiff Euclid Way Ltd. ("**Euclid Way**") is an Antigua company limited by its shares and a subsidiary of Plaintiff Alameda LLC.

19.     Plaintiff Paper Bird Inc. ("**PaperBird**") is a Delaware corporation that as of the Petition Date was 100% owned by Bankman-Fried.

20.     Plaintiff Clifton Bay Investments LLC ("**Clifton**" and, together with FTX Trading, Alameda Ltd., Alameda LLC, WRS, WRSS, Cottonwood, Euclid Way, and PaperBird (the "**Debtor Plaintiffs**"), is a Delaware limited liability company that as of the Petition Date was 100% owned by Bankman-Fried.

21.     Defendant Binance Holdings, Ltd., d/b/a Binance.com ("**Binance Holdings**") is Cayman Islands limited liability company founded by Defendant Zhao.

22.     Defendant Binance Capital Management Co. Ltd. ("**Binance Capital Management**") is a company established under the laws of the British Virgin Islands.

23.     Defendant Binance Holdings (IE) Limited ("**Binance IE**") is a holding company incorporated in Ireland.

24.     Defendant Binance (Services) Holdings Limited ("**Binance Services**" and, together with Binance IE, Binance Holdings and Binance Capital Management, "**Binance**" or the "**Binance Defendants**") is a holding company incorporated in Ireland. Defendants Binance Holdings, Binance IE, Binance Services, and Zhao consented to the entry of a December 14, 2023 Consent Order entered in the United States District Court for the Northern District of Illinois (the "**Consent Order**") in connection with an action brought by the Commodity Futures Trading Commission.  The Consent Order referenced above states in its Findings of

Fact that Binance Holdings and "at least certain" Binance affiliates, including Binance Holdings, Binance IE and Binance Services "have commingled funds, relied on shared technical infrastructure, and engaged in activities to collectively advertise and promote the Binance brand." Those findings of fact further state that "Binance's reliance on a maze of corporate entities to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and location of the Binance platform."

25. Defendant Changpeng Zhao ("**Zhao**" also commonly known as "**CZ**") is the founder and former CEO of Binance. Zhao pled guilty to violating the Bank Secrecy Act, 31 USC 5311 *et seq*, by causing Binance to fail to implement an effective anti-money laundering program. He ceased his role as CEO of Binance on November 21, 2023. Upon information and belief, Zhao retains his ownership stake in Binance, which is an estimated 90% of the company. The Consent Order states in its Findings of Fact that "Zhao has directly or indirectly owned the scores of entities that collectively operate the Binance platform . . . ."

26. Defendant Dinghua Xiao worked at Binance from approximately 2017 to September 2019 at various Binance subsidiaries, including BitDJ in Tokyo, Japan, and Ruique Culture Development Co, Ltd., in Shanghai, China.

27. Defendant Samuel Wenjun Lim was the Binance Head of Compliance from 2018 through 2022.

28. Does 1-1,000 are defendants, including but not limited to initial and subsequent transferees of the 2021 Fraudulent Transfers (defined below), whose true names, identities and capacities are presently unknown to the Plaintiffs. As and when the names, identities, and capacities of these fictitiously named Defendants become known, the Plaintiffs will amend this Complaint to set forth these Defendants' true names, identities, and capacities and otherwise proceed against them as if they had been named parties upon the commencement of this adversary proceeding.

## FACTUAL BACKGROUND

### A.    The Creation of the Binance and FTX Exchanges

29.    In 2017, Defendant Zhao launched Binance.com to provide services to crypto asset investors.  Since at least July 2017, Binance has operated Binance.com as an international crypto asset trading platform.  The Binance.com platform markets itself as being available to customers in more than 170 countries.  It offers trading in over 350 crypto assets and makes available various other investment opportunities involving crypto assets. Binance operates through a number of affiliated entities, in multiple jurisdictions, all tied to Zhao as the beneficial owner.  Today, Binance.com is the largest cryptocurrency trading exchange in the world with a 24-hour spot trading volume of over $40 billion USD, nearly four times larger than its second closest competitor.

30.    In 2017, Zhao and Binance created a new cryptocurrency, "Binance coin" or "**BNB**."  BNB is the native cryptocurrency of the Binance exchange.  From inception, Binance touted an investment in BNB as an investment in Binance itself, including its efforts to create a successful crypto-only asset trading platform.

31.    In 2019, Binance also introduced its "stablecoin"—a cryptocurrency that is specifically pegged to the value of a stable asset—and called it "**BUSD**."  Unlike BNB, a token that can experience significant volatility in price, BUSD is pegged to and backed by the U.S. dollar.

32.    In 2017, Bankman-Fried co-founded Alameda LLC, a crypto trading hedge fund organized under the laws of Delaware (together with Alameda Ltd. and its subsidiaries, "**Alameda**"). By May 2019, that venture led him to found his own crypto exchange, FTX.com, to operate as an international platform to trade and invest in cryptocurrency.

33.    On May 8, 2019, FTX launched "**FTT**," FTX's native digital asset token.  FTT is an "exchange token" proprietary to FTX that offered its holders certain benefits that flowed

from trading or investment activity on FTX's exchanges. FTT was designed in such a way that it derived its total value from FTX's enterprise value. BNB had a similar function, each of which allowed the respective exchanges control over the coin available on the market, which could inflate or deflate the prices.

**B.   Binance Acquires Equity in FTX Entities**

34.     In or about August 2019, discussions about Binance purchasing an equity stake in FTX began. After months of negotiations, on or about November 27, 2019, Binance purchased 250 Series A Preferred Shares in FTX Trading (equaling an approximately 20% stake) at an issuance price of $73,200 USD per share (the "**2019 Share Transfer**"). To fund the acquisition, Binance paid 1,002,739 BNB, which had a trading value of approximately $18.3 million.

35.     As part of the 2019 Share Transfer, FTX Trading and Binance entered into an Investor's Rights Agreement dated November 27, 2019, whereby Binance received a right of first refusal with respect to any new FTX Trading securities issued up to the equivalent amount that Binance held at the time (the "**Binance ROFR**"). FTX co-founders Bankman-Fried and Wang also entered into non-compete agreements on the same day in which they agreed that they would not obtain an ownership stake in or provide services to any company competing with Binance besides FTX.

36.     By the end of 2019, Bankman-Fried had determined to open a United States-based exchange platform. On February 28, 2020, Zhao signed a waiver of the non-compete allowing Bankman-Fried and Wang to hold equity interests in WRS, the parent company of FTX's new U.S. exchange platform. Bankman-Fried took a 52.9% equity interest in WRS.

37.     That same day, Zhao, along with other Binance executives, Defendants Dinghua Xiao and Samuel Wenjun Lim (collectively, including Zhao, the "**Binance Executives**"), also purchased 200,000 WRS Shares in the aggregate (equaling approximately 18.4% stake in

WRS) pursuant to a founders restricted stock purchase agreements dated February 28, 2020 for an aggregate purchase price of two dollars.

**C. The 2021 Share Repurchase**

38. In July 2021, Bankman-Fried and FTX entered into discussions with Binance regarding a potential repurchase of the FTX Trading and WRS shares held by Binance and the Binance Executives (the "**2021 Share Repurchase**"). The Parties consummated the 2021 Share Repurchase on or about July 15, 2021, as memorialized in seven written agreements executed on the same day:

1) July 15, 2021 Share Transfer Agreement for the transfer of the FTX Trading Series A Preferred Shares to Euclid Way ("**Series A Preferred Share Transfer Agreement**");

2) July 15, 2021 Share Transfer Agreement for the transfer of 42,838 WRS Shares from Xiao to Bankman-Fried ("**Xiao–Bankman-Fried Share Transfer Agreement**");

3) July 15, 2021 Share Transfer Agreement for the transfer of 93,478 WRS Shares from Zhao to Bankman-Fried ("**Zhao–Bankman-Fried Share Transfer Agreement**");

4) July 15, 2021 Share Transfer Agreement for the transfer of 33,122 WRS Shares from Lim to Wang ("**Lim–Wang Share Transfer Agreement**");

5) July 15, 2021 Share Transfer Agreement for the transfer of 10,423 WRS Shares from Xiao to Wang ("**Xiao–Wang Share Transfer Agreement**");

6) July 15, 2021 Share Transfer Agreement for the transfer of 20,139 WRS Shares from Lim to Singh ("**Lim–Singh Share Transfer Agreement**", together with the Lim–Wang Share Transfer Agreement, Zhao–Wang Share Transfer Agreement, Zhao–Bankman-Fried Share Transfer Agreement, and the Xiao–Bankman-Fried Share Transfer Agreement, the "**FTX Executives Share Transfer Agreements**"); and

7) July 15, 2021 Termination Certificate dissolving the Initial Series A Preferred Share Transfer Agreement and the Binance ROFR.

39. The 2021 Share Repurchase recouped both the FTX Trading shares purchased by Binance in 2019 (the "**FTX Trading Repurchase**") and the WRS shares purchased by Binance Executives in 2020 (the "**WRS Repurchase**"). In exchange, FTX and its executives

agreed to pay consideration consisting of BNB, FTT, and BUSD. While the true value of the FTT, which was tied to the value of FTX, was likely zero at the time based on a proper accounting of FTX Trading's assets and liabilities, the BNB and BUSD transferred in consideration for the 2021 Share Repurchase had a fair market value of approximately $1.76 billion.

40.     The WRS Repurchase prong of the 2021 Share Repurchase involved certain FTX executives, as buyers, and the Binance Executives, as sellers, whereby the FTX executives individually entered into the FTX Executives Share Transfer Agreements for the repurchase of the 200,000 WRS Shares, at a price per share of $152.63, for a quantity of BUSD equal to $30,526,000. At the time of the WRS Repurchase, WRS was balance-sheet insolvent based on a proper accounting of the Debtors' assets and liabilities, rendering the repurchased WRS shares worthless.

41.     The FTX Trading Repurchase prong of the 2021 Share Repurchase involved a newly created subsidiary of Alameda, Euclid Way, as the nominal buyer, and Defendant Binance Capital Management Co. Ltd., as nominal seller, whereby Euclid Way agreed to purchase 96,456,750 Series A Preferred Shares (all of Binance's Series A Preferred Shares)[3] for:

1)     A quantity of BUSD equal to $1,172,237,000 based on a conversion formula specified in the Share Transfer Agreement;

2)     A quantity of BNB equal to $554,868,500 based on a conversion formula specified in the Share Transfer Agreement; and

3)     A quantity of FTT equal to $554,868,500 based on a conversion formula specified in the Share Transfer Agreement.

---

[3]     FTX Series A Preferred Shares went through a 385,827 to 1 stock split on April 30, 2020, which converted Binance's 250 (par value $1.00) Series A Preferred Shares into 96,546,750 (par value $0.0000026) Series A Preferred Shares.

42.     At the time of the FTX Trading Repurchase, FTX Trading was balance-sheet insolvent, so it had no equity value.  The repurchased FTX Trading shares therefore had no value based on a proper accounting of FTX Trading's assets and liabilities.

43.     While not a party to any of the agreements, Alameda (specifically, Alameda Ltd.) was the direct transferor of all of the consideration in connection with the 2021 Share Repurchase.  For the FTT portion of the consideration, Alameda transferred the FTT directly to one or more Binance entities.  For the BUSD portion of the consideration, Alameda first needed to obtain the BUSD.  It did so through a series of transactions, including transferring at least $721 million U.S. dollars to a New York trust maintained by an entity called "Paxos." Upon information and belief, Paxos, while not affiliated with Binance, served as the issuer of BUSD on Binance's behalf.  Upon Alameda's transfer of the U.S. Dollars to Paxos, Paxos then "minted" an equivalent amount of BUSD and transferred it to Alameda.   Alameda then transferred the BUSD to an Alameda-controlled account on the Binance.com exchange (which account was held in the name of Evergreen North Ltd. ("**Evergreen**")).   Immediately thereafter, upon information and belief, Alameda directed the transfer of the BUSD from the Evergreen Binance.com account directly to one or more Binance entities.  For the BNB portion of the consideration, Alameda already held a quantity of BNB in the Evergreen account at Binance.com.   On the date of the 2021 Share Repurchase, upon information and belief, Alameda directed the transfer of the requisite BNB directly to one or more Binance entities.

44.     On the back end, Alameda entered into "loan agreements" with each of Euclid Way and the FTX executives for their respective obligations under the 2021 Share Repurchase. But, upon information and belief, none of these loan agreements were ever repaid, nor was there any intention to repay them.

**D.      The 2021 Share Repurchase Was Made By and for Insolvent Companies in Furtherance of Bankman-Fried's Underlying Fraud**

45.      The transfers made by the Debtor Plaintiffs (funded directly by Alameda) to Binance were made at a time when (i) Alameda as a whole, and each of its subsidiaries, were insolvent; (ii) FTX Trading as a whole, and each of its subsidiaries, were insolvent; (iii) Alameda and FTX Trading on a combined and consolidated basis were insolvent; and (iv) all Debtors on a combined and consolidated basis were insolvent.  The causes of the Debtors' insolvency, and the means by which the Debtors were able to conceal it and appear to operate normally, are manifold and will be proven at trial in detail.  Fundamentally, however, major drivers of the Debtors' insolvency include the following:

(i)      The FTT held by the Debtors was worth far less than the amount at which FTX booked its FTT assets.  Indeed, as Ellison testified, it would have been "misleading" to put Alameda's FTT holdings in Alameda's balance sheet around the time of the 2021 Share Repurchase because "we wouldn't have been able to sell all the FTT for that much and it was much larger than the rest of the items on our balance sheet at the time."

(ii)      Similarly, other cryptocurrencies closely tied to FTX and Bankman-Fried, colloquially known as "Sam coins," were overvalued on the Debtors' balance sheet.

(iii)      At the behest of Bankman-Fried, the Debtors concealed, and at times actively misrepresented, material facts about their business, including Alameda's unlimited line of credit against FTX Trading, as well as the fact that funds received from customers, in exchange for a demand obligation, were being used to fund Alameda's risky and illiquid investments.  Indeed, FTX's creditors, and the market generally, were unaware that FTX Trading did not have the financial resources to satisfy all customer deposits at the time of the 2021 Share Repurchase.  FTX would not have been able to continue to operate its business had customers attempted to withdraw their deposits.

(iv)      In part due to its ongoing fraud, at the time of the 2021 Share Repurchase, the Debtors had accrued large regulatory liabilities that were unaccounted for in the Debtors' financial statements, including liabilities to the Internal Revenue Service and the Commodity Futures Trading Commission.

46.      Indeed, just prior to the 2021 Share Repurchase, Ellison prepared a balance sheet that showed that Alameda's net asset value was approximately ***negative*** $2.7 billion, with liabilities of $9.4 billion.  Ellison informed Bankman-Fried that Alameda did not have

sufficient funds to complete the 2021 Share Repurchase Agreement. Accordingly, as set forth above, Bankman-Fried directed Alameda to take approximately $1 billion USD from FTX customer deposits on the FTX.com platform to fund the 2021 Share Repurchase using Alameda's "line of credit on FTX." The line of credit became an unlimited borrowing mechanism which allowed the confiscation of customer deposits.

47. The 2021 Share Repurchase was a critical component of Bankman-Fried's pervasive fraud involving the unauthorized use of FTX customer deposits. Ellison testified that the 2021 Share Repurchase "confirm[ed] that [Bankman-Fried] saw Alameda's line of credit on FTX as a general backstop source of funds for whenever we needed funds." Indeed, according to Ellison, the 2021 Share Repurchase represented a significant scaling up of the scheme, describing it as the "the first time that I can recall an amount that large being taken from FTX."

48. The 2021 Share Repurchase also furthered Bankman-Fried's deceptive scheme to hide the vulnerability of the exchange to a run on the institution by customers seeking to reclaim their assets deposited on the exchange. Contemporaneous communications reflect that Bankman-Fried's goal was to use the 2021 Share Repurchase to project confidence and strength to the market, concealing both the underlying insolvency and the fraudulent use of customer deposits. Just three days after the 2021 Share Repurchase, Bankman-Fried spoke with a reporter from Forbes to discuss the transaction, and he and the reporter engaged in a follow-up email exchange in the following days. In that exchange, the reporter asked:

> *[I]s there a chance we could take a look at Alameda's asset breakdown? The purchase of Binance's shares was worth roughly $2.3B so profits must be huge and the last AUM we had for Alameda was around $2.5B. If I understand correctly, the purchase was made in cash, FTT, BUSD, and BNB. Are these tokens solely Alameda's? Did you spend any of your own FTT?*

Bankman-Fried answered:

***The purchase was entirely from Alameda. Yeah, it had a good last year :P***

Bankman-Fried's false statements that the 2021 Share Repurchase was funded "entirely from Alameda" and a result of Alameda having "a good year last year" evidence Bankman-Fried's intent to use the 2021 Share Repurchase to convey confidence and strength to the market at a time when the Debtors were insolvent and secretly reliant on FTX Trading's cash and crypto from customer deposits for liquidity.

49. For substantially the same reasons that Alameda, FTX Trading, and the Debtors individually and collectively were insolvent on a balance sheet basis, they were also inadequately capitalized and unable to pay their debts as they came due. For example, the customer funds deposited with FTX Trading that were secretly and unlawfully used to fund the 2021 Share Repurchase were callable by the customers at any time. At the time of the 2021 Share Repurchase, neither FTX Trading, nor Alameda, had the assets to satisfy customer withdrawal requests if all customers, or even a significant portion of them, were to demand the return of their assets at the same time because FTX had committed customer deposits, and its own assets, to risky and illiquid investments. FTX's inability to cover customer deposits in the event of such a "run on the bank" scenario became clear to the world in November 2022 when FTX collapsed, but FTX was similarly unprepared for such a scenario at the time of the 2021 Share Repurchase.

50. While the Debtors were able to raise new equity capital, at even higher valuations, shortly after the 2021 Share Repurchase, those transactions were tainted by the same overarching fraud. Indeed, investors who acquired equity in the Debtors after the 2021 Share Repurchase have asserted that such investments were induced by fraud. For example, one such investor later asserted that its $275 million equity investment was induced by material misrepresentations by FTX about "key aspects of FTX's operations, including, among other things, by claiming that FTX was legally compliant, that Alameda did not have superior access

to the FTX exchanges, and that FTX did not rehypothecate or loan customer funds." According to the same investor, during the diligence process, FTX also "kept hidden . . . that FTX and Alameda were more closely linked than FTX had claimed and that Alameda had a very large exposure to FTT, the native token of the FTX exchanges."

51.     Based on their assertions that they were fraudulently induced to invest in FTX Trading, preferred shareholders also asserted the right to forfeiture proceeds recoverable by the Department of Justice from FTX insiders, leading to competing claims by the Debtors and the preferred shareholders to such proceeds. As part of a settlement of that dispute, the Debtors agreed to waive the Debtors' claims for up to $230 million of those forfeiture proceeds in favor of the preferred shareholders.

**E.     Zhao's Campaign to Destroy FTX**

52.     Following the 2021 Share Repurchase, a widely reported feud arose between Zhao and Bankman-Fried. This feud was due in part to public statements by Bankman-Fried implying that Binance was not cooperative with government regulators and that FTX did not want to be associated with Binance. Binance was indeed facing public accusations around the globe of purposefully skirting banking and securities regulations, allowing money laundering on its platform, allowing Iranian firms to trade on its platforms despite international sanctions, allowing money to be funneled to terrorist organizations through its platform, and other illegal conduct.

53.     In or around summer 2022, calls for governments to regulate cryptocurrency exchanges, including a proposed regulatory scheme known as "BitLicense" in the United States, gathered steam. FTX and Bankman-Fried adopted a pro-regulation stance, with Bankman-Fried claiming that FTX was going to be "the most regulated and law-abiding cryptocurrency exchange in the world." On the other hand, many crypto enthusiasts favored decentralization. Such enthusiasts included Zhao, who ultimately, along with Binance, were

found to have violated numerous U.S. regulations by using an intentionally opaque common enterprise to engage in a "calculated strategy of regulatory arbitrage to their commercial benefit." Some crypto influencers, who, upon information and belief, were partially funded by Binance, published explosive tweets calculated to turn customers against FTX, in part because of its public support for crypto regulation. Such influencers were bringing Bankman-Fried's pro-regulation efforts to the crypto community's attention. Tweets, YouTube videos, Telegram groups, TikTok videos, and Reddit posts dedicated to criticizing Bankman-Fried's regulatory efforts were widely disseminated, sometimes getting hundreds of thousands of views and comments.

54.    Around this time, FTX management began to suspect Binance was engaged in a "months-long coordinated [fear, uncertainty, and doubt] campaign against FTX." On the evening of November 6, 2022, Bankman-Fried drafted a document titled "Coordinated FUD" (*i.e.* fear, uncertainty, and doubt) in which he detailed his theory. FTX management were not the only ones who suspected this. The Examiner in the above-captioned chapter 11 cases noted in the *Report of Robert J. Cleary, Examiner*, that "after the Voyager Digital auction closed [in late October 2022], there was concern that Binance and CZ were putting out negative press statements in order to derail the FTX Group's purchase of Voyager Digital's assets." In a U.S. Senate hearing, an investor close to Bankman-Fried testified that Zhao and Bankman-Fried "were at war with each other, and one put the other out of business, intentionally."

### F.    Zhao Deliberately Causes a Bank Run on FTX

55.    On or about November 1, 2022, confidential Alameda financials were leaked to CoinDesk, a news and media company that covers cryptocurrency and blockchain technology and industries. Within FTX, it was strongly suspected that Binance and Zhao were involved in the leak. On November 2, 2022, CoinDesk published its now-infamous article, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*

(Ian Allen), revealing, among other things, that Alameda's assets were made up largely of FTT, raising serious concerns about both Alameda's and FTX Trading's financial condition.

56.      On November 6, 2022, Zhao sent the following tweets (the "**November 6 Tweet Thread**"):



CZ ◆ BNB ✔
@cz_binance

As part of Binance's exit from FTX equity last year, Binance received roughly $2.1 billion USD equivalent in cash (BUSD and FTT). Due to recent revelations that have came to light, we have decided to liquidate any remaining FTT on our books. 1/4

10:47 AM · Nov 6, 2022



CZ ◆ BNB ✔
@cz_binance

We will try to do so in a way that minimizes market impact. Due to market conditions and limited liquidity, we expect this will take a few months to complete. 2/4

10:47 AM · Nov 6, 2022



CZ ◆ BNB ✔
@cz_binance

Binance always encourages collaboration between industry players. Regarding any speculation as to whether this is a move against a competitor, it is not. Our industry is in it's nascency and every time a project publicly fails it hurts every user and every platform. 3/4

10:47 AM · Nov 6, 2022



CZ ◆ BNB ✔
@cz_binance

We typically hold tokens for the long term. And we have held on to this token for this long. We stay transparent with our actions. 4/4

10:47 AM · Nov 6, 2022

57.     Zhao's November 6 Tweet Thread was false and misleading in multiple respects.  *First*, it is known from the circumstances that Zhao's apparent liquidation of FTT and related public statements were part of a deliberate strategy to destroy FTX, and improve Binance's market position.  Therefore, contrary to Zhao's denial, Binance's highly-publicized apparent liquidation of its FTT was indeed a "move against a competitor" and was not, as Zhao indicated, "due to recent revelations."  As Ellison testified, "if [Zhao] really wanted to sell his FTT, he wouldn't preannounce to the market that he was going to sell it.  He would just sell it […] his real aim in that tweet, as I saw it, was not to sell his FTT, but to hurt FTX and Alameda."[4]  And, as Bankman-Fried observed, Binance "very publicly" sold its FTT to "maximize the PR impact of it."  Similarly, in a Senate Hearing, an FTX investor stated: "All of a sudden, in social media, CZ is asking for another $500 million.  He wants to do a block trade of FTT, or the proprietary token of FTX.  He wants to convert it back to fiat.  Why would you put that out there?  You know it is going to push down the value of that coin dramatically, and that is exactly what happened."

58.     *Second*, contrary to Zhao's statement, Binance's apparent liquidation of FTT was not done in a way that would "minimize [] market impact."  Rather, as set forth above, Zhao's intent was to *maximize* market impact and to cause a decline in the price of FTT, thereby harming FTX and increasing Binance's market share.  Indeed, by the time Zhao sent the first tweet in the November 6 Tweet Thread, Binance had apparently *already* sold a massive amount of FTT in a single trade.  Zhao publicly confirmed such trade in a tweet Zhao sent later the same day:

---

[4]     Caroline Ellison testified that Zhao's tweet thread "brought concerns back and made them even stronger" because it referred to "recent revelations" that came to light, "suggesting that Binance is aware of negative news about FTX and Alameda."



By this later tweet, Zhao confirmed that a November 5 tweet from an account called "Whale Alert" regarding the transfer of 22,999,999 FTT was indeed "part of" Zhao's announced liquidation of its FTT. This amount was greater than the 18,516,602 FTT that Binance received in the 2021 Share Repurchase. Whether or not Binance had actually sold this FTT is unclear, but what is clear is that Zhao wanted the market to believe he had done so.

59.     As it was intended to do, Zhao's November 6 Tweet Thread sparked a market panic and a run on the bank at FTX. As the Examiner in the above-captioned chapter 11 cases reported, Zhao's announcement that "Binance would be liquidating its sizeable FTT holdings . . . caused a rapid sell off of FTT." Customer net withdrawals went from averaging $18 million per hour over the period from October 31, 2022 and November 6, 2022 (prior to the November 6 Tweet Thread) to around $150 million per hour from November 6, 2022 and November 7, 2022 (after the November 6 Tweet Thread). Alameda contributed the vast majority of any liquid assets to cover the withdrawals, but at the rate customers were withdrawing funds, FTX management knew, in the words of FTX co-founder, Gary Wang, "FTX was not fine and assets were not fine because FTX did not have enough assets for customer withdrawals."

60.     Later in the day on November 6, 2022, Zhao published the following tweet (the "**November 6 Risk-Management Tweet**" and, together with the November 6 Tweet Thread, the "**November 6 False Tweets**"):



61. The November 6 Risk-Management Tweet was false and misleading in that, as discussed above, Binance's apparent liquidation of its FTT and Zhao's public announcements regarding the same, were not "just post-exit risk management." Instead, as discussed above, they were part of a deliberate strategy to cause a run on FTX as a means to destroy Binance's competitor FTX and improve Binance's market position.

62. Upon information and belief, the run on the bank at FTX would not have occurred had Zhao not misrepresented his true intentions in sending the November 6 False Tweets. To the contrary, if the market had been aware that Zhao's true intention was to harm FTX, it is highly unlikely that the November 6 False Tweets would have sparked the panic that it did. Customers would have understood that Zhao's actions were motivated by a personal and professional feud between FTX and Binance (and their respective founders) and not by sincere concerns about "risk management" or "recent revelations."

63. Unquestionably, the panic that Binance and Zhao created through the November 6 False Tweets caused financial harm to FTX and its creditors. Even assuming that the Debtors were insolvent at the time of the November 6 Tweet Thread, Binance and Zhao's statements destroyed value that would have otherwise been recoverable by FTX's stakeholders. As discussed above, the resulting panic caused a surge in withdrawal and repayment requests by customers and creditors. Not only did the withdrawals and repayments themselves diminish FTX's assets, but value was also destroyed because, among other reasons, the market panic forced FTX to liquidate assets at discounted prices to generate liquidity to address the crisis,

including to satisfy the withdrawal and repayment requests. The same panic forced FTX to respond to emergency collateral calls by FTX's lenders, which also ultimately diminished the value recoverable by FTX's stakeholders.

64. Given the unprecedented rate of withdrawals following the November 6 False Tweets, FTX was in desperate need of an emergency infusion of capital. Bankman-Fried noted FTX would "take whatever we can get, at whatever terms make people comfortable." FTX formed an "emergency funding team" to reach out to potential investors. Around the same time, Bankman-Fried estimated that FTX only had a short time before it would run out of liquidity to match customer withdrawals.

65. Around 1 a.m. on November 8, 2022, Bankman-Fried called Zhao. Upon information and belief, during this phone call, Bankman-Fried informed Zhao that FTX would soon find itself unable to satisfy customer withdrawal requests, in part because Alameda had been borrowing large amounts from FTX.com customer deposits, necessitating the emergency financing that Bankman-Fried was requesting from Zhao. Bankman-Fried reflected to the FTX team that Zhao "seemed receptive" but needed to consider the proposal.

66. Only having considered Bankman-Fried's proposal for approximately one hour, around 2:30 a.m Zhao confirmed the "[r]ough proposal from us would be: we do a full take over, cover all user asset shortage, to minimize damage to the market and the user . . . . [W]e can move quickly." Immediately thereafter, Bankman-Fried redirected FTX management's efforts toward building out a transaction with Binance where "CZ gets all dollars, tokens, and FTX.com" and FTX would halt processing customer withdrawals from the FTX.com platform.

67. On November 8, 2022, Bankman-Fried and Zhao executed a letter of intent on behalf of their respective companies (the "**Letter of Intent**"). The Letter of Intent provided that, subject to due diligence to be completed within 30 days, Binance would acquire FTX Trading and inject capital sufficient to address FTX's liquidity issues. The Letter of Intent also

23

included an exclusivity period in which FTX agreed not to seek financing from any other investors.

68.　　A few hours later Zhao tweeted (the "**November 8 Tweets**"):



69.　　Based on the Letter of Intent, and the November 8 Tweets announcing the same, FTX leadership halted communications with investors. As one officer at FTX wrote to a colleague at this time, "In light of [the exclusivity provision], don't think it makes sense to engage with" certain other potential investors. Instead, FTX employees, including FTX executives, quickly got to work gathering the documents requested by Binance. Binance sent over a revised due diligence request list around 12:00 p.m. on November 9, 2022. Around the same time, FTX employees and Binance employees started having kick-off calls to determine the scope of the due diligence. The general counsel of FTX.US. wrote on November 9, 2022,

"[s]poke to Binance legal this morning as a diligence kick-off call. Was very high level and they said they would follow-up . . . ."

70.　At 3:00 p.m. on November 9, 2022, while FTX employees were still working on Binance's updated diligence requests and despite Zhao's warning that there was "a lot to cover and [the deal] will take some time," Binance published a tweet thread announcing that it was backing out "as a result of corporate due diligence" (the "**November 9 Tweets**").



71.　According to Ellison, "within a day" after Binance's November 9 Tweets, everything at FTX fell apart.

72.　As stated above, at the time Zhao entered into the Letter of Intent, he had, upon information and belief, already been made aware of the "mishandled" customer funds during his conversation with Bankman-Fried. This is contrary to Binance's representation in the November 9 Tweets that he learned that fact after entering into the Letter of Intent. In addition,

Zhao was also aware that the Debtors were insolvent when he entered into the Letter of Intent. Moreover, upon information and belief, during the approximately 24-hour period during which Binance supposedly conducted "due diligence," no new material information was provided to Zhao and Binance in the diligence process that would have revealed new issues beyond Binance's "control or ability to help," causing Binance to withdraw.

73.     Based on these circumstances, it is now apparent that Binance's execution of the Letter of Intent, as well Zhao's November 8 Tweets (announcing that Binance "intend[ed] to fully acquire FTX.com") and Binance's November 9 Tweets (withdrawing from the Letter of Intent "as a result of corporate due diligence") were false and misleading in that Zhao and Binance never intended to consummate the contemplated acquisition. Instead, upon information and belief, the Letter of Intent, and Zhao's public statements, advanced Zhao's goal of destroying FTX by (i) preventing FTX from seeking alternate financing, and (ii) allowing Zhao to create the impression, through Binance's November 9 Tweets, that Binance had seen something in the due diligence regarding FTX's finances that was even worse than what the public already believed.

74.     FTX and its creditors were harmed by Binance's and Zhao's false and misleading statements that they intended to acquire FTX, as well as their false and misleading subsequent statements regarding the reason why they decided not to acquire FTX. This series of false communications eliminated any possibility that FTX would obtain adequate emergency financing from any other source. They also eliminated any possibility that FTX could resume and stabilize its business.

75.     As discussed above, FTX.com and FTX.US. experienced a significant increase in gross and net withdrawals following the November 6 False Tweets. On November 6 and November 7, 2022, FTX.com and FTX.US. exchanges processed approximately $6 billion in net customer withdrawals, with many of the customers withdrawing more than 90% of their

account value. This unprecedented increase in withdrawals led to withdrawals being halted on the FTX.com exchange on November 8, 2022.

76.     Notably, the withdrawal rate increased slightly following the publication of the CoinDesk article on November 2, 2022 and then stabilized in the days following. Within hours of the November 6 False Tweets, however, the withdrawal rate skyrocketed to unmanageable levels. Furthermore, the publication of the CoinDesk article coincided with a slight dip in the price of FTT, but some of that value had been recuperated in the days following publication. However, after the Binance and Zhao's tweets, the price of FTT plummeted from $24.36 to $2.30.

77.     On November 10, 2022, the Securities Commission of The Bahamas petitioned the Supreme Court of The Bahamas for the winding up of FTX DM, the FTX.com entity holding the license to operate the exchange in The Bahamas, as a result of, among other things, the fallout from the Letter of Intent, the November 6 Tweet Thread, the November 8 Tweets, and the November 9 Tweets. The request was provisionally granted placing FTX DM into provisional liquidation. Almost simultaneously, on November 11, 2022, Bankman-Fried appointed John J. Ray III ("**Ray**") as CEO, withdrawing his managerial power for the rest of the FTX enterprise. As his first act, Ray directed the filing of the above-captioned chapter 11 cases on an emergency basis on November 11, and November 14, 2022.

78.     Additional factual background relating to FTX's businesses and the commencement of the above-captioned chapter 11 cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

79. After November 6, 2022, Binance saw a significant growth and increased activity in the cryptocurrency market. Specifically, Binance experienced a surge in new users, increase in trading volume and liquidity, and a significant increase in Binance's market share. In fact, Binance's official blog stated that "[t]he biggest winner in 2022, Binance, gained nearly 20% market share."

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
Avoidance and Recovery of Fraudulent Transfers (Constructive) Against All Defendants
[11 U.S.C. §§ 548(a)(1)(B) and 550]

80. Plaintiffs repeat and reallege each of the allegations set forth above and below as if fully set forth herein.

81. Under 11 U.S.C. § 548(a)(1)(B), a debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred on or within 2 years before the date of the filing of the petition if the debtor (i) received less than reasonably equivalent value in exchange for such transfer or obligations; and (ii) was insolvent; engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction; or intended to incur, or believed that the debtor would incur debts beyond its ability to pay such debts as they became due.

82. As set forth above, in connection with the 2021 Share Repurchase, one or more of the Debtor Plaintiffs made the following transfers within two years of the Petition Date (the "**2021 Fraudulent Transfers**") to or for the benefit of the Defendants as follows:

| Transferee | Amount Received | Transferor and Stated Purpose Transfer |
|---|---|---|
| Binance (with Binance Capital Management as nominal counterparty) | 1,172,237,000 in BUSD | From Alameda, for FTX Trading Repurchase |
| Binance (with Binance Capital Management as nominal counterparty) | 18,516,602 in FTT | From Alameda, for FTX Trading Repurchase |
| Binance (with Binance Capital Management as nominal counterparty) | 1,764,041 in BNB | From Alameda, for FTX Trading Repurchase |
| Binance (with Zhao as nominal counterparty) | 14,267,547.14 in BUSD | From Alameda, for WRS Repurchase |
| Binance (with Xiao as nominal counterparty) | 1,590,862.49 in BUSD | From Alameda, for WRS Repurchase |
| Binance (with Xiao as nominal counterparty) | 6,538,363.94 in BUSD | From Alameda, for WRS Repurchase |
| Binance (with Lim as nominal counterparty) | 5,055,410.864 in BUSD | From Alameda, for WRS Repurchase |
| Binance (with Lim as nominal counterparty) | 3,073,815.57 in BUSD | From Alameda, for WRS Repurchase |

83.     The 2021 Fraudulent Transfers were made as part of a single overall transaction, the 2021 Share Repurchase, and should be treated as a single transfer for purposes of this action. The 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, constituted a transfer of an interest in the property of the Debtor Plaintiffs.

84.     The 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, were made in exchange for less than fair consideration and less than reasonably equivalent value.

85.     Each of (i) FTX Trading, (ii) Alameda, (iii) FTX Trading and Alameda on a combined and consolidated basis, and (iv) all Debtors on a combined and consolidated basis, were insolvent at the time of, or became insolvent as a result of, the 2021 Fraudulent Transfers.

86.     At the time of the 2021 Share Repurchase, each of (i) FTX Trading, (ii) Alameda, (iii) FTX Trading and Alameda on a combined and consolidated basis, and (iv) all Debtors on a combined and consolidated basis, were engaged in a business or

transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

87. At the time of the 2021 Share Repurchase, each of (i) FTX Trading, (ii) Alameda, (iii) FTX Trading and Alameda on a combined and consolidated basis, and (iv) all Debtors on a combined and consolidated basis, intended to, believed, or reasonably should have believed that they would incur debts beyond their ability to pay such debts as they became due.

88. By virtue of the foregoing, the 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, were fraudulent transfers avoidable under section 548 of the Bankruptcy Code and the Debtor Plaintiffs are entitled to avoid and recover each of the 2021 Fraudulent Transfers under sections 548 and 550 of the Bankruptcy Code.

89. Under section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

90. Upon information and belief, each Defendant is an initial transferee of one or more of the 2021 Fraudulent Transfers, an entity for whose benefit one or more of the 2021 Fraudulent Transfers was made, or an immediate or mediate transferee of one or more of the 2021 Fraudulent Transfers.

91. To the extent that one or more of the 2021 Fraudulent Transfers is avoided, the Debtor Plaintiffs may recover the property transferred, or the value of the transferred property, from each Defendant pursuant to section 550(a) of the Bankruptcy Code.

**SECOND CLAIM FOR RELIEF**

Avoidance and Recovery of Fraudulent Transfers (Constructive) Against All Defendants
[11 U.S.C. §§ 544, and 550, and applicable state law including Uniform Fraudulent Transfer
Act as enacted in Delaware or other applicable state law]

92.     Plaintiffs repeat and reallege each of the allegations set forth above and below as if fully set forth herein.  Under section 544(b) of the Bankruptcy Code, any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.  The phrase "under applicable law" has been interpreted to include the state fraudulent transfer laws that would govern potentially fraudulent transactions.  The Debtor Plaintiffs include Alameda LLC, a limited liability company organized under the laws of the State of Delaware, as well as multiple other entities organized under the laws of the State of Delaware.

93.      Under the Uniform Fraudulent Transfer Act as enacted in Delaware, a transfer is fraudulent as to present creditors where the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.  Del. Code tit. 6, § 1305.  A transfer is fraudulent as to present and future creditors where the debtor did not receive reasonably equivalent value for the transfer and the debtor (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed that the debtor would incur debts beyond the debtor's ability to pay as they became due.  Del. Code tit. 6, § 1304.

94.     In connection with the 2021 Share Repurchase, one or more of the Debtor Plaintiffs made the 2021 Fraudulent Transfers to or for the benefit of the Defendants.

95.     The 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, constituted a transfer of an interest in the property of the Debtor Plaintiffs.

96.     At the times of, and subsequent to, each of the 2021 Fraudulent Transfers, Debtor Plaintiffs had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

97.     The 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, were made in exchange for less than fair consideration and less than reasonably equivalent value.

98.     Each of (i) FTX Trading, (ii) Alameda, (iii) FTX Trading and Alameda on a combined and consolidated basis, and (iv) all Debtors on a combined and consolidated basis, were insolvent at the time of, or became insolvent as a result of, the 2021 Fraudulent Transfers.

99.     At the time of the 2021 Share Repurchase, each of (i) FTX Trading, (ii) Alameda, (iii) FTX Trading and Alameda on a combined and consolidated basis, and (iv) all Debtors on a combined and consolidated basis, were engaged in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction.

100.    At the time of the 2021 Share Repurchase, each of (i) FTX Trading, (ii) Alameda, (iii) FTX Trading and Alameda on a combined and consolidated basis, and (iv) all Debtors on a combined and consolidated basis, intended to, believed, or reasonably should have believed that they would incur debts beyond its ability to pay such debts as they became due.

101.    By virtue of the foregoing, the 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, were fraudulent transfers avoidable under Delaware law or other applicable state law by a creditor holding an unsecured claim that is

allowable under section 502 of the Bankruptcy Code, and the Debtor Plaintiffs are entitled to avoid and recover each of the 2021 Fraudulent Transfers under sections 544 and 550 of the Bankruptcy Code.

102.    Under section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

103.    Upon information and belief, each Defendant is an initial transferee of one or more of the 2021 Fraudulent Transfers, an entity for whose benefit one or more of the 2021 Fraudulent Transfers was made, or an immediate or mediate transferee of one or more of the 2021 Fraudulent Transfers.

104.    To the extent that one or more of the 2021 Fraudulent Transfers is avoided, the Debtor Plaintiffs may recover the property transferred, or the value of the transferred property, from each defendant pursuant to section 550(a) of the Bankruptcy Code.

### THIRD CLAIM FOR RELIEF
Avoidance and Recovery of Fraudulent Transfers (Intentional) Against All Defendants
[11 U.S.C. §§ 548(a)(1)(A) and 550]

105.    Plaintiffs repeat and reallege each of the allegations set forth above and below as if fully set forth herein.

106.    Under 11 U.S.C. § 548(a)(1)(A), a debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred on or within 2 years before the date of the filing of the petition date if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud a creditor.

107. In connection with the 2021 Share Repurchase, one or more of the Debtor Plaintiffs made the 2021 Fraudulent Transfers to or for the benefit of the Defendants.

108. The 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, constituted a transfer of an interest in the property of the Debtor Plaintiffs.

109. The 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, were made with the actual intent to hinder, delay, or defraud present and future creditors. As set forth above, a large portion of the of the 2021 Share Repurchase was secretly funded using assets deposited on the FTX Trading exchange by FTX customers, who were all creditors of FTX. As set forth above, the 2021 Share Repurchase was also in furtherance of Bankman-Fried's fraud insofar as it was used to convey confidence and strength to the market at a time when the Debtors were insolvent and secretly reliant on customer deposits for liquidity.

110. By virtue of the foregoing, the 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, were fraudulent transfers avoidable under section 548(a)(1)(A) of the Bankruptcy Code, and the Debtor Plaintiffs are entitled to avoid and recover each of the 2021 Fraudulent Transfers under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

111. Under section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

112.     Upon information and belief, each Defendant is an initial transferee of one or more of the 2021 Fraudulent Transfers, an entity for whose benefit one or more of the 2021 Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

113.     To the extent that one or more of the 2021 Fraudulent Transfers is avoided, the Debtor Plaintiffs may recover the property transferred, or the value of the transferred property, from each defendant pursuant to section 550(a) of the Bankruptcy Code.

## FOURTH CLAIM FOR RELIEF
Avoidance and Recovery of Fraudulent Transfers (Intentional) Against All Defendants
[11 U.S.C. §§ 544, and 550, and applicable state law including the Uniform Fraudulent
Transfer Act as enacted in Delaware or other applicable state law]

114.     Plaintiffs repeat and reallege each of the allegations set forth above and below as if fully set forth herein.

115.     Under 11 U.S.C. § 544(b), a debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e). The phrase "under applicable law" has been interpreted to include state fraudulent transfer laws that would govern potentially fraudulent transactions.  The Debtor Plaintiffs include Alameda LLC, a limited liability company organized under the laws of the State of Delaware, as well as multiple other entities organized under the laws of the State of Delaware.

116.     Under the Uniform Fraudulent Transfer Act as enacted in Delaware, a transfer is fraudulent as to present and future creditors if the transfer was made with actual intent to hinder, delay or defraud any creditor of the debtor.  Del. Code tit. 6, § 1304.

117.     In connection with the 2021 Share Repurchase, one or more of the Debtor Plaintiffs made the 2021 Fraudulent Transfers to or for the benefit of the Defendants.

118. The 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, constituted a transfer of an interest in the property of the Debtor Plaintiffs.

119. The 2021 Fraudulent Transfers collectively, and each of the 2021 Fraudulent Transfers individually, were made with the actual intent to hinder, delay, or defraud present or future creditors. As set forth above, a large portion of the of the 2021 Share Repurchase was secretly funded using assets deposited on the FTX Trading exchange by FTX customers, who were all creditors of FTX. As further set forth above, the 2021 Share Repurchase was also in furtherance of Bankman-Fried's fraud insofar as it was used to convey confidence and strength to the market at a time when the Debtors were insolvent and secretly reliant on customer funds for liquidity.

120. At the times of, and subsequent to, each of the 2021 Fraudulent Transfers, the Debtor Plaintiffs had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

121. By virtue of the foregoing, each of the 2021 Fraudulent Transfers was a fraudulent transfer avoidable under 11 U.S.C. §544 and applicable state law including the Uniform Fraudulent Transfer Act as enacted in Delaware, by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and the Debtor Plaintiffs are entitled to avoid and recover each of the 2021 Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

122. Under section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

123.     Upon information and belief, each Defendant is an initial transferee of one or more of the 2021 Fraudulent Transfers, an entity for whose benefit one or more of the 2021 Fraudulent Transfers was made or an immediate or mediate transferee of the initial transferee.

124.     To the extent that one or more of the 2021 Fraudulent Transfers is avoided, the Debtor Plaintiffs may recover the property transferred, or the value of the transferred property, from each defendant pursuant to section 550(a) of the Bankruptcy Code.

**FIFTH CLAIM FOR RELIEF**
Recovery of Fraudulent Transfers Against All Defendants
[11 U.S.C. § 550]

125.     Plaintiffs repeat and reallege each of the allegations set forth above and below as if fully set forth herein.

126.     Under section 550(a) of the Bankruptcy Code, "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

127.     Upon information and belief, each Defendant is an initial transferee of one or more of the 2021 Fraudulent Transfers, an entity for whose benefit one or more of the 2021 Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

128.     Pursuant to 11 U.S.C. § 550(a), the Debtor Plaintiffs are entitled to recover the property they transferred in connection with the 2021 Fraudulent Transfers or the value of such property.

**SIXTH CLAIM FOR RELIEF**
Injurious Falsehood Against Binance and Changpeng Zhao

129.     Plaintiffs repeat and reallege each of the allegations set forth above and below as if fully set forth herein.

130.     Under applicable law, a person who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (1) the person intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (2) the person knows that the statement is false or acts in reckless disregard of its truth or falsity.

131.     As set forth above, the following statements by Binance Defendants and Zhao, individually and collectively, were false and misleading: (1) the November 6 False Tweets, (2) Binance's execution of the Letter of Intent, (3) the November 8 Tweets, and (4) the November 9 Tweets (collectively the "**Binance False Statements**").  Upon information and belief, the Binance Defendants and Zhao maliciously intended for publication of the Binance False Statements to harm the pecuniary interests of FTX.  In particular, the Binance Defendants and Zhao, through the Binance False Statements, intended to trigger a run on the bank by publicizing Binance's apparent liquidation of FTT.  They then purported to come to the rescue, publicly positioning Binance as the first third-party to gain access to FTX's books and records and other confidential information, thereby preventing FTX from seeking alternative financing in the process and, subsequently, creating the impression that Binance had seen something in the due diligence regarding FTX's financials that was even worse than what the public already believed.  Upon information and belief, the Binance Defendants and Zhao knew that these statements were false. In addition, the Binance False Statements were the partial basis for the Securities Commission of The Bahamas seeking a winding up order for Plaintiff FTX DM.

132.     As a direct and proximate result of the Binance False Statements, Plaintiffs have suffered damages in an amount to be determined at trial.  The Binance Defendants and Zhao are jointly and severally liable to the Plaintiffs for such damages, plus pre- and post-judgment interest, punitive damages, and all other relief to which Plaintiffs are entitled as a result of the misconduct alleged herein.

## SEVENTH CLAIM FOR RELIEF
### Fraud Against Binance and Changpeng Zhao

133. Plaintiffs repeat and reallege each of the allegations set forth above and below as if fully set forth herein.

134. Under applicable law, a claim for fraud requires proof of (1) a false representation, (2) a defendant's knowledge or belief of its falsity or his reckless indifference to its truth, (3) a defendant's intention to induce action, (4) reasonable reliance, and (5) causally related damages.

135. As set forth above, the Binance False Statements, collectively and individually, were false, and the Binance Defendants and Zhao made the Binance False Statements with knowledge of their falsity. The Binance Defendants and Zhao made the Binance False Statements with the intent to induce FTX's customers to withdraw their deposits in order to harm FTX, and FTX's customers reasonably relied in the November 6 False Tweets when they submitted an unprecedented surge in withdrawal requests in the following days. In addition, with respect to Binance's execution of the Letter of Intent and the November 8 Tweets specifically, those statements were also intended to cause FTX to cease seeking alternative financing, and FTX indeed ceased its search for alternative financing in reasonable reliance upon those statements.

136. As a direct and proximate result of the Binance False Statements collectively and individually, and the reasonable reliance thereon, Plaintiffs have suffered damages in an amount to be determined at trial. The Binance Defendants and Zhao are jointly and severally liable to Plaintiffs for such damages, plus pre- and post-judgment interest, punitive damages, and all other relief to which Plaintiffs are entitled as a result of the misconduct alleged herein.

## EIGHTH CLAIM FOR RELIEF
### Intentional Misrepresentation Against Binance and Changpeng Zhao

137.     Plaintiffs repeat and reallege each of the allegations set forth above and below as if fully set forth herein.

138.     Under applicable law, an intentional misrepresentation claim requires proof of (1) deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) scienter on the part of the defendant; (3) the defendant's intent to induce plaintiff's reliance upon the concealment; (4) causation; and (5) damages resulting from the concealment.

139.     As set forth above, the Binance False Statements, collectively and individually, concealed material facts, and the Binance Defendants and Zhao made the Binance False Statements with the intent to conceal such facts.  Specifically, in making the Binance False Statements, the Binance Defendants and Zhao concealed the facts that (i) they were made in a deliberate attempt to destroy their competitor, FTX and (ii) Binance never intended to acquire FTX.  The Binance Defendants and Zhao knew the Binance False Statements were false, and nonetheless made the statements with the intent to induce FTX's customers to withdraw their deposits in order to harm FTX.  FTX's customers reasonably relied on the November 6 False Tweets when they submitted an unprecedented surge in withdrawal requests in the following days.  In addition, with respect to Binance's execution of the Letter of Intent and the November 8 Tweets specifically, those statements were also intended to cause FTX to cease seeking alternative financing, and FTX indeed ceased its search for alternative financing in reasonable reliance upon those statements.

140.     As a direct and proximate result of the Binance False Statements collectively and individually, Plaintiffs have suffered damages in an amount to be determined at trial.  The Binance Defendants and Zhao are jointly and severally liable to the Plaintiffs for such damages,

plus pre-and post-judgment interest, punitive damages, and all other relief to which Plaintiffs are entitled as a result of the misconduct alleged herein.

**NINTH CLAIM FOR RELIEF**
Unjust Enrichment Against Binance and
Changpeng Zhao

141.     Plaintiffs repeat and reallege each of the allegations set forth above and below as if fully set forth herein.

142.     Under applicable law, a cause of action for unjust enrichment exists where one party unjustly retains a benefit to the loss of another without justification, and where there is no other legal remedy at law.

143.     As set forth above, the Binance Defendants and Zhao made the Binance False Statements with the intent to harm FTX and improve Binance's market position.  FTX suffered the intended harm, and Binance's customer base and revenues increased as a result.

144.     As a result of the Binance False Statements collectively and individually, Plaintiffs have suffered damages in an amount to be determined at trial.  The Binance Defendants and Zhao are jointly and severally liable to the Plaintiffs for such damages, plus pre- and post-judgment interest, punitive damages, and all other relief to which Plaintiffs are entitled as a result of the misconduct alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor, as requested above, and as further set forth below:

A.     For an order avoiding and setting aside the transfers identified in Claims I–V;

B.     For an order directing each respective initial, immediate, and/or mediate transferee of the transfers identified in Claims I-V to return to FTX the property transferred or pay the value of such property, as determined by the Court;

C.     For an order compelling Defendants to pay to Plaintiffs, in restitution, an amount not less than that which will make Plaintiffs whole;

D.   For an award of compensatory damages in an amount to be determined at trial;

E.   For an award of punitive damages in an amount to be determined at trial;

F.   For prejudgment interest;

G.   For costs of suit; and

H.   For such additional and further relief that Plaintiffs may be entitled to under law or equity.

Dated: November 10, 2024
       Wilmington, Delaware

*/s/ Brendan J. Schlauch*
**RICHARDS, LAYTON & FINGER, P.A**.
Kevin Gross (No. 209)
Paul N. Heath (No. 3704)
Brendan J. Schlauch (No. 6115)
Robert C. Maddox (No. 5356)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
gross@rlf.com
heath@rlf.com
schlauch@rlf.com
maddox@rlf.com

-and-

*/s/ J. Christopher Shore*
**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Brian D. Pfeiffer (admitted *pro hac vice*)
Colin West (*pro hac vice* pending)
Ashley R. Chase (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
cshore@whitecase.com
brian.pfeiffer@whitecase.com
cwest@whitecase.com
ashley.chase@whitecase.com
brett.bakemeyer@whitecase.com

*Attorneys for the Plaintiffs*
