# Exhibit 1

EXECUTION COPY

## SHARE TRANSFER AGREEMENT

This Share Transfer Agreement (this "Agreement"), dated as of July 15, 2021 is entered into by and between FTX Trading Ltd., a company established under the laws of Antigua and Barbuda ("FTX"), Binance Capital Management Co. Ltd., a company established under the laws of the British Virgin Islands ("Seller") and Euclid Way Ltd, a company established under the laws of Antigua and Barbuda ("Purchaser").

**WHEREAS**, Purchaser desires to purchase, and Seller desires to sell, 96,456,750 Series A preferred shares, par value $0.0000026 per share (the "Transferred Shares") of FTX.

**NOW THEREFORE**, in consideration of the mutual representations, warranties, covenants and agreements set forth herein, the parties to this Agreement agree as follows:

### ARTICLE I
### TRANSFER OF TRANSFERRED SHARES

**1.1     Transaction**.  Upon the terms and conditions set forth herein, Seller hereby conveys, sells and transfers the Transferred Shares (together with all rights, benefits and privileges of Seller thereunder), as beneficially owned by it, free and clear of claims, liens or other encumbrances, to Purchaser, and Purchaser hereby purchases and accepts the Transferred Shares and all such rights, benefits and privileges. FTX hereby consents to such transfer and waives any applicable restrictions on transfer contained in the Series A Transaction Documents (as defined in Exhibit A) or its constitutional documents with respect to such transfer of the Transferred Shares.

**1.2     Purchase Price**.  The aggregate purchase price to be paid by Purchaser to Seller for the Transferred Shares shall be US$2,281,974,000 (the "Purchase Price").

**1.3     Payment of Purchase Price.**  On the Closing Date (as defined below), Purchaser shall pay 100% of the Purchase Price to Seller in the following manner:

(a)     Purchaser shall pay an amount equal to US$1,172,237,000 by remittance of immediately available U.S. dollar denominated funds to a bank account that is designated by Seller, or alternatively according to Seller's prior written instruction in its absolute and sole discretion, transfer good and marketable title to such number of cryptographic tokens with the symbol "BUSD" with value equal to US$1,172,237,000 in accordance with Section 1.4 to Seller, free and clear of any liens, security interests or any other encumbrances;

(b)     Purchaser shall transfer good and marketable title to such number of cryptographic tokens with the symbol "FTT" with value equal to US$554,868,500 in accordance with Section 1.4 to Seller, free and clear of any liens, security interests or any other encumbrances; and

(c)     Purchaser shall transfer good and marketable title to such number of cryptographic tokens with the symbol "BNB" with value equal to US$554,868,500 in accordance with Section 1.4 to Seller, free and clear of any liens, security interests or any other encumbrances.

**1.4     Token Conversion Price**.  The number of cryptographic tokens with symbols  "BUSD", "FTT" and "BNB" to be transferred by Purchaser to Seller pursuant to Section 1.3 shall be determined by dividing the corresponding U.S. dollar amount in respect of such

cryptographic tokens set forth in Section 1.3 by the average quoted "closing price" per token of such cryptographic tokens as quoted at https://coinmarketcap.com/ in the five (5) consecutive calendar days immediately prior to the Closing Date.

      **1.5**     **Closing; Closing Deliverables**.

(a)     The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely and electronically on the date hereof or on another date that is mutually agreed between Seller and Purchase in writing (the "Closing Date").  On the Closing Date, (i) Seller shall deliver the deliverables set forth in Section 1.5(b) below to Purchaser, (ii) Purchaser shall deliver the deliverables set forth in Section 1.5(c) below to Seller and (iii) Purchaser shall pay 100% of the Purchaser Price to Seller in the manners set forth in Section 1.3 above. Effective as of the Closing Date, Seller acknowledges and agrees that it is relinquishing all rights of a holder of Series A preferred shares with respect to the Transferred Shares, and the Purchaser shall be deemed the exclusive owner of such Transferred Shares.

(b)     Seller shall deliver the following deliverables on the Closing Date:

(i)     an executed lost certificate affidavit and a stock power and assignment certificate, each in the form provided by FTX;

(ii)     an executed copy of the Termination Certificate attached hereto as Exhibit A ("Termination Certificate"); and

(iii)     a copy of resolutions passed at a duly convened and held general meeting of Seller that evidences the approval of the consummation of the transactions contemplated under this Agreement.

(c)     Purchaser shall deliver an executed copy of the Termination Certificate and a copy of resolutions passed at a duly convened and held board meeting of Purchaser that evidences the approval of the consummation of the transactions contemplated under this Agreement to Seller on the Closing Date.

      **1.6**     **Regulation S Compliance**.

(a)     Seller acknowledges and agrees that the BUSD, FTT and BNB tokens payable to the Seller pursuant to Section 1.3 herein (collectively, the "Payment Tokens") are subject to the additional restrictions set forth on Exhibit B, to the extent that Regulation S (as defined in Exhibit B) is applicable.  Purchaser acknowledges that Seller's acknowledgment and agreement in the foregoing sentence shall not be deemed in any way to represent Seller's view that the Payment Tokens are "securities" under the Securities Act (as defined in Exhibit B).

(b)     Purchaser acknowledges and agrees that the Transferred Shares are subject to the additional restrictions set forth on Exhibit C.

      **1.7**     **Further Assurances**.  From time to time after the Closing Date, Purchaser and Seller, without charge to the other, shall perform such other acts, and shall execute and acknowledge and shall furnish such other documents, instruments, materials and/or information that such other party reasonably may request in order to effect the intent of, and the consummation of the transactions provided in, this Agreement, including, without limitation, those actions necessary to transfer by Seller to Purchaser good and marketable title to the Transferred Shares,

free and clear of all claims, liens and other encumbrances and transfer by Purchaser to Seller good and marketable title to such cryptographic tokens according to Section 1.3, free and clear of all claims, liens and other encumbrances.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser that the following statements are true, correct and complete as of the date hereof and as of the Closing Date:

**2.1** **Capitalization**.  Seller is the sole owner (legal and beneficial) of the Transferred Shares and save as otherwise provided in FTX's articles of association or the Series A Transaction Documents, Seller has good, valid and marketable title to the Transferred Shares, free and clear of all restrictions, liens, encumbrances, options and claims, and upon transfer of the Transferred Shares held by Seller to Purchaser in accordance with this Agreement, Purchaser shall own, and shall have good, valid and marketable title to, the Transferred Shares held by Seller, free and clear of all liens, encumbrances, options and claims.

**2.2** **Authority of Seller; No Conflict**.  Seller has the full right, power, legal capacity and authority to perform its obligations under this Agreement, including transferring the Transferred Shares as described herein to Purchaser pursuant to this Agreement.  The execution and delivery of this Agreement and Seller's performance hereunder will not conflict with, or breach or result in a default under, any laws or any agreement by which Seller is bound.  No third party consent, filing, notice, authorization or approval, governmental or otherwise, is necessary to enable Seller to enter into, and to perform Seller's obligations under this Agreement. This Agreement has been duly executed and delivered by Seller and, assuming due authorization, execution and delivery by Purchaser, constitutes the valid, legal and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.  The Transferred Shares as described herein have not (nor has any portion thereof) been assigned, pledged, or encumbered by Seller.

**2.3** **Compliance with Applicable Law**.  There is no claim, action, suit, proceeding, arbitration, investigation or inquiry pending or, to the best of Seller's knowledge, threatened, against or involving Seller before any national, provincial, federal, state, municipal, foreign, or other court or governmental or administrative body or agency, or any private arbitration tribunal that would have a material adverse effect on the transactions contemplated hereunder.

**2.4** **Sophisticated Seller**.  Seller (a) is a sophisticated entity familiar with transactions similar to those contemplated by this Agreement, (b) has adequate information concerning the business and financial condition of FTX to make an informed decision regarding the sale of the Transferred Shares, (c) has independently and without reliance upon Purchaser or FTX, and based on such information and the advice of such advisors as Seller has deemed appropriate, made its own analysis and decision to enter into this Agreement. Seller acknowledges that neither Purchaser nor FTX nor any of their respective affiliates is acting as a fiduciary or financial or investment adviser to Seller, and that neither Purchaser nor FTX nor any of their respective affiliates has given Seller any investment advice, opinion or other information on whether the sale of the Transferred Shares is prudent.  Seller acknowledges that (i) Purchaser currently may have, and later may come into possession of, information with respect to FTX that is not known to Seller and that may be material to a decision to sell the Transferred Shares (the "***Seller Excluded Information***"), (ii) Seller has determined to sell the Transferred Shares

notwithstanding its lack of knowledge of the Seller Excluded Information, and (iii) Purchaser shall have no liability to Seller, and Seller waives and releases any claims that it might have against Purchaser whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Seller Excluded Information in connection with the sale of the Transferred Shares and the transactions contemplated by this Agreement.  Seller understands that Purchaser will rely on the accuracy and truth of the foregoing representations, and Seller hereby consents to such reliance.

      **2.5**     **Taxes**.  Seller agrees that it shall be fully responsible for its own income tax and other tax consequences, if any, associated with the transactions contemplated herein.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

      Purchaser represents and warrants to Seller that the following statements are true, correct and complete as of the date hereof and as of the Closing Date:

      **3.1**     **Ownership of Tokens**.  Purchaser is the sole owner (legal and beneficial) of the Payment Tokens, Purchaser has good, valid and marketable title to the Payment Tokens, free and clear of all restrictions, liens, encumbrances, options and claims, and upon transfer of the Payment Tokens held by Purchaser to Seller in accordance with this Agreement, Seller shall own, and shall have good, valid and marketable title to, the Payment Tokens, free and clear of all liens, encumbrances, options and claims.

      **3.2**     **Authority of Purchaser**.  Purchaser has the requisite power, capacity and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and to consummate the purchase of the Transferred Shares. This Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery by Seller, constitutes the valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. The Payment Tokens as described herein have not (nor has any portion thereof) been assigned, pledged, or encumbered by Purchaser.

      **3.3**     **Compliance with Applicable Law**.  There is no claim, action, suit, proceeding, arbitration, investigation or inquiry pending or, to the best of Purchaser's knowledge, threatened, against or involving Purchaser before any national, provincial, federal, state, municipal, foreign, or other court or governmental or administrative body or agency, or any private arbitration tribunal that would have a material adverse effect on the transactions contemplated hereunder.

      **3.4**     **Sophisticated Purchaser**.  Purchaser (a) is a sophisticated entity familiar with transactions similar to those contemplated by this Agreement, (b) has adequate information concerning the business and financial condition of FTX to make an informed decision regarding the purchase of the Transferred Shares, (c) has independently and without reliance upon Seller or FTX, and based on such information and the advice of such advisors as Purchaser has deemed appropriate, made its own analysis and decision to enter into this Agreement. Purchaser acknowledges that neither Seller nor FTX nor any of their respective affiliates is acting as a fiduciary or financial or investment adviser to Purchaser, and that neither Seller nor FTX nor any of their respective affiliates has given Purchaser any investment advice, opinion or other information on whether the purchase of the Transferred Shares is prudent.  Purchaser acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to FTX that is not known to Purchaser and that may be material to a decision to purchase the Transferred

-4-

Shares (the "***Purchaser Excluded Information***"), (ii) Purchaser has determined to purchase the Transferred Shares notwithstanding its lack of knowledge of the Purchaser Excluded Information, and (iii) Seller shall have no liability to Purchaser, and Purchaser waives and releases any claims that it might have against Seller whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Purchaser Excluded Information in connection with the purchase of the Transferred Shares and the transactions contemplated by this Agreement.  Purchaser understands that Seller will rely on the accuracy and truth of the foregoing representations, and Purchaser hereby consents to such reliance.

      **3.5**    **Taxes**.  Purchaser agrees that it shall be fully responsible for its own tax consequences, in any, associated with the transactions contemplated herein.

**ARTICLE IV**
**MISCELLANEOUS**

      **4.1**    **Confidentiality**.  Other than as required by applicable law, each party shall at all times use commercially reasonable efforts to keep confidential the terms of this Agreement, any agreement ancillary to, or referred to in, this Agreement, and any confidential information which it has acquired and may acquire in relation to the transaction contemplated hereunder (for the avoidance of doubt, the fact that Seller shall no longer be a shareholder of FTX shall not be deemed confidential information).  The parties agree that, unless otherwise required by applicable laws, neither of them shall issue or permit to be issued a press release or make any public announcement with respect to this Agreement or the transaction contemplated hereunder without the prior written consent of the other parties. In case Purchaser or Seller is required to make any public announcement as required by applicable laws, the other party shall have reasonable opportunity to provide comments on such announcement.

      **4.2**    **Survival**.  The representations and warranties set forth in this Agreement shall survive for one (1) month after the Closing Date.

      **4.3**    **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given if delivered personally, electronically mailed (if confirmed), or if mailed by registered or certified mail (return receipt requested) on the third business day after mailing to the parties at the addresses set forth below (or at such other address for a party as shall be specified by like notice).

      To Purchaser:

Euclid Way Ltd

| | |
|---|---|
| Address: | No. 11 Mandolin Place |
| | Friar's Hill Rd |
| | Saint John's |
| | Antigua |
| Attn: | Samuel Bankman-Fried |
| E-mail: | sam@ftx.com |

*with copies (which shall not constitute notice) to*:

FTX Trading Ltd
Attn: Daniel Friedberg, General Counsel
Email: dan@ftx.com

and

Fenwick & West LLP
Address:        1191 Second Ave, 10th Floor
Attn:           Andrew Albertson
E-mail:         aalbertson@fenwick.com

To Seller:

Binance Capital Management Co. Ltd.
Address:        30 de Castro Street, Wickhams Cay 1, P.O. Box 4519,
                Road Town, Tortola ,British Virgin Islands
Attn:           Hon Ng
E-mail:         hon.ng@binance.com and legal@binance.com

*with a copy (which shall not constitute notice) to*:

Paul Hastings LLP
Address:        43/F, Jing An Kerry Center Tower II
                1539 Nanjing West Road
                Shanghai 200040, PRC
Attn:           David S. Wang
E-mail:         davidwang@paulhastings.com

To FTX:

FTX Trading Ltd.
Address:        c/o Corporate & Trust Services(Caribbean) Limited
                Lower Factory Road
                Saint John's
                Antigua
Attn:           Samuel Bankman-Fried
E-mail:         sam@ftx.com

*with copies (which shall not constitute notice) to*:

FTX Trading Ltd
Attn: Daniel Friedberg, General Counsel
Email: dan@ftx.com

and

Fenwick & West LLP
Address:        1191 Second Ave, 10th Floor
Attn:           Andrew Albertson
E-mail:         aalbertson@fenwick.com

**4.4    Assignment**.  Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by any party (whether by operation of law or otherwise) without the prior written consent of the other party.  Subject only to the preceding

sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by and against the parties and their respective successors, heirs, personal representatives, executors and permitted assigns.

**4.5** **Construction**. Each party acknowledges and agrees that it has been represented by legal counsel in the negotiation and delivery of this Agreement and that this Agreement has been drafted and prepared through the efforts of all parties and the rule of construction that any vague or ambiguous terms are to be construed against the party drafting such terms shall not be applied to any party to this Agreement.

**4.6** **Terms**. Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the person or persons, firm, or corporation may in the context require.

**4.7** **Governing Law; Jurisdiction**. This Agreement shall be governed by the internal laws of Hong Kong, without regard to conflict of law principles that would result in the application of any law other than such laws. Any controversy or claim arising out of or relating to this Agreement or the interpretation, breach, termination or validity hereof shall be resolved through arbitration in accordance with the Hong Kong International Arbitration Centre Arbitration Rules. There shall be three arbitrators. Each of Purchaser and Seller has the right to appoint one arbitrator and the third arbitrator shall be appointed by the Hong Kong International Arbitration Centre. The language to be used in the arbitral proceedings shall be English and the seat of the arbitration shall be Hong Kong.

**4.8** **Specific Enforcement**. All breaches of this Agreement are subject to specific enforcement, without prejudice to the right to seek damages or other remedies.

**4.9** **Entire Agreement; Third Party Beneficiaries**. This Agreement constitutes the entire understanding between the parties with respect to the sale and purchase of the Transferred Shares and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter of this Agreement. No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

**4.10** **Amendment and Waiver**. Except as otherwise expressly provided herein, any provision of this Agreement may be amended or modified and the observance of any provision of this Agreement may be waived (either generally or any particular instance and either retroactively or prospectively) only with the written consent of the parties or, with respect to a waiver, with the written consent of the party against whom such waiver is sought. The failure of any party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights.

**4.11** **Severability**. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable, to any extent, such provisions shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

**4.12** **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument. Transmission by facsimile or electronic mail of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

**4.13     Expenses**.  Each party hereto shall bear its own costs and expenses in connection with this Agreement and the transactions contemplated hereby.

**4.14     Headings**.  Headings and captions are for convenience only and are not to be used in the interpretation of this Agreement.

[THE REMINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by an authorized person as of the date first written above.

**Purchaser:**

**Euclid Way Ltd**

By: _____
Name:  Samuel Bankman-Fried
Title:    CEO

*[Signature Page to Share Transfer Agreement (FTX)]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by an authorized person as of the date first written above.

**Seller:**

**BINANCE CAPITAL
MANAGEMENT CO. LTD.**

By: _____
Name: Changpeng Zhao
Title: Director

*[Signature Page to Share Transfer Agreement (FTX)]*

FTX hereby consents to the above agreement.


**FTX:**


**FTX Trading Ltd**

By: _____
Name: Samuel Bankman-Fried
Title:   CEO

[*Signature Page to Share Transfer Agreement (FTX)*]

**Exhibit A**

**Termination Certificate**

Each of FTX Trading Ltd, Binance Capital Management Co. Ltd., Cottonwood Grove Ltd, Samuel Bankman-Fried and Zixiao Wang hereby terminates, or causes to terminate, all the documents set forth below (each a "Series A Transaction Document" and collectively, the "Series A Transaction Documents").

1. Series A Preferred Share Purchase Agreement entered into by and between FTX Trading Ltd. and Binance Capital Management Co. Ltd. dated November 27, 2019.

2. Voting Agreement entered into by and among FTX Trading Ltd., Binance Capital Management Co. Ltd. and Samuel Bankman-Fried dated November 27, 2019.

3. Investor's Rights Agreement entered into by and between FTX Trading Ltd. and Binance Capital Management Co. Ltd. dated November 27, 2019.

4. Right of First Refusal Agreement entered into by and among FTX Trading Ltd., Binance Capital Management Co. Ltd. and Samuel Bankman-Fried dated November 27, 2019.

5. Token Exchange Agreement entered into by and between Cottonwood Grove Limited and Binance Capital Management Co. Ltd. dated November 27, 2019.

6. Non-Competition Agreement entered into by and among FTX Trading Ltd., Binance Capital Management Co. Ltd. and Samuel Bankman-Fried dated November 27, 2019.

7. Non-Competition Agreement entered into by and among FTX Trading Ltd., Binance Capital Management Co. Ltd. and Zixiao Wang dated November 27, 2019.

8. Services Agreement entered into by and between Cottonwood Grove Limited and Binance Capital Management Co. Ltd. dated November 27, 2019.

9. Services Agreement entered into by and between Alameda Research Ltd. and Binance Capital Management Co. Ltd. dated November 27, 2019.

10. Services Agreement entered into by and between FTX Trading Ltd. and Binance Capital Management Co. Ltd. dated November 27, 2019.

11. Any other agreement or document entered into between FTX Trading Ltd and its affiliates and Binance Capital Management Co. Ltd., except for that certain Share Transfer Agreement dated July 14, 2021 by and among FTX Trading Ltd, Binance Capital Management Co. Ltd., and Euclid Way Ltd.

Without limiting any of foregoing, and other than as required under applicable laws, any lock-ups existing on the FTT and BNB tokens that are subject to the Series A Transaction Documents are released in full.

[signature page follows]

IN WITNESS WHEREOF, the parties have caused this Termination Certificate to be executed by an authorized person as of the date first written above.

**FTX Trading Ltd**

By:_____

Name:  Sam

Title:  ceo

**Binance Capital Management Co. Ltd**

By:_____

Name:  Changpeng Zhao

Title:  Director

**Cottonwood Grove Ltd**

By:_____

Name: Sam

Title:  ceo

**Samuel Bankman-Fried**

By:_____

**Zixiao Wang**

By:_____

[Signature page to Termination Certificate]

**Exhibit B**

Seller makes the following additional representations, warranties and agreements with respect to the Payment Tokens:

(a)    Seller is not a U.S. Person as defined in Rule 902(k) of Regulation S ("Regulation S") under the U.S. Securities Act of 1933, as amended (the "Securities Act"). Seller understands and agrees that: (i) the offer and sale of the Payment Tokens is made in an offshore transaction (as defined in Rule 902(h) of Regulation S); (ii) no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States; (iii) Seller is not acquiring the Payment Tokens for the account or benefit of any U.S. Person; and (iv) Seller's acquisition of the Payment Tokens is not part of a plan or scheme to evade the requirements of the Securities Act.

(b)    Seller will not, (i) during the restricted period that is applicable to the Payment Tokens set forth in the legend set forth below (the "Restricted Period") and to any certificate representing the Payment Tokens, offer or sell any Payment Tokens (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S, or (ii) engage in hedging transactions with regard to the Payment Tokens prior to the expiration of the Restricted Period.

(c)    Seller will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise transfer the Payment Tokens (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the Securities Act or any available exemption therefrom and, in any case, in accordance with applicable U.S. state securities laws.

(d)    Seller acknowledges and agrees that the Payment Tokens will be deemed to bear the legend set forth below (in addition to any other legend required by applicable U.S. federal, state or non-U.S. securities laws):

> THE TOKENS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***ACT***") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND NO PERSON INTENDS TO REGISTER THEM. PRIOR TO THE ONE-YEAR ANNIVERSARY OF THE CLOSING DATE (THE "***ONE-YEAR DEADLINE***"), THE TOKENS MAY NOT BE OFFERED OR SOLD (INCLUDING OPENING A SHORT POSITION IN SUCH TOKENS) IN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED BY RULE 902(k) ADOPTED UNDER THE ACT), OTHER THAN TO DISTRIBUTORS, UNLESS THE TOKENS ARE REGISTERED UNDER THE ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. PURCHASERS OF TOKENS PRIOR TO THE ONE-YEAR DEADLINE MAY RESELL SUCH TOKENS ONLY PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT OR OTHERWISE IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S OF THE ACT, OR IN TRANSACTIONS EFFECTED OUTSIDE OF THE UNITED STATES, PROVIDED, IN EACH CASE, THEY DO NOT SOLICIT (AND NO ONE ACTING ON THEIR BEHALF SOLICITS) PURCHASERS IN THE UNITED STATES OR OTHERWISE ENGAGE(S) IN SELLING EFFORTS IN THE UNITED STATES AND PROVIDED THAT HEDGING TRANSACTIONS INVOLVING THESE TOKENS MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. A HOLDER

OF THE TOKENS WHO IS A DISTRIBUTOR, DEALER, SUB-UNDERWRITER OR OTHER SECURITIES PROFESSIONAL, IN ADDITION, CANNOT PRIOR TO THE ONE-YEAR DEADLINE, RESELL THE TOKENS TO A U.S. PERSON AS DEFINED BY RULE 902(k) OF REGULATION S UNLESS THE TOKENS ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT IS AVAILABLE.

**Exhibit C**

Purchaser makes the following additional representations, warranties and agreements with respect to the Transferred Shares:

(a)     Purchaser is not a U.S. Person as defined in Rule 902(k) of Regulation S ("Regulation S") under the U.S. Securities Act of 1933, as amended (the "Securities Act"). Purchaser understands and agrees that: (i) the offer and sale of the Transferred Shares is made in an offshore transaction (as defined in Rule 902(h) of Regulation S); (ii) no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States; (iii) Purchaser is not acquiring the Transferred Shares for the account or benefit of any U.S. Person; and (iv) Purchaser's acquisition of the Transferred Shares is not part of a plan or scheme to evade the requirements of the Securities Act.

(b)     Purchaser will not, (i) during the restricted period that is applicable to the Transferred Shares set forth in the legend set forth below (the "Restricted Period") and to any certificate representing the Transferred Shares, offer or sell any Transferred Shares (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S, or (ii) engage in hedging transactions with regard to the Transferred Shares prior to the expiration of the Restricted Period.

(c)     Purchaser will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise transfer the Transferred Shares (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the Securities Act or any available exemption therefrom and, in any case, in accordance with applicable U.S. state securities laws.

(d)     Purchaser acknowledges and agrees that the Transferred Shares will be deemed to bear the legend set forth below (in addition to any other legend required by applicable U.S. federal, state or non-U.S. securities laws):

> THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***ACT***") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND NO PERSON INTENDS TO REGISTER THEM. PRIOR TO THE ONE-YEAR ANNIVERSARY OF THE CLOSING DATE (THE "***ONE-YEAR DEADLINE***"), THE SHARES MAY NOT BE OFFERED OR SOLD (INCLUDING OPENING A SHORT POSITION IN SUCH SHARES) IN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED BY RULE 902(k) ADOPTED UNDER THE ACT), OTHER THAN TO DISTRIBUTORS, UNLESS THE SHARES ARE REGISTERED UNDER THE ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. PURCHASERS OF SHARES PRIOR TO THE ONE-YEAR DEADLINE MAY RESELL SUCH SHARES ONLY PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT OR OTHERWISE IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S OF THE ACT, OR IN TRANSACTIONS EFFECTED OUTSIDE OF THE UNITED STATES, PROVIDED, IN EACH CASE, THEY DO NOT SOLICIT (AND NO ONE ACTING ON THEIR BEHALF SOLICITS) PURCHASERS IN THE UNITED STATES OR OTHERWISE ENGAGE(S) IN SELLING EFFORTS IN THE UNITED STATES AND PROVIDED THAT HEDGING TRANSACTIONS INVOLVING THESE SHARES MAY NOT BE

CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. A HOLDER OF THE SHARES WHO IS A DISTRIBUTOR, DEALER, SUB-UNDERWRITER OR OTHER SECURITIES PROFESSIONAL, IN ADDITION, CANNOT PRIOR TO THE ONE-YEAR DEADLINE, RESELL THE SHARES TO A U.S. PERSON AS DEFINED BY RULE 902(k) OF REGULATION S UNLESS THE SHARES ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT IS AVAILABLE.