**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, FTX DIGITAL MARKETS, LTD., | |
| Plaintiffs, | Adv. Pro. No. 24-50222 (KBO) |
| v. | **Re: Adv. D.I. 1** |
| BINANCE HOLDINGS LIMITED, BINANCE CAPITAL MANAGEMENT CO. LTD., BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, CHANGPENG ZHAO, DINGHUA XIAO, SAMUEL WENJUN LIM, and DOES 1-1000 | |
| Defendants. | |

**DEFENDANT CHANGPENG ZHAO'S
<u>MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS</u>**

Dated: August 4, 2025

Teresa Goody Guillén (admitted *pro hac vice*)
Katherine L. McKnight (admitted *pro hac vice*)
1050 Connecticut Ave., NW, S-1100
Washington, D.C. 20036
Cleveland, OH 44114
(202) 861-1630
tgoodyguillen@bakerlaw.com
kmcknight@bakerlaw.com

BAKER & HOSTETLER LLP
Jeffrey J. Lyons (#6437)
1201 N. Market Street, Suite 1407
Wilmington, DE 19801-1147
(302) 468-7088
jjlyons@bakerlaw.com

*Attorneys for Defendant Changpeng Zhao*

**TABLE OF CONTENTS**

**Page**

ARGUMENT ........................................................................................................................ 1

I.      Service on Mr. Zhao Was Improper and Ineffective ............................................. 1

II.     The Complaint Does Not Establish a Basis of Personal Jurisdiction Over Mr. Zhao ....................................................................................................................... 3

      A.      The Complaint's Failure to Allege Personal Jurisdiction Shows That Plaintiffs Attempted to Rely, and Failed to Meet, the Minimum Contacts Test ............................................................................................................... 3

      B.      An Exercise of Jurisdiction Would Not Satisfy the Fifth Amendment ................... 5

III.    Claims Predicated on the 2021 Buyout Fail on Numerous Grounds (First through Fifth Claims) ......................................................................................................... 7

      A.      The Fraudulent Transfer Claims Impermissibly Exert Extraterritorial Reach Under Statutes with Only Domestic Application ....................................... 8

      B.      The State Fraudulent Transfer Claims Under Delaware Law Fail for Lack of a Basis to Assume Delaware Law Applies ...................................................... 10

      C.      Mr. Zhao Is Not Plausibly Alleged to Be a Transferee ....................................... 12

      D.      Actual Fraudulent Intent Is Not Adequately Shown in the Allegations ............... 14

      E.      The Constructive Fraudulent Transfer Claims Are Unavailable and Inadequately Pleaded ........................................................................................ 16

            1.      The Claims Are Legally Unavailable .......................................................... 16

            2.      The Claims Are Inadequately Pleaded ........................................................ 17

IV.     The Claims Predicated on Social Media Posts and Letter of Intent Fail on Numerous Grounds .............................................................................................. 18

      A.      No Injurious Falsehood Claim Exists, and No Claim Could Lie Against Mr. Zhao's Concededly True Statements (Sixth Claim) ...................................... 20

            1.      No Injurious Falsehood Claim Exists .......................................................... 20

            2.      The Injurious Falsehood Claim Is Barred by the Statute of Limitations ................................................................................................. 22

3.    Injurious Falsehood Is Not Pleaded Under Any Cognizable
Standard ........................................................................................... 23

B.    The Fraud Claims Erroneously Blame Mr. Zhao for Plaintiffs' Own Fraud
(Seventh and Eighth Claims) ..................................................................... 25

1.    Fraud Theory Based on Social-Media Posts ............................................. 26

2.    The Fraud Theory Based on Letter of Intent............................................. 27

C.    The Unjust Enrichment Claim Fails Because It Is not Unjust for a
Fraudulent Enterprise to Fail (Ninth Claim)............................................... 29

CONCLUSION........................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Pages**

*In re Amp'd Mobile, Inc.*,
  404 B.R. 118 (Bankr. D. Del. 2009) ..................................................................................27

*Art Metal-U.S.A., Inc. v. United States*,
  753 F.2d 1151 (D.C. Cir. 1985) ................................................................................21, 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .........................................................................................................12

*Balsiano v. Borell (In re Furniture Factory Ultimate Holding, L.P.)*,
  2023 WL 5662747 (Bankr. D. Del. Aug. 31, 2023) ..............................................................13

*In re Bankr. Est. of Midland Euro Exch. Inc.*,
  347 B.R. 708 (Bankr. C.D. Cal. 2006) ..............................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .........................................................................................................27

*Bernard L. Madoff Inv. Sec. LLC v. Ida Fishman Revocable Tr. (In re Bernard L.
    Madoff Inv. Sec. LLC)*,
  773 F.3d 411 (2d Cir. 2014) ............................................................................................17

*BFP v. Resol. Tr. Corp.*,
  511 U.S. 531 (1994) ...................................................................................................14, 18

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ...........................................................................................................7

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
  498 U.S. 533 (1991) ...........................................................................................................2

*BV Advisory Partners, LLC v. Quantum Computing Inc.*,
  2024 WL 2723119 (Del. Ch. May 28, 2024) ...................................................................30

*Carolina Indus. Prods., Inc. v. Learjet, Inc.*,
  189 F. Supp. 2d 1147 (D. Kan. 2001) ..........................................................................21, 22

*Cercacor Lab'ys, Inc. v. Metronom Health, Inc.*,
  2025 WL 1180186 (Del. Super. Apr. 23, 2025) ..............................................................28

*Charys Liquidating Trust v. Hades Advisors, LLC (In re Charys Holding Co.,
    Inc.)*,
  2010 WL 2788152 (Bankr. D. Del. July 14, 2010) ...........................................................17

*In re CIL Ltd.*,
  582 B.R. 46 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, 2018 WL
  3031094 (Bankr. S.D.N.Y. June 15, 2018) ....................................................................8, 9

*Cir. City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001) ....................................................................................................2

*City of Philadelphia v. Beretta U.S.A. Corp.*,
  277 F.3d 415 (3d Cir. 2002) ......................................................................................21

*CMI, Inc. v. Intoximeters, Inc.*,
  918 F. Supp. 1068 (W.D. Ky. 1995) ......................................................................21, 22

*In re Colonial Realty Co.*,
  980 F.2d 125 (2d Cir. 1992) ........................................................................................9

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) ....................................................................................................9

*Corning Inc. v. SRU Biosystems, LLC*,
  292 F. Supp. 2d 583 (D. Del. 2003) ......................................................................11, 20

*In re Cred Inc.*,
  650 B.R. 803 (Bankr. D. Del. 2023) ..........................................................................14

*Creditors' Committee of Essex Builders, Inc. v. Farmers Bank*,
  251 A.2d 546 (Del. 1969) ..........................................................................................30

*Daimler AG* v. *Bauman*,
  571 U.S. 117 (2014) ....................................................................................................4

*Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*,
  458 B.R. 155 (Bankr. D. Del. 2011) ..........................................................................12

*In re Direct Response Media, Inc.*,
  466 B.R. 626 (Bankr. D. Del. 2012) ..........................................................................12

*Douglas Asphalt Co. v. QORE, Inc.*,
  657 F.3d 1146 (11th Cir. 2011) ............................................................................20, 22

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
  46 F.4th 226 (5th Cir. 2022) ........................................................................................6

*In re Eachpole, Inc.*,
  2025 WL 351823 (Bankr. D. Nev. Jan. 24, 2025) ........................................................9

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*,
  2018 WL 2727542 (Del. Ch. June 6, 2018) ................................................................26

*In re Fedders N. Am., Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...............................................................................15

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
    539 A.2d 1060 (Del. 1988) ..............................................................................................29

*Folk v. York-Shipley, Inc.*,
    239 A.2d 236 (Del. 1968) ....................................................................................11, 12, 20

*In re FTX Trading Ltd.*,
    2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024) .........................................................14

*In re FTX Trading Ltd.*,
    No. 22-11068 (Bankr. D. Del. Mar. 17, 2023).................................................................17

*Fuld v. Palestine Liberation Org.*,
    606 U.S. ----, 145 S. Ct. 2090 (2025) .................................................................. *passim*

*In re Green Field Energy Servs., Inc.*,
    594 B.R. 239 (Bankr. D. Del. 2018) .................................................................................13

*In re Hechinger Inv. Co. of Del.*,
    327 B.R. 537 (D. Del. 2005), *aff'd on other grounds*, 278 F. App'x 125 (3d
    Cir. 2008) .........................................................................................................................15

*In re IIG Glob. Trade Fin. Fund Ltd.*,
    666 B.R. 38 (Bankr. S.D.N.Y. 2024)..................................................................................9

*In re Int'l Mgmt. Assoc.*,
    399 F.3d 1288 (11th Cir. 2005) .......................................................................................13

*Johnson v. Preferred Pro. Ins. Co.*,
    91 A.3d 994 (Del. Super. 2014).......................................................................................25

*LaNuova D & B, S.p.A. v. Bowe Co.*,
    513 A.2d 764 (Del. 1986) ..................................................................................................4

*Leo v. Kerr-McGee Chem. Corp.*,
    37 F.3d 96 (3d Cir. 1994)................................................................................................21

*Lesnick v. Hollingsworth & Vose Co.*,
    35 F.3d 939 (4th Cir. 1994) .............................................................................................10

*Lightfoot v. Cendant Mortg. Corp.*,
    580 U.S. 82 (2017)..............................................................................................................3

*In re LMI Legacy Holdings, Inc.*,
  2017 WL 1508606 (Bankr. D. Del. Apr. 27, 2017), *aff'd*, 625 B.R. 268 (D.
  Del. 2020) ..........................................................................................................................11

*In re Lyondell Chem. Co.*,
  543 B.R. 127 (Bankr. S.D.N.Y. 2016).................................................................................10

*McClanahan v. Anti-Defamation League*,
  2023 WL 8704258 (W.D. Mo. Dec. 15, 2023) ...................................................................24

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  583 U.S. 366 (2018)............................................................................................................16

*Microsoft Corp. v. AT & T Corp.*,
  550 U.S. 437 (2007)..............................................................................................................8

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010)............................................................................................................10

*NACCO Indus., Inc. v. Applica Inc.*,
  997 A.2d 1 (Del. Ch. 2009)................................................................................................26

*In re Nat'l Collegiate Student Loan Trusts Litig.*,
  2020 WL 3960334 (Del. Ch. July 13, 2020)......................................................................20

*Nationwide Mut. Ins. Co. v. Buffetta*,
  230 F.3d 634 (3d Cir. 2000)...............................................................................................21

*Nestle USA, Inc. v. Doe*,
  593 U.S. 628 (2021)..............................................................................................................8

*New Start Holdings, LLC v. Zhou*,
  2024 WL 4039440 (Del. Ch. Sept. 4, 2024) ......................................................................30

*Nicolet, Inc. v. Nutt*,
  525 A.2d 146 (Del. 1987) .......................................................................................25, 26, 28

*Garfield on behalf of ODP Corp. v. Allen*,
  277 A.3d 296 (Del. Ch. 2022).............................................................................................30

*Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*,
  484 U.S. 97 (1987)............................................................................................................1, 5

*Page v. Oath Inc.*,
  270 A.3d 833 (Del. 2022) ....................................................................................................25

*Peltz v. Hatten*,
  279 B.R. 710 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F.
  App'x 401 (3d Cir. 2003)......................................................................................18

*In re PHP Healthcare Corp.*,
  128 F. App'x 839 (3d Cir. 2005) ..........................................................................11

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
  917 F.3d 85 (2d Cir. 2019).................................................................................9, 10

*In re Quorum Health Corp.*,
  2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023)................................................16

*Ramada Inns, Inc. v. Dow Jones & Co.*,
  543 A.2d 313 (Del. Super. 1987).................................................................21, 22, 24

*RJR Nabisco v. Eur. Cmty.*,
  579 U.S. 325 (2016).............................................................................................8, 9

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999)................................................................................................3

*Rupp v. Markgraf*,
  95 F.3d 936 (10th Cir. 1996) .................................................................................13

*Sibbach v. Wilson & Co.*,
  312 U.S. 1 (1941)....................................................................................................6

*Smith v. Delaware State Univ.*,
  47 A.3d 472 (Del. 2012) ........................................................................................22

*Sys. Operations, Inc. v. Sci. Games Dev. Corp.*,
  555 F.2d 1131 (3d Cir. 1977).....................................................................22, 23, 24

*In re The Brown Sch.*,
  368 B.R. 394 (Bankr. D. Del. 2007) ......................................................................21

*In re The Brown Sch.*,
  386 B.R. 37 (Bankr. D. Del. 2008) ........................................................................14

*In re Trib. Co. Fraudulent Conv. Litig.*,
  10 F.4th 147 (2d Cir. 2021) ..................................................................................15

*Turkiye Halk Bankasi A.S. v. United States*,
  598 U.S. 264 (2023)..............................................................................................2, 3

*VFB LLC v. Campbell Soup Co.*,
  482 F.3d 624 (3d Cir. 2007)..................................................................................18

*Vichi v. Koninklijke Philips Elecs. N.V.*,
    62 A.3d 26 (Del. Ch. 2012)..................................................................................................30

*Walden* v. *Fiore*,
    571 U.S. 277 (2014)............................................................................................................4

*Matter of Walldesign, Inc.*,
    872 F.3d 954 (9th Cir. 2017) ............................................................................................13

*Wells Fargo Bank, N.A. v. Est. of Malkin*,
    278 A.3d 53 (Del. 2022) ...................................................................................................30

*Willy v. Coastal Corp.*,
    503 U.S. 131 (1992)............................................................................................................6

*Wojchowski v. Daines*,
    498 F.3d 99 (2d Cir. 2007)..................................................................................................3

*Yates v. United States*,
    574 U.S. 528 (2015)............................................................................................................3

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)............................................................................................................6

*In re Zambrano Corp.*,
    478 B.R. 670 (Bankr. W.D. Pa. 2012) ..............................................................................15

*In re Zetta Jet USA, Inc.*,
    2024 WL 3198826 (C.D. Cal. Mar. 26, 2024)....................................................................9

*In re Zetta Jet USA, Inc.*,
    624 B.R. 461 (Bankr. C.D. Cal. 2020)...........................................................................9, 10

**Statutes**

10 *Del. C.* § 3104(b) ...............................................................................................................4

11 U.S.C. 546(e) ...................................................................................................................16

11 U.S.C. § 101......................................................................................................................17

11 U.S.C. § 541(a) ..................................................................................................................9

11 U.S.C. § 546(e) .................................................................................................................16

11 U.S.C. § 548(a)(1)(A) .......................................................................................................14

11 U.S.C. § 548(a)(1)(B) .......................................................................................................17

11 U.S.C. § 550.................................................................................................................12, 13

11 U.S.C. § 741(7) ...................................................................................................................16

28 U.S.C. § 112(b) .....................................................................................................................2

28 U.S.C. § 2072(b) ...................................................................................................................6

**Other Authorities**

Fed. R. Bankr. P. 7004 ..........................................................................................................5, 6

Fed. R. Bankr. P. 7009 .............................................................................................................14

Fed. R. Bankr. P. 7012(b) ..........................................................................................................2

Fed. R. Civ. P. 4.....................................................................................................................2, 3

Fed. R. Civ. P. 9(b) .....................................................................................................14, 26, 27

Fed. R. Civ. P. 12(b) ..................................................................................................................2

W. Page Keeton et al., *Prosser and Keeton on Torts*, § 128 (5th ed. 1984)................................21

Defendant Changpeng Zhao is a successful entrepreneur, and resident of the United Arab Emirates, who founded entities the Complaint refers to as the "Binance Defendants" or "Binance" that operate Binance.com, the world's largest cryptocurrency exchange.[1] According to the Complaint, Mr. Zhao's enterprises have been highly successful. Plaintiffs, by contrast, are a group of failed entities founded by Sam Bankman-Fried, and they admit they fell apart because of their founder's "pervasive malfeasance." Compl. ¶ 1. While Plaintiffs and Binance were rivals, they were also briefly business partners when the Binance Defendants owned about a 20% stake in FTX Trading. But Messrs. Zhao and Bankman-Fried could not work together, and the parties separated. The Binance Defendants returned their equity stake in exchange for cryptocurrency (including FTX's exchange token). Over a year later, Plaintiffs' precarious financial position became public, Mr. Zhao announced that Binance liquidated its share of the FTX exchange token, and FTX imploded. Mr. Bankman-Fried is now in prison.

In the instant action, Plaintiffs nonsensically blame Mr. Zhao and others for Mr. Bankman-Fried's failings. But Mr. Zhao is not amenable to suit in this forum, and the statutes Plaintiffs seek to enforce do not reach the extraterritorial transactions described in the Complaint. The claims are in any event legally unfounded, and many are outright incoherent. Mr. Zhao joins the motions to dismiss filed by the other Defendants and has striven to minimize overlap in argument.

## ARGUMENT

## I.     Service on Mr. Zhao Was Improper and Ineffective

Service is a "prerequisite[] to … personal jurisdiction," *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987), but Mr. Zhao was not lawfully served. Although this Court authorized service by alternative means (Adv. D.I. 79 at 2–3), this motion properly contests

---

[1] This memorandum utilizes the Complaint's defined terms.

service. *See* Fed. R. Civ. P. 12(b)(4) and (5); Fed. R. Bankr. P. 7012(b). The Court invoked a rule providing means of serving "an individual … at a place not within any judicial district of the United States." Fed. R. Civ. P. 4(f)(3). Mr. Zhao was not served at a place outside the United States; Plaintiffs sought and received from this Court permission to serve Mr. Zhao through "United States counsel" (Adv. D.I. 79 at 3), and did so (Adv. D.I. 81 at 2 (stipulation with United States counsel regarding service)).

Service on lawyers of a foreign person does not satisfy Rule 4(f)(3). Rule 4(f) provides means by which "an individual" may be served "at a place not within any judicial district of the United States." Fed. R. Civ. P. 4(f). New York is within a federal judicial district. *See* 28 U.S.C. § 112(b). The form of service Plaintiffs used contravened the rule's "plain meaning." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 540–41 (1991).

Several points of context confirm that service on U.S. counsel of a foreign defendant is improper. One is that Rule 4(f) itself authorizes types of service that only make sense in foreign nations, such as by "internationally agreed means" like "the Hague Convention on the Service Abroad of Judicial and Extrajudicial documents" and by means "prescribed by the foreign country's law." Fed. R. Civ. P. 4(f)(1) and (2). Rule 4(f)(3) is governed by the same threshold text of Rule 4(f) that governs 4(f)(1) and 4(f)(2) and is equally restricted by that threshold text. *See Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (describing the role of "neighboring … provisions" in interpretation). Moreover, Rule 4(f)(3) is a catch-all provision— authorizing "other means" of service—following 4(f)(1) and (f)(2) and should be "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (citation omitted) (*ejusdem generi*s canon). A reference to means otherwise available means "*similar*" means "rather than

2

*every*" means. *Yates v. United States*, 574 U.S. 528, 545 (2015) (opinion of Ginsburg, J., for four Justices); *see also id.* at 550 (opinion of Alito, J.) (same rationale). Because 4(f)(1) and (f)(2) govern service abroad, the means contemplated in 4(f)(3) are also for foreign service. *See Wojchowski v. Daines*, 498 F.3d 99, 109 (2d Cir. 2007) (employing *ejusdem generis* canon to limit the phrase "other legal process" to those like enumerated forms of process).

The reach of Rule 4(f) is further clarified by its place in the "overall … scheme" of the rule. *Turkiye Halk Bankasi*, 598 U.S. at 275 (citation omitted). Rule 4 expressly addresses service on "an individual … in a judicial district of the United States," but does so elsewhere—in subsection (e). Fed. R. Civ. P. 4(e). It is strange to repurpose Rule 4(f), with its focus on service "not within a judicial district of the United States," to address the topic of Rule 4(e), which is service "in a judicial of the United States." Because service on Mr. Zhao's U.S. counsel violates the rule, it is invalid, and the claims against him should be dismissed.

**II.    The Complaint Does Not Establish a Basis of Personal Jurisdiction Over Mr. Zhao**

The complaint makes no attempt to allege that the Court possesses personal jurisdiction over Mr. Zhao. *See* Compl. ¶¶ 9–10. But "personal jurisdiction" is the Court's very "power over the parties," *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017), "without which the court is 'powerless to proceed to an adjudication.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (citation and alteration marks omitted). That is the situation here.

**A.    The Complaint's Failure to Allege Personal Jurisdiction Shows That Plaintiffs Attempted to Rely, and Failed to Meet, the Minimum Contacts Test**

The complaint's failure to identify a basis of personal jurisdiction is dispositive because personal jurisdiction rests on the "protections of due process which ensure that individuals are 'subject only to lawful power.'" *Fuld v. Palestine Liberation Org.*, 606 U.S. ----, 145 S. Ct. 2090, 2103 (2025) (citation omitted). In *Fuld*, the Supreme Court revisited personal-jurisdiction doctrine

3

and held that the traditional minimum-contacts test will apply in most, but not all, cases in federal court. *See id.* at 2101. Because federal courts "ordinarily follow state law in determining the bounds of their jurisdiction over persons," and because states are bound by the Fourteenth Amendment, that Amendment's minimum-contacts test will continue to apply in federal suits where jurisdiction depends on a state long-arm statute (i.e., most federal cases). *Id.* However, in "only a subset of cases," including those where "personal jurisdiction is . . . 'authorized by a federal statute,'" the Fifth Amendment governs, and the Court declined "to delineate the outer bounds of the Federal Government's power, consistent with due process." *Id.* at 2102, 2106. Accordingly, *Fuld* calls for a threshold identification of the statutory basis of jurisdiction and an analysis of whether the Fifth or Fourteenth Amendment applies.

The complaint, however, fails to state the basis of personal jurisdiction or to address the issue at all. Compl. ¶¶ 9–10 (no mention of personal jurisdiction). Assuming the case is founded on Delaware's long-arm statute, 10 *Del. C.* § 3104(b), the Fourteenth Amendment's minimum-contacts test applies. *LaNuova D & B, S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986); *Fuld*, 145 S. Ct. at 2101–02. The complaint does not even attempt to satisfy that test, which requires allegations that at least one of "two types of personal jurisdiction" exist, "general" and "specific." *Id.* at 2102 (citation omitted). The complaint does not establish general jurisdiction because it does not allege that Mr. Zhao is "at home" in Delaware. *Daimler AG* v. *Bauman*, 571 U.S. 117, 137 (2014). Nor could it when he is a resident of the United Arab Emirates. Adv. D.I. 20 at 3; Adv. D.I. 50 at 2. Specific jurisdiction, meanwhile, requires "suit-related conduct" to "create a substantial connection with the forum." *Walden* v. *Fiore*, 571 U.S. 277, 284 (2014). The claims are so far removed from Delaware, and even the United States, that the statutes at issue, which

lack extraterritorial application, do not even apply. In any event, the Complaint alleges no conduct by Mr. Zhao creating ties with Delaware.

### B.   An Exercise of Jurisdiction Would Not Satisfy the Fifth Amendment

Insofar as the case was intended to rest solely on Bankruptcy Rule 7004, that effort would fail. Although *Fuld* did not "delineate the outer bounds of the Federal Government's power," it declined to hold "that the Fifth Amendment imposes *no* territorial limits on personal jurisdiction." *Fuld*, 145 S. Ct. at 2106. Indeed, the Supreme Court had previously stated, in a case *Fuld* cited favorably, that the "exercise of personal jurisdiction" under the Fifth Amendment requires "a constitutionally sufficient relationship between the defendant and the forum." *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). In *Fuld*, the Supreme Court expressed the analysis in three conceptual parts, examining (1) the federal interest furthered by the jurisdictional statute, (2) the degree to which the statute was "suitably limited to those ends," and (3) the weight of the government's interest as compared to the defendant's interest. 145 S. Ct. at 2106–09. An exercise of personal jurisdiction here fails at each step.

First, no weighty federal interest supports this suit. *Fuld* reoriented the personal-jurisdiction inquiry around "governmental power," which "must be exercised in subordination to the applicable provisions of the Constitution." *Id.* at 2106. *Fuld* upheld a statute in which "Congress and the President made a considered judgment to subject" enumerated terrorist groups "to liability in U.S. courts as part of a comprehensive legal response" international terrorism. *Id.* at 2107. Looking to Justice Jackson's iconic test, the Supreme Court explained that "the Executive and Congress have spoken with one voice in" a "sphere" of their unilateral power, which merited "the widest latitude of judicial" deference. *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

5

In stark contrast, rules promulgated by the judicial branch of government, if read to create personal jurisdiction independent of any legislative act, would present federal power "at its lowest ebb." *Youngstown*, 343 U.S. at 636 (Jackson, J., concurring). Like Federal Rule of Civil Procedure 4, which it incorporates, Bankruptcy Rule 7004 is "just a procedural rule about issuing summonses." *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 234 (5th Cir. 2022). Both rules were authorized by the Rules Enabling Act, which explicitly prohibits rules "that abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Accordingly, "federal courts, in adopting rules, [are] not free to extend or restrict the jurisdiction conferred by a statute." *Willy v. Coastal Corp.*, 503 U.S. 131, 135 (1992); *Sibbach v. Wilson & Co.*, 312 U.S. 1, 10 (1941). This forecloses a "rule expanding the scope of a court's personal jurisdiction." *Douglass*, 46 F.4th at 234. Indeed, Bankruptcy Rule 7004 explicitly recognizes jurisdiction only if that "is consistent with the United States Constitution and laws." Fed. R. Bankr. P. 7004(f)(1). The Constitution directs a minimum-contacts test where state law supplies the basis of personal jurisdiction, *Fuld*, 145 S. Ct. at 2103, and the Rules Enabling Act forbids courts from creating their own jurisdiction in the absence of a statutory foundation.

Second, Bankruptcy Rule 7004 (like Rule 4, which it incorporates) exhibits no tailoring at all. *Fuld* deemed it significant that the jurisdictional statute reached only certain claims against certain defendants. "It does not put respondents at broad risk of being haled into U. S. courts for myriad civil liability actions." 145 S. Ct. at 2107. But Rules 4 and 7004 work in the very opposite manner, as they are unbounded in any way and are crafted to be generally applicable, save where

the Constitution places limits. That is not suitably limited to anything and in fact begs courts to impose constitutional boundaries on its face.[2]

Third, no "substantial interest" of "the forum sovereign" is shown "in adjudicating [this] dispute," *Fuld*, 145 S. Ct. at 2109, as the complaint says nothing of Mr. Zhao's ties to the United States or a U.S. interest in the matter. As explained below (§ III(A)), the statutes at issue do not even reach the extraterritorial transactions. By comparison, there would be no "fairness" to Mr. Zhao in adjudicating the case here, where he has no ties and would suffer practical hardship. Whereas *Fuld* upheld a statute basing jurisdiction on the defendants' "activities" in the United States, ensuring "jurisdiction" is tied "to specific and narrow conduct that directly implicates issues of sensitive and ongoing concern in respondents' relationships with the United States," *id.* at 2109, the complaint alleges no connection between Mr. Zhao and the United States. Accordingly, he cannot be made to defend claims here.

## III. Claims Predicated on the 2021 Buyout Fail on Numerous Grounds (First through Fifth Claims)

Plaintiffs' claims are equally deficient on the merits. The first five claims concern a business relationship that existed between the Binance Defendants and FTX Trading for fewer than two years. Compl. ¶¶ 34–44. The Complaint alleges that Mr. Zhao founded Binance.com in 2017, and it has become "the largest cryptocurrency trading exchange in the world." *Id.* ¶ 29. It alleges that, in 2019, Mr. Bankman-Fried founded "his own crypto exchange, FTX.com, to operate as an international platform to trade and invest in cryptocurrency." *Id.* ¶ 32. In August 2019, the Binance Defendants—all incorporated abroad, *see id.* ¶¶ 21–24—purchased a large stake in FTX—a group of companies most of which are also incorporated abroad, *id.* ¶¶ 12–20, 37.

---

[2] The drafters presumably anticipated a minimum-contacts test, which was universally held to apply under the Fifth Amendment before *Fuld*. *See Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) (meaning is assessed "at the time of enactment").

This business marriage was short-lived, however, because of "personal grievances" between Messrs. Zhao and Bankman-Fried. *Id.* ¶ 4; *see also id.* ¶ 52 (describing their "widely reported feud"). The enterprises separated in July 2021. *Id.* ¶¶ 38–44. In the transaction accomplishing this divorce, the shares were transferred back to FTX in exchange for cryptocurrency. *Id.* ¶¶ 38–39. Alameda Ltd., a British Virgin Islands company affiliated with the FTX family of entities, was the transferor of "all of the consideration" for the buyout. *Id.* ¶ 43. The transaction was publicized. *Id.* ¶ 5. The Complaint alleges that, as of July 2021, FTX was a sufficiently robust enterprise that "it became a clear threat to Binance's market dominance." *Id.* ¶ 7. Plaintiffs, however, seek to avoid the transfer of cryptocurrency that was consideration for FTX's receipt of shares (and, hence, jettisoning of the Binance Defendants). *Id.* ¶¶ 80–128. These claims should be dismissed.

## A.    The Fraudulent Transfer Claims Impermissibly Exert Extraterritorial Reach Under Statutes with Only Domestic Application

Plaintiffs fail to state claims under Sections 544, 548, and 550 of the Bankruptcy Code because those statutes do not reach the foreign transfer described in the Complaint. United States law "does not rule the world." *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007). A "presumption against exterritoriality" directs that federal statutes "be construed to have only domestic application," "[a]bsent clearly expressed congressional intent to the contrary." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016). Except where "Congress has affirmatively and unmistakably instructed" that a statute apply to foreign conduct, *id.*, claims must be tied to the United States with allegations "that 'the conduct relevant to the statute's focus occurred in the United States.'" *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 33 (2021) (citation omitted).

"Nothing in the language of sections 544, 548 and 550 of the Bankruptcy Code suggests that Congress intended those provision to apply to foreign transfers." *In re CIL Ltd.*, 582 B.R. 46,

84 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018). Each statute generically addresses asset transfers, but none "affirmatively and unmistakably" reaches beyond U.S. borders. *RJR Nabisco*, 579 U.S. at 335. By comparison, Congress demonstrated that it knew how to extend bankruptcy law abroad in Section 541, which reaches estate property "wherever located and by whomever held."[3] 11 U.S.C. § 541(a); *see In re CIL Ltd*, 582 B.R. at 88; *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 812 (2024) (rejecting proposed construction of statute where Congress demonstrated it "knew how to" accomplish that construction in a different section). Congress chose to afford only domestic reach to Sections 544, 548, and 550, which concern property held by third-party transferees. *See In re Bankr. Est. of Midland Euro Exch. Inc.*, 347 B.R. 708, 717 (Bankr. C.D. Cal. 2006). Hence the "majority of cases" hold that Section "548 do[es] not have extraterritorial application." *In re Zetta Jet USA, Inc.*, 624 B.R. 461, 476 (Bankr. C.D. Cal. 2020) (collecting cases); *accord In re IIG Glob. Trade Fin. Fund Ltd.*, 666 B.R. 38, 85 (Bankr. S.D.N.Y. 2024). That holding reflects the only fair construction of text.

Plaintiffs' fraudulent transfer claims improperly demand the extension of bankruptcy law abroad. "[T]he focus of the statutory avoidance and recovery provisions of Sections 548 and 550 is the initial transfer that depletes the property that would have become property of the estate." *In re Eachpole, Inc.*, 2025 WL 351823, at *75 (Bankr. D. Nev. Jan. 24, 2025); *see In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 98 (2d Cir. 2019); *In re Zetta Jet USA, Inc.*, 2024 WL 3198826, at *30 (C.D. Cal. Mar. 26, 2024). Here, every pertinent part of the "initial transfer" occurred overseas. Compl. ¶¶ 43, 82. Alameda LTD, which Plaintiffs identify as

---

[3] Property alleged to be fraudulently transferred is not part of the bankruptcy estate. *See In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992).

the "transferor" (Compl. ¶ 43), is a British Virgin Islands company (*id.* ¶ 13), and the "Binance Entities," the alleged transferees (*id.* ¶ 43), are incorporated variously in Ireland, the Cayman Islands, and the British Virgin Islands (*id.* ¶¶ 22–24). Supreme Court precedent deems this an extraterritorial transaction. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010); *contrast Picard*, 917 F.3d at 99 n.9 (finding a transfer domestic because transferor was a "domestic entity" and transferred property from U.S. bank accounts); *see also Zetta Jet*, 624 B.R. at 492 ("[T]he majority of cases addressing the issue find that the parties' nationalities is relevant."). To the extent it matters, the nominal counterparties also are not alleged to be United States residents. Compl. ¶¶ 22, 25 (Mr. Zhao), 26, 27. The cryptocurrency exchanged was on global exchanges; the transaction did not occur in U.S. dollars. *Id.* ¶¶ 1, 82, 29 (Binance.com is an "international crypto asset trading platform"), 29 (FTX.com the same). *See, e.g.*, *FAH Liquidating Corp.*, 572 B.R. at 124 (euros). The complaint alleges no facts that might somehow transform these overseas transactions into domestic acts. *See In re Lyondell Chem. Co.*, 543 B.R. 127, 148 (Bankr. S.D.N.Y. 2016). Because the transfer sought to be avoided did not occur in the United States, Sections 544, 548, and 550 do not reach it.

**B.    The State Fraudulent Transfer Claims Under Delaware Law Fail for Lack of a Basis to Assume Delaware Law Applies**

Plaintiffs rest their fraudulent transfer claims in part on the Delaware Uniform Fraudulent Transfer Act (DUFTA) as applicable under Section 544(b). Compl. ¶¶ 92–204, 114–24. Even assuming counterfactually that Section 544(b) can apply to extraterritorial transactions, the Complaint alleges no basis to bring a claim under Delaware law, or that of any other state.

"It remains well-established that a state's sovereignty over persons, property and activities extends only within the state's geographical borders and that therefore its laws have no operation" outside those borders. *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 941 (4th Cir. 1994). For

that reason, states adjudicating claims against foreign defendants for out-of-state conduct apply the substantive law of the place where the conduct occurred. *Folk v. York-Shipley, Inc.*, 239 A.2d 236, 240 (Del. 1968). If, however, that jurisdiction provides "no right of action" for the conduct alleged, then the plaintiff "has no right of action enforceable in Delaware court." *Id.*

"Because there is no 'significant conflict between some federal policy or interest and the use of state law,'" the "choice of law rule[s] of Delaware," where this court sits, govern the inquiry. *In re PHP Healthcare Corp.*, 128 F. App'x 839, 843 (3d Cir. 2005); *In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606, at *5 (Bankr. D. Del. Apr. 27, 2017), *aff'd*, 625 B.R. 268 (D. Del. 2020). "Delaware courts apply the most significant relationship test" articulated in the Restatement (Second) of Conflicts § 145 (1971); *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 584 (D. Del. 2003) (citing *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991)). Factors governing this inquiry are "1) the place where the injury occurred, 2) the place where the conduct causing the injury occurred, 3) the place of incorporation and principal place of business of the parties, and 4) the place where the relationship between the parties is centered." *Corning*, 292 F. Supp. 2d at 585.

The Complaint supplies no reason to believe Delaware law applies to what is a foreign transaction involving foreign persons. The parties' various places of incorporation include Antigua and Barbuda (Compl. ¶ 11 (FTX Trading)), The Bahamas (*id.* ¶ 12 (FTX DM)), the British Virgin Islands (*id.* ¶ 12), the Cayman Islands (*id.* ¶ 21 (Binance Holdings)), and Ireland (*id.* ¶ 22 (Binance Capital Management)). The principal place of the relationship is unclear, but cannot have been in the United States because the principal share purchase between FTX Trading and Binance occurred in 2019, before FTX "determined to open a United States-based exchange platform" in 2020. *Id.* ¶¶ 36–36. The injury appears to be best identified in The Bahamas, given that FTX DM is deemed

11

to own customers' claims. *See id.* ¶ 12. And the conduct constituting the supposed fraudulent transfer consisted of transfers by Alameda, using the Binance.com exchange (*id.* ¶ 43), which is not based in the United States (*id.* ¶ 29). Thus, the sovereign with the most significant relationship may be The Bahamas or Antigua and Barbuda, or the British Virgin Islands. But it is not Delaware or any other state. Accordingly, without identifying a cause of action under law properly applicable, Plaintiffs have "no right of action enforceable in a Delaware court." *Folk*, 239 A.2d at 240.

### C.    Mr. Zhao Is Not Plausibly Alleged to Be a Transferee

Even assuming application of the statutes Plaintiffs cite, all fraudulent transfer claims against Mr. Zhao should be dismissed because he is not plausibly alleged to have received them. "Under the Bankruptcy Code and the Delaware Uniform Fraudulent Transfer Act, the Trustee may only recover the value of an avoidable transfer from the initial transferee of such transfer, or an entity for whose benefit the transfer was made. *In re Direct Response Media, Inc.*, 466 B.R. 626, 654 (Bankr. D. Del. 2012) (citing 11 U.S.C. § 550(a)); *see* Compl. ¶¶ 90, 103, 112, 123, & 127 (predicating recovery on 11 U.S.C. § 550). Only a person who exerts "dominion" over the initially transferred property to the extent he "has the right to put the money to [his] own purposes" is a transferee. *Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*, 458 B.R. 155, 158 (Bankr. D. Del. 2011).

The Complaint makes the bare legal assertion that "each Defendant is an initial transferee of one or more of the 2021 Fraudulent Transfers, an entity for whose benefit one or more of the 2021 Fraudulent Transfers was made, or an immediate or mediate transferee of one or more of the 2021 Fraudulent Transfers." Compl. ¶¶ 90, 103, 112, 123, 127. That conclusory statement comes nowhere near the federal pleading requirements to survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009) ("bare elements" of the claim not enough); *Balsiano v. Borell (In*

*re Furniture Factory Ultimate Holding, L.P.)*, 2023 WL 5662747, at \*10 (Bankr. D. Del. Aug. 31, 2023). And it is otherwise impermissible group pleading. *See* Adv. D.I. 67 at 29–30. Plaintiffs do not alleged that Mr. Zhao received or possessed dominion over the exchanged cryptocurrency.

Plaintiffs in fact show that Mr. Zhao was *not* a transferee. They allege he was merely a "nominal counterparty" in the transfer of BUSD from Alameda LTD to Binance. Compl. ¶¶ 82, 43. A "nominal" party is a party "in name or form only." *See* Nominal, Merriam-Webster Online.[4] And Mr. Zhao was indeed merely a nominal signatory, not the receiver of the property. The receiver of the BUSD, per the Complaint, was "one or more Binance entities," not Mr. Zhao. Compl. ¶ 43. The Complaint could not be clearer: the transfers went "to Binance." Compl. ¶ 45. Accordingly, Mr. Zhao was not a transferee, even if he had some role in directing the transaction. See *Matter of Walldesign, Inc.*, 872 F.3d 954, 965 (9th Cir. 2017) ("a corporate principal … who effects a transfer of company funds in his or her representative capacity does not have dominion over those funds in his or her personal capacity"); *accord Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996).

Mr. Zhao is also not an "entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). Plaintiffs have failed to show that (1) the property was actually received by Mr. Zhao, (2) it was quantifiable, or (3) accessible to Mr. Zhao. *In re Green Field Energy Servs., Inc.*, 594 B.R. 239, 287–88 (Bankr. D. Del. 2018). The Complaint alleges neither that Mr. Zhao had access to the transfers nor that the money flowed to him. Even if he stood to benefit indirectly as a shareholder, that is insufficient. *See In re Int'l Mgmt. Assoc.*, 399 F.3d 1288, 1293 (11th Cir. 2005). Rather, there must be a "quantifiable benefit or one bearing the necessary correspondence to the value of the property transferred or received." *Id*. Plaintiffs have not alleged that Mr. Zhao was a

---

[4] https://www.merriam-webster.com/dictionary/nominal.

"guarantor of a debtor" or a "debtor of the initial transferee." *In re The Brown Sch.*, 386 B.R. 37, 53 (Bankr. D. Del. 2008) (collecting Circuit cases adopting the guarantor-or-debtor requirement).

###### D.    Actual Fraudulent Intent Is Not Adequately Shown in the Allegations

Plaintiffs' third and fourth claims require well-pleaded allegations of "actual intent to hinder, delay, or defraud" creditors.  11 U.S.C. § 548(a)(1)(A). These claims are subject to "the elevated pleading standards of Federal Rule of Civil Procedure 9(b)." *In re Cred Inc.*, 650 B.R. 803, 834 (Bankr. D. Del. 2023); *see also* Fed. R. Bankr. P. 7009. But the Complaint supplies no plausible basis to suspect that the transfer Plaintiffs seek to invalidate was anything but what it appeared to be—a business divorce. Messrs. Zhao and Bankman-Fried could not work together, so the Binance Defendants returned the shares in exchange for cryptocurrency. That is not a scheme to defraud creditors.[5]

"The modern law of fraudulent transfers had its origin" in the Elizabethan era, when courts began evaluating allegations of intent to frustrate creditor recovery efforts through "'badges of fraud': proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration)." *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 540 (1994). In the absence of the debtor's direct admission of intent to keep assets from creditors, courts still look to "badges of fraud," including "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction." *In re FTX Trading Ltd.*, 2024 WL 4562675, at *7 (Bankr. D. Del. Oct. 23, 2024). Courts consistently find no basis for allegations of

---

[5] The Complaint does not allege fraudulent intent against Mr. Zhao or anyone but Mr. Bankman-Fried.

fraudulent intent for bona fide business transactions. *See In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 162 (2d Cir. 2021); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 550–51 (D. Del. 2005), *aff'd on other grounds*, 278 F. App'x 125 (3d Cir. 2008); *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545–46 (Bankr. D. Del. 2009); *In re Zambrano Corp.*, 478 B.R. 670, 693–94 (Bankr. W.D. Pa. 2012).

Here, the Complaint supplies no basis to suspect the buyout was anything other than a bona fide effort to separate persons who could not continue business together. The badges do not support Plaintiffs' claims for the simple reason that they cannot explain why Mr. Bankman-Fried would prefer his avowed antagonists (Mr. Zhao and the Binance Defendants) over his customers. He was not incentivized to overpay the Binance Defendants or do anything but the bare minimum to be rid of them. The first badge of fraud, relationship of debtor and transfer, cuts against a finding of fraud, as does the fifth—this was obviously not a transfer to insiders designed to keep Mr. Bankman-Fried's property with him. As explained below (§ III(E)(2)), the Complaint provides no basis to believe the value of the transaction was unfair or that FTX was insolvent, so the second and third badges undercut Plaintiffs' claim. The sixth badge (secrecy) also cuts against a finding of fraudulent intent, as the transfer itself was highly publicized.[6] *See* Compl. ¶ 5. So does the fourth, as the Complaint does not, and could not, plead that substantially all FTX's assets were transferred. Finally, the transfer occurred in July 2021, long before Mr. Sam Bankman-Fried's fraud and other misdeeds and long before anyone at FTX envisioned creditor claims. Indeed, FTX continued to pick up *new* sources of funding at this time. Compl. ¶ 50. This case, in sum, is a misfit for a finding of fraudulent intent.

---

[6] That Mr. Bankman-Fried misled the public about the source of funds for the transaction does not change the fact that the transaction itself was highly publicized. Compl. ¶ 5.

**E.    The Constructive Fraudulent Transfer Claims Are Unavailable and Inadequately Pleaded**

Plaintiffs' first and second claim for relief for constructive fraudulent transfer are legally unavailable under the securities safe harbor and inadequately stated.

**1.    The Claims Are Legally Unavailable**

Section 546(e) prohibits plaintiffs from avoiding certain transfers, including as relevant here any transfer (i) by a "financial participant" (ii) made "in connection with a securities contract." 11 U.S.C. § 546(e) (the "Safe Harbor").  Once the relevant transfer is identified, *see Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 370 (2018), the safe harbor applies when "(1) there is a qualifying transaction" and "(2) there is a qualifying participant," *In re Quorum Health Corp.*, 2023 WL 2552399, at *5 (Bankr. D. Del. Mar. 16, 2023).

Here, Plaintiffs seek avoidance of eight transfers where Alameda is the "transferor" and Binance is the "transferee." *See* Compl. ¶ 82 (listing relevant transfers and specifically defining these transfers as the "2021 Fraudulent Transfers"). Plaintiffs contend that what they define as the "2021 Fraudulent Transfers" are constructively fraudulent transfers and thus Plaintiffs "are entitled to avoid and recover each of the 2021 Fraudulent Transfers under sections 548 and 550 of the Bankruptcy Code." Compl. ¶¶ 88, 101 (similar for Count II). The safe harbor applies to the first two claims. Both should be dismissed.

First, the transfers Plaintiffs seek to avoid are all "qualifying transactions," which include a transfer payment "made in connection with a securities contract." 11 U.S.C. 546(e). The Bankruptcy Code broadly defines a "securities contract" as any "contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein," along with "any other agreement or transaction that is similar to" such an agreement.  11 U.S.C. § 741(7);

16

*Bernard L. Madoff Inv. Sec. LLC v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 417 (2d Cir. 2014) (noting that "securities contract" is defined with "extraordinary breadth"). Plaintiffs cannot dispute that the transfers were made in connection with a securities contract because they allege that the transfers were made "in connection with the 2021 Share Repurchase," Compl. ¶ 82, and Plaintiffs define "2021 Share Repurchase" as the purchase of "WRS shares held by Binance and the Binance executives," Compl. ¶ 38.

Second, Alameda is a "qualifying participant." As relevant here, a qualifying participant includes a "financial participant" as defined in 11 U.S.C. § 101 (22A)(A), to include an entity with "gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition." As of the Petition date, Alameda held more than six times the threshold amount, which is evident from public filings, *see* Statements & Schedules Summary at 17, *In re FTX Trading Ltd.*, No. 22-11068 (Bankr. D. Del. Mar. 17, 2023) (D.I. 1101-1), and the Court can take judicial notice of those filings, *Charys Liquidating Trust* v. *Hades Advisors, LLC (In re Charys Holding Co., Inc.)*, 2010 WL 2788152, at *8 n.3 (Bankr. D. Del. July 14, 2010). The constructive fraudulent transfer claims are barred.

### 2.    The Claims Are Inadequately Pleaded

The constructive fraudulent transfer claims are, besides, not supported by well-pleaded allegations. A constructive fraud claim requires well-pleaded allegations that "the debtor received less than reasonably equivalent value in exchange of the transfers" and "was insolvent on the date that the transfers were made or became insolvent as a result of the transfers." 11 U.S.C. § 548(a)(1)(B). The Complaint supports no fair inference on these points.

There is, first, no reason to believe Alameda received anything lower than "roughly the value it gave." *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007). The FTX family of entities (and Mr. Bankman-Fried) had no incentive to pay anyone associated with the Binance Defendants a penny more than absolutely necessary to get them out the door. The Complaint does not show otherwise. Instead, it draws a false comparison between the alleged value of the cryptocurrency and the value of the shares measured by FTX Trading's supposed "balance-sheet" insolvency, representing "no equity value." Compl. ¶¶ 39 42. That makes no sense when Mr. Bankman-Fried's fraud was not then known to the world; the shares would have traded well above zero. The assessment is not made in "hindsight." *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003). Further, even if the consideration exceeded the going value of the shares, that phenomenon is typical in "forced-sale" cases where the stress dynamics of the sale create a "forced-sale value" differing perhaps markedly from fair-market value. *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537 (1994). Absent collusion—which did not occur here—the price arrived at in arms-length dealing is presumptively the fair value, even if it results from uneven bargaining positions. *See id.* at 545–46.

There is, second, no grounds to assume FTX was already insolvent 16 months before its failure where the Complaint provides many bases to conclude otherwise. Compl. ¶¶ 7, 33, 50; *see* Adv. D.I. 67 at 18.

## IV.   The Claims Predicated on Social Media Posts and Letter of Intent Fail on Numerous Grounds

The sixth through ninth causes of action related to a separate series of events in November 2022, when Sam Bankman-Fried's fraud caught up with him. Compl. ¶¶ 55–79. The Complaint alleges that a November 2 CoinDesk article disclosed "that Alameda's assets were made up largely of" FTX's exchange token (FTT), which "was designed in such a way that it derived its total value

18

from FTX's enterprise value." *Id.* ¶¶ 33, 55. This publication—which was true—raised "serious concerns about both Alameda's and FTX Trading's financial condition." *Id.* ¶ 56. On November 6, Mr. Zhao stated on Twitter that "Binance received roughly $2.6 billion USD equivalent in cash (BUSD and FTT)" in the 2021 buyout (*see supra* § I) and that "we have decided to liquidate any remaining FTT on our books," due to "recent revelations." *Id.* ¶ 56. These statements were true. *See id.* ¶ 58. The Complaint, however, criticizes Mr. Zhao for stating this was "not" "a move against a competitor," *id.* ¶ 56, and alleges that Mr. Zhao did intend to harm FTX, *id.* ¶¶ 57–58. The Complaint alleges that a "run on the bank at FTX" followed, as customers rushed to withdraw their funds. *Id.* ¶¶ 62–64. FTX did not have the capital to pay its own customers. *Id.* ¶ 64.

At that point, Mr. Zhao briefly considered purchasing FTX. *Id.* ¶¶ 65–79. "Bankman-Fried called Zhao" on November 8, explaining "that FTX would soon find itself unable to satisfy customer withdrawal requests, in part because Alameda had been borrowing large amounts from FTX.com customer deposits." *Id.* ¶ 65. Mr. Bankman-Fried requested emergency financing from Mr. Zhao. *Id.* ¶ 65. Mr. Zhao ultimately made a "rough proposal" that Binance would "cover all user asset shortage," and a letter of intent was executed providing that, "subject to due diligence," "Binance would acquire FTX" and "address FTX's liquidity issues." *Id.* ¶ 67. Mr. Zhao described the deal in social-medial posts. *Id.* ¶ 68. However, on November 9, Mr. Zhao returned to social media announcing that Binance "was backing out 'as a result of corporate due diligence.'" *Id.* ¶ 70. The Complaint summarily announces that Mr. Zhao "never intended to consummate the contemplated acquisition," that FTX forewent alternative financing opportunities, and that FTX "experienced a significant increase in gross and net withdrawals." *Id.* ¶¶ 73, 75. FTX collapsed.

Based on these events, Plaintiffs present claims for injurious falsehood, duplicative fraud and intentional misrepresentation counts, and an unjust enrichment action. *Id.* ¶¶ 125–44. As an

initial matter, these claims do not belong in bankruptcy court for reasons the BHL Defendants have explained. *See* Adv. D.I. 67 at 23–24. Moreover, the Complaint supplies no basis to believe Delaware law, or the law of any state, apply. As shown above, these international events require a threshold choice-of-law inquiry. *Corning*, 292 F. Supp. 2d at 584. The only well-articulated injury to FTX flowing from the social-medial posts and letter of intent is that the Securities Commission of The Bahamas tried to wind up FTX DM, the entity holding the license to operate the exchange. Compl. ¶¶ 8, 77; *see also id.* ¶ 112 (restating this as the injury from "injurious falsehood"). Accordingly, the first factor (place of injury) and the second (place of incorporation) favor the law of The Bahamas. The remaining factors cannot be discerned from the Complaint, leaving all well-pleaded facts in favor of the law of The Bahamas, not Delaware. *See Folk*, 239 A.2d at 240. In all events, Plaintiffs claims lack merit under Delaware law.[7]

### A. No Injurious Falsehood Claim Exists, and No Claim Could Lie Against Mr. Zhao's Concededly True Statements (Sixth Claim)

#### 1. No Injurious Falsehood Claim Exists

Even if Delaware law somehow applied, it is not properly read to provide a claim for injurious falsehood. "It is not the function of federal courts to expand state tort doctrine in novel directions absent state authority suggesting the propriety of doing so." *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1154 (11th Cir. 2011) (declining to assume the Georgia Supreme Court would recognize a claim for "injurious falsehood"). The Delaware Supreme Court has never recognized the tort of injurious falsehood. Two Delaware trial court rulings assumed that such a claim exists, but the point was uncontested in one of them. *See In re Nat'l Collegiate Student Loan Trusts Litig.*, 2020 WL 3960334, at *4 (Del. Ch. July 13, 2020) ("The parties agree" on standards

---

[7] The Binance Defendants have fulsomely demonstrated that these claims are barred by the doctrine of *in pari delicto*, and those arguments are not repeated here. *See* Adv. D.I. 67 at 28–29.

for "a viable injurious falsehood claim"). The other assumed the Delaware Supreme Court would necessarily follow the Second Restatement of Torts, which identifies injurious falsehood as a tort, merely because it has cited other Restatement provisions favorably on occasion. *See Ramada Inns, Inc. v. Dow Jones & Co.*, 543 A.2d 313, 328 (Del. Super. 1987). The "decisional law of lower state courts" is "not conclusive" in guiding federal courts' prediction of state law, *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000), and the rulings available here say too little to be of persuasive value. In all events, this Court "must predict how the state's highest court would decide" to create such a right of action. *In re The Brown Sch.*, 368 B.R. 394, 414 (Bankr. D. Del. 2007).

There is no reason to guess the Delaware Supreme Court would recognize an injurious falsehood tort. Federal courts should be reluctant to act ahead of state courts of highest resort in fashioning state-law claims. *See Leo v. Kerr-McGee Chem. Corp.*, 37 F.3d 96, 101 (3d Cir. 1994) ("Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law."); *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002) (similar). There are enhanced reasons for reluctance where the law of injurious falsehood "is far from uniform among the states." *Carolina Indus. Prods., Inc. v. Learjet, Inc.*, 189 F. Supp. 2d 1147, 1167 (D. Kan. 2001). The development of injurious falsehood "may have so loosened the tort's historic roots that it is now confused with pre-existing torts for which it is not an alternative." *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1087 (W.D. Ky. 1995).

One quandary is that injurious falsehood is "closely related" to defamation, begging the question why another speech-based tort is necessary. *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155 (D.C. Cir. 1985). Another quandary is that its "scope" is amorphous and subject to different constructions. W. Page Keeton et al., *Prosser and Keeton on Torts*, § 128, p.963 (5th

21

ed. 1984). For example, it can be construed "as 'disparagement of property,' 'slander of goods,' and 'trade libel,'" *Art Metal-U.S.A.*, 753 F.2d at 1155 n.6, as where the defendant is alleged to have made false statements "concerning plaintiff's property or product." *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1140 (3d Cir. 1977) (New Jersey law of product disparagement). But Plaintiffs do not wield the tort in that manner, *see infra* § IV(A)(3). Yet another difficulty is determining what statute of limitations would apply to the new claim, *see infra* § IV(A)(2). Federal courts have repeatedly declined to assume a state injurious-false claim into existence without prior ratification by the state's highest court. *See Douglas Asphalt*, 657 F.3d at 1154; *CMI*, 918 F. Supp. at 1087; *Carolina Indus.*, 189 F. Supp. 2d at 1167. This Court should follow suit.

### 2.    The Injurious Falsehood Claim Is Barred by the Statute of Limitations

Even if the injurious falsehood claim were cognizable and properly pleaded, it would be time-barred. As a "defamation-related" claim, see *Ramada Inns, Inc. v. Dow Jones & Co.*, 543 A.2d 313, 328 (Del. Super. 1987), the claim implicates the statute of limitations governing defamation claims, which provides a two-year limitations period. *Smith v. Delaware State Univ.*, 47 A.3d 472, 480 (Del. 2012) (citing 10 *Del. C.* § 8119). The Complaint alleges injury based on publications on November 6, 8, and 9, 2022, as well as the November 8, 2022, letter of intent. The "run on the bank" occurred "[o]n November 6 and November 7, 2022," which "led to withdrawals being halted on the FTX.com exchange on November 8, 2022." Compl. ¶ 75. And "[w]ithin hours of the November 6 False Tweets … withdrawal rate skyrocketed to unmanageable levels." *Id.* ¶ 76. Thus the action accrued no later than November 8, 2022. This action, filed November 10, 2024, comes too late.

### 3.   Injurious Falsehood Is Not Pleaded Under Any Cognizable Standard

Plaintiffs' injurious falsehood claim is, in any event, incoherent. The traditional test, rooted in product disparagement, requires "(1) publication (2) with malice (3) of false allegations concerning plaintiff's property or product (4) causing special damages, i.e., pecuniary harm." *Sys. Operations*, 555 F.2d at 1140 (New Jersey law); *see* Restatement (Second) of Torts § 623A cmt. a (1977) (explaining that cause of action lies "chiefly in cases of the disparagement of property in land, chattels or intangible things or of their quality").

The Complaint alleges no false statement concerning Plaintiffs' product or property. Its only alleged publications concerning FTX's property are Mr. Zhao's assertions that "Binance received roughly $2.1 billion USD equivalent in cash (BUSD and FTT)" and that "we have decided to liquidate any remaining FTT on our books." Compl. ¶ 56. Both statements were true. *Id.* ¶¶ 55–57. Even if disparagement could be inferred from Mr. Zhao's posts(Compl. ¶ 56), this also would be true: the Complaint admits that "Alameda's assets were made up largely of FTT, raising serious concerns about both Alameda's and FTX Trading's financial condition." *Id.* ¶ 55. More generally still, FTX was a *fraudulent enterprise*. It is hard to see how any amount of disparagement could be false. Had Mr. Zhao broadcast that FTX was plagued by "many material errors," including "Bankman-Fried's pervasive malfeasance," he would have been anticipating the Complaint. Compl. ¶ 1. FTX could not give customers their own money because "Alameda has been borrowing large amounts from FTX.com customer deposits." *Id.* ¶ 65. It takes pluck for a failed fraudulent enterprise to bring a derivation of product-disparagement claim seeking recompense for harm to its *reputation*.

Plaintiffs repurpose the concept of falsehood with startling breadth, claiming that Mr. Zhao's supposed misrepresentation of his *motive* for telling the *truth* is actionable. *See id.* ¶ 57. That is nonsensical in the extreme. For one thing, motive is irrelevant to injurious falsehood claims.

*McClanahan v. Anti-Defamation League*, 2023 WL 8704258, at *4 (W.D. Mo. Dec. 15, 2023) ("[I]t does not matter whether a statement was made in bad faith, so long as it was true."); Restatement (Second) of Torts § 581A cmt. a (1977) ("There can be no recovery in defamation for a statement of fact that is true, although the statement is made for no good purpose and is inspired by ill will toward the person about whom it is published and is made solely for the purpose of harming him."); *see also Ramada Inns, Inc. v. Dow Jones & Co.*, 543 A.2d 313, 328 (Del. Super. Ct. 1987) (applying same false statement standards under the Restatement for "defamation-related" torts of injurious falsehood and defamation). To repurpose the falsity element as going to motive would mangle the tort beyond recognition.

For another thing, the injurious falsehood test cannot fairly be separated from its basis in false statements *about the plaintiff*, such as "aspersions upon the [plaintiff's] title to property, or its quality," or else "the plaintiff's business by reflecting on its existence or character, the manner in which it conducted, its employees, or its customers, or its popularity or danger." W. Page Keeton, *supra*, § 128, pp. 965–66 (internal footnotes omitted); Restatement § 623A cmt. a; *Sys. Operations*, 555 F.2d at 1140 (explaining that New Jersey's test, cited above, "is substantially identical to the cause of action for product disparagement described by" the Restatement). Plaintiffs' strange theory of this tort—creating liability for supposedly false statements by the defendant about the defendant's own motive for truth-telling—would confer liability on a whistleblower who exposes a Ponzi scheme but states his motive for doing so is the common good when he secretly hopes for a monetary reward and fame. How could that be right? And how could any court figure out his actual motive?

Even on Plaintiffs' own terms, the false statements do not support the injurious falsehood claim; a statement is false if it does not produce "the same effect on the mind of the recipient which

24

the precise truth would have produced." *Page v. Oath Inc.*, 270 A.3d 833, 844 (Del. 2022) (defamation standard). Applying that rule here, if Mr. Zhao had disclosed the supposed "truth" that his motive was to "destroy FTX" by liquidating the FTT and had tweeted that his desire was to "maximize market impact" and help Binance's market position, that would have made no difference. The "run on the bank" would have followed all the same. The Complaint alleges that it was the fact of the publicizing of the liquidation that "trigger[ed]" the run on the bank. *See* Compl. ¶ 131. As noted, the fact of the liquidation was true. For the same reasons, causation and damages are not alleged either. *See infra* § IV(B)(2) (causation analysis for fraud claims).

## B. The Fraud Claims Erroneously Blame Mr. Zhao for Plaintiffs' Own Fraud (Seventh and Eighth Claims)

Plaintiffs' fraud claims flip the doctrine on its head. They admit *they* defrauded *their* customers—they "concealed, and at times actively misrepresented, material facts about their business." Compl. ¶ 45(iii). When Mr. Zhao announced that his companies would liquidate their remaining FTT, FTX's fraudulent enterprise imploded, as it would have sooner or later. *Id.* ¶¶ 57–59. Plaintiffs claim that, because of Mr. Zhao's truthful statements, they were prevented from carrying on their fraudulent enterprise—and likely extending their fraud—for a longer period of time. In fact, the Complaint alleges that new creditors were being swept in by fraud. Compl. ¶ 50. But Plaintiffs had no interest in more fraud and cannot plausibly claim such an interest as the basis of fraud claims against Mr. Zhao. The fraud claims fail in every way.[8]

---

[8] Because the fraud and intentional misrepresentation claims feature the same elements, *see Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987), the Court may analyze (and dismiss) them together. *See, e.g.*, *Johnson v. Preferred Pro. Ins. Co.*, 91 A.3d 994, 1017 (Del. Super. 2014) (applying the same analysis to both claims because "it would appear that common law fraud and intentional misrepresentation are essentially the same things.").

### 1.    Fraud Theory Based on Social-Media Posts

Plaintiffs' principal fraud theory is that "Mr. Zhao made the Binance False Statements with the intent to induce FTX's customers to withdraw their deposits in order to harm FTX." *Id.* ¶ 135. The theory has no legal foundation.

The elements of fraud and intentional misrepresentation are: (1) "[d]eliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak," (2) "scienter," (3) "intent to induce plaintiff's reliance upon the concealment," (4) "[c]ausation," and (5) "[d]amages resulting from the concealment." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987). Under Rule 9(b), fraud must be pleaded with particularity. *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *10 (Del. Ch. June 6, 2018). Here, the clearest failing is under the third element—intent to induce the *plaintiff's* reliance on a falsehood. The Complaint alleges Mr. Zhao's intent to induce "*customers*" to withdraw their funds. *Id.* ¶ 135 (emphasis added). To be sure, common law fraud is not limited to "misrepresentations made directly from one party to another," but it does require that "the persons or class of persons whom" the defendant "intends or has reason to expect to act or to refrain from action" be those suing for "pecuniary loss." *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 29 (Del. Ch. 2009). The customers here are not suing for pecuniary loss; to the contrary, the Complaint alleges that Mr. Zhao induced them to act in their own self-interest by doing what any rational FTX customer would do—withdraw funds. Compl. ¶ 135. Plaintiffs allege that *they* were injured by their own customers' rational choices, but that does not mean Mr. Zhao induced *Plaintiffs* to take action detrimental to themselves.  It means Plaintiffs should not have defrauded their own customers.

The fraud claims fail under the remaining elements. As explained, Mr. Zhao made no false statement of fact, let alone material fact: it was true that "Binance received roughly $2.1 billion USD equivalent in cash (BUSD and FTT)" and that Binance "decided to liquidate any remaining

26

FTT on [its] books." Compl. ¶ 56. The "recent revelations" were also true. *Id.* Representations regarding motive are neither fact-based nor material. No factfinder could sort among Mr. Zhao's motives, and a different statement of motive would have made no difference. Had Mr. Zhao announced liquidation of FTT for the avowed purpose of "demolishing FTX as fast as humanly possible," withdrawals would have occurred even more rapidly than they did.[9] In any event, a concededly fraudulent enterprise was destined to fail sooner or later, so Plaintiffs cannot blame Mr. Zhao for their own failings. That defeats Plaintiffs' claims on the falsehood, scienter, and causation elements.

### 2.    The Fraud Theory Based on Letter of Intent

Plaintiffs also propose that Mr. Zhao committed fraud by entering the letter of intent without a genuine interest in buying the FTX entities. But the crucial component of this claim, "that Zhao and Binance never intended to consummate the contemplated acquisition," Comp. ¶ 73, is a conclusory assertion that does not satisfy the default pleading test of Rule 8, much less the heightened Rule 9(b) standard.

The law demands that Plaintiffs "nudge[] their claims across the line from conceivable to plausible" with "allegations plausibly suggesting (not merely consistent with)" their theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see In re Amp'd Mobile, Inc.*, 404 B.R. 118, 122 (Bankr. D. Del. 2009). But Plaintiffs acknowledge the letter of intent was contingent on "due diligence," and that Mr. Zhao backed out "as a result of corporate due diligence." Compl. ¶¶ 67, 70. Where the Complaint prominently declares "pervasive fraud that infected virtually all aspects

---

[9] Paragraph 62 is implausible in stating that the "market" would have behaved differently had it "been aware that Zhao's true intention was to harm FTX." Knowing that a major market player is actively trying to destroy a company where one's money is invested creates a keen incentive to withdraw now. Moreover, the market would have all the reasons to doubt Mr. Zhao's statements about his intent (true or not) that the Complaint infers at paragraph 57, so it is fanciful to think it made a difference one way or the other.

of FTX's business" (*id.* ¶ 6), the due-diligence explanation is as obvious as it gets. And the timing

of Mr. Zhao's actions bears it out. The letter of intent was executed November 8, and Mr. Zhao

backed out at 3:00pm on November 9. *Id.* ¶¶ 68–70. Someone intent on preventing FTX from

seeking alternative financing would have run the clock out longer. By comparison, Mr. Bankman-

Fried's fraud was so pervasive that the Binance Defendants' due-diligence team must have found

it immediately. And there was no need for Mr. Zhao to propose intervention at all to bring down a

company collapsing under its own weight; Bahamian authorities swooped in just two days later.[10]

*id.* ¶ 77. The allegation that Mr. Zhao entered the letter of intent without actual intent to honor its

terms has nothing by way of factual support; all allegations point the other way. The letter of intent

provided that, "subject to due diligence," "Binance would acquire FTX" and "address FTX's

liquidity issues." *Id.* ¶ 67. The letter of intent therefore provided an option—but *not* an obligation—

for Binance to consider acquiring FTX. There is no requirement per the letter of intent about the

form, depth, or length of such due diligence before Binance could decide whether or not to acquire

FTX. Hence, Mr. Zhao's actually "honor[ed]" the letter of intent, and in accordance with that letter

of intent he did not go through with the transaction based on the conducted due diligence. That

also defeats the first three elements of fraud (falsehood, scienter, and intent to induce). *Nicolet*,

525 A.2d at 149. And to be sure, "'mere fact that a party did not follow through on its promise is

not sufficient to state a claim for fraudulent inducement.'" *Cercacor Lab'ys, Inc. v. Metronom*

*Health, Inc.*, 2025 WL 1180186, at *9 (Del. Super. Apr. 23, 2025) (citation omitted).

---

[10] It is strange for the Complaint to fault Mr. Zhao for the implicit suggestion "that Binance had seen something in the due diligence regarding FTX's financials that was even worse than what the public had already believed." Compl. ¶ 131. Even if such a representation were somehow implicit, it would have been plainly true.

The final two elements—causation and damages—are equally unsupportable. The theory that Mr. Zhao's actions "prevent[ed] FTX from seeking alternative financing" is fanciful. Compl. ¶ 131. Mr. Bankman-Fried reached out to his own avowed enemy (Mr. Zhao) at 1:00am for the transparent reason that a buyout by the Binance Defendants was FTX's last, best hope. *See id.* ¶ 65. There is no basis to assume that, where a relatively new cryptocurrency giant would not purchase FTX, a traditional source of funding would come to the aid of a novel cryptocurrency company marinating in its own fraud. The Complaint does not even attempt to say where alternative financing might have come from, and it seems unimaginable to believe FTX could have obtained new creditors without defrauding them. Simply put, Plaintiffs' causation theory is that Mr. Zhao's actions prevented them from carrying on, and adding to, their own fraud. The Court can safely disregard this perspective.

### C.  The Unjust Enrichment Claim Fails Because It Is not Unjust for a Fraudulent Enterprise to Fail (Ninth Claim)

Plaintiffs' unjust enrichment claim describes what is supposed to happen in free societies. FTX failed because it was permeated with fraud, and some of its customers shifted to the Binance Defendants. *See* Compl. ¶¶ 141–44. If Plaintiffs wanted to avoid that outcome, they should have run an honest business. The proposal that Defendants owe FTX money because of free and rational choices of FTX's injured customers is baffling.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988). Plaintiffs' claim is deficient on all points, and that may be the easiest to see for the latter ones. There is no "fundamental principle[] of justice" that a fraudulent enterprise should maintain its customers, or continue in business at all, and nothing in "equity and good conscience" supports a court order

29

requiring payment to that fraudulent enterprise by the business its customers chose as an alternative. Even if Mr. Zhao's social media posts contributed to the timing of the FTX downfall, FTX had no right to exist and certainly no right to persist in fraud indefinitely. To hold Mr. Zhao liable for FTX's implosion would be no different than holding a whistleblower liable for the Ponzi scheme she exposed, on the theory that her exposure caused "the proverbial run on the bank." Compl. ¶ 7. That notion is itself unjust.

In any event, the cause of action requires a "relation" between the benefit to the defendant and loss to the plaintiff, *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 345 (Del. Ch. 2022); *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59–60 (Del. Ch. 2012), in the sense that "the plaintiff acted for the defendant's benefit" but received no recompense. *Wells Fargo Bank, N.A. v. Est. of Malkin*, 278 A.3d 53, 70 (Del. 2022). But Plaintiffs did nothing to confer a benefit on Mr. Zhao that he unjustifiably retained. Even if Mr. Zhao's actions affected the timing of FTX's failure, there is no cognizable connection between his actions and the free choice of customers to leave FTX and do business with the Binance Defendants. "Receipt of a benefit as the incidental result of someone else's activities is not enough to require restitution." *Creditors' Committee of Essex Builders, Inc. v. Farmers Bank*, 251 A.2d 546, 549 (Del. 1969). That is—at most—all the Complaint alleges.

## CONCLUSION

For the foregoing reasons, all claims against Mr. Zhao should be dismissed with prejudice.

30

Dated: August 4, 2025

BAKER & HOSTETLER LLP

*/s/ Jeffrey J. Lyons*
Jeffrey J. Lyons (#6437)
1201 N. Market Street, Suite 1407
Wilmington, DE 19801
(302) 407-4222
jjlyons@bakerlaw.com

Teresa Goody Guillén (admitted *pro hac vice*)
Katherine L. McKnight (admitted *pro hac vice*)
1050 Connecticut Ave., NW, S-1100
Washington, D.C. 20036
Cleveland, OH 44114
(202) 861-1630
tgoodyguillen@bakerlaw.com
kmcknight@bakerlaw.com

*Attorneys for Defendant Changpeng Zhao*