## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, FTX DIGITAL MARKETS, LTD. | Adv. Pro. No. 24-50222 (KBO) |
| Plaintiffs, | |
| v. | **Re: Adv. D.I. 1** |
| BINANCE HOLDINGS LIMITED., BINANCE CAPITAL MANAGEMENT CO. LTD, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, CHANGPENG ZHAO, DINGHUA XIAO, SAMUEL WENJUN LIM, and DOES 1-1000 | |
| Defendants. | |

### PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION OF THE BINANCE DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

Dated: August 7, 2025

**RICHARDS, LAYTON & FINGER, P.A**.
Kevin Gross (No. 209)
Paul N. Heath (No. 3704)
Brendan J. Schlauch (No. 6115)
Robert C. Maddox (No. 5356)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of reorganized debtor entities (the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), a complete list of the Reorganized Debtors' last four digits of their federal tax identification numbers is not provided herein, but may be obtained on the website of the Reorganized Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Facsimile: (302) 651-7701
gross@rlf.com
heath@rlf.com
schlauch@rlf.com
maddox@rlf.com

-and-

**WHITE & CASE LLP**
J. Christopher Shore (admitted pro hac vice)
Brian D. Pfeiffer (admitted pro hac vice)
Colin West (admitted *pro hac vice*)
Ashley R. Chase (admitted pro hac vice)
Brett L. Bakemeyer (admitted pro hac vice)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
cshore@whitecase.com
brian.pfeiffer@whitecase.com
cwest@whitecase.com
ashley.chase@whitecase.com
brett.bakemeyer@whitecase.com

*Attorneys for Plaintiffs*

RLF1 33536498v.1

# TABLE OF CONTENTS

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING......................1

PRELIMINARY STATEMENT .......................................................................1

BACKGROUND AND SUMMARY OF ARGUMENT ...................................................4

ARGUMENT ...............................................................................................6

I.  THIS COURT HAS PERSONAL JURISDICTION OVER EACH OF THE
    BINANCE DEFENDANTS.......................................................................7

    A.  Relevant Standards.......................................................................7
    B.  The Traditional Test Is Satisfied Here.......................................10
    C.  The Effects Test Is Also Satisfied..............................................27
    D.  If This Court Finds That Plaintiffs Have Not Made A *Prima Facie*
        Showing Of Personal Jurisdiction, Plaintiffs Are Entitled To
        Jurisdictional Discovery...............................................................28

II. THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE
    PREDATORY ACTS CLAIMS ...............................................................29

    A.  The Predatory Acts Claims are Estate Claims and Therefore "Arise In"
        a Case Under Title 11. .................................................................29
    B.  The Predatory Acts Claims are "Related to" the Chapter 11 Cases. .........32
    C.  This Court Should Not Abstain from Hearing the Predatory
        Acts Claims.................................................................................36

III. THE FRAUDULENT CONVEYANCE CLAIMS ARE NOT ARBITRABLE ...38

    A.  Fraudulent Conveyance Claims Are Not Derivative of the Debtor...........39
    B.  Alternatively, This Court Should Exercise Discretion to Deny
        the Motion to Compel. .................................................................42

IV. THE COMPLAINT ADEQUATELY PLEADS the 2021 FRAUDULENT
    TRANSFERS UNDER FEDERAL AND STATE LAW ......................................44

    A.  Plaintiffs Have Adequately Pled a Claim for Constructive Fraudulent
        Transfer (Counts I and II). ...........................................................45
    B.  Plaintiffs Have Adequately Pled a Claim for Actual Fraudulent
        Transfer (Counts III and IV). .......................................................50

V.  THE COMPLAINT ADEQUATELY PLEADS the Predatory Acts Claims ........57

    A.  Plaintiffs Are Permitted to Collectively Reference the Binance
        Defendants. .................................................................................58
    B.  Plaintiffs Have Plausibly Alleged That the Tweets Were False or
        Misleading....................................................................................61
    C.  Plaintiffs Have Adequately Pled a Claim for Injurious Falsehood
        (Count VI)....................................................................................65
    D.  Plaintiffs Have Adequately Pled a Claim for Fraud (Count VII) and
        Intentional Misrepresentation (Count VIII)..................................68
    E.  Plaintiffs Have Adequately Pled a Claim for Unjust Enrichment

(Count IX)...............................................................................................73

VI.   THE BINANCE DEFENDANTS PURPORTED AFFIRMATIVE
      DEFENSES ARE NOT APPROPRIATE GROUNDS FOR DISMISSAL
      AT THIS STAGE. ...............................................................................................75

      A.   The Fraudulent Conveyance Claims Are Not Barred by the
           Safe Harbor Defense...................................................................................75
      B.   The Predatory Acts Claims Are Not Barred by the Doctrine of
           *In Pari Delicto*. .......................................................................................77

VII.  ALTERNATIVELY, ANY DISMISSAL SHOULD BE
      WITHOUT PREJUDICE....................................................................…..80

RLF1 33536498v.1

# TABLE OF AUTHORITIES

Page(s)

## CASES

*875 I.B.T. Pension Fund v. Pollack*,
  992 F. Supp. 545 (E.D.N.Y. 1998) ...................................................................... 20

*Activision Publ'g, Inc. v. EngineOwning UG*,
  2023 WL 3272399 (C.D. Cal. Apr. 4, 2023) ...................................................... 23

*Alameda Rsch. Ltd. v. Platform Life Scis. Inc.*,
  2023 WL 8814216 (Bankr. D. Del. Dec. 20, 2023) .............................................. 8

*Aoki v. Benihana Inc.*,
  839 F. Supp. 2d 759 (D. Del. 2012) .................................................................... 62

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 67

*AstroPower Liquidating Tr. v. KPMG LLP*,
  2007 WL 1549048 (D. Del. May 25, 2007) ........................................................ 79

*Baldonado v. Avrinmeritor, Inc.*,
  2014 U.S. Dist. LEXIS 69231 (D. Del. May 20, 2014) ...................................... 68

*Bauxites de Guinee v. L'Union Atlantique S.A.*,
  723 F.2d 357 (3d Cir. 1983) ............................................................................... 29

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 67

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013) ............................................................................... 78

*Bench Walk Lighting LLC v. LG Innotek Co.*,
  530 F. Supp. 3d 468 (D. Del. 2021) .................................................................... 58

*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006) ............................................................................... 10

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................................................ 25

v

*Burns v. Ferro*,
  1991 Del. Super. LEXIS 99 (Del. Super. Mar. 28, 1991)....................................79

*Calder v. Jones*,
  465 U.S. 783 (1984)..........................................................................................9

*Carteret Sav. Bank, FA v. Shushan*,
  954 F.2d 141 (3d Cir. 1992)..............................................................................25

*Commodity Futures Trading Comm'n v. Zhao*,
  2023 No. 1:23-cv-01887 (N.D. Ill. 2023) ..........................................................25

*Compagnie Des Bauxites de Guinee*,
  723 F.2d362 (3d Cir. 1983)...............................................................................29

*Consent Ord. for Permanent Injunction, CFTC v. Zhao*,
  (N.D. Ill. Dec. 14, 2023) ..................................................................................11

*Contant v. Bank of Am. Corp.*,
  385 F. Supp. 3d 284 (S.D.N.Y. 2019)................................................................10

*Dac v. Booking Holdings Inc.*,
  2023 U.S. Dist. LEXIS 62209 (D. Del. Apr. 7, 2023)........................................68

*Danziger & De Llano, LLP v. Morgan Verkamp LLC*,
  948 F.3d 124 (3d Cir. 2020)..............................................................................14

*Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*,
  297 F.3d 1343 (Fed. Cir. 2002).........................................................................21

*Drivetrain, LLC v. X. Commerce, Inc.*,
  2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023) ..............................................53

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
  343 F.3d 189 (2d Cir. 2003)..............................................................................72

*Ephoca Inc. v. Olimpia Splendid USA, Inc.*,
  2024 WL 687840 (Del. Super. Feb. 20, 2024)...................................................65

*Finjan LLC v. Trustwave Holdings, Inc.*,
  2021 WL 5051147 (D. Del. Oct. 29, 2021) ........................................................8

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
  592 U.S. 351 (2021)..........................................................................................14

RLF1 33536498v.1

*Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*,
    496 B.R. 706 ................................................................................................ 34

*Genesee County Employees' Retirement System v. DocGo Inc.*,
    773 F. Supp. 3d 62 (S.D.N.Y. 2025) .......................................................... 59

*Gonzalez v. Bam Trading Servs., Inc. et al.*,
    2024 No. 2:24-cv-10286 (D.N.J. 2024) ..................................................... 25

*Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*,
    988 F.2d 476 (3d Cir. 1993)........................................................................ 21

*Gurmessa v. Genocide Prevention in Ethiopia, Inc.*,
    2022 WL 608924 (D. Del. Feb. 23, 2022) ................................................... 8

*Gwynedd Props., Inc. v. Lower Gwynedd Twp.*,
    970 F.2d 1195 (3d Cir. 1992)...................................................................... 36

*Hasson v. FullStory, Inc.*,
    114 F.4th 181 (3rd Cir. 2024) ..................................................................... 14

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    885 F.2d 1149 (3d Cir. 1989)...................................................................... 42

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    586 U.S. 63 (2019)...................................................................................... 41

*Hughes Tech. Servs., LLC v. Glob. Consulting & Mech. Servs., LLC*,
    2020 WL 7350994 (E.D. Pa. Dec. 15, 2020)............................................. 17

*In re APF Co.*,
    264 B.R. 344 (Bankr. D. Del. 2001) .......................................................... 43

*In re APF Co.*,
    308 B.R. 183 (Bankr. D. Del. 2004) .......................................................... 50

*In re AstroPower Liquidating Tr.*,
    335 B.R. 330 (Bankr. D. Del 2005) ........................................................... 37

*In re Austin Truck Rental, Inc.*,
    183 B.R. 398 (E.D. Pa. 1995) ..................................................................... 41

*In re Bernard L. Madoff Inv. Sec. LLC*,
    418 B.R. 75 (Bankr. S.D.N.Y. 2009) ......................................................... 26

*In re Bernard L. Madoff Inv. Sec. LLC*,
　　440 B.R. 274 (Bankr. S.D.N.Y. 2010)...................................................................26

*In re Bethlehem Steel Corp.*,
　　390 B.R. 784 (Bankr. S.D.N.Y. 2008)...................................................................40

*In re Boston Reg'l Med. Ctr., Inc.*,
　　410 F.3d 100 (1st Cir. 2005)...............................................................................35

*In re Buena Vista Oceanside, LLC*,
　　2015 WL 9957185 (2015)....................................................................................36

*In re Burlington Coat Factory Sec. Litig.*,
　　114 F.3d 1410 (3d Cir. 1997)...............................................................................68

*In re BWI Liquidating Corp.*,
　　437 B.R. 160 (Bankr. D. Del. 2010) ....................................................................30

*In re Centaur, LLC*,
　　2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) ............................................75

*In re Charys Holding Co.*,
　　2010 WL 2774852 (Bankr. D. Del. July 14, 2010) ............................................50

*In re Citadel Watford City Disposal Partners, L.P.*,
　　2018 WL 6841361 (Bankr. D. Del. Dec. 17, 2018)............................................71

*In re Cred Inc.*,
　　650 B.R. 832 (Bankr. D. Del. 2023) ....................................................................74

*In re Crown Village Farm, LLC*,
　　415 B.R. 95 (Bankr. D. Del 2009) .......................................................................36

*In re DBSI, Inc.*,
　　445 B.R. 344 (Bankr. D. Del. 2011) ....................................................................47

*In re DBSI, Inc.*,
　　451 B.R. 373 (Bankr. D. Del. 2011) ....................................................................26

*In re DBSI, Inc.*,
　　467 B.R. 309 (Bankr. D. Del. 2012) ....................................................................25

*In re DHP Holdings II Corp.*,
　　435 B.R. 220 (Bankr. D. Del. 2010) ....................................................................36

*In re DPH Holdings Corp.*,
    437 B.R. 88 (S.D.N.Y. 2010)................................................................................34

*In re Emoral, Inc.*,
    740 F.3d 875 (3d Cir. 2014)................................................................................30

*In re Essar Steel Minnesota LLC*,
    2019 WL 2246712 (Bankr. D. Del. May 23, 2019)............................................55

*In re EXDS*,
    316 B.R. 817 (Bankr. D. Del. 2004) ...................................................................41

*In re Exide Techs.*,
    544 F.3d 196 (3d Cir 2008)................................................................................31

*In re Fah Liquidating Corp.*,
    572 B.R. 117 (Bankr. D. Del. 2017) ...................................................................46

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006)................................................................................46

*In re FTX Trading Ltd. v. Giles*,
    2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024) ............................................80

*In re GBG USA Inc.*,
    666 B.R. 115 (Bankr. S.D.N.Y. 2024).................................................................28

*In re Genesis Health Ventures, Inc.*,
    355 B.R. 438 (Bankr. D. Del 2006) ....................................................................70

*In re Green Field Energy Servs., Inc.*,
    554 B.R. 315 (Bankr. D. Del. 2016) ...................................................................78

*In re Health Mgmt., Inc. Sec. Litig.*,
    970 F. Supp. 192 (E.D.N.Y. 1997) .....................................................................59

*In re HealthSouth Corp. S'holders Litig.*,
    845 A.2d 1096 (Del. Ch. 2003)...........................................................................79

*In re HRB Winddown Inc.*,
    2024 WL 1099724 (Bankr. D. Del. Mar. 13, 2024)............................................72

*In re Ipswich Bituminous Concrete Prods., Inc.*,
    79 B.R. 511 (Bankr. D. Mass. 1987) ..................................................................47

ix

*In re Joshua Slocum Ltd.,*
    121 B.R. 442 (E.D. Pa. 1989) ...........................................................................47

*In re Joshua Slocum, Ltd.,*
    103 B.R. 610 (Bankr. E.D. Pa.) ........................................................................47

*In re LGI, Inc.,*
    322 B.R. 95 (Bankr. D.N.J. 2005) ....................................................................34

*In re Live Well Financial, Inc.,*
    652 B.R. 699 (Bankr. D. Del. 2023) .................................................................54

*In re Live Well Financial, Inc.,*
    2023 WL 3995900 (Bankr. D. Del. Jun. 13, 2023) ...........................................54

*In re LSC Wind Down, LLC,*
    610 B.R. 779 (Bankr. D. Del. 2020) .................................................................44

*In re Mallinckrodt PLC,*
    2024 WL 206682 (2024)....................................................................................77

*In re Maxus Energy Corp.,*
    597 B.R. 235 (Bankr. D. Del. 2019) .................................................................31

*In re Mervyn's Holdings, LLC,*
    426 B.R. 488 (Bankr. D. Del. 2010) ...................................................................1

*In re Millenium Lab Holdings II, LLC,*
    2019 WL 1005657 (2019)..................................................................................50

*In re Mintze,*
    434 F.3d 222 (3d Cir. 2006)..............................................................................43

*In re MPC Computers,*
    465 B.R. 394 (Brankr. D. Del 2012)..................................................................34

*In re Nat'l Collegiate Student Loan Trusts Litig.,*
    2020 WL 3960334 (Del. Ch. July 13, 2020)......................................................65

*In re Nat'l Serv. Indus., Inc.,*
    2015 WL 3827003 (Bankr. D. Del. June 19, 2015)............................................50

*In re Nortel Networks Inc.,*
    737 F.3d 265 (3d Cir. 2013)..............................................................................40

x

*In re Northstar Offshore Grp., LLC,*
    616 B.R. 695 (Bankr. S.D. Tex. 2020) ................................................................ 49

*In re Oakwood Homes Corp.*,
    2005 WL 670310 (2005)..................................................................................... 42

*In re Our Alchemy, LLC,*
    642 B.R. 155 (Bankrr. D. Del. 2022) ................................................................ 54

*In re PA Co-Man, Inc.,*
    644 B.R. 553 (Bankr. W.D. Pa. 2022) ............................................................. 57

*In re PennySaver USA Publishing, LLC,*
    587 B.R. 445 (Bankr. D. Del. 2011) ................................................................ 46

*In re Penson Worldwide,*
    587 B.R. 6, 22 (Bankr. D. Del. 2018) .............................................................. 56

*In re Pitt Penn Holding Co.,*
    484 B.R. 25 (Bankr. D. Del. 2012) .................................................................. 78

*In re Port Neches Fuels, LLC,*
    2024 Bankr. LEXIS 1654 (Bankr. D. Del. July 18, 2024)................................. 75

*In re Resorts Int'l,*
    372 F.3d 154 (3d Cir. 2004)............................................................................. 35

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.,*
    311 F.3d 198 (3d Cir. 2002) ............................................................................ 70

*In re Roco Corp.,*
    701 F.2d 978 (1st Cir. 1983)............................................................................ 48

*In re SCH Corp.,*
    569 F. App'x 119 (3d Cir. 2014)...................................................................... 36

*In re Seaboard Hotel Member Assocs., LLC,*
    2021 Bankr. LEXIS 1564 (Bankr. D. Del. June 10, 2021)................................. 78

*In re Seven Fields Dev. Corp.,*
    505 F.3d 237 (3d Cir. 2007)............................................................................ 31

*In re Tandycrafts, Inc. v. Salci,*
    317 B.R. 287 (Bankr. D. Del. 2004) ................................................................ 8

*In re TC Liquidations LLC*,
463 B.R. 257 (Bankr. E.D.N.Y. 2011)................................................................55

*In re Thorpe Insulation Co.*,
671 F.3d 1011 (9th Cir. 2012) ..........................................................................43

*In re Tribune Co. Fraudulent Conveyance Litigation*,
2019 WL 1771786 (S.D.N.Y. April 23, 2019) ..................................................77

*In re UD Dissolution Corp.*,
629 B.R. 11 (Bankr. D. Del. 2021) ...................................................................12

In re Uni-Marts, LLC,
404 B.R. 767 (Bankr. D. Del. 2009) ..................................................................17

*In re Vaso Active Pharms., Inc.*,
2012 WL 4793241 (Bankr. D. Del. Oct. 9, 2012) .............................................54

*In re Venoco, LLC*,
596 B.R. 480 (Bankr. D. Del. 2019) ..................................................................34

*In re W.J. Bradley Mortgage Capital, LLC*,
598 B.R. 150 (Bankr. D. Del. 2019) ..................................................................73

*In re Weiand Automotive Indus.*,
612 B.R. 824 (Bankr. D. Del. 2020) ..................................................................30

*In re Welded Constr., L.P.*,
609 B.R. 101 (Bankr. D. Del. 2019) ..................................................................37

*In re Windhaven Top Ins. Holdings, LLC*,
636 B.R. 596 (Bankr. D. Del. 2021) ..................................................................38

*In re Winstar Commc'ns, Inc.*,
554 F.3d 382 (3d Cir. 2009).............................................................................54

*In re WorldCom, Inc. Sec. Litig.*,
293 B.R. 308 (S.D.N.Y. 2003)..........................................................................37

*In re Zawawi*,
644 B.R. 907 (Bankr. M.D. Fla. 2022) ..............................................................58

*In re Zohar III, Corp.*,
631 B.R. 133 (Bankr. D. Del. 2021) ..................................................................51

*In re: Yellow Corp.*,
   2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024)............................................. 42

*Inc. v. Lesh*,
   114 A.3d 527 (Del. 2014) ..................................................................... 71

*ING Bank v. PNC Fin. Servs. Group*,
   629 F. Supp. 2d 351 (D. Del. 2009)....................................................... 65

*Institutional Investors Group v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)................................................................. 59

*InterGen N.V. v. Grina*,
   344 F.3d 134 (1st Cir. 2003)................................................................ 38

*Jamie, Inc.*,
   230 B.R. 36 (Bankr. D.N.J. 1998) ........................................................ 31

*Johnson v. Preferred Pro. Ins. Co.*,
   91 A.3d 994 (Del. Super. Ct. 2014) ...................................................... 68

*King v. Doe*,
   2011 WL 2669221 (D. Del. July 6, 2011) .............................................. 56

*Kowalski et al. v. Binance Holdings Ltd et al.*,
   No. 2021-, 2021 023426-CA-01 (Fla. Cir. 2021) .................................... 25

*Kumar v. Kulicke and Soffa Industries, Inc.*,
   2019 WL 5081896 (E.D. Pa. Oct. 9, 2019)............................................. 59

*Lahav v. Binance Holdings Limited et al.*,
   2025 No. 1:24-cv-21421 (S.D. Fla. 2025) ............................................. 28

*Lawal v. McDonald*,
   546 F. App'x 107 (3d Cir. 2014) .......................................................... 58

*LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*,
   2018 Del. Ch. LEXIS 101 (Del. Ch. Mar. 28, 2018)............................... 74

*Marino v. Cross Country Bank*,
   2003 WL 503257 (D. Del. Feb. 14, 2003)............................................. 65

*Marnavi SpA v. Keehan*,
   2010 WL 1499583 (D. Del. Apr. 14, 2010)........................................... 29

*Martin et al. v. Binance Holdings Ltd et al.*,
    2025 No. 1:25-cv-22100 (S.D. Fla. 2025) ....................................................... 25

*Matter of Wood*,
    825 F.2d 90 (5th Cir. 1987) .............................................................................. 31

*MBIA Ins. Corp. v. Royal Indem. Co.*,
    221 F.R.D. 419 (D. Del. 2004) ......................................................................... 59

*Metcalfe v. Renaissance Marine, Inc.*,
    566 F.3d 324 (3d Cir. 2009) ............................................................................. 29

*Miller v. Mott*,
    2023 WL 6467368 (Bankr. D. Del. Oct. 4, 2023) ............................................ 55

*Miller Yacht Sales, Inc. v. Smith*,
    384 F.3d 93 (3d Cir. 2004) ............................................................................... 10

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
    473 U.S. 614 (1985) ........................................................................................ 40

*NACCO Indus., Inc. v. Applica Inc.*,
    997 A.2d 1 (Del. Ch. 2009) .............................................................................. 71

*Narrowstep, Inc. v. Onstream Media Corp.*,
    2010 WL 5422405 (Del. Ch. Dec. 22, 2010) ................................................... 72

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) ............................................................................... 73

*Newman et al. v. BAM Trading Servs., Inc. et al.*,
    2024 No. 2:24-cv-00134 (M.D. Ala. 2024) ..................................................... 25

*O'Connor v. Sandy Lane Hotel Co., Ltd.*,
    496 F.3d 312 (3d Cir. 2007) ............................................................................. 25

*Off. Comm. of Unsecured of Allegheny Health, Educ. & Rsch. Found. v.
    PricewaterhouseCoopers, LLP*,
    607 F.3d 346 (3d Cir. 2010) ............................................................................. 79

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
    267 F.3d 340 (3d Cir. 2001) ............................................................................. 78

*Pa. Emp. Benefit Trust Fund v. Zeneca, Inc.*,
    710 F. Supp. 2d 458 (D. Del. 2010) ................................................................. 61

xiv

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002) ............................................................ 46

*Pinker v. Roche Holdings, Inc.*,
    292 F.3d 361 (3d Cir. 2002) ............................................................ 26

*Rolo v. City Investing Co. Liquidating Trust*,
    155 F.3d 644 (3d Cir. 1998) ............................................................ 68

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010) ............................................................ 12

*Savine v. Interactive Brokers, LLC*,
    799 F. App'x 97 (2d Cir. 2020) ...................................................... 43

*Seville Indus. Machinery v. Southmost Machinery*,
    742 F.2d 786 (3d Cir. 1984) ............................................................ 68

*Shearson/American Exp., Inc. v. McMahon*,
    482 U.S. 220 (1987) ........................................................................ 42

*Sheeran v. Blyth Shipholding, S.A.*,
    2015 WL 9048979 (D.N.J. Dec. 16, 2015) .................................... 80

*Sizemore et al. v. Zhao et al.*,
    2023 No. 1:23-cv-21261 (S.D. Fla. 2023) ...................................... 25

*St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*,
    884 F.2d 688 (2d Cir. 1989) ............................................................ 32

*State ex rel. Jennings v. Monsanto Co., Solutia*,
    299 A.3d 372 (Del. 2023) ................................................................ 74

*Stewart v. Wilmington Trust SP Servs.*,
    112 A.3d 271 (Del. Ch. 2015) ........................................................ 79

*Street v. The End of the Road Trust*,
    386 B.R. 539 (D. Del. 2008) .......................................................... 35

*Theseus Strategy Group LLC v. Barsa*,
    2021 WL 4453595 (D. Del. Sept. 29, 2021) .................................. 65

*Toys "R" Us, Inc. v. Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003) ............................................................ 29

*Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC,*
    318 A.3d 450 (Del. Ch. 2024) ............................................................. 70

*TriStrata Tech., Inc. v. Emulgen Lab'ys, Inc.,*
    537 F. Supp. 2d 635 (D. Del. 2008) ..................................................... 26

*Off. Comm. Of Unsecured Creditors of Arcapita, Bank. v. Bahrain Islamic Bank,*
    549 B.R. 56 (S.D.N.Y. 2016) ................................................................ 20

*Envolve Pharm. Sols. v. Rite Aid Headquarters Corp.,*
    2023 Del. Super. LEXIS 134 (Del. Super. Mar. 17, 2023) ................. 74

*Wattum Mgmt., Inc. v. Chengdu Chenxiyu Tech. Co., Ltd. et al.,*
    2024 No. 1:24-cv-21052 (S.D. Fla. 2024) ........................................... 25

*Wellness Publ'g v. Barefoot,*
    128 F. App'x 266 (3d Cir. 2005) .......................................................... 24

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) ............................................................................... 7

*Zazzali v. AFA Fin. Grp., LLC,*
    2012 WL 4903593 (Bankr. D. Del. Aug. 28, 2012) ........................... 75

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.,*
    952 F. Supp. 1119 (W.D. Pa. 1997) ..................................................... 24

## **STATUTES**

6 Del. C. § 13-01(7) ....................................................................................... 54

6 Del. C. § 13-04(b)(1) ................................................................................... 54

11 U.S.C. § 101 .............................................................................................. 76

11 U.S.C. § 101(31) ....................................................................................... 54

11 U.S.C. § 541 .............................................................................................. 31

11 U.S.C. § 544(b) ......................................................................................... 41

11 U.S.C. § 546(e) ......................................................................................... 75

11 U.S.C. § 548 .............................................................................................. 52

11 U.S.C. § 548(a)(1) ..................................................................................... 41

11 U.S.C. § 550(a)(1) ................................................................. 49

11 U.S.C. § 561 ........................................................................ 76

11 U.S.C. § 561(a)(1) ................................................................. 76

28 U.S.C. § 157(b)(2)(E) ............................................................. 31

28 U.S.C. § 157(b)(3) ................................................................. 30

28 U.S.C. § 1334 ...................................................................... 31

## **FEDERAL RULES**

Fed. R. Bankr. P. 7009 ............................................................... 69

Fed. R. Bankr. P. 7012(b)(6) ....................................................... 75

Fed. R. Civ. P. 8 .................................................................. *passim*

Fed. R. Civ. P. 9 .................................................................. *passim*

Fed. R. Evid. 201 ..................................................................... 10

## **OTHER AUTHORITIES**

PAXOS, *Binance Partners with Paxos to Launch USD-Backed Stablecoin 'BUSD'*
https://www.paxos.com/newsroom/binance-partners-with-paxos-to-launch-usd-
backed-stablecoin-busdBin ........................................................ 19

BINANCE, *About*
https://www.binance.com/en/about ................................................. 13

CNN, *US regulator orders Paxos to halt new issues of Binance-branded stablecoin*
https://www.cnn.com/2023/02/14/investing/paxos-binance-busd-halt-order-us-
intl-hnk ............................................................................. 19

COINTELEGRAPH, *Binance CEO CZ on FTX Crash: 'We've Been Set Back a Few
Years,'*
https://cointelegraph.com/news/binance-ceo-cz-on-ftx-crash-we-ve-been-set-
back-a-few-years .................................................................... 15

xvii

FORTUNE, *Binance Aggressively Converted Rivals' Stablecoins in a Massive Cash Grab. It Didn't Always Tell its Customers* https://fortune.com/crypto/2023/02/22/binance-stablecoin-cash-grab-customers-funds/ ................................................................................................................... 19

KROLL, *FTX Recovery Trust - FTX Trading Ltd. Case No. 22-11068*, https://restructuring.ra.kroll.com/ftx/Home-ClaimInfll ....................................... 16

PAXOS, *BUSD Attestations* https://www.paxos.com/busd-transparency#busd-attestations ........................... 19

PAXOS, *Paxos Will Halt Minting New BUSD Tokens* , https://www.paxos.com/newsroom/paxos-will-halt-minting-new-busd-tokens .. 19

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiffs FTX Recovery Trust[2] and FTX Digital Markets Ltd. ("**FTX DM**" and collectively, the "**Plaintiffs**") submit this memorandum of law (the "**Memorandum**") in opposition to: (1) the motion of Binance (Services) Holdings Limited, ("**Binance Services**"), Binance Holdings Limited, d/b/a Binance.com ("**Binance Holdings**"), Binance Holdings (IE) Limited ("**Binance IE**" and, together with Binance Services and Binance Holdings, "**BHL**") to dismiss [Adv. D.I 66-67] (the "**BHL Motion**") the complaint [Adv. D.I. 1] (the "**Complaint**") filed in the above-captioned adversary proceeding; and (2) the motion of Digital Anchor Holdings Limited (f/k/a Binance Capital Management Co. Ltd.) ("**Digital Anchor**" and collectively with BHL, the "**Binance Defendants**") to compel arbitration, dismiss, or abstain [Adv. D.I. 62-63] (the "**Digital Anchor Motion**" and together with the BHL Motion, the "**Motions**").[3] Plaintiffs respectfully state as follows:

## PRELIMINARY STATEMENT

1.      By the Complaint, the FTX Recovery Trust fundamentally seeks two things: (1) to vindicate the priority scheme at the core of the Bankruptcy Code—in which creditors come before common equity—and thereby unwind the Defendants' 2021 stock redemption; and (2) together with co-Plaintiff FTX DM, to remedy the damage those Defendants subsequently caused to FTX and its thousands of victims by intentionally sparking and fueling the FTX conflagration in 2022.

---

[2]     This Court substituted the Consolidated Wind Down Trust (the "**FTX Recovery Trust**") as the plaintiff for certain Debtors in the above-captioned adversary proceeding (the "**Adversary Proceeding**") on February 11, 2025. Case No. 22-11068 [D.I. 29554].

[3]     Although the various Binance Defendants seek (improperly) to incorporate by reference every argument each other has made, a chart detailing which Binance Defendant made which argument in the Motions is attached as **Exhibit A**. The Binance Defendants also improperly include various exhibits that were not "integral or explicitly relied upon in the complaint." *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that a court may not consider matters extraneous to the pleadings unless it is a document integral to or explicitly relied upon in the complaint); *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 496-98 (Bankr. D. Del. 2010) (same).

To that end, the Complaint contains a concise statement of alleged facts establishing two key concepts: (1) that Defendants took digital assets of a determinate worth in the billions of dollars in exchange for FTX stock that had no value at all; and (2) that Defendants made everything worse for victims in the weeks leading up to the FTX collapse, not by "revealing the fraud" as they contend, but by making intentionally false statements and taking intentionally punitive acts to ensure that the FTX enterprise, their one true competitor at the time, would cease to exist.[4]

2.      That the Binance Defendants would seek to dismiss both sets of claims in their entirety is certainly not unexpected in the modern litigation practice (though some of the purported reasons push the envelope of existing precedent). But, as explained below, the Binance Defendants' *seriatim* attempts to make this case go away at this stage are wholly premature.  Each of the Binance Defendants' arguments in support of dismissal are addressed in full below, but two of their principal arguments merit mention at the outset. ***First***, the Binance Defendants at heart protest that they should not be subject to the jurisdiction of a court in the U.S. as a matter of "fair play and substantial justice" because of their sparse contacts with the U.S. What Defendants do not disclose is that, among numerous other contacts with the U.S. that directly relate to the claims here, Binance Holdings admitted in a plea agreement with the U.S. Department of Justice that, as part of "a deliberate and calculated effort to profit from the U.S. market without implementing controls required by U.S. law," Binance "operated a cryptocurrency exchange *wholly or in substantial part in the United States*" on which U.S. customers conducted "*trillions of dollars* in transactions" during the time period relevant to this Complaint.[5] In that same plea agreement, Binance Holdings admitted going to extraordinary lengths to conceal the Binance enterprise's

---

[4]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Complaint.

[5]     Washington Plea Agreement (as defined herein), Attachment A ¶¶ 1, 4, 48 (emphasis added).

2

connections to the U.S.[6] In view of these facts, outlined in more detail below, the Binance

Defendants' personal jurisdiction arguments should be seen for what they are:  a continuation of

their long-running and *admitted* effort to downplay, or outright conceal, their extensive U.S.

contacts for the purpose of avoiding regulatory and judicial oversight in this country. Under these

circumstances, what would violate "fair play and substantial justice" would be if the Binance

Defendants were able to take advantage of the U.S. court system to resolve issues of criminal

liability but then declare themselves immune from U.S. courts addressing their civil liability.

3.      ***Second***, both for purposes of their personal jurisdiction and Rule 12(b)(6)

arguments, the Binance Defendants critique what they refer to as Plaintiffs' "group pleading." But,

once again, the Binance Defendants fail to apprise this Court that, as part of the Binance

enterprise's legal skirmishes with the U.S. government, Binance consented to the entry of a CFTC

Consent Order (as defined herein) finding that "Binance's reliance on a maze of corporate entities

to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and

location of the Binance platform" and that defendant Zhao "has directly or indirectly owned the

scores of [Binance] entities that *collectively* operate the Binance platform…." Compl. ¶¶ 24-25

(emphasis added). In light of these facts, Plaintiffs have more than adequately pleaded each of the

Binance Defendants' U.S. contacts and the actions giving rise to their liability under Plaintiffs'

claims, which involve (1) a fraudulent transfer made directly to the "Binance platform," and (2)

actions taken to harm a competitor, FTX, for the benefit of the "Binance platform."

4.      For these and the reasons set forth below, this Court should, under existing well-

settled precedent, deny the Motions and allow this Adversary Proceeding to proceed to discovery.

---

[6]      *Id.* at ¶ 38.

Alternatively, any dismissal in whole or in part should be without prejudice and should permit Plaintiffs to file a motion to amend the Complaint within thirty (30) days of such decision.

## BACKGROUND AND SUMMARY OF ARGUMENT

5.     As noted, Plaintiffs seek two direct forms of relief in this Adversary Proceeding. In Counts I through V, the FTX Recovery Trust seeks to avoid the $1.76 billion-dollar fraudulent transfer the Debtors made in exchange for the Binance Defendants' equity stake in FTX Trading and West Realm Shires ("**WRS**"), which occurred while FTX was, as alleged properly, balance-sheet insolvent (collectively, the "**Fraudulent Conveyance Claims**"). In Counts VI through IX, Plaintiffs seek redress for a series of false and misleading Tweets published by the Binance Defendants and their founder, majority equity holder, and then-CEO, Changpeng Zhao ("**CZ** or "**Zhao**"), which were intended to, and indeed did, trigger a market panic and a "run" on FTX, leading to its immediate collapse in 2022 (collectively, the "**Predatory Acts Claims**" and, together with the Fraudulent Conveyance Claims, the "**Claims**").

6.     The Fraudulent Conveyance Claims are supported by a plain statement of well-supported facts alleged in good faith, which need not be repeated here in full.  *See generally* Compl. In short, prior to the collapse of FTX, the Binance Defendants were the largest cryptocurrency exchange in the world by trading volume. For two years, they had also been equity partners with FTX.   Then, in 2021, the Binance Defendants and certain of their executives exited their investments in FTX due to, among other things, CZ's purported grievances against FTX's founder and then-CEO, Samuel Bankman-Fried ("**Bankman-Fried**" or "**SBF**"). Compl. ¶¶ 2-4. Specifically, in July 2021, the Binance shareholders disengaged via a share repurchase transaction whereby FTX bought back what were worthless shares in FTX Trading and WRS in exchange for $1.76 billion in valuable cryptocurrency paid to the Binance Defendants and their executives.

4

Compl. ¶ 39.[7] This 2021 Share Repurchase is plausibly alleged to be a constructive fraudulent transfer under Section 548(a)(1)(B) of the Bankruptcy Code. Compl. ¶ 88. Likewise, because the fraudulent transfers were made in furtherance of Bankman-Fried's scheme, as shown by the testimony from Bankman-Fried's second-in-command, Caroline Ellison, demonstrating that customer funds were taken to fund the repurchase, and Bankman-Fried's statements to a Forbes reporter that Bankman-Fried sought to use the transaction to convey a false sense of strength to existing and future customers at a time when FTX was in fact insolvent, the 2021 Share Repurchase was also an intentional fraudulent transfer under Section 548(a)(1)(A) of the Bankruptcy Code. Compl. ¶ 47-48. Other than quibble with the identities of the exact transferees within the Binance Defendants' enterprise, which the Defendants most surely know (and which is addressed below), the Binance Defendants do not contend that any of these facts are unclear or ambiguous. *See generally* BHL Mot.; DA Mot.

7.      As with the Fraudulent Conveyance Claims, the Predatory Acts Claims are well-supported with plain statements of facts alleged in good faith in the Complaint. *See generally* Compl. Specifically, after CZ and his satellite people and entities divested themselves of their equity stake in FTX, he and the Binance Defendants set out to destroy their (now) unaffiliated competitor. Compl. ¶¶ 52-55. In November 2022, CZ and Binance intentionally and maliciously publicly launched a series of false and misleading Tweets to destroy FTX, knowing that FTX's customers and creditors would suffer the consequences in the U.S. and elsewhere. *See, e.g.*, Compl. ¶ 56, 58, 60, 68, 70. At the same time, Digital Anchor (allegedly on behalf of the Binance Defendants) executed a Letter of Intent to "acquire" FTX even though it had no intention of

---

[7]      While the 2021 Share Repurchase was purportedly funded by FTX's Alameda Research division, FTX had in fact used customer funds from its trading platform. Compl. ¶¶ 109, 119.

performing, thereby preventing FTX from receiving third-party rescue funding. Compl. ¶ 67. CZ's false Tweets and the Letter of Intent triggered the proverbial run on the bank that CZ knew and should have known would cause FTX to collapse. Compl. ¶ 73. Collectively and individually, these false public statements destroyed value that would have otherwise been recoverable by FTX's stakeholders. Compl. ¶¶ 62-63. All of this is in the Complaint in plain English, and the Binance Defendants do not contend that any of these allegations are unclear or ambiguous. *See generally* BHL Mot.; DA Mot. Instead, they contend (incorrectly) that those facts fail to state a cognizable claim under any law. *Id.* But the actual law is to the contrary, and these claims too should proceed to discovery.

## ARGUMENT

8.      Through the Motions, the Binance Defendants make a series of arguments as to why the facts, even if true, do not support a valid claim for relief against any of them in this Court. *See generally* BHL Mot.; DA Mot. They say, as discussed in Section I *infra*, that this Court has no personal jurisdiction over any of them. *See* BHL Mot. at 7-12; DA Mot. at 10-13. They are simply wrong on multiple grounds, including their own sworn statements to other U.S. courts. *See generally* Washington State Plea Agreement (as defined herein); CFTC Consent Ord. They then say, as discussed in Section II, *infra*, that even if this Court has personal jurisdiction over them, and even though this Court plainly has subject matter jurisdiction over the Fraudulent Conveyance Claims, that this Court has no (or if it does should abstain from exercising) section 1334 jurisdiction over the Predatory Acts Claims. *See* BHL Mot. at 23-24; DA Mot. at 13-19. They are wrong, and those claims should proceed here. Then, working down the laundry list of purported complaint deficiencies, certain Defendants contend that the Fraudulent Conveyance Claims must be arbitrated, even though, as discussed in Section III, *infra*, the law is directly against them. *See*

6

DA Mot. at 6-10. Then come the inadequate pleading arguments, with all of the Binance Defendants claiming that this Court should resolve, at this stage, fact intensive issues like reasonably equivalent value, insolvency, badges of fraud, and the false nature of their words and deeds. *See* BHL Mot. at 12-36; DA Mot. at 21-23. They then go so far as to claim ignorance as to which of them actually received the transfers at issue or which made the false Tweets. *See* BHL Mot. at 16-20; DA Mot. at 21-23. All of the main deficiencies of their factual protests are addressed in Sections IV and V, *infra*, which address the adequacy in pleading of the Fraudulent Conveyance and Predatory Acts Claims, respectively. Finally, reflecting the kitchen sink nature of the Motions, BHL asks this Court to resolve at the pleading stage what will be highly contested factual intensive defenses such as section 546(e) safe harbor and the *in pari delicto* defense. *See* BHL Mot. at 13-15, 28-29. The main reasons why this Court should decline that invitation are documented in Section VI, *infra*.

## I.  THIS COURT HAS PERSONAL JURISDICTION OVER EACH OF THE BINANCE DEFENDANTS.

9.      As their lead argument in their Motions, all of the Binance Defendants dispute that this Court can properly exercise personal jurisdiction over them. BHL Mot. at 7-12; DA Mot. at 10-13. Yet, at the very least, this Court has specific personal jurisdiction over the Binance Defendants because they have purposefully availed themselves of the U.S. such that they "should reasonably anticipate being haled into court []here." *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

### A.      Relevant Standards.

10.      As an initial matter, the Binance Defendants misstate the standard regarding the parties' respective burdens in connection with personal jurisdiction, arguing that the Complaint

must be dismissed because of Plaintiffs' purported failure to allege facts that would establish personal jurisdiction. *See* BHL Mot. at 7; DA Mot. at 11-12. But Rule 8 of the Federal Rules of Civil Procedure (the "**Federal Rules**") "does not require a plaintiff to set forth in the complaint 'the grounds upon which the court has personal jurisdiction over the defendant.'" *Gurmessa v. Genocide Prevention in Ethiopia, Inc.*, 2022 WL 608924, at *1 (D. Del. Feb. 23, 2022) (citation omitted); *see also Alameda Rsch. Ltd. v. Platform Life Scis. Inc.*, 2023 WL 8814216, at *1 (Bankr. D. Del. Dec. 20, 2023) ("Rule 8 does not require a plaintiff to set forth in the complaint the grounds upon which the court has personal jurisdiction over the defendant . . . .") (internal quotations and citations omitted). Plaintiff only has the burden of proof "[o]nce the defense has been raised," such that the Court's determination of a motion to dismiss for lack of personal jurisdiction "inherently . . . requires [the] resolution of factual issues outside the pleadings." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93 101 n.6 (3d Cir. 2004) (citations omitted). A plaintiff is able to satisfy this burden by establishing jurisdictional facts through affidavits or other competent evidence showing with reasonable particularity the sufficient minimum contracts between the forum and the defendant. *See Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330-31 (3d Cir. 2009) (holding plaintiffs submitted affidavits and documentary evidence to support personal jurisdiction). Even then, a plaintiff need only make a *prima facie* showing that personal jurisdiction exists at the motion to dismiss stage and "'the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor.'" *Finjan LLC v. Trustwave Holdings, Inc.*, 2021 WL 5051147, at *4 (D. Del. Oct. 29, 2021) (quoting *Miller*, 384 F.3d at 97). In bankruptcy cases, the relevant forum is the U.S.; thus, a bankruptcy court will apply a "national contacts" standard. *See In re Tandycrafts, Inc. v. Salci*, 317 B.R. 287, 289 (Bankr. D. Del. 2004) ("Where service is

8

made under Rule 7004(d), the defendant 'need only have minimum contacts with the United States

to satisfy Fifth Amendment due process.'") (citations omitted)).

11.     Here, even though they did not need to do so, Plaintiffs have alleged sufficient facts

in the Complaint to establish specific personal jurisdiction over each of the Binance Defendants.

In any event, as supported by the additional facts set forth in the Chase Declaration,[8] Plaintiffs

easily satisfy their burden to make a *prima facie* showing of personal jurisdiction at the motion to

dismiss stage.

12.     Turning more generally to the substantive jurisdictional issue, a defendant may be

subject to a court's specific personal jurisdiction under either of two tests: the "traditional test"

(also known as the "minimum contacts" or "purposeful availment" test) or the "effects" test.

*Hasson* v. *FullStory, Inc.*, 114 F.4th 181, 186 (3rd Cir. 2024). For the traditional test, courts in the

Third Circuit engage in a three-step inquiry to determine whether the plaintiff has established that:

(1) the defendant has "minimum contacts with the forum such that it purposefully availed itself of

the privilege of conducting activities within the forum and invoked the benefits and protections of

the forum's laws"; (2) plaintiff's claims "arise out of or relate to at least some of those contacts";

and (3) "the exercise of jurisdiction over the defendant . . . comport[s] with traditional notions of

fair play and substantial justice such that the defendant should reasonably anticipate being haled

into court in that forum." *Id.* (internal quotations omitted).

13.     Alternatively, where, as here, a plaintiff has alleged an intentional tort (the

Predatory Acts Claims), courts may exercise specific jurisdiction under the "effects" test if the

tortious conduct is "calculated to cause injury" in the forum. *Calder v. Jones*, 465 U.S. 783, 789,

---

[8]     *Declaration of Ashley Rona Chase in Support of Omnibus Memorandum of Law in Opposition of Binance Defendants' Motions to Dismiss Complaint* (the "**Chase Declaration**"), filed contemporaneously herewith.

791 (1984). Under the "effects test," a court may exercise jurisdiction over a non-resident

defendant when: (1) "the defendant committed an intentional tort"; (2) "the plaintiff felt the brunt

of the harm in the forum such that the forum can be said to be the focal point of the harm suffered

by the plaintiff as a result of that tort"; and (3) "the defendant expressly aimed his tortious conduct

at the forum such that the forum can be said to be the focal point of the tortious activity." *Miller

Yacht Sales*, 384 F.3d at 108 n.10 (citation omitted).

      **B.**       **The Traditional Test Is Satisfied Here.**

      **1.**       **The Binance Defendants' Purposeful Activity in the U.S. Easily
Establishes the Requisite Minimum Contacts.**

      14.       At the outset, the Binance Defendants' protests to this Court that they are "foreign

entities" fundamentally mischaracterizes the reality of their activities in the U.S. in 2021 and 2022

based on their own sworn words in two separate on-the-record sworn statements to other U.S.

courts. These published admissions establish that (1) the Binance enterprise as a whole—that is,

Binance Holdings and its affiliates—acted as a single unit and failed to observe the formalities of

corporate separateness for the specific purpose of concealing ownership and control of the Binance

platform, and (2) this collective Binance enterprise had vast connections with the U.S., whose

citizens conducted *trillions* of dollars in transactions on the Binance platform. As noted, *supra* ¶

10, this Court can look outside the pleadings to determine the bona fides of the Defendants'

jurisdictional defenses.[9] To that end, attached to the Chase Declaration are the CFTC Consent

---

[9]     This Court can, in any event, take judicial notice of court filings like these documents herein. Federal Rule of
Evidence 201 authorizes a court to "judicially notice a fact that is not subject to reasonable dispute because it ...
can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned ... at
any stage in the proceeding," including on a motion to dismiss. FED. R. EVID. 201; *Contant v. Bank of Am. Corp.*,
385 F. Supp. 3d 284, 294 n.3 (S.D.N.Y. 2019) (noting that in ruling on a motion to dismiss, "[t]he Court may
take judicial notice of the CFTC Order, DOJ plea agreement[,] and similar public documents such as consent
orders" and it may consider these documents in deciding a Rule 12(b)(2) motion; *see also Buck v. Hampton
Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (stating that in evaluating a motion to dismiss, the Court may

Order and the Washington State Plea Agreement. The one attached as Exhibit 17 is a consent order (the "**CFTC Consent Order**") between the Commodity Futures Trading Commission and three defendants: BHL; Zhao; and Samuel Lim.[10] The second, attached as Exhibit 16, is a plea agreement by Binance Holdings with the U.S. Department of Justice (the "**Washington State Plea Agreement**").[11] Under these circumstances, the Binance Defendants' attempt to deny minimum contacts with the U.S. is clearly meritless, and this Court can and should reject the Binance Defendants' arguments that Plaintiffs have not adequately specified which specific the Binance Defendants had the U.S. contacts alleged. *See* BHL Mot. at 7, 10; DA Mot. at 12-13.

15.    ***First***, in the CFTC Consent Order, three of the four Binance Defendants consented to the entry of, and did not deny, Findings of Facts stating that Defendant Binance Holdings and "at least certain" Binance affiliates, including (at least) Defendants Binance IE and Binance Services "have commingled funds, relied on shared technical infrastructure, and engaged in activities to collectively advertise and promote the Binance brand." CFTC Consent Ord. ¶ 23; *see also* Compl. ¶ 24. The CFTC Consent Order further states that "Binance's reliance on a maze of corporate entities to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and location of the Binance platform" and that "Zhao has directly or indirectly owned the scores of entities that collectively operate the Binance platform as a common enterprise." *See* CFTC Consent Ord. ¶¶ 19, 24; *see also* Compl. ¶ 25.[12] Given these admissions,

---

consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" (citations omitted).

[10]    *Consent Ord. for Permanent Injunction, CFTC v. Zhao*, Case No. 1:23-cv-cv-01887, [D.I. 80] (N.D. Ill. Dec. 14, 2023).

[11]    *Plea Agreement, U.S. v. Binance Holdings Ltd., d/b/a Binance.com*, 23-cr-0178RAJ, Attachment A, Statement of Fact s[D.I. 23] (W.D. Wash. Nov. 21, 2023).

[12]    Binance Holdings and its affiliates—the "maze of corporate entities" operating the Binance platform—which include all Binance Defendants, are referred to herein as the "**Binance Enterprise**" or "**Binance**." *See* CFTC Consent Ord. ¶ 24.

Plaintiffs have plausibly alleged that the Binance Defendants, all of which are among these "scores" of entities within the Binance Enterprise owned by CZ, controlled and operated the Binance platform. Thus, all of the contacts alleged herein between the Binance platform as a whole and the U.S. are properly attributed to all the Binance Defendants, and this Court should reject Binance's attempts to *again* use its "maze of corporate entities" to obscure these contacts. *See In re UD Dissolution Corp.*, 629 B.R. 11, 27-28 (Bankr. D. Del. 2021) (finding personal jurisdiction proper over two defendants when the complaint made allegations against them as a group because "each took actions as Directors of [the Company]…that were directed [towards an entity] in the United States with knowledge that the brunt of the injury would be felt in the United States"); *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138-39 (2d Cir. 2010) (holding that the Court had personal jurisdiction over the defendant because "[t]he factual allegations in [plaintiff's] complaint, supported by declarations and deposition testimony, constituted a specific averment of facts that, if credited, would suffice to show that all of the [defendant]—owned entities operate as a single economic unit and that [defendant] dominates and controls the [defendant] entities.").

16.    ***Second***, the Washington State Plea Agreement also establishes the Binance Enterprise's sweeping connections to the U.S., as well as its elaborate attempt to conceal those connections. Among other admissions, Binance admitted to:

a)    "[O]perat[ing] a cryptocurrency exchange wholly or in substantial part in the United States. . ." Washington State Plea Agreement, Attachment A ¶ 1.

b)    Engaging in "a deliberate and calculated effort to profit from the U.S. market without implementing controls required by U.S. law." *Id.*

c)    Operating a platform on which U.S. users conducted "trillions of dollars in transactions" between August 2017 and October 2022. *Id.* ¶ 48.

d)    "[I]ntentionally maintain[ing] substantial connections to the United States, from which it generated, among other things, web traffic, user base, transaction volume, and profit." *Id.* ¶ 27.

12

e)      "[A]ttracting a substantial number of U.S. users to Binance.com—particularly U.S. VIP users, who accounted for a significant percentage of the overall trading volume on Binance's platform." *Id.* ¶ 21.

f)      "[W]illfully caus[ing] transactions between U.S. users and users in comprehensively sanctioned jurisdictions in violation of U.S. law." *Id.* ¶ 23.

g)      Maintaining a customer base whose largest single share by nationality was U.S. users, *at least* through late 2020, despite Binance's attempts to conceal those customers' nationality by removing the U.S. label and recategorizing those users as "UNKWN." *Id.* ¶¶ 29, 47.

h)      Relying (illicitly) on U.S. users to achieve their sizeable market share, as well the "network effect" of U.S. users resulting in additional revenue for Binance—a circumstance which caused CZ to remark that it is "better to ask for forgiveness than permission." *Id.* ¶¶ 31, 48.

17.     Put concisely, all these court filings establish that the Binance Defendants operated a *multi-trillion-dollar* cryptocurrency operation *in the U.S.* and exploited the U.S. market at every opportunity. *See id.* ¶¶ 4, 48. There is no question that the Binance Defendants' previously sworn admissions to U.S. courts admitting that they operated in the U.S. renders suffices for the minimum contacts prong of the traditional test. *See* CFTC Consent Ord. ¶ 30; Washington State Plea Agreement, Attachment A ¶ 1. Indeed, the Binance Defendants actually took advantage of the U.S. laws when they entered into the CFTC Consent Order and Washington State Plea Agreement, which provided the enterprise with a final, consensual resolution of the legal issues faced by the Binance Defendants as a result of their illegal conduct. *See* CFTC Consent Ord. ¶ 1; Washington State Plea Agreement ¶ 9. These agreements in their very nature have allowed Binance to avoid its own collapse and now tout itself as the "world's leading blockchain ecosystem." *About*, BINANCE, https://www.binance.com/en/about (last visited on July 31, 2025).

## 2.      Both Sets of Claims Arise out of or Relate to the Binance Defendants' Contacts with the U.S.

18.     Plaintiffs also satisfy the relation prong of the traditional test because Plaintiffs' Claims "arise out of or relate to at least some" of the Binance Defendants' U.S. contacts. *See*

*Hasson*, 114 F.4th at 186. As described in different words by the United States Supreme Court, this second prong requires that "there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum . . . . and is therefore subject to the [forum]'s regulation." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359-60 (2021) (citation modified). As the Third Circuit has also repeatedly observed, "'[t]he degree of relatedness required in a given case is inversely proportional to the overall intensity of the defendant's forum contacts.'" *Hasson*, 114 F.4th at 193 (quoting *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 320 (3d Cir. 2007). Especially in light of the robustness of the Binance Defendants' admitted overall contacts with the U.S.—a multi-trillion-dollar cryptocurrency platform being operated in the U.S. specifically—there is no question that the required "affiliation" between the Binance Defendants and the Claims exists here. *See* Washington State Plea Agreement, Attachment A ¶¶ 4, 48. There is also no question that the Binance Defendants benefited from U.S. laws enough "to make the burden of facing litigation there proportional to those benefits." *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 130 (3d Cir. 2020).

19.     At its heart, the Complaint alleges that the Binance Defendants (1) invested in their competitor, FTX, (2) cashed out of that investment in 2021 as part of the 2021 Share Repurchase, and (3) deliberately engaged in conduct to bring about the destruction of FTX, Binance's then-largest competitor. At all relevant times, the Binance Defendants, as set forth above, were reliant on U.S. customers to fuel the growth of the Binance Enterprise, both in the U.S. and abroad. *See generally* Compl. As CZ commented, "[i]f we blocked US users from day 1, Binance will be not [sic] as big as we are today. We would also not have had any US revenue we had for the last 2 years. And further, we would not have had additional revenue resulted from the network effect . .

14

. better to ask for forgiveness than permission. . . ." Washington State Plea Agreement, Attachment A ¶ 31 (internal quotations omitted). In short, the Binance Defendants knew that the U.S. market—and particularly its ability to attract U.S. based "VIP users"—were critical to its success. *See id.* ¶ 18. At the same time, Binance was aware that FTX was also heavily connected to the U.S. market and also had a substantial U.S. customer base.[13] For example, in the immediate aftermath of certain of the Tweets giving rise to the Predatory Acts Claims, CZ and SBF had an exchange of direct messages. *See* Chase Decl. Ex. 11 (showing a screenshot of messages between SBF and CZ on November 7, 2022). In that exchange, CZ criticized SBF for an earlier Tweet in which SBF questioned CZ's ability to travel to Washington D.C. because he might face potential regulatory or criminal liability in the U.S. Addressing that Tweet, CZ messaged SBF: "[W]hy would I want to visit DC? Unlike FTX, Binance.US is a separate entity." *Id.* That is, CZ claimed (falsely, as is now known from, *inter alia*, the Washington State Plea Agreement) that Binance had actually segregated its U.S. based activity into Binance.US, which purported to comply with U.S. regulations, as distinct from its main platform Binance.com. *See id*; Washington State Plea Agreement, Attachment A ¶¶ 31-32. This was, according to CZ, "[u]nlike FTX." *See* Chase Decl. Ex. 11. In other words, CZ was well aware that *FTX Trading,* the theoretically non-U.S. entity whose shares were sold in the 2021 Share Repurchase, was in fact substantially engaged in the U.S. market, attracting and servicing U.S. customers—the very same activity that CZ had acknowledged had launched Binance Enterprises' success. *See id.*; Washington State Plea

---

[13]    *See, e.g.*, Compl. ¶¶ 34-37; Chase Decl., Ex. 2 (showing that notice of the 2019 Share Transfer agreement was directed to Andrew Albertson at Fenwick & West, a law firm located in the U.S.); Sarkar, Arijit, *Binance CEO CZ on FTX Crash: 'We've Been Set Back a Few Years,' CoinTelegrap*h, (Nov. 12, 2022), https://cointelegraph.com/news/binance-ceo-cz-on-ftx-crash-we-ve-been-set-back-a-few-years  (showing CZ was clearly aware of FTX's U.S. connections when he stated his "[o]riginal intention was let's save the [FTX] users, but then the news of misappropriating user funds, especially U.S Regulatory Agencies investigations (made us realize) we can't touch that anymore") (emphasis added), attached as Ex. 12  to Chase Decl.

Agreement, Attachment A ¶ 18. Binance's knowledge of FTX's U.S. connections and customer base is not surprising, given that, until the 2021 Share Repurchase, Binance was a 20% shareholder—indeed, an insider—of FTX.  Compl. ¶ 34.  And indeed, in the aftermath of FTX's collapse, the extent of FTX's connections to the U.S. quickly became clear to the world, with U.S. based creditors constituting 25 percent of all creditors whose country of residence is known (169,183 creditors)—representing the largest amount for any individual country. *See generally* KROLL, *FTX Recovery Trust - FTX Trading Ltd.* Case No. 22-11068, https://restructuring.ra.kroll.com/ftx/Home-ClaimInfo (last visited July 30, 2025).

20.     In short, the Binance Enterprise was aware that the company transferring $1.76 billion to it to repurchase its shares as part of the 2021 Share Repurchase had a massive base of U.S. customers—the same customers who would ultimately become creditors in these Chapter 11 Cases. *Id.*; *supra* ¶ 16. Similarly, the Binance Enterprise was aware that the competitor it sought to—and did—destroy with the conduct underlying the Predatory Acts Claims had a large base of U.S. customers who would be—and were—harmed by that conduct. *See* Compl. ¶ 75 ("FTX.US experienced a significant increase in gross and net withdrawals following the November 6 False Tweets."); FTX Creditor Matrix [D.I. 574]. And, given CZ's admissions regarding the importance of U.S. customers to the growth of his Binance business, it is reasonable for this Court to infer that the Binance Enterprise was particularly interested in harming the U.S. portion of SBF's FTX enterprise in order to absorb these critical U.S. customers. *See* Washington State Plea Agreement, Attachment A ¶ 18. As set forth in the Complaint, Binance's official blog described it as "[t]he biggest winner in 2022," having "gained nearly 20% market share." Compl. ¶ 79.

21.     All of this by itself would suffice to establish the necessary "affiliation" or "close connection" between the Binance Defendants' U.S. contacts and the Claims. But the Binance

16

Defendants' suit-related contacts with the U.S. go much deeper. As to the Fraudulent Conveyance Claims, **first**, a *sine qua non* of the 2021 Share Repurchase was the repurchase of shares of a Delaware corporation, WRS, which was also known as "FTX US." *See* Compl. ¶¶ 15, 38-40; *In re Zawawi*, 644 B.R. 907, 915-16 (Bankr. M.D. Fla. 2022) (denying defendants' motion to dismiss and holding that defendants' contacts with the U.S. were based on, in part, in their ownership of shares in a U.S. corporation and such contacts directly related to plaintiffs' claims, which "concern the ownership and/or transfer" of the U.S company). Indeed, the initial discussions made clear that Binance understood that WRS was the "parent of FTX US," Chase Decl., Ex. 4, and subsequent negotiations referred to Binance selling "100% of its shareholdings in both FTX and FTX US." Chase Decl., Ex. 3; *see also In re Uni-Marts, LLC,* 404 B.R. 767, 777 (Bankr. D. Del. 2009) (holding defendant had more than merely entered into a contract with a forum resident, he had "extensive contacts with the U.S.… and remained engaged" through the contracts of the disputed transaction).[14] And, the evidence is clear that the entire 2021 Share Repurchase would not have happened but for the agreement to include the WRS shares. Chase Decl., Ex. 4 (SBF stating, "I do think it's important to include FTX US here; that's being included in this raise, and is relevant to where the combined valuation is coming from. The raise would be meaningfully different without it, and likely at a lower valuation.").

---

[14] The cases cited by BHL are clearly distinguishable. For example, the *Hughes* Court explained that it was unable to find specific personal jurisdiction over the Defendants for a breach of contract claim because the contract itself stated "that activities carried out to effectuate the [contracts'] purposes be directed towards and share affiliations with forums *other* than Pennsylvania," the forum state. *Hughes Tech. Servs., LLC v. Glob. Consulting & Mech. Servs., LLC*, 2020 WL 7350994, at *10 (E.D. Pa. Dec. 15, 2020). The *Hughes* Court found that the overall terms, and not simply the governing law clause (as BHL implies), indicated the parties' desire to avail themselves exclusively of other forums. *Id.* Here, the 2021 Share Repurchase was a one-time purchase of stock, with essentially no ongoing performance obligations in any forum, and the Complaint and the evidence establish ample connections between that transaction and the U.S.

17

22.    Despite the Binance Defendants' protests that the Individual Defendants, and not the Binance Defendants, were the nominal sellers in the WRS prong of the 2021 Share Repurchase, the evidence is also clear that the Binance Defendants, and not the Individual Defendants, were the direct transferee for *all* of the consideration in connection with the 2021 Share Repurchase, including the consideration paid for the WRS shares. *See* Compl. ¶ 43; Chase Decl., Ex. 7 (showing that the BUSD for both the shares in WRS and FTX Trading went to the same wallet on the Binance.com platform). Consistent with the CFTC Consent Order's conspicuous statement that Binance Holdings and its affiliates operated a "maze of corporate entities" that "comingled funds" and "collectively operate[d]" the Binance.com platform as a "common enterprise," the Binance Defendants are properly treated, at least at the motion to dismiss stage, as the initial transferees of the consideration paid for the Delaware corporation, WRS. *See* CFTC Consent Ord. ¶¶ 19, 23-24; *see also* Compl. ¶¶ 24, 25, 90, 103, 112, 123, 127. Put simply, an indispensable component of the 2021 Share Repurchase was FTX's transfer of funds to the Binance.com platform, which was owned and controlled by the Binance Defendants, in exchange for shares of a Delaware corporation commonly known as "FTX US."   Therefore, just as in in *Zawawi*, the Binance Defendants' contacts with U.S., through, among other things, a sale of a U.S. entity's shares, are directly related to the Fraudulent Conveyance Claims. *See Zawawi*, 644 B.R. at 915-16.

23.    ***Second***, at Binance's insistence, $1.1 billion of the total $1.7 billion of consideration took the form of Binance's proprietary "stablecoin," known as "**BUSD**." *See* Compl. ¶¶ 31, 41; Chase Decl., Ex. 6 (showing that in an email chain prior to the closing of the 2021 Share Repurchase, SBF stated, "Hon [Binance's General Counsel] had mentioned we would settle entirely with BUSD instead of 50% with USD and 50% with BUSD").   Unlike other cryptocurrencies that experiences significant volatility relative to fiat currency, a stablecoin is a

18

form of cryptocurrency that is pegged to fiat. *See* Compl. ¶ 31. BUSD was a creation of the Binance

Enterprise that, as its name suggests, was pegged to the U.S. dollar. *Id.* In order to "mint" BUSD,

a party would have to transfer U.S. dollars to a New York Trust called "**Paxos**," which had

partnered with Binance to issue BUSD,[15] which would hold the U.S. dollars in trust in U.S. banks

to "back" the BUSD.[16] Paxos' independent accountant's report as of July 30, 2021—the closest in

time to the 2021 Share Repurchase—indicate that Paxos held $12.2 billion in reserve to back the

12.2 billion of BUSD then in circulation.[17]

24.     As noted, Binance insisted that a large portion of the consideration for the 2021

Share Repurchase take the form of BUSD. Chase Decl., Ex. 6. Practically speaking, and as the

Binance Defendants were well aware, this meant that FTX would have to use a New York trust to

"mint" the BUSD in order to complete the transaction. *See* Compl. ¶ 43. And FTX indeed did so,

transferring at least $721 million to Paxos in New York and receiving the equivalent amount of

BUSD, which it then transferred to Binance to complete the 2021 Share Repurchase.  Compl. ¶

43. Denominating the consideration in BUSD (as opposed to say, U.S. dollars) benefitted Binance

by increasing the market share of BUSD, raising its, and Binance's, profile in the crypto industry

and earning millions in interest from the reserves that backed the BUSD.[18] Indeed, Binance

---

[15]    Paxos partnered with Binance in 2019. *See* Paxos, *Binance Partners with Paxos to Launch USD-Backed Stablecoin 'BUSD'* (Sept. 4, 2019), https://www.paxos.com/newsroom/binance-partners-with-paxos-to-launch-usd-backed-stablecoin-busd, attached as Ex. 1 to the Chase Decl.; *see also* Michele Toh, *BUSD: US regulator orders Paxos to halt new issues of Binance-branded stablecoin*, CNN (Feb. 14, 2023), https://www.cnn.com/2023/02/14/investing/paxos-binance-busd-halt-order-us-intl-hnk (quoting Binance's statements: "Binance licenses its brand to Paxos for use with BUSD, which is entirely owned by Paxos and regulated"), attached as Ex. 14 to the Chase Decl.

[16]    *See e.g.*, Compl. ¶ 43; *see also* Paxos, *Paxos Will Halt Minting New BUSD Tokens* (Feb. 13, 2023), https://www.paxos.com/newsroom/paxos-will-halt-minting-new-busd-tokens, attached as Ex. 13 to the Chase Decl.

[17]    Withum Audit Tax Advisory, *Paxos Trust Company, LLC Examination of Management Assertions Reserve Accounts Report –BUSD Token*, PAXOS, at 3 (July 30, 2021) https://www.paxos.com/busd-transparency#busd-attestations (the "**Paxos Audit Report**"), attached as Ex. 8 to the Chase Decl.

[18]    Leo Schwartz, *Binance Aggressively Converted Rivals' Stablecoins in a Massive Cash Grab. It Didn't Always Tell its Customers*, Fortune (Feb. 22, 2023), https://fortune.com/crypto/2023/02/22/binance-stablecoin-cash-

19

aggressively marketed BUSD for this very purpose. *Id.* The 2021 Share Repurchase greatly assisted Binance in these efforts, as the BUSD minted for the 2021 Share Repurchase made up a substantial portion of the approximately 12.3 billion in BUSD circulation at that time. *See* Compl. ¶ 41; Paxos Audit Report at 3.

25.    The U.S. contacts associated with the BUSD aspect of the 2021 Share Repurchase cannot be overstated. The minting of BUSD goes far beyond merely routing funds through a U.S. financial institution to complete a transaction—a fact which itself would weigh in favor of personal jurisdiction in the U.S. *See* Compl. ¶ 43; *Off. Comm. Of Unsecured Creditors of Arcapita, Bank. v. Bahrain Islamic Bank*, 549 B.R. 56, 67-71 (S.D.N.Y. 2016) (holding that the defendants' selection and use of correspondent bank accounts in New York provided a sufficient basis to assert personal jurisdiction over them); *Loc. 875 I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545, 559 (E.D.N.Y. 1998) (explaining that defendant's knowledge that the disputed funds originated from the forum is one factor favoring personal jurisdiction). Here, at the Binance Defendants' demand, the consideration (BUSD) that the FTX Debtors needed to complete the 2021 Fraudulent Transfers, was created and issued in the U.S. and by a U.S. entity partnered with Binance to facilitate the very transfer that gives rise to the Fraudulent Conveyance Claims. *See* Toh, *supra* n. 15; *see also* Compl. ¶ 41.

26.    ***Third***, FTX had U.S. based counsel, including Daniel Friedberg ("**Friedberg**") and Fenwick & West LLP ("**Fenwick**"), who negotiated the 2021 Share Repurchase. Binance's General Counsel, who negotiated the 2021 Share Repurchase, was in direct communications with Friedberg regarding the transaction and asked Fenwick to send the "documents" and have Binance's external lawyers connect with Fenwick. *See* Chase Decl., Exs. 4, 5 (showing Hon Ng,

---

grab-customers-funds/, attached as Ex. 15 to Chase Decl.

Binance's General Counsel, emailing Friedberg stating "safe travels back to the US"); *Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction."). In fact, Friedberg and Fenwick were listed in the notice section of the Series A Preferred Shares Agreement and FTX Executives Share Transfer Agreements, *with their U.S. addresses listed*.[19] *Id*. ("[C]ontract negotiations with forum residents can empower a court to exercise personal jurisdiction over persons outside the forum."). Similarly, Bankman-Fried, along with the other FTX executives purchasing WRS shares, were listed as notice parties in FTX Executives Share Transfer Agreements with their Berkeley, California address listed.[20]   That FTX's professionals negotiated the 2021 Share Repurchase in the U.S. weighs heavily in favor of specific personal jurisdiction, notwithstanding the choice-of law and arbitration provisions upon which the Binance Defendants heavily rely, despite the fact that the Complaint does not allege contract-based claims.[21] *See Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1354-56 (Fed. Cir. 2002) (holding minimum contacts were present and satisfied due process where the parties negotiated the contract in the forum, despite the contract's foreign choice-of-law and arbitration provisions). The Binance Defendants are all alleged, with support, to have been aware of such U.S. connections.

27.      ***Fourth***, the Binance Defendants knew that the transfer was made not from the FTX Trading silo of the FTX enterprise, but from the Alameda silo. Alameda Research LLC ("**Alameda**"), the parent of that silo, was a Delaware corporation. *See Declaration of John J. Ray*

---

[19]    *See Declaration of Karen R. King in Support of Defendant Digital Anchor Holdings Limited's Motion to Compel Arbitration and Motion to Dismiss* (the "**King Declaration**"), Exs. 1-7. *See, e.g.*, Ex. 1 at 6 (listing Fenwick's Seattle office address at 1191 Second Ave, 10th floor.).

[20]    King Decl., Ex. 2 at 4, Ex. 3 at 4, and Ex. 4 at 4.

[21]    Based on Binance's course of dealings with FTX, Binance was aware that FTX typically used U.S. counsel. For example, the 2019 Share Transfer was also negotiated by U.S. counsel. Chase Decl., Ex. 2.

*III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], at Ex. B; Chase Decl., Ex. 5. And although the direct transferor was a non-US subsidiary of Alameda called Alameda Ltd., the consideration paid would ultimately deplete the liquidity of Alameda as parent. *See* Compl. ¶¶ 41, 45-47. Indeed, as a practical matter, all understood that the payment was from Alameda, with SBF commenting to a Forbes reporter shortly after the 2021 Share Repurchase that "[t]he purchase was entirely from Alameda. Yeah, it had a good last year :P" (*i.e.*, an emoji for a tongue sticking out). *See id*. ¶ 48.

28.    Similarly, the Predatory Acts Claims also "arise under or relate to" the Binance Defendants' contacts with the U.S. The Predatory Acts Claims relate to, among other things, a series of Tweets by CZ and the official Binance account on Twitter (now "**X**"). Related to those Tweets, CZ publicly announced that "we" or "Binance" signed the Letter of Intent to acquire FTX.com. *See id*. ¶ 68. Indeed, that same day, Digital Anchor (then called Binance Capital Management) signed the Letter of Intent to acquire FTX Trading. Chase Decl., Ex. 9.[22] The next day, without first informing FTX, the official Binance account tweeted that "we will not pursue the potential acquisition." Compl. ¶ 70. Binance then backed out of the deal. *Id.* ¶¶ 70-71. As alleged, Binance never intended to complete the acquisition and the entire series of Tweets by CZ and Binance, together with the Letter of Intent, were false and misleading and were designed to harm Binance's competitor FTX and to absorb FTX's customers. *See id.* ¶¶ 73-74. Among other things, the exclusivity portion of the Letter of Intent prevented FTX from continuing to engage with other potential buyers who might provide critical liquidity. *Id.* ¶¶ 67, 73-74.

---

[22]    Contradicting Digital Anchor's assertions that they did not make any misrepresentations associated with the Predatory Acts Claims, Digital Anchor was the Binance party in the Letter of Intent. *See* Chase Decl., Ex. 9; DA Mot. at 12; *see also* Compl. ¶ 67.

29.     As set forth above, at the time, Binance was well aware that FTX Trading had a substantial U.S. customer base and that FTX had *not* segregated its U.S. and non-U.S. businesses between FTX Trading and FTX US.   *See supra* ¶¶ 19-20. Thus, the business that Binance was attempting to destroy was substantially a U.S. business, and the customers that Binance was attempting to attract were substantially U.S. customers, whose specific value CZ had recognized in internal communications, as noted above. *Id.* These facts alone suffice establish the requisite affiliation between the Binance Defendants' contacts with the U.S. and the Predatory Acts Claims. *See Activision Publ'g, Inc. v. EngineOwning UG*, 2023 WL 3272399, at *10-11 (C.D. Cal. Apr. 4, 2023) (explaining that foreign defendant purposely targeted a U.S. company and U.S. users because, among other things, 27.86% of the defendant's website traffic came from U.S. users).

30.     In addition, Binance was aware from previous dealings that FTX's negotiations of the Letter of Intent and the potential acquisition in large part involved U.S.-based personnel. *See supra* ¶¶ 19-20; *see also* Compl. ¶ 69. The general counsel of FTX.US, who was located in the U.S. at the time, was negotiating certain aspects of the transaction on FTX's behalf. Compl. ¶ 69. Moreover, in connection with the Letter of Intent, the Binance Defendants engaged a PR company in New York and held a call with FTX and a representative of the PR company on November 8, 2022. *See* Chase Decl., Ex. 10.

31.     Moreover, the November 9 Tweets (regarding the underlying transaction from the Letter of Intent) were made by the Binance Defendants' official "X" account (@binance). Compl. ¶ 70. The @binance "X" account does not make a distinction that it does not target U.S.-connected entities (because it did). Instead, it states that it only does not target the U.K.[23] Nor does it

---

[23]     *See* X, (@binance), x.com/binance?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor (accessed on Jul 30, 2025) ("Posts are not directed towards UK users.").

distinguish the Binance Entity it is representing, and, more specifically, the use of "we" and "Binance" to refer to the Letter of Intent that was signed by Digital Anchor is consistent with Binance's admitted pattern of using its web of affiliates to act as a single enterprise, without observing corporate formality. *See* Compl. ¶ 70; Chase Decl., Ex. 9. Moreover, as discussed *supra* ¶¶ 19-20, given CZ's admissions regarding the importance of U.S. customers to the growth of his Binance business, it is reasonable for this Court to infer that such Tweets were indeed directed at least in part at the U.S. market. *See* Washington State Plea Agreement, Attachment A ¶ 18; *see, e.g.*, *Wellness Publ'g v. Barefoot*, 128 F. App'x 266, 270 (3d Cir. 2005) (finding specific jurisdiction over certain defendants because those defendants had launched an infomercial that, although had a national scope, induced forum residents to call and place orders); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1125-26 (W.D. Pa. 1997) (holding that the defendant's operation of a website that had commercial contacts with the forum residents constituted purposeful business activity). The Binance Defendants' internet activity, thus, supports this Court's exercise of personal jurisdiction over them as they solicited U.S. investors through the internet, including through the Tweets that give rise to the Predatory Acts Claims. *See* Compl. ¶¶ 56-71; *Pinker v. Roche Holdings, Inc.*, 292 F.3d 361, 371-72 (3d Cir. 2002) ( "[P]ersonal jurisdiction [is] appropriate where a foreign corporation has directly solicited investment from the American market" even if the complaint does not "allege that the fraudulent [statements] were specifically directed to American investors").

> ### 3.    The Binance Defendants Have Sufficient Minimum Contacts with the U.S. Such That Exercising Personal Jurisdiction Over Them Will Not Offend Due Process.

32.    The three BHL defendants (but not Digital Anchor) then contend that Plaintiffs have not established the third prong of the traditional test—*i.e.*, that this Court exercising

24

jurisdiction will be fundamentally fair.  BHL Mot. at 11-12. All the Binance Defendants, however, have more than the requisite minimum contacts with the U.S. such that exercising jurisdiction over them will not offend due process.

33.     "The existence of minimum contacts makes jurisdiction presumptively constitutional," *O'Connor*, 496 F.3d at 324, at which point the heavy burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992) (citation omitted) (aggregating contacts to find specific jurisdiction over defendant). In evaluating whether the assertion of personal jurisdiction comports with "fair play and substantial justice," courts consider: (1) the burden on the defendant of litigating in the U.S.; (2) the interest of the U.S. in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief that is sought; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies;" and (5) the "shared interest of the several States in furthering fundamental substantive social policies." *Id.*; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). The Binance Defendants fail to satisfy this heavy burden. All five factors clearly weigh in Plaintiffs' favor, as follows:

    a)    **Burden on Defendant of Litigation in the U.S.**  The Binance Defendants will not be burdened by litigating in the U.S.  The Court's exercise of jurisdiction over Defendants—some of whom have litigated in the U.S. and/or entered into consent orders with U.S. federal agencies[24]—would not make it "so gravely difficult and inconvenient that [Defendants] [are] at a severe disadvantage in comparison to [Plaintiffs]," which previously filed for Chapter 11 in this Court.  *See In re DBSI,*

---

[24]   *See, e.g.*, *Consent Order; Martin et al. v. Binance Holdings Ltd et al.*, No. 1:25-cv-22100 (S.D. Fla. May 7, 2025); *Gonzalez v. Bam Trading Servs., Inc. et al.*, No. 2:24-cv-10286 (D.N.J. Nov. 5, 2024); *Wattum Mgmt., Inc. v. Chengdu Chenxiyu Tech. Co., Ltd. et al.*, No. 1:24-cv-21052 (S.D. Fla. Mar. 18, 2024); *Newman et al. v. BAM Trading Servs., Inc. et al.*, No. 2:24-cv-00134 (M.D. Ala. Feb. 26, 2024); *Sizemore et al. v. Zhao et al.*, No. 1:23-cv-21261 (S.D. Fla. Mar. 31, 2023); *Commodity Futures Trading Comm'n v. Zhao et al*, No. 1:23-cv-01887 (N.D. Ill. Mar. 27, 2023); *Cox v. CoinMarketCap OpCo, LLC, et al*, No. 23-15363 (9th Cir. Mar. 13, 2023); *Kowalski et al. v. Binance Holdings Ltd et al.*, No. 2021-023426-CA-01 (Fla. Cir. Ct. Oct. 19, 2021); *Zaif Inc. v. Binance Holdings Ltd et al.*, No. CGC-21-589318 (Cal. Super. Ct. Jan. 19, 2021).

*Inc.*, 467 B.R. 309, 315 (Bankr. D. Del. 2012) (quotations omitted). All of the Binance Defendants have retained U.S. counsel. *See* Adv. D.I. 28-33, 41, 42; *TriStrata Tech., Inc. v. Emulgen Lab'ys, Inc.,* 537 F. Supp. 2d 635, 642 (D. Del. 2008) (holding that litigating in Delaware would not substantially burden the defendant based on among other things, retention of counsel) (quotation omitted).

b)    **The Interest of the U.S. in Adjudicating the Dispute**.  The U.S. has a strong interest in applying the provisions of its laws, especially in a high-profile case, such as this, in which FTX customers and creditors have suffered extensive losses and the claims arise under the U.S. Bankruptcy Code or U.S. state law. *See, e.g., In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010); Compl. Counts I-IX.

c)    **Plaintiff's Interest in Obtaining Convenient and Effective Relief.** The Binance Defendants have engaged in substantial business activities throughout the U.S. *See, supra,* ¶¶ 14-16, 31.  And the substantial core of the activities at issue in the Complaint indisputably involve actions taken at the U.S. or involve the assets of the Reorganized Debtors in these Chapter 11 Cases.  *See generally* Compl. Requiring the Binance Defendants to litigate in this Court is the most efficient and convenient way to resolve the action; in fact, litigating these same issues in foreign courts would needlessly waste the Reorganized Debtors' and their creditors' resources.[25]

d)    **National Interest in Furthering the Policies of the Laws.[26]**  It is clear that "the most efficient resolution of the controversy would be in the United States," which is the location of Plaintiffs' "inextricably-related" bankruptcy, where this case has been pending for years and this Court is well-acquainted with the parties and issues.[27] *In re Bernard L. Madoff Inv. Sec. LLC*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009) (citation omitted). Moreover, the 2021 Fraudulent Conveyance Claims arise under the U.S. Bankruptcy Code. *See Pinker*, 292 F.3d at 372-73.

---

[25]    *See Tristrata Tech., Inc.*, 537 F. Supp. 2d at 642 ("[T]he judicial system's interest in the efficient resolution of [Plaintiff's] claims against [Defendant] and its co-defendants in a single action before this Court beg the Court's conclusion that the assertion of personal jurisdiction over [Defendant] will comport with fair play and substantial justice"); *In re DBSI, Inc.*, 451 B.R. 373, 378 (Bankr. D. Del. 2011) (finding that, even if litigating in the forum would impose a burden on the foreign defendant, it would avoid the expense of "duplicative litigation [that] would be borne by the creditors for whose benefit the fraudulent transfers actions are meant to serve").

[26]    "In the federal court context, the inquiry will be slightly different, taking less account of federalism concerns [factors (iv) and (v)], and focusing more on the national interest in furthering the policies of the law(s) under which the plaintiff is suing." *Pinker,* 292 F.3d at 370-71 (finding personal jurisdiction over a Swiss corporation when the corporation sponsored a U.S. financial instrument that was traded by American investors).

[27]    Although Honorable Judge John T. Dorsey presided over the bankruptcy cases, this Court continues to have jurisdiction and has overseen all of the adversary proceedings.

34.     In short, the Binance Defendants have not shown that *any* of the relevant factors are satisfied, and thus, have failed to rebut the presumption that the exercise of personal jurisdiction would comport with traditional notions of fair play and substantial justice.

## C.     The Effects Test is Also Satisfied

35.     While Plaintiffs' satisfying the "traditional test" is sufficient to establish specific personal jurisdiction, Plaintiffs also independently satisfy the alternative "effects test" for the Predatory Acts Claims, which allege intentional torts by the Binance Defendants (and if applicable, the Fraudulent Conveyance Claims). ***First***, the Complaint alleges that the Binance Defendants committed intentional torts (*e.g.*, injurious falsehood, fraud, and intentional misrepresentation) by making the Binance False Statements.[28] *See* Compl. ¶¶ 129-40. As stated, *supra*, the Letter of Intent was executed on behalf of Digital Anchor and the November 9 Tweets were made by the Binance Defendants' official "X" account (@binance). *See supra*, ¶ 31.

36.     ***Second***, the Binance Defendants "expressly aimed" their wrongful conduct at the U.S.  Binance Holdings, Binance Services, Binance IE, and Digital Anchor were aware of FTX's presence in the U.S. and the damage that such statements would cause FTX in the U.S. *See supra* ¶ 20; *see also In re Uni-Marts, LLC,* 404 B.R. at 777 (finding that even if the defendant was directing his tortious activity from outside the U.S., he directed it at the plaintiff inside the U.S., and hence was subject to personal jurisdiction). Binance Holdings, Binance Services, Binance IE, and Digital Anchor, through CZ, had previous business dealings with FTX and were aware of their U.S. connections. *See supra* ¶¶ 19-20. As set forth above, the Binance Defendants knew how much their actions affected FTX in the U.S. that they engaged a PR company in New York and held a

---

[28]     The Complaint also alleges Fraudulent Conveyance Claims against Binance Defendants. *See* Compl. ¶¶ 105-128.

call with FTX and a representative of the PR company on November 8, 2022. *See* Chase Decl., Ex. 10. Moreover, as further discussed, *supra*, the Binance Defendants "expressly aimed" their conduct at the U.S. when they bought shares of a U.S. company and intended for consideration for the 2021 Share Repurchase to be "minted" from a New York Trust. *See supra* ¶¶ 21-25.

37.    ***Third***, Plaintiffs clearly "felt the brunt of the harm" of the Binance Defendants' intentional torts in the U.S. The Binance False Statements led to the "run on the bank" on FTX, which caused a significant increase in gross and net withdrawals in FTX.com and FTX.US. *See* Compl. ¶¶ 75-76.[29] As discussed above, FTX had a huge number of U.S. customers and other creditors that relied on and/or were affected by the Binance False Statements. *See* FTX Creditor Matrix [D.I. 574] (showing U.S. creditors located across the U.S. in various states); *see also Lahav v. Binance Holdings Limited et al.*, No. 1:24-cv-21421 (KMM) (S.D. Fla. Apr. 17, 2025) (showing U.S. plaintiffs bringing actions for loss of value based on the November 2022 Tweets by CZ and Binance).[30] Moreover, FTX.US "experienced a significant increase in gross and net withdrawals following the November 6 False Tweets." Compl. ¶ 75. FTX was also not able to seek third-party rescue funding and ultimately, filed for bankruptcy in this Court. *Id*. ¶¶ 74, 77. The Binance Defendants' actions, including the Tweets encompassing the Binance False Statements, were directed at U.S. cryptocurrency users and investors, causing harm to those users in the U.S. *Id*. ¶ 74.

### D. If this Court Finds That Plaintiffs Have Not Made a *Prima Facie* Showing of Personal Jurisdiction, Plaintiffs Are Entitled to Jurisdictional Discovery.

---

[29]    Customer net withdrawals went from averaging $18 million per hour over the period from October 31, 2022, to November 6, 2022 (prior to the November 6 False Tweets) to around $150 million per hour from November 6, 2022, to November 7, 2022 (after the November 6 False Tweets).  Compl. ¶ 59.

[30]    *See also In re GBG USA Inc*., 666 B.R. 115, 136-38 (Bankr. S.D.N.Y. 2024) (holding that defendants' knowledge that their actions would be to the detriment U.S. creditors was a factor supporting an exercise of personal jurisdiction).

38.     If this Court finds that Plaintiffs have not met their burden of establishing a *prima facie* showing of jurisdiction over the Binance Defendants, this Court should permit Plaintiffs to take jurisdictional discovery. Unless a plaintiff's claim is "clearly frivolous," courts "should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983).  In order to demonstrate an entitlement to jurisdictional discovery, a plaintiff only needs to present factual allegations that suggest with reasonable particularity the requisite contacts between the forum and the defendant." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (internal citations omitted); *Marnavi SpA v. Keehan*, 2010 WL 1499583 at *7 (D. Del. Apr. 14, 2010) (same). The Third Circuit has specifically found that "jurisdictional discovery [is] particularly appropriate where the defendant is a corporation." *Metcalfe*, 566 F.3d at 336; *see Compagnie Des Bauxites de Guinee*, 723 F.2d, 362 (3d Cir. 1983) Plaintiffs have plainly identified numerous contacts that each Binance Entity has with the U.S., along with supporting evidence, thereby meeting this standard.

## II.     THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE PREDATORY ACTS CLAIMS

39.     Each of the Binance Defendants next argue that this Court does not have federal bankruptcy jurisdiction over the Predatory Acts Claims. BHL Mot. at 23; Digital Anchor at 13. These arguments are misguided. As set forth below, this Court has jurisdiction over the Predatory Acts Claims both under its "arising in" and "related to" jurisdiction.

### A.     The Predatory Acts Claims are Estate Claims and Therefore "Arise In" a Case Under Title 11.

40.     The Binance Defendants first argue that the Predatory Acts Claims do not "arise under" or "arise in" the Bankruptcy Code because the claims "would exist even outside the

29

bankruptcy case" and "do not fit within any of the enumerated categories in section 1334." BHL Mot. at 23; DA Mot. at 14.[31] The Binance Defendants' arguments on this point amount to a claim that a bankruptcy court has no jurisdiction to adjudicate cases relating to the direct causes of a debtor filing for bankruptcy. But that remarkable sentiment is unsupported[32] and glosses over the fact that, as estate claims, the Predatory Acts Claims are "core" and therefore "arise under" the Bankruptcy Code.

41.    *First*, the Predatory Acts Claims are plainly "estate claims" (*i.e.*, claims of a generalized harm of the Debtors' creditors). In *Emoral*, the Third Circuit explained that "after a company files for bankruptcy, creditors lack standing to assert claims that are property of the estate." *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (citations omitted). The "estate," as defined in section 541, includes all legal or equitable interests of the debtor in property as of the Petition Date, including causes of action "that the debtor could have asserted the claim on his own behalf under state law." *Id.* For the claim to be property of the estate, the claim must be a general one, with no particularized injury arising from it (versus a claim that is specific to the creditor). *Id.*

42.    Here, the Predatory Acts Claims, which go to the heart of why the FTX enterprise collapsed, are generalized claims that allege a harm that is not particularized to any one creditor. There are no facts alleged (or that might exist) that would demonstrate otherwise because the

---

[31]    Binance Defendants also argue that because the Predatory Acts Claims are "based exclusively on state tort law, not under Title II [sic], and could be filed in any court of competent jurisdiction." DA Mot., at 14. If Binance Defendants are arguing that by being state law claims that could be brought in another court they do not fit the Court's "arise in" or core jurisdiction, that argument has been conclusively rejected by the Third Circuit. *See In re Seven Fields Dev. Corp.*, 505 F.3d 237, 263 n.24 (3d Cir. 2007) ("[A] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.") (quoting 28 U.S.C. § 157(b)(3)); *see also In re Weiand Automotive Indus.*, 612 B.R. 824, 855 (Bankr. D. Del. 2020).

[32]    Binance Defendants' only citation is to *In re BWI* for the proposition that state law claims "would exist outside of bankruptcy" and therefore cannot "arise under" the Bankruptcy Code, but there, Judge Walrath noted that "the parties agree that the only category under which the Plaintiff's claims may fall is 'related to' jurisdiction" and did not provide any further analysis. *In re BWI Liquidating Corp.*, 437 B.R. 160, 164 (Bankr. D. Del. 2010).

Binance's False Statements triggered the collapse of FTX, which triggered the bankruptcy and widespread creditor harm. *See* Compl. ¶¶ 74, 77. The FTX Recovery Trust is the only entity entitled to prosecute the claims, and the creditors will be bound by the results. *See id.*.

43.     ***Second****,* a claim is "core" if it involves a right created by bankruptcy law. *In re Resorts Int'l*, 372 F.3d 154, 163 (3d Cir. 2004) ("[A] core proceeding . . . 'invokes a substantive right provided by title 11' or one that, 'by its nature, could arise only in the context of a bankruptcy case.'") (quotations omitted); *Matter of Wood*, 825 F.2d 90, 97 (5th Cir. 1987) (same).  Estate claims are therefore "core" claims.[33] *See In re Maxus Energy Corp.*, 597 B.R. 235, 244 (Bankr. D. Del. 2019) (concluding that alter ego, unjust enrichment, and conspiracy claims are "core") *aff'd* 611 B.R. 532; *In re Bldgs. by Jamie, Inc.*, 230 B.R. 36, 44-45 (Bankr. D.N.J. 1998) (concluding that because the claims alleged a generalized harm were property of the estate, which could only be brought by the trustee, the claims were "core" under 28 U.S.C. § 157(b)(2)(E)).  Put differently, estate claims can only "arise in" the context of a bankruptcy case because individual creditors' generalized harm causes of action *become* property of the estate under section 541 of the Bankruptcy Code and *Emoral*.

44.     Where claims, such as the Predatory Acts Claims, are property of the debtor or are claims available to all creditors, such claims are conclusively claims seeking to bring property into

---

[33]   The Third Circuit in *Seven Fields* noted that "a determination of whether a matter is core or non-core is unnecessary in an inquiry of whether there is federal jurisdiction over a bankruptcy proceeding," 505 F.3d at 257.  Here, however, Binance Defendants challenge not only this Court's jurisdiction under 28 U.S.C. §1334, but also request that this Court exercise its discretion and permissively abstain from hearing these claims.  DA Mot. at 20; BHL Mot. at 23.  Relevant to that abstention analysis is whether or not the Predatory Acts Claims are "core" or non-core. *See In re Crown Village Farm, LLC*, 415 B.R. at 95. Accordingly, this Court is required to determine whether the Predatory Acts Claims are "core." *See, e.g.*, *In re Exide techs.*, 544 F.3d 196 (3d Cir 2008) (holding courts must make the core/non-core distinction where it is raised); *see also Seven Fields*, 505 F.3d at 257 n.18 (concluding that a determination of whether the proceeding was core or non-core was necessary because the parties challenged two aspects of jurisdiction).

31

the estate under 28 U.S.C. § 157(b)(2)(E).[34] In sum, because the Predatory Acts Claims are "core" and "arise under" the Bankruptcy Code, this Court not only has subject matter jurisdiction over them, it has world-wide *exclusive* jurisdiction over them.

### B.    The Predatory Acts Claims are "Related to" the Chapter 11 Cases.

45.    If, however, this Court were to conclude the Predatory Acts Claims do not "arise in" the Chapter 11 Cases, at a minimum, the Predatory Acts Claims plainly "relate to" the Chapter 11 Cases. In *Resorts International*, the Third Circuit clarified that after a chapter 11 plan has become effective, the "close nexus" test must be applied. 372 F.3d at 166-67. In *Resorts International*, the Court explained that, for the bankruptcy court to retain jurisdiction over claims, "the claim must affect an integral aspect of the bankruptcy process-there must be a close nexus to the bankruptcy plan or proceeding." *Id.* at 167.

46.    The "close nexus" standard for "related to" jurisdiction is satisfied here because the Predatory Acts Claims are "logically linked to the Debtor's prepetition losses, and entrusted to the Plaintiff *via the Plan for the benefit of creditors*." *In re LGI, Inc.*, 322 B.R. 95, 104 (Bankr. D.N.J. 2005) (emphasis in original); *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 324 (Bankr. D. Del. 2005) (quoting *LGI*, 322 B.R. at 104) (emphasis in original). In *LGI*, defendants advanced arguments similar to those advanced by the Binance Defendants here, *Id.* at 102-04, but the Bankruptcy Court upheld "related to" jurisdiction, and distinguished *Resorts*, because the claims at issue (1) arose prepetition and were "logically linked to the Debtor's prepetition losses," unlike the professional malpractice claims at issue in *Resorts,* which were an "accidental happenstance

---

[34]    *St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("Section 157(b) includes within the definition of core proceedings, 'proceedings related to the property of the estate,' and property of the estate, in turn, includes causes of action that are the property of the debtor. It follows that proceedings having the effect of bringing property into the estate of the debtor are core proceedings as defined by section 157(b).") (quotation omitted).

32

arising [post-petition] in the operation of the Distribution Trust," and (2) were contemplated by the Plan. *Id.* at 104. The same is true here. The Predatory Acts Claims are clearly linked to the Debtors' prepetition losses because they allege a series of acts in the days before the petition date that deliberately "sparked a market panic and a run on the bank at FTX" and thereby "caused financial harm to FTX and its creditors." Compl. ¶¶ 54-55, 59, 63; *see generally Id.* at ¶¶54-79. Moreover, the Plan[35] indisputably "entrusted to the Plaintiff…for the benefit of creditors" the Predatory Acts Claims, as the Predatory Acts Claims are "Cause[s] of Action" that were preserved under the Plan and transferred to the liquidating trust—Plaintiff here. Plan, Art. 5.17; *see also Notice of Filing of Plan Supplement*, No. 22-11068 (JTD) (Bankr. D. Del. Aug. 2, 2024) [D.I. 22163-2] at Art. 2.3(a) (providing that the FTX Recovery Trust shall be successor in interest to any Cause of Action that was or could have been commenced by any of the Debtors prior to the Effective Date). The Recovery Trust has the duty to investigate and, if advisable, prosecute all of the Debtors' Causes of Action for the benefit of the Debtors' creditors. *Id.* at Schedule 2 (q); *see Liquidating Tr. of the MPC Liquidating Tr. v. Granite Fin. Sols., Inc. (In re MPC Computs., LLC)*, 465 B.R. 384, 393 (Bankr. D. Del. 2012) ("The Trust was established for the purpose of fulfilling the obligations to Debtors' creditors under the Plan, in part by pursuing causes of action owned by Debtors and transferred to the Trust. The Plan clearly contemplated the maintenance of this action, and thus I hold that it is related to the Debtors' bankruptcy case" even under the "close nexus" standard).

47.    The Plan does not specifically enumerate the Predatory Acts Claims as a cause of action (because the Plan did not enumerate *any* causes of action that had not yet been brought),

---

[35]    *Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates*, No. 22-11068 (JTD) (Bankr. D. Del. Oct. 8, 2024) [D.I. 26404-1] (the "**Plan**"), at Art. 5.17.

nor did it need to, because it generally identified the Debtors' Causes of Action against any party were being investigated. *See In re MPC Computers*, 465 B.R. at 394 (finding a close nexus existed where "[t]he Plan and Conformation Order specifically provide for the retention of […] any actions against customers."). In any event, the Plan documents *do* identify the acts that form the basis for the Predatory Acts Claims as triggering the "acute liquidity crisis" that led to the bankruptcy.[36] Specifically, the Disclosure Statement identifies the Binance Defendants and CZ as leading to the "severe 'run' on the FTX Exchanges," and notes Binance's withdrawal from the Letter of Intent as sealing FTX's fate. Disclosure Statement, at Sec. 2B.3. Under these circumstances, the Predatory Acts Claims are "not independent afterthought of the post-confirmation trustee, but were integral to the Plan, thus maintaining the close nexus which confers bankruptcy court jurisdiction." *LGI*, 322 B.R. at 106. Unlike in *Resorts*, where the trustee filed the action in question seven years after the plan's effective date, here the Debtors brought these claims shortly after the plan was confirmed and *before* it went effective.[37]

48.     Moreover, the fact that the Plan is in the nature of a liquidating plan further weighs in favor of finding "related to" jurisdiction. *In re Boston Reg'l Med. Ctr., Inc.*, 410 F.3d 100, 107 (1st Cir. 2005) (holding when a trustee acting to the debtor's behalf "commences litigation designed to marshal the debtor's assets for the benefit of its creditors pursuant to a liquidating plan of reorganization, the compass of related to jurisdiction persists undiminished after plan confirmation").[38] Liquidating plans are pertinent to the analysis because "in the case of a

---

[36]   *Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Affiliated Debtors and Debtors-in Possession*, No. 22-11068 (JTD) (Bankr. D. Del. June 27, 2024) [D.I. 19143] (the "**Disclosure Statement**"), at Sec. 2B.3.

[37]   *See In re Venoco, LLC,* 596 B.R. 480, 490 (Bankr. D. Del. 2019) *aff'd*, 610 B.R. 239 (D. Del. 2020), *aff'd*, 998 F.3d 94 (3d Cir. 2021) ("In the adversary proceeding, the Trustee filed the case within one month of the Plan going effective, which leads the Court to believe that a close nexus exists.).

[38]   *See In re DPH Holdings Corp.*, 437 B.R. 88 (S.D.N.Y. 2010) ("[W]here a debtor's plan is a liquidating plan … the bankruptcy court's post-confirmation jurisdiction is more broad because its jurisdiction relates directly to the

liquidating trust, which by definition cannot reenter the marketplace (unlike a reorganized debtor)" by its nature maintains a connection to the bankruptcy even after the plan has been confirmed, and exists only until the debtor's remaining assets have been liquidated. *Street v. The End of the Road Trust*, 386 B.R. 539, 545 (D. Del. 2008). And while the case law in Delaware is mixed on this particular issue, a Delaware district court has cited favorably to *Boston Regional*,[39] and the issue has not been addressed by the Third Circuit itself.

49.     In the face of all of this, the Binance Defendants argue, citing *Resorts*, that the "'potential to increase the assets of the [Recovery Trust] and its beneficiaries' . . . is not enough to establish post-confirmation 'related to' jurisdiction." DA Mot. at 15 (quoting *Resorts*, 372 F.3d at 170); Binance Mot. at 24. But the Binance Defendants ignore subsequent case law applying *Resorts*, which makes clear that *Resorts'* "holding that 'the potential to increase assets of the [post-confirmation] Trust and its beneficiaries does not *necessarily* create a close nexus' to the bankruptcy proceeding does not mean that a sufficiently close nexus might not exist on different facts." *AstroPower*, 335 B.R. at 324 (quoting *Resorts*, 372 F.3d at 170) (emphasis added). Here, the "different facts" include that the Binance False Statements caused the downfall of FTX and resulted in the Chapter 11 Cases, that such actions were described in the Plan documents, and the claims were sufficiently identified and preserved for prosecution by the FTX Recovery Trust (Plaintiff here) under the jurisdiction of the Bankruptcy Court. Indeed, as Judge Walrath observed, *Resorts* only "decided the narrow issue of "related to" jurisdiction over a claim that arose post-confirmation." *AstroPower*, 335 B.R. at 324. As such, the Binance Defendants' reliance on

---

core functions of the bankruptcy court…"); *Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 496 B.R. 706, 710 (same).

[39]     In *Street v. The End of the Road Trust*, Judge Farnan cited favorably to *Boston Regional* for this proposition and further recognized that "[w]hether a liquidating trust has been created is pertinent to [close nexus] analysis" because it negates the Third Circuit's worry of unending jurisdiction raised in *Resorts Int'l*. 386 B.R. at 545 (citing *Boston Reg'l*, *Street v. The End of the Road Trust, 386 B.R. 539, 545 (D. Del.*, 410 F.3d at 107).

35

*Resorts* is misplaced, and the Predatory Acts Claims are "related to" the Chapter 11 Cases. This Court therefore has subject matter jurisdiction to hear them.

### C.    This Court Should Not Abstain from Hearing the Predatory Acts Claims.

50.    Effectively conceding the weakness of their arguments that this Court does not have at least exclusive world-wide "related to" jurisdiction over these claims, Digital Anchor (but not the other the Binance Defendants) then argues that perhaps this Court should decline to exercise that jurisdiction.  DA Mot. at 17-21.

51.    In general, "[f]ederal courts have a virtually unflagging obligation to exercise the jurisdiction conferred on them." *In re SCH Corp.*, 569 F. App'x 119, 121 (3d Cir. 2014) (internal quotations omitted). As such, abstention is "the exception, not the rule" and "rarely should be invoked." *In re Penson Worldwide*, 587 B.R. 6, 22 (Bankr. D. Del. 2018) (quoting *Gwynedd Props., Inc. v. Lower Gwynedd Twp.*, 970 F.2d 1195, 1199 (3d Cir. 1992)). Based on the "narrow sphere" of cases where discretionary abstention applies, courts follow a multi-factor test to determine whether abstention is appropriate. *In re Crown Village Farm, LLC*, 415 B.R. at 95. When considering the twelve-factor test, courts give the following factors more weight than the others: (1) the effect on the administration of the estate; (2) whether the proceeding is core or non-core; and (3) whether the claim involves only state law issues. *In re DHP Holdings II Corp.*, 435 B.R. 220, 224 (Bankr. D. Del. 2010). These three factors (and others) do not favor abstention.

a)    **Factors 1 and 6: The Effect or Lack Thereof on the Efficient Administration of the Estate and the Degree of Relatedness or Remoteness to the Main Bankruptcy Case.** Digital Anchor argues that both of these factors weigh in favor of abstention because the plan has been confirmed, and, therefore, resolution of the Predatory Acts Claims will have "no discernible effect on the administration of the estate." DA Mot. at 17, 19 (citing *In re Buena Bista Oceanside, LLC*, 2015 WL 9957185, at *6 (Bankr. W.D. Pa. Sept. 22, 2015).[40] However, the Predatory Acts

---

[40]    *In re Buena Vista Oceanside, LLC* is inapposite.  In that case, substantial activity in a prepetition litigation took place in state court, and the Bankruptcy Court determined the state court was better positioned to determine a

Claims have a "close nexus" with the Plan and have been assigned to Plaintiff FTX Recovery Trust for the benefit of creditors and envisioned prosecution of these claims in this Court. *Supra,* ¶ 47. Resolution of two sets of related claims, especially when there are federal claims involved, is also inefficient. *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 334 (S.D.N.Y. 2003) This factor weighs against abstention. [41]

b)  **Factors 5, 7 and 8: Whether the Proceeding is Core and the Feasibility of Severing State Law Claims from Core Bankruptcy Matters.** The Predatory Acts Claims are estate claims, rendering them "core" under 28 U.S.C. § 157(b)(2)(E). Factor 7 weighs against abstention and factor 8 is inapplicable here. *Supra,* Sect. II.A. Because federal bankruptcy jurisdiction exists here since the claims are "core," factor 5 (another jurisdictional basis exists) weighs against abstention here. Assuming, arguendo, that the Predatory Acts Claims are not core, courts have held that "[e]ven where there are some state-law issues, the presence of federal-law issues must always be a major consideration weighing against surrender of federal jurisdiction." *WorldCom, Inc. Sec. Litig.*, 293 B.R. at 333 (quotation omitted).

c)  **Factors 2 and 3: Predominance of State Law Issues and the Difficulty or Unsettled Nature of the Applicable State Law.** While the Predatory Acts Claims are based on state law, this is not by itself determinative of whether this Court should abstain from hearing the Predatory Acts Claims. *In re Welded Constr., L.P.*, 609 B.R. 101, 114 (Bankr. D. Del. 2019) ("[U]sing applicable state law to adjudicate core disputes involving state-law issues is at the heart of the bankruptcy court's role."). Moreover, this Court is "very accustomed to deciding state law issues which somewhat reduces the significance of this factor." *In re Venoco, LLC*, 596 B.R. at 493.

d)  **Factor 4: The Presence of a Related Proceeding Commenced in State or Other Non-Bankruptcy Court.** Digital Anchor argues this factor is "neutral," but their failure to cite to any related proceeding commenced in state court or another non-bankruptcy court actually weighs against abstention here. *See AstroPower*,335 B.R. 309 at 331 ("[T]he Court agrees with the Plaintiff that the absence of a related proceeding here, and thus the fourth factor, weighs against abstention.").

e)  **Factor 9: The Burden on this Court's Docket.** Digital Anchor cites to no specific facts as to how this Court is overburdened by overseeing the resolution of the Predatory Acts Claims. And any burden would be incremental, as the Court undoubtedly has jurisdiction over the Fraudulent Conveyance Claims. Thus, this

---

stipulation reached between the parties regarding the litigation. *See In re Buena Vista Oceanside, LLC*, 2015 WL 9957185, at *6 .

[41]  *See In re AstroPower Liquidating Tr.*, 335 B.R. at 330 (finding "effect on administration of the estate" factor weighed against abstention where prepetition claims, asserted post-confirmation by liquidating trustee, (1) were intrinsically connected to the plan due to plan's assignment of such claims to liquidating trustee and (2) the outcome of such litigation could have a significant impact on creditor recoveries); *In re Venoco, LLC*, 596 B.R. at 493.

37

factor is neutral or weighs against abstention. *See In re Penson Worldwide*, 587 B.R. at 24 ("While this court has a significant caseload, I have nothing before me showing that the state court docket is any less significant.  This factor does not favor abstention.").

f)    **Factor 10: The Likelihood of Forum Shopping.** Plaintiffs brought the Adversary Proceeding before this Court, which is the situs for the bankruptcy proceedings and all other adversary proceedings. This factor is neutral.  *See In re Windhaven Top Ins. Holdings, LLC*, 636 B.R. 596, 610 (Bankr. D. Del. 2021) ("As this Court is the situs for the bankruptcy proceeding and the other issues arise only in the court for which permissive abstention is requested, the risk of forum shopping is low. This factor is neutral.").

g)    **Factor 11: The Existence of a Right to a Jury Trial.** Although this Court may not be able to hold a jury trial, withdrawal of the reference to the District Court may be utilized to handle any jury trial demands. *See AstroPower*, 335 B.R. 309 at 332 (holding that the eleventh factor was neutral where "withdrawal of the reference to the District Court is a mechanism that has been used in the past to deal with jury trial demands.").  This factor is neutral.

h)    **Factor 12: The Presence of Non-Debtor Parties.** While Plaintiff FTX Recovery Trust is not a debtor, it is the post-confirmation representative of the estate whose beneficiaries are former creditors of the estate. Plaintiff FTX Digital Markets is a Debtor in this Court. Because there are both debtor and non-debtor parties, this factor is neutral. *See AstroPower*, 335 B.R. 309 at 332 (presence of the post-confirmation liquidating trust rendered the twelfth factor as neutral due to there being "both debtor and non-debtor parties" and holding that "the fact that the Plaintiff is a distinct legal entity from the Debtor does not change the fact that the estate's creditors are the real parties in interest to this dispute.").

## III.    THE FRAUDULENT CONVEYANCE CLAIMS ARE NOT ARBITRABLE[42]

52.    As its next salvo, one Defendant, Digital Anchor, seeks to have this Court compel

arbitration of all the Fraudulent Conveyance Claims, without citing to any case that supports that

---

[42]    BHL appears to have adopted and incorporated by reference Digital Anchor's argument regarding arbitration, but it is unclear whether they are attempting to argue that the claims against BHL must be arbitrated, or merely that they support the arbitrability of the claims against Digital Anchor.  BHL Mot. 13 n. 8. To the extent they argue for the arbitration of the claims against BHL, however, those defendants were not parties to the arbitration agreement relied upon by Digital Anchor and thus any argument to compel arbitration against them must be rejected for this separate reason, in addition to all the other reasons set forth herein.  *See InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003) (explaining that for a movant to compel arbitration it must show it "is entitled to invoke the arbitration clause").

proposition.  DA Mot. at 6-10. This argument fails because binding Third Circuit precedent explicitly holds that a defendant to an avoidance action cannot enforce an arbitration agreement that the defendant had with the prepetition debtor. *See Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989) (holding "that the trustee's section 544(b) claims are not arbitrable under the arbitration clause because they are not derivative of the debtor and the trustee is accordingly not bound by the Customer Agreement with respect to them"); *see also In re Oakwood Homes Corp.*, 2005 WL 670310, at *4 (Bankr. D. Del. Mar. 18, 2005) (denying motion to dismiss fraudulent transfer claims in favor of arbitration because "[t]he arbitration agreement was entered into by Debtor, pre-petition, and as the courts have made clear, it is the parties to such an agreement who are bound by it . . . [U]nder Hays, as extended by *EXDS*, this Court may not require fraudulent conveyance actions, under either §§ 544(b) or 548…to be submitted to arbitration").  Indeed, Plaintiff FTX Recovery Trust here brings the chapter 5 claims merely as a conduit for the benefit of the creditors it represents—creditors who could not (and did not) consent to the alleged arbitration provision. Digital Anchor's attempt to sidestep this roadblock is an unabashed request that this Court ignore binding precedent and create a one-of-a-kind ruling in this jurisdiction.

### A.    Fraudulent Conveyance Claims Are Not Derivative of the Debtor.

53.    Digital Anchor's argument rests on the fatally flawed assumption that a valid and enforceable arbitration agreement exists among the relevant parties and that the only issue is that agreement's scope. *See, e.g.*, DA Mot. at 6-7 (acknowledging that a court must "determine[] that a written agreement to arbitrate exists" and only analyzing this standard with regard to FTX Recovery Trust and Digital Anchor). Not so. Digital Anchor has not established that the relevant parties entered into an agreement to arbitrate because the party on whose behalf FTX Recovery

Trust brings the Fraudulent Conveyance Claims is the creditor body, not the debtor. *Hays*, 885 F.2d at 1155 ("Claims asserted by the trustee under section 544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the trustee to assert on their behalf."). The rule applies to Section 544(b) claims and Section 548 claims alike. *In re EXDS*, 316 B.R. 817, 826 (Bankr. D. Del. 2004) ("Since EXDS's § 548(a)(1) cause of action, like § 544(b), is Bankruptcy Code created (*i.e.*, not derivative of the bankrupt) I cannot require EXDS to submit [the Section 548 claim] to binding arbitration.").

54.    "The Supreme Court has made it clear that it is the *parties* to an arbitration agreement who are bound by it and whose intentions must be carried out." *Id.* (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625 (1985)). An entity (like a trustee) prosecuting fraudulent transfer claims on behalf of creditors cannot be compelled to arbitrate those claims because "there is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it." *Id.*; *see also In re APF Co.*, 264 B.R. 344, 363 (Bankr. D. Del. 2001) ("[W]here the trustee brings a cause of action on behalf of creditors which the Bankruptcy Code itself authorizes the trustee to assert on the creditors' behalf, the cause of action derives from the Bankruptcy Code, *not* from the debtor. Consequently, these claims are not subject to mandatory arbitration because the parties on whose behalf the trustee is acting, *i.e.*, the creditors, are not a party to the arbitration agreement and are thus not bound by its terms."); *In re Bethlehem Steel Corp.*, 390 B.R. 784, 790 (Bankr. S.D.N.Y. 2008) (confirming the Second Circuit has also "exempted fraudulent transfer claims from arbitration because they are statutory claims belonging to the trustee and are not claims derivative of the debtor's own rights").[43]  And, for the same reasons, Digital Anchor's argument that only an

---

[43]    Unsurprisingly, the Digital Anchor Motion is devoid of any assertion that the third-party creditors are bound by

arbitrator can decide the threshold question of arbitrability also fails.  Plaintiffs here did not agree

to, and are not bound by, any aspect of the agreement to arbitrate, including the "delegation clause"

upon which Digital Anchor relies.[44]

55.    Digital Anchor argues that the claims must be submitted to arbitration because the

arbitration clause in the Series A Share Transfer Agreement is binding on its successors, and that

the FTX Recovery Trust is a successor to the FTX entities, former debtors-in-possession FTX

Trading, Ltd. and Euclid Way, Ltd., who were signatories to such agreement. DA Mot. at 7-8. But

this is irrelevant, as the Fraudulent Conveyance Claims would not be subject to mandatory

arbitration even if it those debtors-in-possession were prosecuting the claims directly. Debtors-in-

possession only have the right to prosecute fraudulent transfer claims in their capacities as trustees

on behalf of creditors, not in their original capacities as the pre-petition debtors who may have

signed an arbitration agreement.  *See* 11 U.S.C. §§ 544(b), 548(a)(1) ("[T]he *trustee* may avoid

any transfer…) (emphasis added); *In re Austin Truck Rental, Inc.*, 183 B.R. 398, 400 (E.D. Pa.

1995) ("[S]ection 1107(a) empowers a debtor-in-possession to do [avoid transfers] by conferring

'all the rights ... and powers ... of a trustee.'" (quoting 11. U.S.C. § 1107(a)). This is why fraudulent

transfer claims brought under Section 544(b) or Section 548 are, as a rule, simply not subject to

mandatory arbitration.  *EXDS*, 316 B.R. at 826; *see also In re: Yellow Corp.*, 2024 WL 1313308,

at *8 (Bankr. D. Del. Mar. 27, 2024).

---

an arbitration clause by and among FTX and Digital Anchor.  *Cf. In re Nortel Networks Inc.,* 737 F.3d 265, 270 (3d Cir. 2013) ("Arbitration 'is a matter of consent, not coercion' . . . [such that a] party may not be compelled under the [Federal Arbitration Act] to submit to . . . arbitration unless there is a contractual basis for concluding that the party agreed to do so.") (internal citations omitted).

[44]    *See* DA Mot. at 9.  In fact, *Henry Schein*, which Digital Anchor cites for support, clearly holds that it is the "*parties* [who] may agree to have an arbitrator decide [] the merits of a particular dispute."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67–68 (2019) (emphasis added) (explaining that "[w]hen the *parties'* contract delegates the arbitrability question to an arbitrator, a court may not override the contract").  The Supreme Court did not hold that a court may submit a question of arbitrability over a third party's claim to an arbitrator.  *See id.*

41

**B.     Alternatively, This Court Should Exercise Discretion to Deny the Motion to Compel.**

56.     Courts in this Circuit, including this Court, also hold that bankruptcy courts have discretion to refuse enforcement of an otherwise applicable arbitration provision when Congressional intent precludes arbitration on the subject matter of the dispute. *See In re APF Co.*, 264 B.R. at 362 (citing cases); *FTX*, Hr'g Tr. 121:9-14 (July 22, 2025) ("Under Third Circuit precedent, . . . courts are instructed to honor valid arbitration agreements unless the party opposing arbitration can adequately show a congressional intent to create an exception to the [Federal Arbitration Act]'s mandate with respect to the parties' statutory claims at issue."); *see also Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) ("[T]he Arbitration Act's mandate may be overridden by a contrary congressional command"); *Hays*, 885 F.2d at 1157 (same). There is clearly a congressional intent to preclude arbitration of fraudulent conveyance claims. Therefore, even if the Court determined that the arbitration provision was otherwise enforceable with respect to the Fraudulent Conveyance Claims (and it is not), this Court should exercise that discretion for two reasons.

57.     ***First,*** courts in this Circuit have made clear that even when arbitration provisions are enforced for pre-bankruptcy claims, an arbitration clause is not enforced when a trustee brings fraudulent transfer claims. *Yellow Corp.*, 2024 WL 1313308, at *8 ("Accordingly, the law in this jurisdiction is settled that a defendant in an avoidance action under § 544(b) cannot enforce against a trustee an arbitration agreement that the defendant had with the prepetition debtor."). The plethora of caselaw adjudicating fraudulent transfer litigation in bankruptcy courts, therefore, constitutes an independent basis for this Court to exercise discretion to retain jurisdiction over these claims. *See In re Oakwood Homes Corp.*, 2005 WL 670310, at *5 (noting that "even if the § 547 and § 548 claims . . . were determined to be derived from Debtor, the interests, policies and

42

objectives of the Bankruptcy Code would be seriously jeopardized by requiring arbitration of such claims"). Of particular concern is that the arbitration clause at issue not only selected the Hong Kong International Arbitration Centre to adjudicate any applicable dispute but also chose Hong Kong as the legal seat. *See* King Decl., Ex. 1 [D.I. 64-1]. This would remove any supervisory authority U.S. courts may otherwise exert over a determination of fraudulent transfer claims, which are indisputably core claims.[45]

58.     On that point, Digital Anchor's reliance on *Mintze* is misplaced. *See* DA Mot. at 9 (citing *In re Mintze*, 434 F.3d 222 (3d Cir. 2006)). Because Mintze's claims did not derive from the Bankruptcy Code, there was "no bankruptcy issue to be decided by the Bankruptcy Court," and the Third Circuit could not "find an inherent conflict between arbitration of Mintze's federal and state consumer protection issues and the underlying purposes of the Bankruptcy Code." *Id.* at 231-32. Here, unlike in *Mintze*, the claims subject to the Digital Anchor Motion—the Fraudulent Conveyance Claims—are at the heart of the Bankruptcy Code. *See* DA Mot. at 7.

59.     **Second**, the Fraudulent Conveyance Claims are not the only claims at issue in this Adversary Proceeding. Compelling arbitration for these claims while retaining jurisdiction over the Predatory Acts Claims would frustrate the Bankruptcy Code's core objective of "protect[ing] creditors and reorganizing debtors from piecemeal litigation." *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1022 (9th Cir. 2012); *In re APF Co.*, 264 B.R. at 363-64 (exercising discretion to deny the motion to compel arbitration because it would lead to "piecemeal litigation"). This is especially true because the parties' relationship at the time of the 2021 Share Repurchase is relevant to establishing the Defendants' intent to cause the harm alleged in the Predatory Acts Claims. *See* Compl. Counts VI-IX. In other words, there will be overlapping facts developed in connection

---

[45]     *Savine v. Interactive Brokers, LLC*, 799 F. App'x 97, 98 (2d Cir. 2020).

with both sets of claims. Compelling the parties to arbitrate the 2021 Share Repurchase related claims may thus lead to conflicting findings of fact that would affect resolution of the claims at issue.

## IV. THE COMPLAINT ADEQUATELY PLEADS THE 2021 FRAUDULENT TRANSFERS UNDER FEDERAL AND STATE LAW

60.     The Binance Defendants next contend that the Fraudulent Conveyance Claims should be dismissed for failure to state a claim, based on a plethora of unfounded assertions, including that Plaintiffs have not alleged (1) that the Debtors were insolvent in July 2021, and (2) that the Debtors did not receive reasonable equivalent value. BHL Mot. at 12-35; DA Mot. at 21-22.  They are again wrong.

61.     The threshold for establishing failure to state a claim under Federal Rule 12(b)(6), however, is high and "the defendant bears the burden to show that the plaintiff's claims are not plausible.'" *In re LSC Wind Down, LLC*, 610 B.R. 779, 783 (Bankr. D. Del. 2020) (Owens, J.).  In deciding a motion to dismiss pursuant to Federal Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *In re Zohar III, Corp.*, 631 B.R. 133, 155 (Bankr. D. Del. 2021) (Owens, J.); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim is facially plausible when the plaintiff pleads facts that lead the court 'to draw a reasonable inference that the defendant is liable for the misconduct alleged.'" *LSC Wind Down, LLC*, 610 B.R. at 783. For purposes of a Federal Rule 12(b)(6) motion, the Court considers the "complaint, public record, and documents that are 'integral to or explicitly relied upon' by a plaintiff, such as documents attached to a complaint and any undisputedly authentic documents upon which the claims are based." *In re Zohar III, Corp.*, 631 B.R. at 156.

44

**A.** **Plaintiffs Have Adequately Pled a Claim for Constructive Fraudulent Transfer (Counts I and II).**

62.     Plaintiffs' constructive fraudulent transfer claims only need to meet Federal Rule 8(a)(2)'s notice pleading standard. *Mervyn's Holdings*, 426 B.R. at 495 ("[C]laims of constructive fraud, *i.e.* fraudulent transfers, are evaluated using Rule 8(a)(2)."); *In re Zohar III, Corp.*, 631 B.R. at 155, 169 (same). A claim subject to Federal Rule 8's lenient standard survives a motion to dismiss "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that this standard is not a "probability requirement"); *see also Zohar III*, 631 B.R. at 169 (explaining Rule 8's is "a plausibility standard – it requires more than a sheer possibility that a defendant acted unlawfully but is not akin to the probability standard").

63.     Generally, a fraudulent transfer claim "will withstand dismissal if it alleges, *inter alia*, the transferor, the transferee, the amount of the transfer, and relevant date." *In re Zohar III, Corp.*, 631 B.R. at 170.  Specifically, to adequately plead a constructive fraud claim at the motion to dismiss stage, "[a]ll that is needed . . . is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent." *Mervyn's Holdings*, 426 B.R. at 495 (quotations omitted) (finding that the pleading was sufficient because "the Trustee ha[d] identified the transfer by date and face amount and ha[d] alleged that it was for no consideration")); *In re FTX Trading Ltd. v. Giles*, 2024 WL 4562675, at *12 (Bankr. D. Del. Oct. 23, 2024) (applying the same standard). A plaintiff does not need to "'set out in detail the facts upon which he bases his claim, so long as he gives the defendant(s) fair notice of what the claim is and the grounds upon which it rests.'" *In re Zohar III, Corp.*, 631 B.R. at 169 (internal citations omitted). The allegations in the Complaint meet this standard.  *See* Compl. ¶ 38-48.  The Complaint specifically alleges that (1) Alameda was the transferor of the 2021 Fraudulent Transfers (Compl.

45

¶ 43),[46] (2) the Binance Defendants were transferees and/or transfer beneficiaries of the 2021 Fraudulent Transfers (Compl. ¶¶ 38-39), (3) the 2021 Fraudulent Transfers had a fair market value of approximately $1.76 billion (Compl. ¶ 39), and (4) the 2021 Fraudulent Transfers occurred on or about July 15, 2021 (Compl. ¶ 38). The Complaint also identifies the specific documents effectuating the 2021 Fraudulent Transfers. *See* Compl. ¶ 38; *In re Zohar III, Corp.*, 631 B.R. at 171. And, as set forth below, the pleading requirements for lack of reasonably equivalent value and insolvency are easily satisfied here.

### 1. Lack of Reasonably Equivalent Value is Sufficiently Pled.

64. A plaintiff satisfies the reasonably equivalent value prong when he or she alleges that the party received less than "roughly the value it gave." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006). Courts in the Third Circuit have made clear that "disputes over reasonably equivalent value are not appropriate for determination on a motion to dismiss. Rather, they are issues to be addressed in the discovery process." *In re PennySaver USA Publishing, LLC*, 587 B.R. 445, 458 (Bankr. D. Del. 2011) (holding that the plaintiffs sufficiently pled defendants were not paid a reasonable equivalent value when they alleged the transfer in question, the date, and that the transfers were made for no material benefit to the debtors); *In re Fah Liquidating Corp.*, 572 B.R. 117, 127 (Bankr. D. Del. 2017) ("[D]isputes as to the actual value of the transfer or value given in exchange for the transfer do not need to be decided on a motion to dismiss so long as the Trustee has identified the transfer by date and face amount and has alleged that it was for no consideration." (internal quotations omitted)).[47]

---

[46] BHL incorrectly implies that Evergreen was the transferor. BHL Mot. at 15. The Complaint alleges that Alameda was the relevant transferor, and that the transfers at issue were of debtor property. Compl. ¶ 43.

[47] Binance's reliance on *In re Cred Inc.*, 650 B.R. 803, 836 (Bankr. D. Del. 2023) and *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002) is misplaced. In *Cred*, the Court found that the transfers were not identified by date or amount and that the complaint alleged facts that showed that the consideration received in the transfer was in fact valuable to the debtor. See *In re Cred Inc.*, 650 B.R. at 836 ("[T]hroughout the Complaint the Trust alleges

65.     Plaintiffs have sufficiently alleged that the Debtors did not receive reasonably equivalent value for the 2021 Fraudulent Transfers. In fact, the Complaint alleges that they received **no value**.  Compl. ¶ 39, 40, 42. The Debtors could not have received reasonable equivalent value in the 2021 Share Repurchase because both FTX Trading and WRS, the companies whose stock was repurchased, were balance-sheet insolvent at the time.  Compl. ¶ 40, 42; *see In re DBSI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011) ("Finally, because Trustee has sufficiently alleged that the unified [debtor] enterprise was insolvent, Trustee has necessarily alleged that [defendants'] interests in the [debtor] enterprise were valueless."); *In re Ipswich Bituminous Concrete Prods., Inc.*, 79 B.R. 511, 517 (Bankr. D. Mass. 1987) ("With respect to the stock redemption transaction, the Debtor received nothing but two-thirds of its outstanding stock, which in view of the Debtor's insolvency was worthless"). Plaintiffs, therefore, clearly did not receive "roughly the value it gave" when it paid $1.76 billion for shares that had no value.  Compl. ¶ 40, 42.

66.     Indeed, courts have found that a Company's repurchase of its stock provides no "value" as a matter of law. *See In re Joshua Slocum, Ltd.*, 103 B.R. 610, 618-19 (Bankr. E.D. Pa.), *aff'd sub nom. In re Joshua Slocum Ltd.*, 121 B.R. 442 (E.D. Pa. 1989). In *Roco Corp.*, the First Circuit held that the debtors did not receive reasonably equivalent value from the redemption of stock and explained that "[u]nder generally accepted accounting principles this treasury stock would be reported on the balance sheet of [debtor] as a reduction of stockholders' equity, not as an asset . . . . As the appellate panel noted, treasury stock is a form of shareholder distribution from

---

facts that support the opposite conclusion: that Uphold's provision of advertising and referral services to Cred was quite valuable."). Here, by contrast, FTX received no value—tangible or otherwise. Compl. ¶¶ 6, 39, 98.  In *Peltz*, the Court properly engaged in a totality-of-the-circumstances analysis—but only because some value had been received. *See generally Peltz*, 279 B.R. 710 (D. Del. 2002).  That approach is inapplicable here, where the Complaint adequately alleges a complete lack of value received. Compl. ¶¶ 6, 39, 98.

47

which the corporation received no assets. When a corporation purchases treasury stock it reduces its capitalization." *In re Roco Corp.*, 701 F.2d 978, 982 (1st Cir. 1983) (internal citations and quotations omitted).  BHL attempts to downplay the Complaint's extensive allegations of the lack of reasonable equivalent value by asserting that FTX must have had positive value based on marketplace valuations, but at the same time it admits to an undisclosed "massive fraud [at FTX] in July 2021." BHL Mot. at 20.  The Complaint clearly alleges that the 2021 Share Repurchase was a critical component of Bankman-Fried's fraud and that he used the repurchase to hide the vulnerability of the FTX exchange. Compl. ¶¶ 45-48; *see In re Millenium Lab Holdings II, LLC*, 2019 WL 1005657, at *6 (Bankr. D. Del. Feb. 28, 2019) (finding plaintiff alleged theory's veracity "is not a decision" at the motion to dismiss stage).

### 2. Insolvency is Sufficiently Pled.

67.     "Insolvency is a fact-intensive inquiry and precise calculations are not needed for [the motion to dismiss] stage." *In re Zohar, Corp.*, 631 B.R. at 173-74 (holding that plaintiffs had sufficiently alleged facts to demonstrate insolvency for purposes of pleading). As discussed, *infra*, Plaintiffs have sufficiently alleged insolvency at the time of the 2021 Fraudulent Transfers.

### 3. Each Binance Entity is Sufficiently Alleged to be a Transferee and/or a Transfer Beneficiary.

68.     Plaintiffs plausibly allege that Binance Services, Binance Holdings, Binance IE, and Digital Anchor are each transferees and/or transfer beneficiaries in connection with the 2021 Fraudulent Transfers. The Complaint alleges that the consideration was transferred to the Binance.com platform (Compl. ¶ 43) and "to Binance." Compl. ¶ 82. And, despite the Binance Defendants' protests of "group pleading," the Complaint plausibly alleges, based on the express language of a binding CFTC Consent Order entered into by the three BHL defendants, that all of the Binance Defendants were transferees because they form part of the "maze of corporate entities"

that "collectively" controlled the Binance.com platform.  Compl. ¶¶ 24-25; *see In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 723 (Bankr. S.D. Tex. 2020) (in denying defendant's motion to dismiss fraudulent transfer claims, rejecting defendant's argument that plaintiff had impermissibly "group pleaded" because "[w]here more than one defendant allegedly committed the same act together, a complaint is not defective for the reason that it asserts that all defendants committed the same act, without identifying each individual defendant.") (internal quotations and citations omitted). And despite the protests of the fourth defendant, Digital Anchor, that it was not a party to the CFTC Consent Order, the findings of the Consent Order were expressly not limited to the three BHL defendants, and instead referred Zhao's ownership of "the scores of entities that collectively operate the Binance platform . . . as a common enterprise" CFTC Consent Ord. ¶19, 23; Compl. ¶ 25. As Digital Anchor (formerly known as Binance Capital Management) is plausibly alleged to be among these scores of Binance affiliates owned by Zhao, Plaintiffs have more than carried their burden at the pleading stage. Compl. ¶¶ 41, 56 (referencing the sale by Digital Anchor (f/k/a Binance Capital Management) of FTX stock in the 2021 Share Repurchase, which Zhao later referred to in a Tweet as "*Binance's* exit from FTX equity last year"). More directly, Digital Anchor ignores that *it was the actual seller* in the 2021 Share Repurchase. Combined with the allegations that the transfers were made "to Binance" on the Binance.com platform, this suffices, at the pleading stage, to allege that Digital Anchor was a transferee. In any event, at a minimum, these facts sufficiently allege that Digital Anchor was an "entity for whose benefit [the] transfer was made" under section 550(a)(1) of the Bankruptcy Code, as it reasonable to infer, at the pleading stage, that the actual seller of shares benefitted from the consideration paid for those shares. *See* 11 U.S.C. § 550(a)(1). Similarly, it is a reasonable inference that the three BHL defendants were, at a minimum, beneficiaries of the transfers in light of the allegations that they

49

collectively, along with other Binance entities, operated the platform to which the transfers were made and that they "comingled funds." Compl. ¶¶ 24-25.

> **B.    Plaintiffs Have Adequately Pled a Claim for Actual Fraudulent Transfer (Counts III and IV).**

69.     While actual fraudulent transfer claims generally must meet the elevated pleading standards of Federal Rule 9(b), "the requirements of Rule 9(b) are to be interpreted liberally where the claim is asserted by a trustee or trust." *In re Cred Inc.*, 650 B.R. at 834 (citing *In re Charys Holding Co.*, 2010 WL 2774852, at *3 (Bankr. D. Del. July 14, 2010)). In any event, "[d]etermining whether a transfer was made with fraudulent intent is a fact intensive inquiry 'rarely susceptible to resolution at the [pleading] stage.'" *In re Our Alchemy, LLC*, 642 B.R. 155, 164 (Bankr. D. Del. 2022) (quotations omitted). As is the case with a constructive fraudulent transfer claim, pleading of an actual fraudulent transfer claim will generally "withstand dismissal if it alleges, *inter alia*, the transferor, the transferee, the amount of the transfer, and relevant date." *In re Zohar III, Corp.*, 631 B.R. at 170; *see also In re Millenium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (same). And, determining whether a transfer was made with fraudulent intent is a fact intensive inquiry "rarely susceptible to resolution at the [pleading] stage." *In re Our Alchemy, LLC*, 642 B.R. at 164.

70.     The actual fraudulent transfer claims are pled with sufficient particularity to satisfy both Federal Rule 8(a) (and even Federal Rule 9(b), to the extent applicable). As an initial matter, the Plaintiff alleging the Fraudulent Conveyance Claims is the FTX Recovery Trust, a party that was not present during the transactions and events in question and should be afforded the more liberal standard in pleading.  *See In re Cred Inc.*, 650 B.R. at 834 ("[T]he requirements of Rule 9(b) are to be interpreted liberally where the claim is asserted by a trustee or trust[.]"); *In re Nat'l Serv. Indus., Inc.*, 2015 WL 3827003, at *4 (Bankr. D. Del. June 19, 2015) (same); *In re APF Co.*,

308 B.R. 183, 188 (Bankr. D. Del. 2004) (same). The Complaint satisfies both pleading standards. *Supra*, ¶ 63; Compl. ¶¶ 38-43.[48]

71.    In any event, the Complaint specifically pleads the facts establishing two distinct forms of fraudulent intent in connection with the 2021 Fraudulent Transfers, both through direct and circumstantial evidence. *In re Mallinckrodt PLC*, 2024 WL 206682, at *24 (Bankr. D. Del. 2024) (holding actual fraudulent intent is satisfied through direct evidence of intent, or through circumstantial evidence of intent). ***First***, the Complaint specifically alleges, with supporting facts, that the 2021 Share Repurchase was done in furtherance of Bankman-Fried's fraud insofar as it was used "to convey confidence and strength to the market at a time when the Debtors were insolvent and secretly reliant on FTX Trading's cash and crypto from customer deposits for liquidity." Compl. ¶ 48; *see also supra* ¶ 6. Delaware Courts have found that actual intent is adequately pled when the Complaint alleges that "the transaction was part of an elaborate ruse that played a critical role in the debtor's larger fraudulent scheme." *Drivetrain, LLC v. X. Commerce, Inc.*, 2023 WL 1804627 at *4 (Bankr. D. Del. Feb. 7, 2023) (denying defendant's motion to dismiss when the complaint did not allege any badges of fraud but instead provided evidence that the transactions were done to perpetuate the debtor's overall fraud). And, as Judge Dorsey previously determined in another FTX adversary proceeding, *Embed*, such a scheme to "head fake" the market "might well be sufficient" at the pleading stage to support fraudulent intent if supported by specific factual allegations. *In re FTX Trading Ltd.*, 2024 WL 4562675, at *17-18 (Bankr. D. Del. Oct.

---

[48]    As discussed, *supra*, the Complaint has adequately pleaded that each of the Binance Defendants were transferees and/or transfer beneficiaries. *See supra* ¶¶ 63,68. *See In re Zohar III Corp.*, 631 B.R. at 171 ("To adequately plead an actual fraudulent transfer claim against multiple defendants, Federal Rule 9(b) requires that a complaint provide notice to each defendant of 'the circumstances surrounding the fraudulent conduct with which he is individually charged' sufficient 'to allow each defendant to prepare an effective answer or defense.'") (quotations omitted); *see also In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 455 (Bankr. D. Del. 2006) ("[P]rovided a plaintiff alleges sufficiently particularized allegations, there is no per se rule that group pleading cannot satisfy Rule 9(b).").

23, 2024). Here, the Complaint amply provides such specific factual support, alleging that, in reference to the 2021 Share Repurchase, Bankman-Fried emailed a Forbes reporter that "[t]he purchase was entirely from Alameda. Yeah, it had a good last year :P" (*i.e.*, an emoji for a tongue sticking out)." Compl. ¶ 48. The Complaint further alleges that this communication is direct evidence of Bankman-Fried's scheme "to hide the vulnerability of the exchange to a run on the institution by customers seeking to reclaim their assets deposited on the exchange." *Id.* These allegations alone are sufficient to plead fraudulent intent, as they adequately support the claim that the transfers were made "with actual intent to hinder, delay, or defraud" FTX's existing and future creditors, which included their existing and future customers.[49] *See* 11 U.S.C. § 548.

72.     ***Second***, distinct from the scheme to project (false) strength to customers and the market generally, the Complaint also alleges that the "2021 Share Repurchase was a critical component of Bankman-Fried's pervasive fraud involving the unauthorized use of FTX customer deposits," as shown by the testimony of Caroline Ellison.  Compl. ¶ 47. As alleged, "the 2021 Share Repurchase represented a significant scaling up of the scheme [to fraudulently use FTX customer funds to fund Alameda's investments, with Ellison] describing it as the 'the first time that I can recall an amount that large being taken from FTX.'" *Id.* In other words, the 2021 Share Repurchase was a major part of Bankman-Fried's fraudulent scheme involving the unauthorized use of fraudulent deposits for the simple reason that the 2021 Share Repurchase was itself—at Bankman-Fried's direction—largely, and secretly, funded through the unauthorized use of customer deposits. *Id.* ¶ 46-48. Again, these allegations standing alone would be more than

---

[49]     BHL's reliance on *Embed* is misplaced, as BHL simply ignores that the supporting factual allegations that Judge Dorsey found were absent in the original complaint in *Embed* are clearly and directly pleaded here.  BHL Mot. at 22 (citing *FTX Trading Ltd.*, 2024 WL 4562675, at *9).

sufficient to plead the requisite fraudulent intent because they adequately support the claim that the transfers were made with actual intent to defraud FTX's customer creditors.

73.     BHL claims these allegations are "flatly inconsistent with other portions of the Complaint," but fails to identify any actual inconsistency (because there are none).  BHL Mot. at 21-22.   BHL's only attempt to do so simplistically contends that Plaintiffs concede in the Complaint that the 2021 Share Repurchase was Zhao's decision, not Bankman-Fried's, and therefore, that the 2021 Share Repurchase could not have been in furtherance of Bankman-Fried's fraud.  BHL Mot. at 22.   Of course, the 2021 Share Repurchase was an *agreement* between FTX and Binance, and in that sense both parties "decided" to enter into the transaction, each with their own motivations. *See* Compl. ¶ 39. What is relevant here is the motivation of the transferor—here, the FTX Enterprise (and Alameda specifically). *See* 5 Collier on Bankruptcy P 548.04 (citing cases). As set forth *supra*, the Complaint amply alleges, with factual support evidencing direct fraudulent intent, that Bankman-Fried made the decision to enter into the transactions constituting the 2021 Fraudulent Transfers "with the actual intent to hinder, delay, or defraud" creditors. *See* 11 U.S.C. § 548; *Drivetrain*, 2023 WL 1804627 at *4.

74.     Even beyond the direct evidence of fraudulent intent referenced above, the Complaint goes even further and provides ample circumstantial evidence of fraudulent intent. *See* Compl. ¶¶ 38, 45-49. Courts recognize that a plaintiff rarely has direct evidence of fraudulent intent at the pleading stage; thus, they "rely on badges of fraud as circumstantial proof of actual fraudulent intent." *In re Our Alchemy, LLC*, 642 B.R. at 164.  The "badges of fraud" often include "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and

(6) secrecy or concealment of the transaction." *In re Zohar III Corp.*, 631 B.R. at 174. Courts also look to allegations of the lack of reasonably equivalent value received as a "badge of fraud." *In re Live Well Financial, Inc.*, 2023 WL 3995900, at *15 (Bankr. D. Del. Jun. 13, 2023). And Delaware's Uniform Fraudulent Transfer Act ("**UFTA**") also considers whether "[t]he transfer or obligation was to an insider." 6 Del. C. § 1304(b)(1). Notably, "[a] court need not find that all— or even a majority—of the badges of fraud are present to find that a debtor acted with actual intent to hinder, delay, or defraud." *In re Our Alchemy, LLC*, 642 B.R. at 164 (citing cases). Only the intent of the transferor, not the transferee, must be established. *In re Live Well Financial, Inc.*, 652 B.R. 699, 704-05 (Bankr. D. Del. 2023); *In re PennySaver USA Publishing LLC*, 587 B.R. at 461 (finding three badges of fraud present in complaint and denying motion to dismiss actual fraudulent transfer claims).

### 1. The Defendants Were Insiders at the Time of the 2021 Fraudulent Transfers.

75.     The Complaint properly alleges that the transferees were part of a small coterie of private shareholders of Plaintiff FTX Trading and WRS—thus, making them insiders. Compl. ¶ 34, 37-38; 11 U.S.C. § 101(31) (defining "insider" to include a "person in control of the debtor"); 6 Del. C. § 1301(7) (same). "The Third Circuit has held that a person can be an insider even if he or she does not fit into one of the enumerated categories. A finding of control is not necessary for an entity to be a non-statutory insider." *See In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *11 (Bankr. D. Del. Oct. 9, 2012) (citing *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 396 (3d Cir. 2009)). The relevant inquiry "is whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length." *Winstar Commc'ns, Inc.*, 554 F.3d at 396-97. Here, at the time of the transfer, the Defendants were non-statutory insiders because of their close relationship with the Debtors,

calling in question whether the 2021 Share Repurchase was conducted at arms' length.  *See In re TC Liquidations LLC*, 463 B.R. 257, 277 (Bankr. E.D.N.Y. 2011) (holding that the badge of fraud regarding the "relationship between the parties" was present because the defendants were shareholders and officers of the debtors).

> **2.      Debtors Were Insolvent at the Time of the 2021 Fraudulent Transfers.**

76.      Whether Debtors were insolvent at the time of the 2021 Fraudulent Transfers is "highly fact-specific" inquiry and "[s]pecific findings of insolvency are best determined following discovery and should not be generally decided on a motion to dismiss." *Miller v. Mott*,  2023 WL 6467368, at *6 (Bankr. D. Del. Oct. 4, 2023). Plaintiffs are "not required to present a fully proven case at the motion to dismiss stage, but only must allege facts that make [their] claim plausible." *Id.*; *see also In re Essar Steel Minnesota LLC*, 2019 WL 2246712, at *5-6 (Bankr. D. Del. May 23, 2019) (holding that complaint's "straightforward allegation that [the debtor] was insolvent, in addition to the balance of [its] factual allegations" at the time of transfers at issue was sufficient to plead insolvency).

77.      The Complaint alleges that at the time of the 2021 Fraudulent Transfers (1) Debtors had overvalued FTT and other cryptocurrencies held by Plaintiffs that were closely tied to FTX and Bankman-Fried, (2) Debtors did not have the financial resources to satisfy all customer deposits, (3) FTX would not have been able to continue to operate as a business had customers attempted to withdraw their deposits because the Debtors concealed and misrepresented material facts about their business, and (4) Debtors had accrued large and unaccounted for regulatory liabilities.  Compl. ¶ 45. Moreover, the Complaint provides that, just prior to the 2021 Fraudulent Transfers, Ellison prepared a balance sheet showing that the transferor, Alameda, had a net asset value that was approximately negative $2.7 billion with liabilities of $9.4 billion.  Compl. ¶ 46.

As such, Plaintiffs have sufficiently alleged insolvency at the time of the 2021 Fraudulent Transfers.[50]

### 3. Debtors Transferred a Significant Portion of their Estates.

78. The Complaint alleges that, upon learning of Alameda's insolvency and while the Defendants were still insider shareholders, Bankman-Fried directed Alameda to take approximately $1 billion USD from FTX customer deposits on the FTX.com platform to fund the 2021 Fraudulent Transfers. Compl. ¶ 46. Plaintiffs have adequately pled this badge of fraud. *In re PennySaver USA Publishing, LLC*, 587 B.R. at 461 (holding that complaint had sufficiently pled "how much of the Debtors' estate was transferred" badge of fraud by alleging the specific dollar amount transferred and "that the amount was most likely more than the Debtors could afford").

### 4. Debtors Received No Value.

79. As discussed *supra*, "taking all facts in the Complaint as true and drawing all reasonable inferences in favor of Plaintiff, Plaintiff has placed Defendants on notice of his theory of the case"—that Debtors did not receive reasonably equivalent value for the 2021 Fraudulent Transfers because the 2021 Fraudulent Transfers, which reduced assets otherwise available to pay creditors with no corresponding reduction to liabilities, "provided no value" to Debtors because the repurchased shares were of insolvent entities. *See supra*, Sec. IV.A.1. Plaintiffs have, therefore, adequately pled that they did not receive reasonably equivalent value in exchange for the 2021

---

[50] BHL suggests that this Court should consider the exhibits attached to the *Declaration of Gregory Strong in Support of Binance Holdings Limited's, Binance Holding (IE) Limited's, and Binance (Services) Holdings Limited's Motion to Dismiss the Complaint* [D.I. 68], which includes FTX Trading's disclosures with the U.S. Securities and Exchange Commission. This is improper for a Rule 12(b)(6) motion to dismiss. *King v. Doe*, 2011 WL 2669221, at *4 (D. Del. July 6, 2011) ("If on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion *must* be treated as one for summary judgment under Rule 56."). In any event, the Complaint alleges that the equity capital raise after the 2021 Share Repurchase was "tainted by the same overarching fraud." Compl. ¶ 50.

Fraudulent Transfers. Again, the Court need not even reach the "badges of fraud" analysis, because the Complaint adequately pleads direct evidence of fraudulent intent. But these badges of fraud remove any doubt that Plaintiffs have adequately pleaded actual fraudulent transfer.

## V.  THE COMPLAINT ADEQUATELY PLEADS THE PREDATORY ACTS CLAIMS

80.     The Binance Defendants next argue that the Predatory Acts Claims are not adequately pleaded. BHL Mot. at 24-36; DA Mot. at 22-23. Like the rest of their motion, BHL employs a scattershot approach, arguing that the Tweets were not false or misleading, that Plaintiffs improperly "group plead," and that certain elements of the Predatory Acts Claims are missing. BHL Mot. at 24-36. For its part, Digital Anchor argues that they did not make any of the false statements. DA Mot. at 22-23. But the Complaint easily satisfies the standards of Federal Rule 8(a)(2) with respect to the injurious falsehood and unjust enrichment claims, and Federal Rule 9(b) with respect to the fraud and intentional misrepresentation claims. Plaintiffs' allegations raise numerous questions of fact that cannot be resolved at the pleading stage, particularly with respect to the Binance Defendants' motives, therefore warranting further development through discovery, not premature dismissal. *See In re Genesis Health Ventures, Inc.*, 355 B.R. at 459.

81.     Further, BHL appears to argue that Plaintiffs' fraudulent transfer claims and Predatory Acts Claims are "internally inconsistent" because an insolvent company cannot be wronged by tortious conduct. BHL Mot. at 22-23. This assertion is entirely unsupported by existing case law in this Circuit, which establishes that an insolvent company may be injured by tortious conduct that affects the sale or value of its assets. *See, e.g.*, *In re Pitt Penn Holding Co*., 484 B.R. 25, 54 (Bankr. D. Del. 2012) (holding that an officer's intentional misrepresentations in public statements injured the company despite the fact that the company was alleged to be insolvent at the time); *In re PA Co-Man, Inc*., 644 B.R. 553, 652 (Bankr. W.D. Pa. 2022) (holding

57

that the debtor suffered damages by tortious conduct because its assets were not marketed or offered up for sale). As in *In re PA Co-Man*, "[p]otentially higher offers for the assets (such as potential deals with [other financers] were . . . scuttled because of the concerted action of" the Binance Defendants and CZ. 644 B.R. at 652; Compl. ¶¶ 69, 74. As alleged, the Binance False Statements destroyed substantial value that would have otherwise been recoverable by FTX's stakeholders, including through "fire sales" of assets at depressed values to respond to withdrawal requests and the need to respond to emergency collateral calls. Compl. ¶ 63. Those statements also "eliminated any possibility that FTX would obtain adequate emergency financing from any other source . . . [and] eliminated any possibility that FTX could resume and stabilize its business." Compl. ¶ 74. Accordingly, Plaintiffs have pleaded a viable theory of damages because, even assuming FTX would have needed to file for bankruptcy.

### A.    Plaintiffs Are Permitted to Collectively Reference the Binance Defendants.

82.    The Binance Defendants' main Rule 12(b)(6) challenge to the Predatory Acts Claims focuses on a collective definition of "Binance" in the Complaint. BHL Mot. at 29-30; DA Mot. at 22-23. But case law from the Third Circuit and elsewhere establish that Plaintiffs are permitted to make collective reference to corporate entities, even under the heightened pleading standard set out by Federal Rule 9(b). *See, e.g.*, *MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004) (explaining there is "no per se rule that group pleading cannot satisfy Rule 9(b)").[51] So long as the plaintiff alleges sufficiently particularized allegations, "[c]ollective allegations of fraud against a group of defendants" can satisfy the heightened pleading standard

---

[51]    The cases cited by BHL and Digital Anchor limit their holdings to their specific contexts, and are thus distinguishable. *See, e.g.*, *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp 3d 468, 488 (D. Del. 2021) ("[I]n order for the plaintiff to have set out a plausible claim of infringement as to each defendant, the plaintiff needs to plead enough facts to render it plausible that each defendant individually has performed[.]"); *Lawal v. McDonald*, 546 F. App'x 107, 113-14 (3d Cir. 2014) (holding that plaintiffs must plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

under Federal Rule 9(b). *Id.*;[52] *see also In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 208 (E.D.N.Y. 1997) (adopting the "group pleading presumption," which provides that "no specific connection between fraudulent [statements] need be pleaded when the facts are exclusively within the defendant's knowledge, as is the case when defendants are insiders or affiliates participating in the statements at issue"). Even absent ownership of or control over corporate entities by an individual defendant, this Court has held that collective reference to corporate defendants can satisfy Rule 9(b). *See In re Genesis*, 355 B.R. at 457.

83.      Here, Plaintiffs have pleaded two theories of fraudulent or otherwise wrongful conduct committed by CZ and the Binance Defendants "as a group": (1) the publication of false statements regarding the reasons for Binance's liquidation of FTT (the November 6 False Tweets); and (2) the communication and/or publication of false statements surrounding the Letter of Intent (execution of the Letter of Intent, the November 8 Tweets, and the November 9 Tweets). *See* Compl. ¶¶ 55-79; *Genesis*, 355 B.R. at 457. Plaintiffs specified the dates of each instance of allegedly wrongful conduct, summarized the substance of the communications, and identified the recipients of the impugned statements. *Id.* ¶¶ 56, 58, 60, 64-70. Since Plaintiffs have alleged that CZ controlled the Binance Defendants at all material times, it would be "unfair" to hold Plaintiffs to the requirement that it identify which of the entity Defendants made each statement.[53] *MBIA,*

---

[52]    For example, the complaint at issue in *MBIA* alleged causes of action in fraud and misrepresentation against an individual defendant and the group of entities the individual "owned and/or controlled," without "distinguish[ing] between, or attribut[ing] certain acts of fraud or misrepresentation to, the individual entities." *Id.* at 421-22. The Court held that "[b]ecause [the individual defendant is] alleged to control or own each of the [corporate entities],…it would be unfair to hold [the plaintiff] to a requirement that it identify which of the [corporate entities] [the individual defendant] was acting through when he, or the entities, made various alleged fraudulent statements, misrepresentations, or concealments." *Id.* The Court also reasoned that, "more importantly," each corporate entity had "notice of the allegations against which they must defend, thus distinguishing the instant action from cases where courts are compelled to dismiss complaints because of vague attributions of fraudulent statements to 'defendants.'" *Id.*

[53]    Although CZ used his "X" account for the November 6 False Tweets and November 8 Tweets, he did so as the founder and CEO of Binance Defendants, referring to actions "we" or "Binance" took. Compl. ¶¶ 56, 68. Therefore, it is appropriate to attribute such statements to Binance Defendants since he was discussing actions

221 F.R.D. at 421-22; Compl. ¶¶ 24-26, 29. And most importantly, the allegations in the Complaint are sufficient to give the Binance Defendants "notice of the allegations against which they must defend." *Id.* This is particularly true, where the three BHL defendants themselves admitted, in a federal CFTC Consent Order they "engaged in activities to collectively advertise and promote the Binance brand" and that "Binance's reliance on a maze of corporate entities to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and location of the Binance platform."[54]

84.    Moreover, the Binance Defendants ignore that the communications underlying the Predatory Acts Claims were, on their face, made on behalf of the Binance Enterprise as a whole, and the statements themselves blurred corporate lines. The corporate Twitter account issuing many of the Tweets at issue was simply called "Binance," not any specific legal entity. Compl. ¶ 70. Even CZ's account was called "@cz_binance"—again without specifying the "Binance" entity referenced in the handle. *See* Compl. ¶ 56. Moreover, many of the Tweets at issue—both from the "Binance" account and the "@cz_binance" account—use the collective "Binance, "we" or "our" to refer to actions taken by the Binance Enterprise as a whole. For example, the very first Tweet at issue refers to "*Binance*'s exit from FTX equity last year" (*i.e.*, the 2021 Share Repurchase) and then proceeds to announce that "we" have decided to liquidate any remaining FTT on their books. Compl. ¶ 56. As Plaintiffs allege (and the Binance Defendants do not dispute), as a formal matter, the specific legal entity that signed the agreement that "exited" FTX equity was Digital Anchor

---

taken by Binance Defendants. *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (noting that statements made by the company's CEO and CFO are can be imputed to the company because they had apparent authority to make those statements); *Kumar v. Kulicke and Soffa Industries, Inc.*, 2019 WL 5081896, at *6-7 (E.D. Pa. Oct. 9, 2019) (noting that the CFO's statement could be imputed to the company because the statement was made in the course of the CFO's employment and for the benefit of the company); *Genesee County Employees' Retirement System v. DocGo Inc.*, 773 F.Supp.3d 62, 87-89 (S.D.N.Y. 2025) (imputing scienter to the company for a false statement made by company's CEO).

[54]    *See* CFTC Consent Ord. ¶¶ 23-24.

(f/ka Binance Capital Management), a fact that completely undermines Digital Anchor's attempts to distance itself from the communications made by or on behalf of "Binance." Compl. ¶ 41. Similarly, a later Tweet from the "@cz_binance" Twitter account stated that "*we* signed a non-binding Letter of Intent, intending to fully acquire FTX.com . . ." and then a Tweet from the "@binance" Twitter account that said, "*we* have decided that we will not pursue the potential acquisition of FTX.com." Compl. ¶ 70.  As established above (in the context of the personal jurisdiction arguments), Digital Anchor was, again, the specific legal entity that signed, and later withdrew from, the Letter of Intent. *Supra* ¶ 29.  Digital Anchor's attempt now to point the finger at the rest of the Binance Enterprise illustrates exactly the problem: the Binance Defendants are essentially playing a shell game—relying on their carefully crafted "maze" of affiliated entities—to escape liability.  The case law set forth above does not allow them to do so.

### B.    Plaintiffs Have Plausibly Alleged That the Tweets Were False or Misleading.

85.    Plaintiffs have sufficiently alleged that the Binance False Statements were false or misleading.[55]  Contrary to BHL's assertions,[56] the allegations in the Complaint rise "above the speculative level."  BHL Mot. at 25 (quoting *Aoki v. Benihana Inc.*, 839 F. Supp. 2d 759, 763 (D. Del. 2012) (quoting *Twombly*, 550 U.S. at 545)).  *Aoki* and *Twombly* establish a low threshold

---

[55]    The Complaint brings the Predatory Acts Claims under "applicable law" – here, Delaware.  *See* Compl., Counts V-IX. Delaware law applies to the Predatory Acts Claims under the "most significant relationship" test employed by Delaware courts. *Pa. Emp. Benefit Trust Fund v. Zeneca, Inc*., 710 F. Supp. 2d 458, 467-68 (D. Del. 2010). Under that test, courts should consider four factors: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where any relationship between the parties is centered.  *Id.* These factors are to be "evaluated according to their relative importance with respect to the particular issue."  *Id.* at 468.  The present case is unique because of the lack of a single U.S. state that can be identified as the center of the parties' relationship, the lack of any overlap between the places of incorporation of both companies (however, certain Plaintiffs were incorporated in Delaware), and the fact that the harmful conduct took place over the Internet harming US creditors.  Therefore, the most relevant state jurisdiction is the place where the injury, *i.e.*, FTX's bankruptcy, took place—Delaware.

[56]    Digital Anchor has incorporated by reference BHL's arguments for "failure to plead a false or misleading statement, injurious falsehood, intent and unjust enrichment. *See* DA Mot. at 23 n.10.

intended to screen out pleadings that contain only "labels and conclusions, and a formulaic recitation of a cause of action's elements." *Aoki*, 839 F. Supp. 2d at 763; *Twombly*, 550 U.S. at 545 (clarifying that it "does not impose a probability requirement at the pleading stage."). Plaintiffs here have set out an extensive narrative of the alleged fraudulent and wrongful conduct, which they expressly incorporate into each of their claims for relief and are far from simply a "formulaic recitation" of claim elements. Compl. ¶¶ 37, 39-41. That narrative is supported by factual allegations of a tumultuous relationship between the Binance Defendants and FTX, the Binance Defendants and CZ's long-standing scheme to destroy FTX, the use of social media platforms to cause a bank run on FTX, and the Binance Defendants' bad faith in entering into the Letter of Intent. Compl. ¶¶ 52-79. The relative merit of Plaintiffs' and BHL's theories surrounding the Binance False Statements is a factual issue to be determined at trial.

86.     Moreover, the Complaint sufficiently contains allegations of the Binance Defendants' (and CZ's) false and misleading statements. The first category of false statements, the November 6 False Tweets, encompass the statements of CZ that: (1) the Binance Defendants' sale of FTT was not a "move against a competitor," (2) the Binance Defendants would try to liquidate FTT in a way that would minimize market impact; and (3) liquidating FTT was "just post-exit risk management."  As alleged in the Complaint, these statements were false—*i.e.*, the sale was in fact a move against a competitor, Binance had no intention of trying to liquidate FTT in a way that would minimize market impact, and liquidating FTT was not simply a "post-exit risk management."  *Id.* ¶¶ 56-63. In establishing that the Binance Defendants' true motive was to destroy FTX, *id.*, Plaintiffs rely not only on sworn testimony from a former FTX insider at the trial of Bankman-Fried, but also upon internal FTX communications and observations around the time of CZ's Tweets and testimony at a Senate Hearing from an FTX investor. *See id.* ¶ 57. Plaintiffs

also point to the fact that the Binance Defendants had already sold a large amount of FTT before the November 6 False Tweets as demonstrating that the subsequent statements were knowingly false because, again, it demonstrates that the public statements announcing a future sale were gratuitous and only designed to harm FTX. Compl. ¶ 58. Most importantly, as explained in the Complaint, falsity of these statements is reasonably inferred from the circumstances, including the fact that the public announcement of the sale of FTT made no sense except to the extent it was done to maximize market impact and harm a competitor, belying the statements in the November 6 False Tweets. *Id.* ¶¶ 57-58. BHL ignores all of these key allegations, which easily clear the low bar of plausibility.

87.    The second category of statements encompass the Letter of Intent, the November 8 Tweets, and November 9 Tweets regarding the Letter of Intent. As demonstrated in the Complaint, the Letter of Intent provided, and CZ publicized, that the Binance Defendants intended to acquire FTX Trading subject to due diligence. *Id.* ¶¶ 67-68. The Binance Defendants pulled out of the acquisition the following day, announcing that it did so "[a]s a result of corporate due diligence as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations." *Id.* ¶ 70. The Complaint demonstrates that, when these public statements were made, the Binance Defendants and CZ intended to create the impression that they had seen something in the "due diligence" regarding FTX's finances that was even worse than what the public already knew. *Id.* ¶ 73. But, as alleged, the fact is that the Binance Defendants and CZ (1) did not receive any new material information that might constitute "corporate due diligence" causing Binance to withdraw from the acquisition, and (2) knew of the mishandled customer funds *prior to* executing the Letter of Intent. *Id.* ¶¶ 65, 72-73. The Complaint provides a detailed timeline supporting these facts:

63

a)   <u>November 8, 2022</u>:

    i)   "Around 1 a.m. . . . Bankman-Fried called Zhao. Upon information and belief, during this phone call, Bankman-Fried informed Zhao that FTX would soon find itself unable to satisfy customer withdrawal requests, in part because Alameda had been borrowing large amounts from FTX.com customer deposits, necessitating the emergency financing that Bankman-Fried was requesting from Zhao. Bankman-Fried reflected to the FTX team that Zhao "seemed receptive" but needed to consider the proposal." *Id.* ¶ 65.

    ii)   "[A]round 2:30 a.m Zhao confirmed the '[r]ough proposal from us would be: we do a full take over, cover all user asset shortage, to minimize damage to the market and the user . . . . [W]e can move quickly.'" *Id.* ¶ 66.

    iii)   Later that day, "Bankman-Fried and Zhao executed a letter of intent on behalf of their respective companies." *Id.* ¶ 67.

b)   <u>November 9, 2022</u>:

    i)   "Binance sent over a revised due diligence request around 12:00 p.m. . . . ." *Id.* ¶ 69.

    ii)   "Around the same time, FTX employees and Binance employees started having kick-off calls to determine the scope of the due diligence." *Id.*

    iii)   "The general counsel of FTX.US wrote on November 9, 2022, '[s]poke to the Binance legal this morning as a diligence kick-off call. Was very high level and they said they would follow-up. . . .'" *Id.* .

    iv)   "At 3:00 p.m. . . . while FTX employees were still working on the Binance's updated diligence requests and despite Zhao's warning that there was 'a lot to cover and [the deal] will take some time,' Binance published a tweet threat announcing that it was backing our 'as a result of corporate due diligence. . . .'" *Id.* ¶ 70.

88.   Given this sequence, the Complaint sufficiently alleges that the Binance Defendants and CZ never intended to consummate the acquisition of FTX Trading when they signed the Letter of Intent, but instead sought to convey to the market the false impression that Binance had received diligence materials showing that situation was worse than already known and to prevent FTX from seeking alternative financing. *Id.* ¶¶ 7, 73, 131, 135, 139. Indeed, there is no alternative plausible explanation for the Binance Defendants' misconduct. Before they ever

64

executed the Letter of Intent, they knew of the very conduct—the customer withdrawals—on which they justified their termination. *Id.* ¶ 65. On these facts, it cannot be said that these allegations are "so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Theseus Strategy Group LLC v. Barsa*, 2021 WL 4453595, at *9 (D. Del. Sept. 29, 2021).[57]

### C. Plaintiffs Have Adequately Pled a Claim for Injurious Falsehood (Count VI).

89.     To establish a claim of injurious falsehood, plaintiffs must establish that the defendant (1) made a false statement "about the plaintiff, his property, or his business," (2) intended for "publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so," and (3) knew that "the statement is false or act[ed] in reckless disregard of its truth or falsity." *In re Nat'l Collegiate Student Loan Trusts Litig.*, 2020 WL 3960334, at *4 (Del. Ch. July 13, 2020).[58] Claims for injurious falsehood only need to meet the less stringent Rule 8(b) pleading standard. *See Marino v. Cross Country Bank*, 2003 WL 503257, at *2 (D. Del. Feb. 14, 2003) (applying the Rule 9(b) standard to plaintiff's fraud claim, and not his injurious falsehood claim); *Ephoca Inc. v. Olimpia Splendid USA, Inc.*, 2024 WL 687840, at *2-4 (Del. Super. Feb. 20, 2024) (holding that the parallel Rule 9(b) in the Delaware Rules of Civil Procedure does not apply to injurious falsehood claims). Plaintiffs' allegations are sufficient.

90.     ***First***, as discussed *supra*, Plaintiffs have adequately alleged that the Binance Defendants and CZ made false and/or misleading statements about (1) the reasons for Binance's

---

[57]    *ING Bank v. PNC Fin. Servs. Group*, 629 F. Supp. 2d 351, 356-357 (D. Del. 2009) (finding counterclaim was alleged with sufficient particularity because it identified a statement and alleged that the statement was false).

[58]    Furthermore, "[t]here must be a direct, foreseeable connection between the false statement, a third person's reliance and harm to the plaintiff's interests." *Id.* at *6.

liquidation of FTT, (2) Binance's intention to acquire FTX Trading "subject to due diligence," and (3) the reasons for Binance's decision not to acquire FTX Trading. *See supra*, Sec. V.B.

91.    ***Second***, the Complaint plausibly alleges malice in that the Binance Defendants actually intended to destroy FTX.   For example, Plaintiffs point to the fact the public announcement of the sale of FTT supported the inference that such sale was intended to cause market panic and a decline in the price of FTT and the ultimate destruction of FTX—which it did. Compl. ¶¶ 58-59. The plausibility of these inferences is not a post-hac invention of Plaintiffs for purposes of the Complaint. Rather, these are common-sense inferences that were widely understood, with one FTX investor testifying in a Senate hearing, "All of a sudden, in social media, CZ is asking for another $500 million. He wants to do a block trade of FTT, or the proprietary token of FTX. He wants to convert it back to fiat. Why would you put that out there? You know it is going to push down the value of that coin dramatically, and that is exactly what happened.'" Compl. ¶ 58.[59] The Binance Defendants (private companies) and CZ were also under no obligation—legally or otherwise—to disclose via their Tweets (1) that they were selling FTT, (2) that they were potentially acquiring FTX Trading and executing the Letter of Intent, or (3) their reasoning for withdrawing from the potential acquisition. *See* Compl. ¶¶ 56-72.[60] In this context, the fact that the Binance Defendants' market share grew after FTX's collapse is not "irrelevant," but rather confirms that the Binance Defendants indeed benefitted from the market panic it caused, further supporting the plausibility of the inferences of malice. *Id.*; *see* BHL Mot at 31. Plaintiffs'

---

[59]    Likewise, a former FTX insider testified in Bankman-Fried's trial that, "if [Zhao] really wanted to sell his FTT, he wouldn't preannounce to the market that he was going to sell it . . . his real aim in that tweet, as I saw it, was not to sell his FTT, but to hurt FTX and Alameda." Compl. ¶ 57

[60]    Plaintiffs have not uncovered any instance from June 1, 2021 through November 11, 2022, where @binance or @cz_binance announced entering into any transaction or the sale of any of its third-party tokens. *See* @binance, X (last visited July 16, 2025), https://x.com/binance; @cz_binance, X (last visited July 16, 2025), https://x.com/cz_binance.

theory and proffered support takes its allegation of actual malice well "above the speculative level." *Aoki*, 839 F. Supp. at 763 (quoting *Twombly*, 550 U.S. at 555).

92.     ***Third***, Plaintiffs have adequately demonstrated a direct, foreseeable connection between the Binance False Statements, third parties' reliance on such statements, and the resulting harm to Plaintiff's interests. As shown in the Complaint, Plaintiffs' allegations demonstrate that customers relied on the Binance Defendants' false statements by (1) rapidly selling off their FTT and (2) withdrawing funds from the FTX platform *en masse*—the "run on the bank." Compl. ¶¶ 58-59.[61] Moreover, the Complaint specifically alleges that customers relied on the *falsity* of the Binance False Statements because customers would not have panicked if they had known the truth: that (1) the Binance False Statements "were motivated by a personal and professional feud between FTX and Binance (and their respective founders) and not by sincere concerns about 'risk management' or 'recent revelations,'" and (2) that Binance never intended to acquire FTX and that it did not withdraw from the Letter of Intent because of what it had seen in diligence. Compl. ¶¶ 62, 73-74. Plaintiffs also allege that the Binance False Statements were the partial basis for the Securities Commission of The Bahamas seeking a winding up order for FTX DM. *Id.* ¶ 131. BHL's dismissive treatment of Plaintiffs' theory of reliance is perhaps due to the fact that BHL's true argument is that their theory is more probable (although incorrect)—*i.e.*, that the Coinbase article and surrounding negative press was the true cause of Plaintiffs' damages. As argued above, *Iqbal* and *Twombly* expressly decline to impose a "probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678. The relative likelihood of Plaintiffs' and BHL's

---

[61]     "As the Examiner in the above-captioned chapter 11 cases reported, Zhao's announcement that Binance would be liquidating its sizeable FTT holdings . . . caused a rapid sell off of FTT.' Customer net withdrawals went from averaging $18 million per hour over the period from October 31, 2022 and November 6, 2022 (prior to the November 6 False Tweets) to around $150 million per hour from November 6, 2022 and November 7, 2022 (after the November 6 False Tweets)." Compl. ¶ 59.

theories surrounding the Binance False Statements is a factual issue to be determined at trial.[62] In any event, Plaintiffs have alleged, with supporting facts, that the Binance theory is wrong because the withdrawal rate had "stablized in the days following" the Coindesk article before "skyrocketing" in the immediate aftermath of the November 6 False Tweets. Compl. ¶ 76.

### D. Plaintiffs Have Adequately Pled a Claim for Fraud (Count VII) and Intentional Misrepresentation (Count VIII).

93.     Typically, fraud and intentional misrepresentation claims require a heightened pleading standard, where plaintiffs must "plead with particularity the 'circumstances' of the alleged fraud." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998); *Baldonado v. Avrinmeritor, Inc.*, 2014 U.S. Dist. LEXIS 69231, at *34 (D. Del. May 20, 2014) (holding that fraud and intentional misrepresentation claims are subject to the heightened pleading standard under Rule 9(b)). Plaintiffs, however, "need not . . . plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Id.* (quoting *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984)). Furthermore, the particularity rule is relaxed where, as in the present case, "the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). Plaintiffs have met this heightened pleading standard with respect to their state law claims for fraud and intentional misrepresentation.[63]

---

[62]    BHL argues that Plaintiffs must prove special damages "in the form of actual lost dealings," but Delaware caselaw has held otherwise. *See* BHL Mot. at 31; *Dac v. Booking Holdings Inc.*, 2023 U.S. Dist. LEXIS 62209, *24-25 (D. Del. Apr. 7, 2023) (explaining that Delaware law only requires that Plaintiffs prove special damages, defined as proof that "the publisher know[s] that 'a reasonable [person would] recognize the likelihood that some third person will act in reliance upon his statement, or that it will otherwise cause harm to the pecuniary interests of the other because of the reliance."). Plaintiffs have sufficiently alleged special damages in the form of a direct, foreseeable connection between the Binance False Statements, the subsequent rapid customer withdrawals, the winding up order for FTX DM, and the run on FTX. Compl. ¶¶ 52-79.

[63]    A fraud claim requires "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's

94.    ***First***, as set forth in Section V.B, *supra*, Plaintiffs adequately allege, with supporting facts, that the Binance Defendants made false representations sufficient to support common law fraud and intentional misrepresentation claims. These false representations (*i.e.*, the Binance False Statements) include the Letter of Intent, the November 6 False Tweets, November 8 Tweets and the November 9 Tweets. Compl. ¶ 131. Plaintiffs sufficiently allege that, in making the Binance False Statements, the Binance Defendants (and CZ) concealed facts that the representations were made in a deliberate attempt to destroy FTX, their competitors, and that the Binance Defendants never intended to acquire FTX after entering into the Letter of Intent. *Id.* ¶¶ 60-61, 73, 139; *see supra*, Sec. V.B. ***Second***, as detailed *supra*, Plaintiffs have also sufficiently alleged that the Binance Defendants made the Binance False Statements with the requisite intent or scienter. *See supra*, Sec. V.B. While Rule 9(b) requires fraud claims to be pled with particularity, intent and knowledge may be alleged generally. *See* F.R.C.P. 9(b); F.R.B.P. 7009; *In re FTX Trading Ltd.*, 2024 WL 4562675, at *7. Further, scienter "may be adequately alleged by setting forth facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 459 (Bankr. D. Del. 2006).  Plaintiffs have met this standard. *See supra*, Sec. V.B. As set forth above, Plaintiffs have pled various factual allegations that support that the Binance False Statements were knowingly false and intended to cause customer reliance.

---

knowledge or belief that the representation was false, or was made with reckless disregard of the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *Johnson v. Preferred Pro. Ins. Co.*, 91 A.3d 994, 1017 (Del. Super. Ct. 2014).  Similarly, a claim for intentional misrepresentation requires "(1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) Defendants' acting with scienter; (3) An intent to induce plaintiff's reliance upon the concealment; (4) Causation; and (5) Damages resulting from the concealment." *Id.* (quotations omitted).  Plaintiffs have adequately alleged claims for both common law fraud and intentional misrepresentation here.

*See supra*, Secs. V.B-C. As discussed, *supra*, the Binance Defendants and CZ were under no obligation—legally or otherwise—to disclose any of their actions (*i.e.*, selling FTT, potentially acquiring FTX Trading, executing the Letter of Intent, and their reasoning for withdrawing from the potential acquisition).  *See id.* ¶¶ 56-72. They did so, however, to advance their goal of destroying FTX through a series of false statements.  *Id.* ¶ 73. Plaintiffs have thus adequately pled fraudulent intent based on a legal theory, which is supported by "factual allegations that make their theoretically viable claim plausible." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). These allegations establish both "a motive and an opportunity to commit fraud." *In re Genesis*, 355 B.R. at 459.

95.    ***Third***, Plaintiffs have adequately pled that FTX and its customers justifiably relied on the Binance False Statements. Compl. ¶¶ 59, 62-63, 73. Delaware law requires that plaintiffs plead justifiable reliance in fraud and intentional misrepresentation claims by alleging facts "making it reasonably conceivable that the plaintiff acted based on the material representation or omission." *Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 465 (Del. Ch. 2024).  Reliance, however, is a "context-dependent inquiry that takes into account the plaintiff's knowledge and experience," making the issue "not generally suitable for resolution on a motion to dismiss" unless the fraud claims focus on a contract with an explicit anti-reliance provision. *Id.*

96.    As an initial matter, the "non-binding" nature of the Letter of Intent does not immunize the Binance Defendants from fraud liability as it relates to the Letter of Intent and surrounding statements, and the Binance Defendants' arguments to the contrary misread Plaintiffs' claims. BHL Mot. at 35.  Plaintiffs do not allege that the Binance Defendants were somehow bound to close the transaction contemplated by the BHL Motion, or that anyone relied on a certainty that

70

the Binance Defendants would close the transaction. *Id.* Rather, Plaintiffs allege that FTX and customers relied on Binance's false statements that it genuinely intended to acquire FTX. Compl. ¶ 73. Had FTX and customers in fact known that the Letter of Intent, and surrounding statements were in fact a ruse to (1) create the impression that Binance had seen something in the diligence to cause it to withdraw from the acquisition, and (2) to cause FTX to cease seeking alternate financing, they would not have relied on those statements as Plaintiffs allege that they did. *See* Compl. ¶¶ 69, 73-74, 131.  And with respect to FTX's cessation of seeking alternative financing specifically, it is clear that FTX actually relied on the exclusivity provision as binding on FTX Compl. ¶ 69, and justifiably so.  *See ev3, Inc. v. Lesh*, 114 A.3d 527, 530-32 (Del. 2014), *as revised* (Apr. 30, 2015) (explaining that while a letter of intent may contain non-binding commitments relating to the execution of a financial transaction, certain provisions relating to "restrictions on the ability of [a party] to engage in discussions with other potential buyers" may be binding and are often expected to be so throughout negotiations).

97. Further, under Delaware law, the author of a fraudulent representation is liable to "the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for . . . their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced." *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 29 (Del. Ch. 2009) (citing RESTATEMENT (SECOND) OF TORTS § 531);[64] *see also In re Citadel Watford City Disposal Partners, L.P.*, 2018 WL 6841361, at *5 (Bankr. D. Del. Dec. 17, 2018) (finding plaintiff's fraud claim sufficiently alleged when the

---

[64] BHL argues that Plaintiffs have improperly relied on a "fraud-on-the-market" theory, a rebuttable presumption of reliance in federal securities actions that is not recognized by Delaware courts, to allege reliance on the Binance False Statements. BHL Mot. at 34. To the contrary, as set forth above, addressing the Predatory Act claims, Plaintiffs have alleged numerous specific acts constituting reliance on the Binance False Statements.

complaint stated that the debtor's investors justifiably relied on false representations made by the defendants because there was a fiduciary relationship between them).[65] The Binance False Statements were clearly not "aimed at the general public," but instead were intended to and did induce the actions of FTX and its customers, a specific class of persons with whom the Binance Defendants and CZ had reason to expect to have influenced by their statements—and on whose behalf the FTX Recovery Trust asserts these claims. *See* Compl. ¶¶ 57, 62, 73-74, 131. The Binance Defendants' true intentions are further evidenced by the Binance Defendants and CZ's use of public online forums to publish "explosive tweets calculated to turn customers against FTX" and put out "negative press" in furtherance of their scheme to destroy FTX leading up to the Binance False Statements. *Id.* ¶¶ 53-54. This provides important context into the audience to which the Binance Defendants and CZ directed the Binance False Statements.

98.    ***Lastly***, Plaintiffs have adequately pleaded loss causation for both the fraud and intentional misrepresentation claims. Loss causation under Delaware law requires "a causal connection between defendant's [false representations] and the subsequent decline in the value of the [object at issue]." *In re HRB Winddown Inc.*, 2024 WL 1099724, at *15 (Bankr. D. Del. Mar. 13, 2024) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). Of importance, loss causation is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Id.* (holding that the allegations of causation were adequate and refusing to "delve into a further analysis of causation on the pending Motion to Dismiss"). In any event, as set forth *supra*, Plaintiffs have adequately alleged that there was a direct, foreseeable

---

[65]    *See also Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *13 (Del. Ch. Dec. 22, 2010) (finding the plaintiff adequately pleaded the justifiable reliance factor because there were "sufficient facts to allow the Court plausibly to infer that [plaintiff's] conduct in entering into the Agreement and holding out hope that [defendant] promptly would close the deal was justifiable given [defendant's] continuous reassurances.").

connection between, on the one hand, the Binance False Statements, the rapid withdrawal of FTT

that ensued and the consequent value destruction, FTX's cessation of its efforts to seek alternative

financing, and the winding up order for FTX DM. *See supra*, Sec. V.C.

**E.    Plaintiffs Have Adequately Pled a Claim for Unjust Enrichment (Count IX).**

99.    To establish a claim for unjust enrichment, plaintiffs must show (1) an enrichment,

(2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the

absence of justification, and (5) the absence of a remedy provided by law.  *Nemec v. Shrader*, 991

A.2d 1120, 1130 (Del. 2010). BHL argues that Plaintiffs have not alleged factors (3) through (5).

BHL Mot. 35-36. This is incorrect.

100.    ***First***, Plaintiffs have alleged a clear relationship between Binance's enrichment and

Plaintiffs' impoverishment.[66]  *See In re W.J. Bradley Mortgage Capital, LLC*, 598 B.R. 150, 177-

78 (Bankr. D. Del. 2019) (finding that Trustee stated a plausible claim for unjust enrichment and

alleged facts "showing a relationship between the enrichment and impoverishment as the

Defendants' acquisition of [a third party]'s 65% interest in the Debtors led to the Debtors'

insolvency"). For example, the Complaint shows that the Binance Defendants falsely represented

to Plaintiffs (through the Binance False Statements) their intention to acquire FTX Trading to,

among other things, diminish Plaintiffs efforts to seek third-party financing and destroy FTX.

Compl. ¶¶ 65-73. As a result, when the Binance Defendants announced they were no longer

pursuing the acquisition, Plaintiffs were significantly harmed by the run on the bank,[67] as well as

the provisional liquidation of FTX DM, while, as a direct and predictable consequence of the

---

[66]    Plaintiffs have clearly shown, and Binance Defendants appear to concede, that Binance Defendants were
enriched, and that Plaintiffs were impoverished. Compl. ¶¶ 141-144.

[67]    The Complaint alleges that after the November 6 False Tweets, customer net withdrawals went from averaging
$18 million to around $150 million per hour.  Compl. ¶ 59.

73

destruction of a major competitor, the Binance Defendants experienced a surge in new users, trading volume, liquidity, and market share. *See* Compl. ¶ 79. ***Second***, similarly, BHL argues that Plaintiffs have failed to allege any wrongdoing to satisfy the "absence of justification" element," ignoring that Plaintiffs have alleged that the Binance False Statements were fraudulent and otherwise illegal, as set forth in Counts VI-VIII.

101.    ***Finally***, the "absence of adequate remedy" prong does not apply to claims in this Court. *See Envolve Pharm. Sols. v. Rite Aid Headquarters Corp.*, 2023 Del. Super. LEXIS 134, at *40 (Del. Super. Mar. 17, 2023) (explaining that the requirement of "[t]he absence of a remedy provided at law" is "jurisdictional.").  Delaware courts have held that "[t]he absence of an adequate remedy at law is required only if an unjust enrichment claim is brought in the Court of Chancery" because "unjust enrichment is historically a legal, not an equitable claim." *State ex rel. Jennings v. Monsanto Co., Solutia*, 299 A.3d 372, 391 (Del. 2023).[68]

102.    Even if Plaintiffs were required to plead that there was no alternative remedy at law, Plaintiffs have sufficiently pleaded this prong. Plaintiffs have established—and BHL has repeatedly acknowledged—that there was no enforceable contract governing the relationship between the Binance Defendants and Plaintiffs because the Letter of Intent was non-binding.  *See* Compl. ¶ 67; BHL Mot. at 6, 27, 35.  Therefore, there is no alternative remedy at law under the Letter of Intent, other than unjust enrichment.  *See LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 Del. Ch. LEXIS 101, *45 (Del. Ch. Mar. 28, 2018) (explaining the contract "itself arose from the Defendants' fraud, [so] the existence of that contract does not bar the unjust enrichment claim.").

---

[68]    Although BHL cites to *In re Cred Inc.* to support their point, the Court only generally listed "absence of a remedy provided by law" factor but did not discuss it in its analysis. *In re Cred Inc.*, 650 B.R. at 832.

74

## VI.   THE BINANCE DEFENDANTS PURPORTED AFFIRMATIVE DEFENSES ARE NOT APPROPRIATE GROUNDS FOR DISMISSAL AT THIS STAGE.

103.   As a last resort, BHL attempts to have this Court decide on two affirmative defenses—safe harbor under section 546(e) and *in pari delicto*—which are highly fact-dependent and not suited for a motion to dismiss. BHL Mot. at 13-16, 28.

### A.   The Fraudulent Conveyance Claims Are Not Barred by the Safe Harbor Defense.

104.   BHL urges this Court to dismiss the constructive fraudulent transfer claims under bankruptcy and state law based on the affirmative defense of safe harbor under section 546(e) of the Bankruptcy Code.  BHL Mot. at 13-14. Delaware courts, however, have consistently held that determinations regarding the safe harbor defense under section 546(e) of the Bankruptcy Code are intensely fact-dependent and inappropriate for resolution at the motion to dismiss stage. *See, e.g.*, *Alameda Research Ltd. et al v. Giles et al.,* No. 23-50380 (JTD) [D.I. 288] at 22; *In re Centaur, LLC*, 2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013) ("Whether the § 546(e) safe harbor applies to the transfers in question also requires a determination of fact and is not suitable for disposition on a motion to dismiss under Fed. R. Bankr. P. 7012(b)(6)."); *Zazzali v. AFA Fin. Grp., LLC*, 2012 WL 4903593, at *11 (Bankr. D. Del. Aug. 28, 2012) (explaining that it is premature to dismiss this count on the basis of the 546(e) defense. . . . [because it is a] fact-based inquiry.").[69]

105.   In any event, BHL's argument is unavailing because (1) Alameda is not a "qualifying participant" and (2) the 2021 Fraudulent Transfers are not a "qualifying transactions." *See* 11 U.S.C. §546(e); *In re FTX Trading Ltd.*, 2024 WL 4562675, at *7 at 22 ("Put simply, the

---

[69]   Only where the safe harbor is "clearly established on the face of the complaint" will courts in the Third Circuit dismiss a complaint.  *Id.* at 23 (quotations omitted); *In re Port Neches Fuels, LLC*, 2024 Bankr. LEXIS 1654, at *3 (Bankr. D. Del. July 18, 2024) ("The availability of an affirmative defense is typically not a basis on which to dismiss a complaint. . .").

safe harbor applies where two requirements are met: (1) there is a <u>qualifying transaction</u> . . . and (2) there is a <u>qualifying participant</u> . . .")  (internal citations and quotations omitted).

106.    BHL's assertion that Alameda was a qualifying participant—specifically a "financial participant"—fails for three independent reasons.  ***First***, BHL's argument is based entirely on its citation to a PowerPoint presentation filed with the Bankruptcy Court (the "**Presentation**").  *See* BHL Mot. at 13-14. Even setting aside that BHL asks this Court to look outside the Complaint, the Presentation, as cited by BHL, does not support the assertion that Alameda was a financial participant. *See id.* BHL misreads, and even misquotes, the definition of financial participant, arguing that Alameda qualified as one because the Presentation shows that it "ha[d] gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more . . . agreements or transactions with . . . any other entity (other than an affiliate) . . ." *See id.* (quoting 11 U.S.C. § 101(22A)(A)) (omissions in BHL Mot.). ***But BHL omits the key word "such" that precedes "agreements or transactions."*** BHL Mot. at 13-14. And the word "such" refers back to critical language earlier in the definition of "financial participant": "one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of Section 561(a). 11 U.S.C. § 101(22A)(A). In turn, Section 561(a)(1)-(6), refers to "securities contracts, as defined in section 741(7)," "commodity contracts, as defined in section 761(4)," "forward contracts," "repurchase agreements," "swap agreements," or "master netting agreements." 11 U.S.C. § 561(a)(1)-(6). BHL makes no attempt to explain how the Alameda investments it refers to in the Presentation qualify as the type of contracts specified in Section 561 of the Bankruptcy Code, and, indeed, they do not.  This is because BHL's misreading of the definition of financial participant leads to the misapprehension that *any investment at all* qualifies. Indeed, BHL argues that the investments described in the Presentation qualify merely because they

76

are "[c]omprised of 100+ equity and fund investments, as well as equity and fixed income securities," again making no attempt to connect such investments to the relevant contracts identified in Section 561.[70]  BHL Mot. at 14. ***Second,*** BHL cites only to the Presentation, which is extrinsic to the Complaint, and in particular to a graph that summarizes certain investments without specifying exactly what those investments consist of.  *See* BHL Mot. at 14. While BHL cites cases where courts have taken judicial notice of other types of documents, BHL provides no authority to support the notion that, at the motion to dismiss stage, the Court may consider, let alone accept as true, a document like the Presentation. *See In re Mallinckrodt PLC*, 2024 WL 206682, at *16 (holding that the Court may not take judicial notice of SEC filings at the motion to dismiss stage to prove that there is a qualifying financial participant for the safe harbor defense). ***Third***, and independently, while there is a split of authority on this issue, the better view is that a debtor, like Alameda, cannot qualify as a financial participant.  *In re Tribune Co. Fraudulent Conveyance Litigation*, 2019 WL 1771786 at *9 (S.D.N.Y. April 23, 2019).

> **B.**     **The Predatory Acts Claims Are Not Barred by the Doctrine of *In Pari Delicto*.**

107.    BHL incorrectly argues that this Court should dismiss the Predatory Acts Claims on the basis that the *in pari delicto* defense applies.  BHL Mot. at 28-29; DA Mot. at 23 n.10 (incorporating BH's *in pari delicto* defense by reference). As an initial matter, the doctrine of *in pari delicto* "is an affirmative defense, so while it can be decided on a motion to dismiss in certain circumstances, if factual issues exist, such a motion must be denied." *In re Seaboard Hotel*

---

[70]    To be clear, the fact that some of the investments at issue may include "securities" does not mean that Alameda had the requisite level of "securities contracts."  The relevant definition makes clear that a "securities contract" is "a contract for," *inter alia*, the "*purchase, sale, or loan* of a security…"  11. U.S.C. § 741(a)(1) (emphasis added).  This is obviously distinct from simply owning a security.   In any event, BHL does not argue, and the Presentation does not show, that "securities" make up at least $100 million of the "investments" referenced in the cited portion of the Presentation.

*Member Assocs., LLC*, 2021 Bankr. LEXIS 1564, at *42, 47 (Bankr. D. Del. June 10, 2021) (holding that the affirmative *in pari delicto* defense could not be decided on a motion to dismiss because questions of fact existed as to whether agent's knowledge is imputed to principal and applicability of adverse interest exception); *see also In re Green Field Energy Servs., Inc.*, 554 B.R. 315, 322 (Bankr. D. Del. 2016) (deferring ruling on an *in pari delicto* defense where the "[d]efendants' conduct remains alleged and the Court would want to know more than is available at the motion to dismiss stage"). The Binance Defendants dispute various allegations in the Complaint, therefore, creating clear factual issues that are not suitable to be resolved at the pleadings stage. *See* BHL Mot. at 29, 31-33; DA Mot. at 23 n.10. In any event, the facts alleged in the Complaint support the potential application of the "adverse interest exception" to *in pari delicto*, because the misconduct of certain executives was for their own benefit. *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 495 (3d Cir. 2013); Compl. ¶¶ 47-48.[71] Whether the adverse interest exception applies is an intensely factual question that cannot be resolved at this stage. *See Seaboard*, 2021 Bankr. LEXIS 1564, at *42, 47.

108.   BHL also misstates the doctrine of *in pari delicto* because such doctrine does not "prevent a plaintiff recovery if it bears 'substantially equal' fault for the **harm**." BHL Mot. at 28 (citing *In re Pitt Penn Holding Co.*, 484 B.R. at 39 (emphasis added)). Rather, it provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears **fault for the claim**. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001); *see also In re Pitt*, 484 B.R. at 39 ("In pari delicto bars a plaintiff from asserting a claim if the plaintiff bears 'substantially equal' **fault for the claim**.") (emphasis added). To successfully assert

---

[71]   "Under the 'adverse interest' exception, where an agent acts in his own interest, and to the corporation's detriment, imputation generally will not apply. *Belmont*, 708 F.3d at 495 (citation modified).

an *in pari delicto* defense, defendants must show that "(1) as a direct result of its own actions, the plaintiff bears at least substantially equal responsibility for the violations it seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the law and other important public policies." *AstroPower Liquidating Tr. v. KPMG LLP*, 2007 WL 1549048, at \*5 (D. Del. May 25, 2007); *see Wilmington Trust SP Servs.*, 112 A.3d 271, 302 (Del. Ch. 2015) (holding that the *in pari delicto* doctrine applies "to situations . . . analogous to those encompassed by the unclean hands doctrine, where the plaintiff has participated in some of the same sort of wrongdoing as the defendant") (internal quotations omitted).[72]

109.    As alleged in the Complaint, the Binance False Statements directly destroyed value that would have otherwise been recoverable by FTX's stakeholders. Compl. ¶ 63. Whatever misconduct was committed by Bankman-Fried, such acts did not give rise to the Predatory Acts Claims—the Binance False Statements did. *See id.* ¶¶ 6, 59, 75-76. Plaintiffs were also not active or voluntary participants in the Binance False Statements, nor do they bear responsibility for the underlying illegality of that specific conduct. *See Wilmington Trust SP Servs.*, 112 A.3d at 302. Not allowing Plaintiffs (standing in the shoes of creditors) to recover for Binance's wrongful conduct would cause an unfair result that would only prejudice FTX's creditors, who unwittingly funded a bad actor.[73] Therefore, even if the *in pari delicto* defense could be assessed at this stage—it should not—it is inapplicable to Plaintiffs.

---

[72]    It is for this reason that the *in pari delicto* doctrine is typically invoked in contractual claims, where the contractual parties participated in a fraudulent scheme. *Burns v. Ferro*, 1991 Del. Super. LEXIS 99, \*5-6 (Del. Super. Mar. 28, 1991).

[73]    *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 (Del. Ch. 2003), *aff'd*, 847 A.2d 1121 (Del. 2004) (holding that the *in pari delicto* defense "would . . . leave … public stockholders and creditors–with no recourse when their corporation is injured by its managers….[and] will not be applied when its acceptance would contravene an important public policy."); *see also Off. Comm. of Unsecured of Allegheny Health, Educ. & Rsch. Found. v. PricewaterhouseCoopers, LLP*, 607 F.3d 346, 354 (3d Cir. 2010) (applying Pennsylvania law but stating generally that "[p]ublic policy. . . is what undergirds *in pari delicto,* not a concern with the interests of the party claiming it as a defense.").

## VII.   ALTERNATIVELY, ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE

110.   In the alternative, to the extent the Court dismisses the Complaint in whole or in part, Plaintiffs respectfully requests that dismissal be without prejudice and that Plaintiffs be granted 30 days to file a motion to amend the Complaint, together with a proposed Amended Complaint, to attempt to address any deficiencies identified by the Court.   In another adversary proceeding related to these Chapter 11 Cases, this Court (Dorsey, J.) dismissed certain claims and denied a "bare request" in an opposition brief for leave to amend as procedurally improper. *FTX Trading Ltd.*, 2024 WL 4562675, at *16. However, the Court subsequently granted a post-dismissal motion to amend to replead the dismissed counts.  *FTX Trading Ltd.*, *Order Granting Plaintiffs' Motion for Leave to Amend Their Complaints*, [D.I. 368] (Dec. 17, 2024). Thus, at this stage, Plaintiffs only request that, if the Court dismisses any aspect of the Complaint, it permits Plaintiffs thirty (30) days to seek leave to amend. *See Zohar III*, 2021 WL 3124298, at *13 n.129; *Sheeran v. Blyth Shipholding, S.A.*, 2015 WL 9048979, at *5 (D.N.J. Dec. 16, 2015) (dismissing plaintiff's claims without prejudice but allowing plaintiff to file a motion for leave to file an amended complaint).

## <u>CONCLUSION</u>

**WHEREFORE**, for the reasons stated above, Plaintiffs respectfully request that this Court (1) deny the Motion, and (2) grant such other relief as is proper.  Alternatively, should the Court grant the Motions in whole or in part by dismissing the Complaint in whole or in part, Plaintiffs respectfully request that any such dismissal be without prejudice and grant Plaintiffs thirty (30) days from the date of the dismissal order to seek leave to amend the Complaint pursuant to Federal Rule 15.

Dated: August 7, 2025
Wilmington, Delaware

/s/ Brendan J. Schlauch
**RICHARDS, LAYTON & FINGER, P.A.**
Kevin Gross (No. 209)
Paul N. Heath (No. 3704)
Brendan J. Schlauch (No. 6115)
Robert C. Maddox (No. 5356)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
gross@rlf.com
heath@rlf.com
schlauch@rlf.com
maddox@rlf.com

-and-

**WHITE & CASE LLP**
J. Christopher Shore (admitted pro hac vice)
Brian D. Pfeiffer (admitted pro hac vice)
Colin West (admitted *pro hac vice*)
Ashley R. Chase (admitted pro hac vice)
Brett L. Bakemeyer (admitted pro hac vice)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
cshore@whitecase.com
brian.pfeiffer@whitecase.com
cwest@whitecase.com
ashley.chase@whitecase.com
brett.bakemeyer@whitecase.com

*Attorneys for Plaintiffs*

81

# **<u>EXHIBIT A</u>**

Binance Defendants' Arguments Chart

RLF1 33536498v.1

**Binance Defendants' Arguments Chart**[74]

| Argument | BHL | Digital Anchor |
|---|---|---|
| Arbitration of the Fraudulent Conveyance Claims | No | Yes |
| Lack of Personal Jurisdiction | Yes | Yes |
| Subject Matter Jurisdiction | | |
| Lack of Subject Matter Jurisdiction for Predatory Acts Claims | Yes | Yes |
| Abstention of Predatory Acts Claims | No | Yes |
| Failure to State a Claim for the Fraudulent Conveyance Claims | | |
| Group Pleading of Transferee | Yes | Yes |
| Insolvency Not Plausibly Alleged | Yes | No |
| Reasonable Equivalent Value Not Alleged | Yes | No |
| No direct evidence of fraud | Yes | No |
| Badges of fraud Not adequately alleged | Yes | No |
| Failure to State a Claim for the Predatory Acts Claims | | |
| Tweets are Not False or Misleading | Yes | No |
| Group Pleading | Yes | Yes |
| Injurious Falsehood Not Adequately Pleaded | Yes | No |
| Intentional Misrepresentation Not Adequately Pleaded | Yes | No |
| Fraud Not Adequately Pleaded | Yes | No |
| Unjust Enrichment Not Adequately Pleaded | Yes | No |
| Affirmative Defenses | | |
| Safe Harbor Defense | Yes | No |
| *In Pari Delicto* Defense | Yes | No |

---

[74] This chart compares the arguments made by BHL and Digital Anchor. The first column lists each argument, while the second and third columns identify which Binance Defendant presented each respective argument.