## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| | |
| FTX RECOVERY TRUST, FTX DIGITAL MARKETS, LTD. | Adv. Pro. No. 24-50222 (KBO) |
| Plaintiffs, | |
| v. | **Re: Adv. D.I. 1, 92, 95** |
| BINANCE HOLDINGS LIMITED., BINANCE CAPITAL MANAGEMENT CO. LTD, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, CHANGPENG ZHAO, DINGHUA XIAO, SAMUEL WENJUN LIM, and DOES 1-1000 | |
| Defendants. | |

### PLAINTIFF FTX RECOVERY TRUST'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION OF THE TWO MANAGEMENT DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

Dated: August 22, 2025

**RICHARDS, LAYTON & FINGER, P.A**.
Kevin Gross (No. 209)
Paul N. Heath (No. 3704)
Brendan J. Schlauch (No. 6115)
Robert C. Maddox (No. 5356)
One Rodney Square
920 N. King Street
Wilmington, DE 19801

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of reorganized debtor entities (the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), a complete list of the Reorganized Debtors' last four digits of their federal tax identification numbers is not provided herein, but may be obtained on the website of the Reorganized Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Telephone: (302) 651-7700
Facsimile: (302) 651-7701
gross@rlf.com
heath@rlf.com
schlauch@rlf.com
maddox@rlf.com

-and-

**WHITE & CASE LLP**
J. Christopher Shore (admitted pro hac vice)
Brian D. Pfeiffer (admitted pro hac vice)
Colin West (admitted *pro hac vice*)
Ashley R. Chase (admitted pro hac vice)
Brett L. Bakemeyer (admitted pro hac vice)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
cshore@whitecase.com
brian.pfeiffer@whitecase.com
cwest@whitecase.com
ashley.chase@whitecase.com
brett.bakemeyer@whitecase.com

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING......................1

PRELIMINARY STATEMENT .......................................................................................1

BACKGROUND AND SUMMARY OF ARGUMENT ...................................................4

ARGUMENT ....................................................................................................................5

I.     THIS COURT HAS SPECIFIC JURISDICTION OVER
BOTH OF THE MANAGEMENT DEFENDANTS................................................6

     A.    Relevant Standards.....................................................................................6
     B.    The Traditional Test Is Satisfied..............................................................8
     C.    The Effects Test is Also Satisfied...........................................................21
     D.    The Management Defendants Have Waived
Their Jurisdictional Defenses. …………………………………………..23
     E.    Alternatively, Plaintiff is Entitled to
Jurisdictional Discovery..........................................................................24

II.    THE COMPLAINT ADEQUATELY PLEADS THE
FRAUDULENT CONVEYANCE CLAIMS AGAINST
THE MANAGEMENT DEFENDANTS...............................................................25

III.   THE FRAUDULENT CONVEYANCE CLAIMS
AGAINST THE MANAGEMENT DEFENDANTS
SHOULD NOT BE DISMISSED FOR THE ADDITIONAL
REASONS STATED IN THE FIRST OPPOSITION.........................................29

IV.   ALTERNATIVELY, ANY DISMISSAL SHOULD BE
WITHOUT PREJUDICE......................................................................................29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alameda Rsch. Ltd. v. Platform Life Scis. Inc.*,
   2023 WL 8814216 (Bankr. D. Del. Dec. 20, 2023)....................................................6, 7

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*,
   2018 WL 5118638 (S.D.N.Y. Oct. 22, 2018) .............................................................15

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).....................................................................................................26

*Bel-Ray Co. v. Chemrite Ltd.*,
   181 F.3d 435 (3d Cir. 1999).................................................................................23, 24

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006)...........................................................................................9

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)......................................................................................11, 18, 20

*Calder v. Jones*,
   465 U.S. 783 (1984).....................................................................................................21

*Carteret Sav. Bank, FA v. Shushan*,
   954 F.2d 141 (3d Cir. 1992).........................................................................................19

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018)...........................................................................................12

*Clapper v. Am. Realty Inv'r, Inc.*,
   2015 WL 3504856 (N.D. Tex. June 3, 2015) ..............................................................28

*Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*,
   723 F.2d 357 (3d Cir. 1983).........................................................................................25

*Contant v. Bank of Am. Corp.*,
   385 F. Supp. 3d 284 (S.D.N.Y. 2019)............................................................................9

*Danzinger & De Llano, LLP v. Morgan Verkamp LLC*,
   948 F.3d 124 (3d Cir. 2020).........................................................................................15

*Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*,
   297 F.3d 1343 (Fed. Cir. 2002)....................................................................................18

*Electrosource Inc. v. Horizon Battery Techs., Ltd.*,
   176 F.3d 867 (5th Cir. 1999) .......................................................................................18

*Finjan LLC v. Trustwave Holdings, Inc.*,
   2021 WL 5051147 (D. Del. Oct. 29, 2021) ...................................................................7

ii

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ............................................................................................. 11, 14

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ............................................................ 23

*Gambone v. Lite Rock Drywall*,
288 Fed. Appx. 9 (3d Cir. 2008) ................................................................................ 22

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ............................................................................................. 14, 19

*Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*,
988 F.2d 476 (3d Cir. 1993) .................................................................................. 17, 19

*Gurmessa v. Genocide Prevention in Ethiopia, Inc.*,
2022 WL 608924 (D. Del. Feb. 23, 2022) .................................................................... 6

*Hasson v. FullStory, Inc.*,
114 F.4th 181 (3rd Cir. 2024) ................................................................................... 8, 14

*Hawk Mountain LLC v. Mirra*,
2016 WL 3182778 (D. Del. June 3, 2016) ................................................................... 28

*IMO Indus., Inc. v. Kiekert AG*,
155 F.3d 254 (3d Cir. 1998) ....................................................................................... 22

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
921 F.3d 98 (3d Cir. 2019) ...................................................................................... 23, 24

*In re AstroPower Liquidating Tr.*,
335 B.R. 309 (Bankr. D. Del. 2005) ............................................................................ 13

*In re Bernard L. Madoff Inv. Sec. LLC*,
418 B.R. 75 (Bankr. S.D.N.Y. 2009) ........................................................................... 21

*In re Bernard L. Madoff Inv. Sec. LLC*,
440 B.R. 274 (Bankr. S.D.N.Y. 2010) ......................................................................... 20

*In re Bozel S.A.*,
434 B.R. 86 (Bankr. S.D.N.Y. 2010) ........................................................................... 11

*In re Capmark Fin. Grp. Inc.*,
479 B.R. 330 (Bankr. D. Del. 2012) ....................................................................... 11, 20

*In re Cred Inc.*,
650 B.R. 803 (Bankr. D. Del. 2023) ............................................................................ 28

*In re DBSI, Inc.*,
451 B.R. 373 (Bankr. D. Del. 2011) ............................................................................ 21

*In re DBSI, Inc.*,
467 B.R. 309 (Bankr. D. Del. 2012) ............................................................................ 20

iii

*In re Goodman Networks, Inc.*,
  2025 WL 73072 (Bankr. N.D. Tex. Jan. 10, 2025)......................................................... 28

*In re LSC Wind Down, LLC*,
  610 B.R. 779 (Bankr. D. Del. 2020) ................................................................. 25, 26, 27

*In re Northstar Offshore Grp., LLC*,
  616 B.R. 695 (Bankr. S.D. Tex. 2020) ........................................................................... 28

*In re Uni-Marts, LLC*,
  404 B.R. 767 (Bankr. D. Del. 2009) ............................................................................... 22

*In re Zawawi*,
  644 B.R. 907 (Bankr. M.D. Fla. 2022) ........................................................................... 15

*In re Zohar III, Corp.*,
  631 B.R. 133 (Bankr. D. Del. 2021) ......................................................................... 26, 27

*Kalaj v. Kay*,
  2023 WL 4564795 (E.D.N.Y. July 17, 2023) ................................................................. 13

*Marnavi SpA v. Keehan*,
  2010 WL 1499583 (D. Del. Apr. 14, 2010) ................................................................... 25

*Metcalfe v. Renaissance Marine, Inc.*,
  566 F.3d 324 (3d Cir. 2009)......................................................................................... 6, 7

*Miller Yacht Sales, Inc. v. Smith*,
  384 F.3d 93 (3d Cir. 2004) .............................................................................................. 6

*O'Connor v. Sandy Lane Hotel Co., Ltd.*,
  496 F.3d 312 (3d Cir. 2007)............................................................................... 7, 14, 19

*Off. Comm. of Unsecured Creditors of Arcapita, Bank. v. Bahrain Islamic Bank*,
  549 B.R. 56 (S.D.N.Y. 2016)......................................................................................... 17

*Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico), S.A.*,
  92 F.4th 450 (2d Cir. 2024) ........................................................................................... 13

*Picard v. Banque Syz & Co. (In re BLMIS)*,
  2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022)..................................................... 13

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018)...................................................................... 14, 17

*Picard v. UBS AG (In re BLMIS)*,
  647 B.R. 42 (Bankr. S.D.N.Y. 2022) ............................................................................. 13

*Pinker v. Roche Holdings, Inc.*,
  292 F.3d 361(3d Cir. 2002)....................................................................................... 7, 21

*Renner v. Lanard Toys Ltd.*,
  33 F.3d 277 (3d Cir. 1994)............................................................................................ 25

iv

*Stranahan Gear Co. v. NL Indus., Inc.*,
  800 F.2d 53 (3d Cir. 1986)................................................................................ 7

*Sheeran v. Blyth Shipholding, S.A.*,
  2015 WL 9048979 (D.N.J. Dec. 16, 2015)..................................................... 30

*Toys "R" Us, Inc. v. Step Two, S.A.*,
  318 F.3d 446 (3d Cir. 2003)..................................................................... 7, 25

*TriStrata Tech., Inc. v. Emulgen Lab'ys, Inc.*,
  537 F. Supp. 2d 635 (D. Del. 2008)............................................................... 20

*U.S. Bank Nat'l Assoc. v. Bank of Am. N.A.*,
  916 F.3d 143 (2d Cir. 2019)........................................................................... 15

*Wellness Publ'g v. Barefoot*,
  128 F. App'x 266 (3d Cir. 2005) ...................................................................... 7

*Wilson v. Deutsche Bank Trust Co.*,
  2019 WL 175078 (N.D. Tex. Jan. 10, 2019) ................................................. 28

**Statutes**
11 U.S.C. § 548................................................................................................. 23

**Other Authorities**
Michele Toh, *BUSD: US regulator orders Paxos to halt new issues of Binance-branded
  stablecoin*, CNN (Feb. 14, 2023), https://www.cnn.com/2023/02/14/investing/paxos-
  binance-busd-halt-order-us-intl-hnk ............................................................... 16

PAXOS, *Binance Partners with Paxos to Launch USD-Backed Stablecoin 'BUSD'* (Sept.
  4, 2019), https://www.paxos.com/newsroom/binance-partners-with-paxos-to-launch-
  usd-backed-stablecoin-busd ............................................................................ 16

PAXOS, *Paxos Will Halt Minting New BUSD Tokens* (Feb. 13, 2023),
  https://www.paxos.com/newsroom/paxos-will-halt-minting-new-busd-tokens ........... 16

Withum Audit Tax Advisory, *Paxos Trust Company, LLC Examination of Management
  Assertions Reserve Accounts Report –BUSD Token*, PAXOS, at 3 (July 30, 2021)
  https://www.paxos.com/busd-transparency#busd-attestations ...................... 16

**Rules**

Fed. R. Civ. P. 8............................................................................................ 6, 28

Fed. R. Civ. P. 9.............................................................................................. 28

Fed. R. Civ. P. 12(b)(2).................................................................................... 9

Fed. R. Civ. P. 12(b)(6).................................................................................. 25
Fed. R. Civ. P. 12(h) ...................................................................................... 24

Fed. R. Civ. P. 15............................................................................................ 30

Fed. R. Evid. 201 .............................................................................................. 9

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiff FTX Recovery Trust (the "**Plaintiff**")[2] submits this memorandum of law (the "**Memorandum**") in opposition to: (1) the motion of Samuel Wenjum Lim ("**Lim**") to dismiss [Adv. D.I. 92-93] the complaint [Adv. D.I. 1] (the "**Complaint**") filed in the above-captioned adversary proceeding, and (2) the motion of Dinghua Xiao ("**Xiao**" and collectively with Lim, the "**Management Defendants**") to dismiss the Complaint [Adv. D.I. 95-96] (the "**Xiao Motion**" and together with the Lim Motion, the "**Motions**").[3] Plaintiff respectfully states as follows:

## PRELIMINARY STATEMENT

1.    The Complaint plainly describes the fraudulent nature of the 2021 Share Repurchase.  Its allegations detail, among other things, the specific, contractual role played by the Management Defendants as named sellers and as named transferees. To that end, the Complaint concisely sets forth factual allegations that the Defendants[4] (including the Management Defendants) obtained, pursuant to their executed contracts with FTX and its executives, digital assets worth billions of dollars from FTX in exchange for their FTX stock that had no value at all; all at a time when FTX was insolvent.

2.    In support of their plea for dismissal, the Management Defendants make two arguments: (1) that this Court lacks personal jurisdiction over either of them and (2) that the

---

[2]    This Court substituted the Consolidated Wind Down Trust (the "**FTX Recovery Trust**") as the plaintiff for certain Debtors in the above-captioned adversary proceeding (the "**Adversary Proceeding**") on February 11, 2025. Case No. 22-11068 [D.I. 29554].

[3]    The Management Defendants seek (improperly) to incorporate by reference every argument asserted in the Binance Defendants' motions to dismiss the Complaint. *See* Lim Mot. at 17, Xiao Mot. at 21. To the extent allowed, Plaintiff incorporates by reference every argument asserted in *Plaintiffs' Omnibus Memorandum of Law in Opposition of the Binance Defendants' Motion to Dismiss the Complaint* [Adv. D.I. 106] (the "**First Opposition**") as applicable herein. Otherwise, Plaintiff requests the Court disregard the Management Defendants requests.

[4]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Complaint.

Complaint fails to state Fraudulent Conveyance Claims against them. As fully addressed herein, neither argument holds.

3.  **_First_**, the two Management Defendants' attempts to paint themselves as mere employees of Binance who purchased shares of a company on behalf of Binance is far from reality. As alleged in the Complaint, the Management Defendants (along with the third individual defendant, Changpeng Zhao) were explicitly named in the operative contracts as the sellers of the 2021 Share Repurchase relating to the purchase of the shares of WRS – a U.S. entity also known as "FTX US." The Management Defendants do not dispute this fact. The Management Defendants also purposefully directed significant activities to the U.S. by transacting with counterparties located there, all in an effort to profit off of and exploit the U.S. market. Moreover, among numerous other contacts with the U.S. that directly relate to the claims here, Lim consented to the entry of a Consent Order with the CFTC. There, Lim admits he was the Chief Compliance Officer of Binance, a company that "actively solicited customers in the United States," from at least April 2018 until at least January 2022, a period of time that squarely covers the 2021 Share Repurchase.[5] In fact, Defendant Binance Holdings admitted in a plea agreement with the U.S. Department of Justice that, as part of "a deliberate and calculated effort to profit from the U.S. market without implementing controls required by U.S. law," Binance "operated a cryptocurrency exchange wholly or in substantial part in the United States" on which U.S. customers conducted "_trillions of dollars_ in transactions" during the time period relevant to this Complaint.[6]  In that same plea agreement, Binance Holdings admitted going to extraordinary lengths to conceal the Binance

---

[5]    _Consent Ord. for Permanent Injunction, CFTC v. Zhao, et. al._, Case No. 1:23-cv-01887 [D.I. 79] at ¶¶ 17, 24 (N.D. Ill. Dec. 14, 2023) (the "**Lim Consent Order**").

[6]    _U.S. v. Binance Holdings Ltd., d/b/a Binance.com_, 23-cr-0178-RAJ, Attachment A, Statement of Facts at ¶¶ 1, 4, 48 [D.I. 23] (W.D. Wash. Nov. 21, 2023) (the "**Washington Plea Agreement**") (emphasis added).

enterprise's connections to the United States.[7]  Lim knew of all of this, and, as part of the same management team, Xiao's knowledge can be reasonably inferred from the pleadings.[8] Given these facts, this Court has personal jurisdiction over the Management Defendants, and its exercise of such personal jurisdiction is neither unreasonable nor violates the Management Defendants' due process rights. At the very least, Plaintiff's case should not be dismissed for lack of personal jurisdiction until Plaintiff has had an opportunity to test Defendants' assertions through jurisdictional discovery.

4.    ***Second***, the Management Defendants argue that the Complaint does not adequately allege the Fraudulent Conveyance Claims against them. In support, the Management Defendants rely almost entirely on the fact that (1) there were many alleged wrongdoers in the 2021 Share Repurchase and (2) their allegedly minimal involvement is masked by "group pleading" in the Complaint. Because of this, the Management Defendants assert that they cannot be liable for the 2021 Fraudulent Transfers and, inconsistent with their plea that this Court has no jurisdiction, ask this Court to find they never received any benefits from the 2021 Share Repurhcase. This is not how the law works at this stage of the proceeding. The Complaint plausibly alleges each Management Defendants' role as an active seller and intended transferee of the 2021 Share Repurchase—a fraudulent conveyance subject to avoidance.

5.    For these reasons and the reasons set forth below, this Court should, under existing well-settled precedent, deny the Motions and allow this Adversary Proceeding to proceed to discovery.  Alternatively, any dismissal in whole or in part should be without prejudice and should permit Plaintiff to file a motion to amend the Complaint within thirty (30) days of such decision.

---

[7]    *Id.* ¶ 38.
[8]    Lim Consent Ord. ¶ 19.

## BACKGROUND AND SUMMARY OF ARGUMENT

6.    Though Plaintiff brings two categories of claims in this Adversary Proceeding, the Motions pertain only to the Fraudulent Conveyance Claims in Counts I through V. These claims seek to avoid the $1.76 billion-dollar fraudulent transfer the Debtors made in exchange for the Binance Defendants'[9] equity stake in FTX Trading and Zhao and the Management Defendants' equity stake in West Realm Shires ("**WRS**"), which occurred while FTX was, as alleged properly, insolvent (collectively, the "**Fraudulent Conveyance Claims**").

7.    The Fraudulent Conveyance Claims are supported by a plain statement of well-supported facts alleged in good faith, which need not be repeated here in full.  *See generally* Compl. In short, prior to the collapse of FTX, the Binance Defendants were the largest cryptocurrency exchange in the world by trading volume. The Management Defendants were executive officers of employees of Binance. *Id.* ¶¶ 26-27, 37. In 2020, the Management Defendants agreed in writing to purchase shares in WRS, a U.S. company that was intended to be FTX's U.S.-based exchange. *Id.* ¶¶ 36-37. For over a year, the Management Defendants were equity partners with the FTX enterprise. *Id.* ¶ 38. Then, in 2021, the Defendants, including the Management Defendants, exited their investments in FTX due to, among other things, Binance's founder and then-CEO, Changpeng Zhao's ("**CZ**") purported grievances against FTX's founder and then-CEO, Samuel Bankman-Fried ("**Bankman-Fried**" or "**SBF**"). *Id.* ¶¶ 2-4. Specifically, in July 2021, the Binance shareholders disengaged via a written share repurchase transaction whereby FTX bought back what were worthless shares in FTX Trading and WRS in exchange for $1.76 billion in valuable cryptocurrency paid to, or for the benefit of, each of the Defendants, including the Management

---

[9]    "**Binance Defendants**" refers collectively to Binance (Services) Holdings Limited, Binance Holdings Limited, d/b/a Binance.com, Binance Holdings (IE) Limited, Digital Anchor Holdings Limited (f/k/a Binance Capital Management Co. Ltd.).

Defendants. *Id.* ¶ 39.[10] And, as discussed *infra*, each of the Management Defendants personally executed a written FTX Executives Share Transfer Agreement.  Because FTX is alleged to have been insolvent at the time of these transfers, the 2021 Share Repurchase is plausibly alleged to be a constructive fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code. *Id.* ¶ 88. The 2021 Share Repurchase was also an intentional fraudulent transfer under section 548(a)(1)(A) of the Bankruptcy Code because the fraudulent transfers were made in furtherance of Bankman-Fried's fraudulent scheme. Compl. ¶ 47-48. Other than quibbling with the identities of the transferees of the 2021 Share Repurchase which the Management Defendants most surely know (and which is addressed below) and Plaintiff's use of the word "nominal" in the Complaint, the Management Defendants do not contend that any of these facts are unclear or ambiguous.

## ARGUMENT

8.      Through the Motions, the Management Defendants make a series of arguments as to why the facts, even if true, do not support a valid claim for relief against any of them in this Court. *See generally* Lim Mot.; Xiao Mot. The Management Defendants argue, as discussed in Section I *infra*, that this Court has no personal jurisdiction over either of them. *See* Lim Mot. at 5-12; Xiao Mot. at 5-14. They are wrong on multiple grounds, including by the facts and findings in the Lim Consent Order and the unrebutted U.S. connections to the 2021 Share Repurchase. They then argue, as discussed in Section II, *infra*, that the Fraudulent Conveyance Claims are inadequately pled against them specifically to survive dismissal. *See* Lim Mot. at 13-17; Xiao Mot. at 15-20. Again, they are wrong. The Fraudulent Conveyance Claims plausibly allege the transferor, the transferee, the amount of the transfer, and the relevant date, which this Court has held is sufficient to withstand dismissal. Finally, the Management Defendants, as discussed in

---

[10]    While the 2021 Share Repurchase was purportedly funded by FTX's Alameda Research division, FTX had in fact used customer funds from its trading platform. Compl. ¶¶ 109, 119.

Section III *infra*, incorporate by reference, arguments made by the Binance Defendants in their motions to dismiss the Complaint as to why the Fraudulent Conveyance Claims are inadequately pled [Adv. D.I. 62-63, 66-67] (the "**Binance Motions**").  *See* Lim Mot. at 17-18; Xiao Mot. at 21-22.  Plaintiff's response to those arguments are addressed fully in the First Opposition, which is incorporated herein by reference and will not be addressed in this Memorandum.[11]

## I.    THIS COURT HAS SPECIFIC JURISDICTION OVER BOTH OF THE MANAGEMENT DEFENDANTS.

### A.    Relevant Standards.

9.     As an initial matter, Rule 8 of the Federal Rules of Civil Procedure (the "**Federal Rules**") "does not require a plaintiff to set forth in the complaint 'the grounds upon which the court has personal jurisdiction over the defendant.'" *Gurmessa v. Genocide Prevention in Ethiopia, Inc.*, 2022 WL 608924, at *1 (D. Del. Feb. 23, 2022) (citation omitted); *see also Alameda Rsch. Ltd. v. Platform Life Scis. Inc.*, 2023 WL 8814216, at *1 (Bankr. D. Del. Dec. 20, 2023) ("Rule 8 does not require a plaintiff to set forth in the complaint the grounds upon which the court has personal jurisdiction over the defendant . . . .") (internal quotations and citations omitted). Plaintiff only has the burden of proof "[o]nce the defense has been raised," such that the Court's determination of a motion to dismiss for lack of personal jurisdiction "inherently . . . requires [the] resolution of factual issues outside the pleadings." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 101 n.6 (3d Cir. 2004) (citations omitted). A plaintiff satisfies this burden by establishing jurisdictional facts through affidavits or other competent evidence showing with reasonable particularity the sufficient minimum contacts between the forum and the defendant. *See Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 331 (3d Cir. 2009) (holding plaintiffs "were entitled to have their allegations

---

[11]    To the extent this Court allows the Management Defendants to incorporate by reference the arguments made in the Binance Motions, Plaintiff also requests to incorporate by reference the arguments made in the First Opposition.

viewed as true and have disputed facts construed in their favor" after submission of affidavits and evidence to support personal jurisdiction). Even then, unless the Court has held an evidentiary hearing, Plaintiff only needs to make a *prima facie* showing that personal jurisdiction exists at the motion to dismiss stage. *Finjan LLC v. Trustwave Holdings, Inc.*, 2021 WL 5051147, at *4 (D. Del. Oct. 29, 2021).

10.     It is also "well established that in deciding a motion to dismiss for lack of [personal] jurisdiction" under Federal Rule 12 (b)(2), a "court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003) (citing *Pinker v. Roche Holdings, Inc.*, 292 F.3d 361, 368 (3d Cir. 2002)). This remains true even when "considering a motion to dismiss on the basis of affidavits." *Wellness Publ'g v. Barefoot*, 128 F. App'x 266, 268 (3d Cir. 2005); *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007) ("[S]ince the District Court did 'not hold an evidentiary hearing … the plaintiff[s] need only establish a *prima facie* case of personal jurisdiction and the plaintiff[s] [are] entitled to have [their] allegations taken as true and all factual disputes drawn in [their] favor.").[12] In bankruptcy cases, the relevant forum is the U.S.in general. *Platform Life Scis. Inc.*, 2023 WL 8814216, at *1; Xiao Mot. at 8.

11.     Here, even though they did not need to do so, Plaintiff has alleged sufficient facts in the Complaint establishing specific personal jurisdiction over both Management Defendants. In any event, supported by the additional facts set forth in both the First Chase Declaration[13] and the

---

[12]     The Management Defendants, citing *Stranahan*, incorrectly argue that Plaintiff's burden rises from needing to allege facts supporting personal jurisdiction with "reasonable particularity" to requiring "actual proofs," but *Stranahan* never discussed the "reasonable particularity" standard and merely stated that, on a motion to dismiss, "plaintiff must respond with actual proofs, not mere allegations." *Stranahan Gear Co. v. NL Indus., Inc.*, 800 F.2d 53, 58 (3d Cir. 1986); Lim Mot. at 6, 9; Xiao Mot. at 6. Subsequent binding Third Circuit precedent has repeatedly clarified that "[i]f the district court does not hold an evidentiary hearing, 'the plaintiff[s] need only establish a *prima facie* case of personal jurisdiction.'" *Metcalfe*, 566 F.3d at 330 (quoting *O'Connor*, 496 F.3d at 316).

[13]     "**First Chase Declaration**" refers to the *Declaration of Ashley Rona Chase in Support of Omnibus Memorandum*

Second Chase Declaration,[14] Plaintiff easily satisfies its burden to make a *prima facie* showing of personal jurisdiction over the Management Defendants at the motion to dismiss stage.

**B.      The Traditional Test Is Satisfied.**

12.      A defendant may be subject to a court's specific personal jurisdiction under either of two tests: the "traditional test" (also known as the "minimum contacts" or "purposeful availment" test) or the "effects" test. *Hasson* v. *FullStory, Inc.*, 114 F.4th 181, 186 (3rd Cir. 2024). For the traditional test, courts in the Third Circuit engage in a three-step inquiry to determine whether the plaintiff has established: (1) the defendant has "minimum contacts with the forum such that it purposefully availed itself of the privilege of conducting activities within the forum and invoked the benefits and protections of the forum's laws"; (2) plaintiff's claims "arise out of or relate to at least some of those contacts"; and (3) "the exercise of jurisdiction over the defendant . . . comport[s] with traditional notions of fair play and substantial justice such that the defendant should reasonably anticipate being haled into court in that forum." *Id.*

**1.      The Management Defendants' Purposeful Activity in the U.S. Establishes the Requisite Minimum Contacts.**

13.      Lim's extensive activities in the U.S. during the relevant time period sufficiently establish minimum contacts. Two separate on-the-record sworn statements made to other U.S. courts establish that (1) Lim, as an officer of Binance, knew and actively participated in the Binance Enterprise's[15] scheme to act as a single unit, without observing formalities of corporate separateness for the specific purpose of concealing ownership and control of the Binance platform

---

*of Law in Opposition of Binance Defendants' Motions to Dismiss Complaint*, which Plaintiff refer to and incorporates fully herein [Adv. D.I. 107-08].

[14]      "**Second Chase Declaration**" refers to the *Declaration of Ashley Rona Chase in Support of Omnibus Memorandum of Law in Opposition of the Two Management Defendants' Motions to Dismiss Complaint*, filed contemporaneously herewith and incorporated by reference.

[15]      Binance Holdings and its affiliates – the "maze of corporate entities" operating the Binance platform – which include all Binance Defendants, are referred to herein as the "**Binance Enterprise**" or "**Binance**." *See* Lim Consent Ord. ¶ 19.

to avoid U.S. regulatory requirements; and (2) this collective Binance Enterprise had vast connections with the U.S., whose citizens conducted *trillions* of dollars in transactions on the Binance platform. *See generally* Lim Consent Ord.;[16] Washington Plea Agreement.[17] In resolving the Motions, this Court can look outside the pleadings to determine the bona fides of Lim's jurisdictional defenses.[18] Under these circumstances, Lim's attempt to deny minimum contacts with the U.S. is clearly meritless, and this Court can and should reject Lim's arguments that Plaintiff has not adequately specified Lim's contacts with the U.S. *See* Lim Mot. at 6.

14.    *First*, in the Lim Consent Order, Lim personally consented to the entry of, and did not deny, findings of facts stating that he "knew that Binance's reliance on a maze of corporate entities to operate the Binance platform is deliberate, and was designed to obscure the ownership, control, and location of the Binance platform." Lim Consent Ord. ¶ 19. Lim also consented to the fact that he "specifically, advis[ed], direct[ed], and assist[ed] Binance employees and customers how to circumvent Binance's controls" in the U.S. *Id.* ¶ 26; *see also* Compl. ¶ 25. The Lim Consent Order further stated that "Binance actively solicited customers in the United States … while failing to implement … procedures … required by U.S. law," that "Lim was aware of the applicability of U.S. regulatory and legal requirements," and, despite this, "assured a state financial regulator in

---

[16]    Attached as <u>Exhibit 1</u> to the Second Chase Declaration is the Lim Consent Order.
[17]    Attached as <u>Exhibit 16</u> to the First Chase Declaration is the Washington Plea Agreement.
[18]    This Court can, in any event, take judicial notice of court filings like the Lim Consent Order and Washington Plea Agreement. Federal Rule of Evidence 201 authorizes a court to "judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned ... at any stage in the proceeding," including on a motion to dismiss. FED. R. EVID. 201; *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 294 n.3 (S.D.N.Y. 2019) (noting that in ruling on a motion to dismiss, "[t]he Court may take judicial notice of the CFTC Order, DOJ plea agreement[,] and similar public documents such as consent orders" and it may consider these documents in deciding a Rule 12(b)(2) motion); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (stating that in evaluating a motion to dismiss, the Court may consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.)'" (citations omitted).

the United States that Binance's compliance program [was adequate]." Lim Consent Ord. ¶¶ 24, 28, 29. Lim also admitted that he "and other members of Binance's senior management failed to properly supervise Binance's activities … and actively facilitated violation of U.S. law, including by assisting and instructing customers located in the United States to evade compliance controls …" *Id.* ¶ 30.  In the conclusions of law, the Court found that Lim aided and abetted the Binance Enterprise in conducting an "office or business in the U.S. for the purposes of soliciting or accepting any order … for leveraged retail commodity transactions." *Id.* ¶ 33.

15.     ***Second***, the Washington Plea Agreement also establishes the Binance Enterprise's sweeping U.S. connections while Lim was a senior executive, as well as its elaborate attempt to conceal those connections which Lim knew about, as set forth in the Lim Consent Order. Among other admissions, Binance admitted to:

a)     "[O]perat[ing] a cryptocurrency exchange wholly or in substantial part in the United States. . ." Washington Plea Agreement, Attachment A ¶ 1.

b)     Engaging in "a deliberate and calculated effort to profit from the U.S. market without implementing controls required by U.S. law." *Id.*

c)     Operating a platform on which U.S. users conducted "trillions of dollars in transactions" between August 2017 and October 2022.  *Id.* ¶ 48.

d)     "[I]ntentionally maintain[ing] substantial connections to the United States, from which it generated, among other things, web traffic, user base, transaction volume, and profit." *Id.* ¶ 27.

e)     "[A]ttracting a substantial number of U.S. users to Binance.com—particularly U.S. VIP users, who accounted for a significant percentage of the overall trading volume on Binance's platform." *Id.* ¶ 21.

f)     "[W]illfully caus[ing] transactions between U.S. users and users in comprehensively sanctioned jurisdictions in violation of U.S. law." *Id.* ¶ 23.

g)     Maintaining a customer base whose largest single share by nationality was U.S. users, *at least* through late 2020, despite Binance's attempts to conceal those customers' nationality by removing the U.S. label and recategorizing those users as "UNKWN."  *Id.* ¶¶ 29, 47.

h)     Relying (illicitly) on U.S. users to achieve their sizeable market share, as well the "network effect" of U.S. users resulting in additional revenue for Binance—a

circumstance which caused CZ to remark that it is "better to ask for forgiveness than permission." *Id.* ¶¶ 31, 48.

16.     These court filings establish that, at Lim's direction and knowledge, the Binance Defendants operated a *multi-trillion-dollar* cryptocurrency operation *in the U.S.* and exploited the U.S. market at every opportunity. *See* Washington Plea Agreement ¶¶ 4, 48. There is no question that these findings in U.S. courts, including not denying that Lim directed significant operations of the Binance Enterprise in the U.S., suffices for the minimum contacts prong of the traditional test. *See* Lim Consent Ord. ¶ 30; Washington Plea Agreement, Attachment A ¶ 1; *see also In re Bozel S.A.*, 434 B.R. 86, 99 (Bankr. S.D.N.Y. 2010) ("Thus, the fact that [defendant's] contacts with the United States arise from his corporate capacity does not shield him from personal jurisdiction."). Put simply, the Management Defendants were officers of a company that "wholly or in substantial part" did business in the U.S. and actively participated in the illegalities that are described in the Lim Consent Order and Washington Plea Agreement. *See In re Capmark Fin. Grp. Inc.*, 479 B.R. 330, 341 (Bankr. D. Del. 2012) (explaining that being an employee, officer, or shareholder of a U.S. company are all factors that support personal jurisdiction).

17.     The Management Defendants' additional purposeful activities in the U.S. further establish requisite minimum contacts. Jurisdiction is proper "where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (emphasis in original). Indeed, the contacts "must be the defendant's own choice" and "show that the defendant deliberately reached out beyond its home—by, for example, exploit[ting] a market in the forum State or entering a contractual relationship centered there." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). Overall, "minimum contacts … exist where the defendant purposefully

availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018).

18.     Here, the Complaint alleges that, by the end of 2019, Bankman-Fried "had determined to open a United States-based exchange platform." Compl. ¶ 36.  And in order to accomplish this, on February 28, 2020, Zhao signed a waiver of non-compete, allowing Bankman-Fried and Wang, U.S.-based co-founders of FTX, to hold equity interests in WRS, a Delaware corporation and the parent company of FTX's new U.S. exchange platform, known as "FTX US." *Id.*  On that same day, the Management Defendants (along with Zhao) purchased 200,000 WRS shares (approximately an 18.4% stake at the time).  *Id.* ¶ 37 Thereafter, in July 2021, SBF and FTX entered into discussions with Binance regarding the 2021 Share Repurchase, which was consummated on or about July 15, 2021. *Id.* ¶ 38.  A "Receipt of Payment of Capital Contribution" shows that FTX received cash payments from Xiao, Lim, and Zhao for the WRS shares on or around March 1, 2020.  *See* Second Chase Decl. Ex. 2.

19.     Then, on July 15, 2021, as part of the specific transactions giving rise to the Fraudulent Conveyance Claims, the Management Defendants and certain FTX executives entered into three FTX Executives Share Transfer Agreements to sell the WRS shares pursuant to the 2021 Share Repurchase. Compl. ¶ 38.  Specifically, Lim and Xiao entered into FTX Executives Share Transfer Agreements with Wang/Singh and Bankman-Fried/Wang, respectively. As discussed, *infra*, the agreements all included U.S. entities and individuals as notice parties. In other words, the Management Defendants entered into agreements with U.S. persons for the sale of shares of a U.S.-based company.

20.     This Court should not entertain the Management Defendants' attempts to now paint themselves as passive shareholders, with no other-directed conduct towards the U.S.  *See* Lim Mot.

at 9; Xiao Mot. at 8.[19] A defendant has minimum contacts with a forum when it determines to deliberately "exploit[] a market in the forum state." *Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico)*, *S.A.*, 92 F.4th 450, 456 (2d Cir. 2024) (citations omitted). Here, the Management Defendants deliberately sought to exploit the U.S. cryptocurrency market. *See* Compl. ¶¶ 36-38; Second Chase Decl. Ex. 1-2. These purposeful efforts began in 2019, when Lim assisted in Binance's efforts to operate a multi-trillion-dollar cryptocurrency enterprise in the United States. *Supra* ¶¶ 15-16. These contacts escalated in 2020, when the Management Defendants became some of the few shareholders in FTX's new U.S. exchange. *See* Comp. ¶¶ 36-37. The Management Defendants deliberate contacts with the U.S. culminated with the 2021 Share Repurchase, where the Management Defendants were able to profit extraordinarily on their earlier investments in the U.S. cryptocurrency market. *Id.* ¶ 39. The Complaint cannot be dismissed where it has properly alleged that the Management Defendants were the buyers (in 2020) and the sellers (in 2021) of shares in FTX's U.S. exchange, as confirmed by the actual terms of the relevant agreements. *See* Second Chase Decl. Ex. 2; Comp. ¶ 38. Plaintiff has more than satisfied its *prima facie* burden of establishing the Management Defendants' minimum contacts. *See Picard v. UBS AG (In re BLMIS)*, 647 B.R. 42, 58-59 (Bankr. S.D.N.Y. 2022) (holding *prima facie* minimum contacts burden met where defendant took actions abroad with the intent of profiting from investments in forum); *Picard v. Banque Syz & Co. (In re BLMIS)*, 2022 WL 2135019, at *4 (Bankr. S.D.N.Y. June 14, 2022) (finding sufficient minimum contacts based on investment activity intentionally directed to forum); *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 318

---

[19]    The Management Defendants supporting Declarations [Adv. D.I. 94, 97] focus entirely on the fact that the Management Defendants were born, lived, and worked outside of the United States at all relevant times. This is insufficient to rebut the Management Defendants' extensive contacts with the U.S. *See Kalaj v. Kay*, 2023 WL 4564795, at *3 (E.D.N.Y. July 17, 2023) ("Even where a party has no offices in New York, conducted no meetings with the plaintiff here, and its agents purportedly have not visited the State, that party's transaction may have a 'center of gravity' in [the forum State].") (citations omitted).

(Bankr. D. Del. 2005) ("A single transaction with the forum plaintiff will suffice [to establish minimum contacts] … [and] the defendant's activity need not take place within the forum so long as it is 'intentional conduct … calculated to cause injury' to the plaintiff within the forum.") (citations omitted).

### 2. The Fraudulent Conveyance Claims Arise out of or Relate to the Management Defendants' Contacts with the U.S.

21.     Plaintiff has also satisfied the relation prong of the traditional test because the Fraudulent Conveyance Claims "arise out of or relate to at least some" of the Management Defendants' U.S. contacts. *See Hasson*, 114 F.4th at 186. As described in different words by the United States Supreme Court, this second prong requires that "there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum . . . . and is therefore subject to the [forum]'s regulation." *Ford Motor Co.*, 592 U.S. at 359-60.  "[P]roof that the plaintiff's claim came about because of the defendant's [in-forum] conduct" is not required.  *Id.*  Instead, the Court need only find an "affiliation between the forum and the underlying controversy."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citations omitted). The Third Circuit has also repeatedly observed, "'[t]he degree of relatedness required in a given case is inversely proportional to the overall intensity of the defendant's forum contacts.'" *Hasson*, 114 F.4th at 193 (quoting *O'Connor*, 496 F.3d at 320).

22.     At its heart, the Complaint alleges that the Management Defendants invested in FTX's new U.S. exchange platform and cashed out of that investment as part of the 2021 Share Repurchase. *See* Compl. ¶¶ 36-43. The Fraudulent Conveyance Claims are directly related to the Management Defendants' investment activities with WRS, a U.S. company.  *See Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) (subjecting foreign defendants to specific jurisdiction, where trustee sought to avoid and recover payments received

on account of defendants' investments arising from defendants' contacts with the forum); *U.S. Bank Nat'l Assoc. v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019) ("We have found that a claim arises out of forum contacts when defendant's allegedly culpable conduct *involves at least in part* financial transactions that touch the forum.") (emphasis added); *In re Zawawi*, 644 B.R. 907, 915-16 (Bankr. M.D. Fla. 2022) (denying defendants' motion to dismiss and holding that defendants' contacts with the U.S. were based on, in part, in their ownership of shares in a U.S. corporation and such contacts directly related to plaintiffs' claims, which "concern the ownership and/or transfer" of the U.S company). Therefore, just as in *Zawawi*, the Management Defendant's contacts with the U.S., through among other things, a sale of a U.S. entity's shares, are directly related to the Fraudulent Conveyance Claims. *See Zawawi*, 644 B.R. at 915-16. The allegations surrounding the Fraudulent Conveyance Claims also occurred at the same time as Lim's admitted purposeful availment of the U.S. as part of Binance's overall scheme to exploit the U.S. market. *See Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, 2018 WL 5118638, at *4 (S.D.N.Y. Oct. 22, 2018) (single cryptocurrency transaction made as "part of a larger business plan" to earn profits in the forum state sufficient to confer jurisdiction). There also is no question that the Management Defendants benefited from the U.S. and its laws in investing in and cashing out of WRS, enough "to make the burden of facing litigation there proportional to those benefits." *Danzinger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 130 (3d Cir. 2020).[20]

23. All of this by itself would suffice to establish the necessary "affiliate" or "close connection" between the Management Defendants' U.S. contacts and the Fraudulent Conveyance Claims. But the Management Defendants' suit-related contacts with the U.S. go much deeper.

---

[20] The Management Defendants argue that specific jurisdiction cannot be established because they "merely" purchased or held shares in a U.S. company. *See* Lim Mot. at 9; Xiao Mot. at 8-11. The cases cited by both all hold that shareholder, employment, board member or limited partner status *alone* are not sufficient to confer jurisdiction. As explained herein, the Management Defendants' contacts with the U.S. extend far beyond that.

***First***, all of the consideration for the WRS prong of the 2021 Share Repurchase took the form of Binance's proprietary "stablecoin," known as "**BUSD**." *See* Compl. ¶¶ 31, 40. Unlike other cryptocurrencies that experience significant volatility relative to fiat currency, a stablecoin is a form of cryptocurrency that is pegged to fiat. *See* Compl. ¶ 31. BUSD was a creation of the Binance Enterprise that, as its name suggests, was pegged to the U.S. dollar. *Id.* In order to "mint" BUSD, a party would have to transfer U.S. dollars to a New York trust called "**Paxos**," which had partnered with Binance to issue BUSD.[21] Paxos would hold the U.S. dollars in trust in U.S. banks to "back" the BUSD.[22] Paxos' independent accountant's report as of July 30, 2021—the closest in time to the 2021 Share Repurchase—indicated that Paxos held $12.2 billion in reserve to back the 12.2 billion of BUSD then in circulation.[23]

24.    In practice, and as the Management Defendants would have been well aware, this meant that FTX would have to use a New York trust to "mint" the BUSD to be paid to the Management Defendants to complete the transaction. *See* Compl. ¶ 43. FTX indeed did so, transferring at least $721 million to Paxos in New York and receiving the equivalent amount of BUSD, which it then transferred to Binance to complete the 2021 Share Repurchase. *Id.* ¶ 43.

25.    The U.S. contacts associated with the BUSD aspect of the 2021 Share Repurchase cannot be overstated. Minting BUSD goes far beyond merely routing funds through a U.S.

---

[21]    Paxos partnered with Binance in 2019. *See* PAXOS, *Binance Partners with Paxos to Launch USD-Backed Stablecoin 'BUSD'* (Sept. 4, 2019), https://www.paxos.com/newsroom/binance-partners-with-paxos-to-launch-usd-backed-stablecoin-busd, attached as Ex. 1 to the First Chase Decl.; *see also* Michele Toh, *BUSD: US regulator orders Paxos to halt new issues of Binance-branded stablecoin*, CNN (Feb. 14, 2023), https://www.cnn.com/2023/02/14/investing/paxos-binance-busd-halt-order-us-intl-hnk (quoting Binance's statements: "Binance licenses its brand to Paxos for use with BUSD, which is entirely owned by Paxos and regulated"), attached as Ex. 14 to the First Chase Decl.

[22]    *See e.g.*, Compl. ¶ 43; *see also* PAXOS, *Paxos Will Halt Minting New BUSD Tokens* (Feb. 13, 2023), https://www.paxos.com/newsroom/paxos-will-halt-minting-new-busd-tokens, attached as Ex. 13 to the First Chase Decl.

[23]    Withum Audit Tax Advisory, *Paxos Trust Company, LLC Examination of Management Assertions Reserve Accounts Report –BUSD Token*, PAXOS, at 3 (July 30, 2021) https://www.paxos.com/busd-transparency#busd-attestations (the "**Paxos Audit Report**"), attached as Ex. 8 to the First Chase Decl.

financial institution to complete a transaction—a fact which itself would weigh in favor of personal jurisdiction in the U.S. *See* Compl. ¶ 43; *Off. Comm. of Unsecured Creditors of Arcapita, Bank. v. Bahrain Islamic Bank*, 549 B.R. 56, 67-71 (S.D.N.Y. 2016) (holding that the defendants' selection and use of correspondent bank accounts in New York provided a sufficient basis to assert personal jurisdiction over them); *Picard v. BNP Paribas S.A.*, 594 B.R. at 191 (plaintiff made *prima facie* showing of specific jurisdiction where foreign defendants wired funds and sent redemption requests to and received redemption payments from forum contacts, which were the proximate cause of fraudulent transfer claims that trustee sought to redress). Here, because Binance and the Management Defendants elected to structure the transaction with BUSD as part of the consideration necessary to consummate the 2021 Fraudulent Transfers, that consideration was created and issued in the U.S. and by a U.S. entity partnered with Binance (where Lim and Xiao were officers and employees). *See supra* n. 21; *see also* Compl. ¶ 41.

26.     ***Second***, FTX had U.S. based counsel, including Daniel Friedberg ("**Friedberg**") and Fenwick & West LLP ("**Fenwick**"), who negotiated the 2021 Share Repurchase, including the WRS prong.  Friedberg and Fenwick were listed *with their U.S. addresses*[24] in the notice section of the FTX Executives Share Transfer Agreements. *Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) ("[C]ontract negotiations with forum residents can empower a court to exercise personal jurisdiction over persons outside the forum."). Similarly, Bankman-Fried and the other FTX executives purchasing WRS shares from the Management Defendants were listed with their Berkeley, California address, as notice parties in the FTX Executives Share Transfer Agreements.[25] Lim and Xiao each signed the FTX Executives Share Transfer

---

[24]    *See Declaration of Karen R. King in Support of Defendant Digital Anchor Holdings Limited's Motion to Compel Arbitration and Motion to Dismiss* [Adv. D.I. 64] (the "**King Declaration**"), Exs. 1-7. *See, e.g.*, Ex. 1 at 6 (listing Fenwick's Seattle office address at 1191 Second Ave, 10th floor.).

[25]    King Decl., Ex. 3 at 4, Ex. 4 at 4, Ex. 5 at 4, Ex. 6 at 4,

Agreements.[26] That FTX's professionals negotiated the 2021 Share Repurchase in the U.S. weighs in favor of specific personal jurisdiction, notwithstanding the inapplicable choice-of law and arbitration provisions upon which the Management Defendants rely, since the Complaint does not allege contract-based claims.[27] *See Burger King Corp.*, 471 U.S. at 482 (finding that choice-of-law provision alone as not determinative of whether to confer jurisdiction); *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1354-56 (Fed. Cir. 2002) (holding minimum contacts were present and satisfied due process where the parties negotiated the contract in the forum, despite the contract's foreign choice-of-law and arbitration provisions); *Electrosource Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 873 (5th Cir. 1999) (holding that although agreement at issue contained a choice-of-Indian-law clause, the defendant's contacts with the forum state "substantially outweigh[ed] the law choice factor").

27.   ***Third***, the transfers made by FTX to acquire the Management Defendants' WRS shares were made from the Alameda silo—not the FTX Trading silo. Alameda Research LLC ("**Alameda**"), the parent of that silo, was (like WRS) a Delaware corporation. *See Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], at Ex. B; First Chase Decl., Ex. 5.  And, although the direct transferor was a non-US subsidiary of Alameda, the consideration paid would ultimately deplete the liquidity of Alameda as parent.  *See* Compl. ¶¶ 41, 45-47. Indeed, as a practical matter, all parties understood that the payment was from Alameda. Bankman-Fried even told a Forbes reporter shortly after the 2021 Share Repurchase that "[t]he purchase was entirely from Alameda.  Yeah, it had a good last year :P" (*i.e.*, an emoji for a tongue sticking out). *See id*. ¶ 48.

---

[26]   King Decl., Ex. 3 at 9, Ex. 4 at 9, Ex. 5 at 9, Ex. 6 at 9.

[27]   Based on Binance's course of dealings with FTX, Binance was aware that FTX typically used U.S. counsel. For example, the 2019 Share Transfer was also negotiated by U.S. counsel. First Chase Decl., Ex. 2.

28.     Accordingly, the Fraudulent Conveyance Claims are affiliated with the Management Defendants' alleged conduct and contacts in the U.S. *See Goodyear Dunlop Tires,* 564 U.S. at 919 ("[S]pecific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'") (citations omitted).

### 3. Exercising Personal Jurisdiction Over The Management Defendants Will Not Offend Due Process.

29.     The Management Defendants next contend that Plaintiff has not established the third prong of the traditional test—*i.e.*, that this Court exercising jurisdiction will be fundamentally fair.  Lim Mot. at 11-13; Xiao Mot. at 12-15. The Management Defendants, however, have more than the requisite minimum contacts with the U.S. such that exercising jurisdiction over them will not offend due process.

30.     "The existence of minimum contacts makes jurisdiction presumptively constitutional," *O'Connor*, 496 F.3d at 324, at which point the heavy burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992) (citation omitted) (aggregating contacts to find specific jurisdiction over defendant); *see also Grand Ent. Group., Ltd.*, 988 F.2d at 483 (noting that in considering whether a court's exercise of jurisdiction squares with notions of fair play and substantial justice, "the burden on a defendant who wishes to show an absence of fairness or lack of substantial justice is heavy".). In evaluating whether the assertion of personal jurisdiction comports with "fair play and substantial justice," courts consider: (1) the burden on the defendant of litigating in the U.S.; (2) the interest of the U.S. in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief that is sought; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies;" and (5) the "shared interest of the several States in furthering fundamental

substantive social policies." *Id.*; *Burger King Corp.*, 471 U.S. at 477. The Management Defendants

fail to satisfy this heavy burden. All five factors weigh in Plaintiff's favor, as follows:

    a)    **Burden on Defendants of Litigation in the U.S.**  The Management Defendants will not be burdened by litigating in the U.S. so as to "rise to a level of constitutional concern."  *See In re DBSI, Inc.*, 467 B.R. 309, 315 (Bankr. D. Del. 2012) (quotations omitted). Courts have only found this burden to weigh in favor of a defendant in "highly unusual cases," especially "in this age of instant communication and transportation, [where] the burdens of litigating in a distant forum have lessened." *Id.* (citations and quotations omitted).  The Court's exercise of jurisdiction over the Management Defendants—with Lim having already entered into the Lim Consent Order—would not make it "so gravely difficult and inconvenient that [Defendants] [are] at a severe disadvantage in comparison to [Plaintiff]." *Id.* Both Management Defendants have also retained U.S. counsel and Plaintiff is willing to accommodate the Defendants through remote discovery and litigation, as appropriate. *See* Adv. D.I. 74, 75, 86-88; *TriStrata Tech., Inc. v. Emulgen Lab'ys, Inc.,* 537 F. Supp. 2d 635, 642 (D. Del. 2008) (holding that litigating in Delaware would not substantially burden the defendant based on among other things, retention of counsel) (quotation omitted).

    b)    **The Interest of the U.S. in Adjudicating the Dispute**.  The U.S. has a strong interest in applying its laws, including overseeing the Fraudulent Conveyance Claims arising under the U.S. Bankruptcy Code or U.S. state law, especially in a high-profile case, such as this, in which U.S.-based FTX customers and creditors have suffered extensive losses. *See, e.g., In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010); Compl. Counts I-V. This Court also has a strong interest in allowing the litigation to continue in this forum as "[t]he federal bankruptcy system was designed to provide 'one forum for adjudicating almost all disputes arising in or out of a particular case.'" *In re Capmark Fin. Grp. Inc.*, 479 B.R. at 341.

    c)    **Plaintiff's Interest in Obtaining Convenient and Effective Relief.** As discussed herein, the Management Defendants have engaged in substantial business activities throughout the U.S. The substantial core of the activities at issue in the Complaint indisputably involve the assets of the Reorganized Debtors. *See generally* Compl. It also is in Plaintiff's interest and "in furtherance of its duty to act for the benefit of creditors, to avoid wasting resources associated with litigating in multiple forums." *Capmark*, 479 B.R. at 341-42 (holding that litigation in another forum would waste estate resources and needlessly require a foreign court to be educated on U.S. fraudulent conveyance law).  Requiring the Management Defendants to litigate in this Court is the most efficient and convenient way to resolve the action; in fact, litigating these same issues in foreign courts would needlessly waste the Reorganized Debtors' and their creditors' resources.[28]

---

[28]    *See Tristrata Tech., Inc.*, 537 F. Supp. 2d at 642 ("[T]he judicial system's interest in the efficient resolution of

d)   **National Interest in Furthering the Policies of the Laws.**[29]  It is clear that "the most efficient resolution of the controversy would be in the United States," which is the location of Plaintiff's "inextricably-related" bankruptcy, where this case has been pending for years and this Court is well-acquainted with the parties and issues.[30] *In re Bernard L. Madoff Inv. Sec. LLC*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009) (citation omitted).  Moreover, the Management Defendants "purposefully avail[ed] [themselves] of the American securities market" and the Fraudulent Conveyance Claims arise under the U.S. Bankruptcy Code.  *Pinker*, 292 F.3d at 372-73.

31.     In short, the Management Defendants have not shown that *any* of the relevant factors are satisfied, and thus, have failed to rebut the presumption that this Court's exercise of personal jurisdiction over either of them comports with traditional notions of fair play and substantial justice.

**C.     The Effects Test is Also Satisfied.**

32.     While Plaintiff's satisfaction of the "traditional test" is sufficient to establish specific personal jurisdiction, Plaintiff also independently satisfies the alternative "effects test" for the Fraudulent Conveyance Claims.  Where a plaintiff has alleged an intentional tort, courts may exercise specific jurisdiction under the "effects" test if the tortious conduct is "calculated to cause injury" in the forum.  *Calder v. Jones*, 465 U.S. 783, 789, 791 (1984).  Under the "effects" test, a court may exercise jurisdiction over a non-resident defendant when (1) the defendant committed an intentional tort, (2) the plaintiff felt the brunt of the harm caused by that tort in the forum, and

---

[Plaintiff's] claims against [Defendant] and its co-defendants in a single action before this Court beg the Court's conclusion that the assertion of personal jurisdiction over [Defendant] will comport with fair play and substantial justice"); *In re DBSI, Inc.*, 451 B.R. 373, 378 (Bankr. D. Del. 2011) (finding that, even if litigating in the forum would impose a burden on the foreign defendant, it would avoid the expense of "duplicative litigation [that] would be borne by the creditors for whose benefit the fraudulent transfers actions are meant to serve").

[29]   "In the federal court context, the inquiry will be slightly different, taking less account of federalism concerns [factors (iv) and (v)], and focusing more on the national interest in furthering the policies of the law(s) under which the plaintiff is suing." *Pinker*, 292 F.3d at 370-71 (finding personal jurisdiction over a Swiss corporation when the corporation sponsored a U.S. financial instrument that was traded by American investors).

[30]   Although Honorable Judge John T. Dorsey presided over the bankruptcy cases, this Court continues to have jurisdiction and has overseen all of the adversary proceedings.

(3) the defendant expressly aimed his tortious conduct at the forum. *See IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 257 (3d Cir. 1998).

33.     If this Court finds that the Fraudulent Conveyance Claims are torts, Plaintiff also satisfies the "effects" test.

34.     ***First***, the Complaint alleges that the Management Defendants engaged in fraudulent transfers in connection with the 2021 Share Repurchase. *See* Compl. ¶¶ 80-128. The Third Circuit has classified fraudulent transfers as a "species of the intentional tort of fraud" in assessing whether the exercise of jurisdiction is appropriate over a defendant. *Gambone v. Lite Rock Drywall*, 288 Fed. Appx. 9, 13-14 (3d Cir. 2008) (holding that district court could exercise personal jurisdiction over non-resident transferee because he "prevent[ed] the plaintiffs, who are Pennsylvania creditors, from collecting on a judgment rendered in their favor by a court in Pennsylvania … and thus 'expressly aimed' his conduct at the forum.").

35.     ***Second***, the Management Defendants "expressly aimed" their conduct at the U.S. when they bought shares of a U.S. company to profit from the U.S. market and intended for the consideration for the 2021 Share Repurchase to be "minted" from a New York Trust.  Such consideration received is now subject to the Fraudulent Conveyance Claims. *See In re Uni-Marts, LLC*, 404 B.R. 767, 777 (Bankr. D. Del. 2009) (subjecting defendant to personal jurisdiction when he, while outside the U.S., directed his tortious activity at plaintiff inside the U.S.).

36.     ***Third***, Plaintiff "felt the brunt of the harm" of the effects of the Fraudulent Conveyance Claims in the U.S. The Complaint alleges that the 2021 Share Repurchase was funded with over $1.7 billion in misappropriated customer assets, which were used, in part, to repurchase the WRS shares from the Management Defendants even though the WRS shares were effectively worthless. Compl. ¶¶ 40, 46. FTX had a massive number of U.S. customers and other creditors

that were affected by the Fraudulent Conveyance Claims. *See* FTX Creditor Matrix [D.I. 574] (showing U.S. creditors located across the U.S. in various states). If not for the fraudulent transfers underpinning the 2021 Share Repurchase, approximately $1.7 billion in funds would be available to creditors of the Reorganized Debtors. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *7 (S.D.N.Y. Aug. 18, 2017) ("[W]here … the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff … the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum.").[31]

### D.   The Management Defendants Have Waived Their Jurisdictional Defenses.

37.     By their Motions, the Management Defendants simultaneously argue that (i) this Court does not have jurisdiction and (ii) this Court should dismiss the Fraudulent Conveyance Claims because they are not proper transferees.  The Management Defendants cannot have it both ways.

38.     Courts have repeatedly held that "where a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter." *Bel-Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 443 (3d Cir. 1999); *In re Asbestos Prods. Liab. Litig. (No. VI)*, 921 F.3d 98, 105 (3d Cir. 2019) ("Simply put, '[t]he actions of the defendant may amount to a legal submission to the jurisdiction of the court' even where a defendant has raised the defense [of lack of personal jurisdiction]") (citation

---

[31]     It is inapposite that the WRS prong of the 2021 Share Repurchase was for $8.13 million, Lim Mot. at 12. Lim cites to no authority for the proposition that a fraudulent transfer can be excused or a defendant can avoid jurisdiction due to the amount of the consideration paid in the challenged transfer. *See generally* 11 U.S.C. § 548 ("The trustee may avoid *any* transfer …") (emphasis added).

omitted). Indeed, "even where a party has met the technical requirements of Rule 12(h), that is not always sufficient to avoid waiver." *Asbestos Prods. Liab. Litig. (No. VI)*, 921 F.3d at 105.

39. The relevant inquiry under the Third Circuit is whether the Management Defendants' conduct "is consistent with waiver, and which indicates an intent to litigate the case on the merits." *Asbestos Prods. Liab. Litig. (No. VI)*, 921 F.3d at 107 (finding a waiver of personal jurisdictional defenses where, among other things, defendants requested the court make rulings before jurisdiction was determined, thus seeking affirmative relief from the Court).

40. Here, the Management Defendants have sought (and extensively litigated) dismissal of the Fraudulent Conveyance Claims. In support of the Motions, each Management Defendant submitted a declaration alleging that they each "served as a nominal shareholder of [WRS]" and they each "nominally held WRS securities exclusively on behalf of [their] former employer, Binance." [Adv. D.I. 94, ¶¶ 8-9; Adv. D.I. 97, ¶¶ 9-10]. These statements seeking to disclaim all liability on the Fraudulent Conveyance Claims are a thinly veiled request that this court make a factual determination that neither Management Defendant is a proper transferee. *See* Lim Mot. at 14-15; Xiao Mot. at 18. Such a request is nonsensical. The Management Defendants cite no support for the proposition that the "nominee shareholder" of a U.S. entity (i.e., *the named party holding the shares*) is *per se* absolved from liability for fraudulent transfer. The Management Defendants' request for factual findings regarding liability is also improper on a motion to dismiss. Regardless, this affirmative request for relief on the merits acts as a waiver of any personal jurisdiction defense. *See Asbestos Prods. Liab. Litig. (No. VI)*, 921 F.3d at 106 ("Generally, a party who requests affirmative relief and rulings from a court is considered to have waived the personal jurisdiction defense.") (citing *Bel-Ray Co.*, 181 F.3d at 443).

### E.   Alternatively, Plaintiff is Entitled to Jurisdictional Discovery.

41.     If this Court finds that Plaintiff has not met their burden of establishing a *prima facie* showing of jurisdiction over the Management Defendants, this Court should permit Plaintiff to take jurisdictional discovery. Unless a plaintiff's claim is "clearly frivolous," courts "should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983); *see also Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 283 (3d Cir. 1994) (jurisdictional discovery should be "freely permitted" when record may be "ambiguous" as to whether defendant has purposefully availed forum state). Entitlement to jurisdictional discovery only requires a plaintiff present factual allegations suggesting "with reasonable particularity" the requisite contacts between the forum and the defendant. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d at 456 (internal citations omitted); *Marnavi SpA v. Keehan*, 2010 WL 1499583 at *6-7 (D. Del. Apr. 14, 2010) (same). Plaintiff has plainly identified numerous contacts each Management Defendant has with the U.S., along with supporting evidence, thereby meeting this standard.

## II.     THE COMPLAINT ADEQUATELY PLEADS THE FRAUDULENT CONVEYANCE CLAIMS AGAINST THE MANAGEMENT DEFENDANTS.

42.     The Management Defendants next contend that the Fraudulent Conveyance Claims should be dismissed for failure to state a claim, based entirely on the unfounded assertions that Plaintiff has not alleged either Lim or Xiao were transferees of the 2021 Share Repurhcase or that the alleged transfers were made for their benefit. *See* Lim Mot. at 13-17; Xiao Mot. at 15-21. The Management Defendants' apparent disregard of the Complaint's details should not be rewarded.

43.     The Management Defendants face a high bar to establish failure to state a claim under Federal Rule 12(b)(6). *See In re LSC Wind Down, LLC*, 610 B.R. 779, 783 (Bankr. D. Del. 2020) (Owens, J.) ("the defendant bears the burden to show that the plaintiff's claims are not plausible."). In deciding a motion to dismiss pursuant to Federal Rule 12(b)(6), a court must

"accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *In re Zohar III, Corp.*, 631 B.R. 133, 155 (Bankr. D. Del. 2021) (Owens, J.); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim is facially plausible when the plaintiff pleads facts that lead the court 'to draw a reasonable inference that the defendant is liable for the misconduct alleged.'" *LSC Wind Down, LLC*, 610 B.R. at 783. For purposes of a Federal Rule 12(b)(6) motion, the Court considers the "complaint, public record, and documents that are 'integral to or explicitly relied upon' by a plaintiff, such as documents attached to a complaint and any undisputedly authentic documents upon which the claims are based." *In re Zohar III, Corp.*, 631 B.R. at 156 (citations omitted).

44.     Both Management Defendants rely almost entirely on the Complaint's description of the Defendants as "nominal counterparties" to the 2021 Share Repurchase in support of their assertions that neither were transferees of the 2021 Share Repurchase or that the alleged transfers were made for their benefit.  *See generally* Lim Mot.; Xiao Mot. To back this up, the Management Defendants submitted declarations containing the same, unsubstantiated statements that they were "nominal shareholders" of WRS and "nominally held" the WRS shares on behalf of Binance. *Supra* ¶ 40. Such statements directly contravene the FTX Executives Share Transfer Agreements explicit identification of both Lim and Xiao as "Sellers." *Id*. As discussed above, the Management Defendants cite to any authority for the proposition that a *named* contractual counterparty can disclaim transferee status on a motion to dismiss on what is essentially their mere say-so. *Id*. Plaintiff, on the other hand, has alleged in the Fraudulent Conveyance Claims: (i) the transferor, ***FTX and its executives***, (ii) the transferee, ***the Defendants (including the Management Defendants)***, (iii) the amount of consideration, ***no less than $1.76 billion***, and (iv) the relevant

date, **on or about July 15, 2021**.   Because this Court has held this is sufficient to withstand dismissal, the Fraudulent Conveyance Claims must proceed to discovery.   *In re Zohar III, Corp.*, 631 B.R. at 170 ("[A] fraudulent transfer claim will withstand dismissal if it alleges, *inter alia*, the transferor, the transferee, the amount of the transfer, and relevant date.").

45.    The Management Defendants are wrong that the Fraudulent Conveyance Claims should be dismissed due to supposed pleading inadequacies for additional reasons. The Lim Consent Order stated that the Binance Enterprise "commingled funds, relied on shared technical infrastructure, and engaged in activities to collectively advertise and promote the Binance Brand." Lim Consent Ord. ¶ 18. The Lim Consent Order further confirmed that the Binance Enterprise acted "through their officers, employees, and agents" in executing and maintaining positions and conducting other activities in the U.S. *Id.* ¶ 33. And again, the Management Defendants ignore that *they were the actual sellers* in the WRS prong of the 2021 Share Repurchase, and that they paid for the WRS shares in the first instance. *Supra* ¶ 26; Compl. ¶ 37. Coupled together, the Complaint contains sufficient allegations at the pleading stage to plausibly allege that the Management Defendants were transferees and/or transfer beneficiaries in connection with the 2021 Share Repurchase. *See LSC Wind Down, LLC*, 610 B.R. at 783. At a minimum, these facts sufficiently allege that the Management Defendants were "for whose benefit [the] transfer was made" under section 550(a)(1) of the Bankruptcy Code or "immediate or mediate transferees" under section 550a(2) of the Bankruptcy Code, because reasonable to infer that the actual sellers of the WRS shares benefited from the consideration paid from those shares and/or subsequently received consideration for the shares, especially when they paid for the WRS shares themselves in 2020.

46.    Further, "[w]here more than one defendant allegedly committed the same act together, a complaint is not defective for the reason that it asserts that all defendants committed

the same act, without identifying each individual defendant." *In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 723 (Bankr. S.D. Tex. 2020) (quoting *Wilson v. Deutsche Bank Trust Co.*, 2019 WL 175078, at *7 (N.D. Tex. Jan. 10, 2019); *see also Clapper v. Am. Realty Inv'r, Inc.*, 2015 WL 3504856, at *4 (N.D. Tex. June 3, 2015) ("plaintiffs are permitted under federal procedure to allege that more than one defendant (i.e., a group of named defendants) committed the same alleged act."). Here, with respect to the constructive Fraudulent Conveyance Claims, Rule 8 allows Plaintiff to allege that the Defendants committed the same alleged act. *See Northstar*, 616 B.R. at 723 (complaint did not violate Rule 8's prohibition against group pleading where "the Trustee's allegations are that each of the Defendants participated in the transfers alleged").  As for the actual Fraudulent Conveyance Claims, any prohibition against group pleading applies only to the extent the plaintiff must allege the "who" of fraudulent conduct. *Id.* at 734.  And while actual fraudulent transfer claims must meet the elevated pleading standards of Federal Rule 9(b), "the requirements of Rule 9 (b) are to be interpreted liberally where the claim is asserted by a trustee or trust," like in this case*. In re Cred Inc.*, 650 B.R. 803, 834 (Bankr. D. Del. 2023). Plaintiff has satisfied its burden at this stage by making clear who specifically their allegations are against and what conduct was fraudulent such that the Management Defendants can defend themselves, as demonstrated by their Motions. *See Northstar*, 616 B.R. at 734 (finding that trustee had not engaged in group pleading and sufficiently plead the "who" as required by Rule 9(b) where he properly set forth which defendants he was making allegations and included the date and subject of each transfer).[32]

---

[32]    The cases cited by Lim in support of the notion that the Complaint doesn't satisfy Rule 8 or Rule 9 are inapposite. Lim Mot. at 19. In *Goodman Networks, Inc.*, the Court found that the trustee "didn't even attempt[] to tie" the transfers to certain defendants and noted, as an example, that one defendant was not referenced in the complaint outside of the title page or the "parties" section of the Complaint. 2025 WL 73072, at *9 (Bankr. N.D. Tex. Jan. 10, 2025). *Hawk Mountain LLC v. Mirra* didn't allege fraudulent conveyances and the complaint didn't "distinguish[] the separate roles of each defendant." 2016 WL 3182778, at *16 (D. Del. June 3, 2016).

III.    **THE FRAUDULENT CONVEYANCE CLAIMS AGAINST THE MANAGEMENT DEFENDANTS SHOULD NOT BE DISMISSED FOR THE ADDITIONAL REASONS STATED IN THE FIRST OPPOSITION.**

47.    Without providing any basis for this Court to do so, the Management Defendants request that this Court dismiss the Fraudulent Conveyance Claims for the reasons stated in the Binance Motions. Lim Mot. at 17-18; Xiao Mot. at 21-22. To the extent that this Court considers such requests (it should not), for brevity, Plaintiff adopts and incorporates by reference any arguments made in its First Opposition, to the extent applicable to this Memorandum.

48.    With respect to all claims against Lim and Xiao (Counts I-V), Plaintiff adopts and incorporates by reference the arguments in the First Opposition regarding compelling arbitration of all the Fraudulent Conveyance Claims [Adv. D.I. 106 at ¶¶ 52-59].  For the reasons stated therein, the Fraudulent Conveyance Claims are not arbitrable.  *Id.*

49.    With respect to all claims against Lim and Xiao (Counts I-V), Plaintiff adopts and incorporates by reference the arguments in the First Opposition regarding the adequacy in pleading the Fraudulent Conveyance Claims [Adv. D.I. 106 at ¶¶ 62-74].

IV.    **ALTERNATIVELY, ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE**

50.     In the alternative, to the extent the Court dismisses the Complaint in whole or in part, Plaintiff respectfully requests that dismissal be without prejudice and that Plaintiff be granted 30 days to file a motion to amend the Complaint, together with a proposed Amended Complaint, to address any deficiencies identified by this Court.  In another adversary proceeding related to these Chapter 11 Cases, this Court (Dorsey, J.) dismissed certain claims and denied a "bare request" in an opposition brief for leave to amend as procedurally improper. *In re FTX Trading Ltd.*, 2024 WL 4562675, at *16 (Bankr. D. Del. Oct. 23, 2024). However, the Court subsequently granted a post-dismissal motion to amend to replead the dismissed counts.  *FTX Trading Ltd.*,

*Order Granting Plaintiffs' Motion for Leave to Amend Their Complaints*, Adv. Pro. No. 23-50379 [D.I. 368] (Dec. 17, 2024). Thus, at this stage, Plaintiff only requests that, if this Court dismisses any aspect of the Complaint, it permits Plaintiff thirty (30) days to seek leave to amend. *See Sheeran v. Blyth Shipholding, S.A.*, 2015 WL 9048979, at *5 (D.N.J. Dec. 16, 2015) (dismissing plaintiff's claims without prejudice but allowing plaintiff to file a motion for leave to file an amended complaint).

## <u>CONCLUSION</u>

**WHEREFORE**, for the reasons herein, Plaintiff respectfully requests this Court (1) deny the Motion, and (2) grant such other relief as is proper. Alternatively, should the Court grant the Motions in whole or in part by dismissing the Complaint in whole or in part, Plaintiff respectfully requests that any such dismissal be without prejudice and grant Plaintiff thirty (30) days from the date of the dismissal order to seek leave to amend the Complaint pursuant to Federal Rule 15.

Dated: August 22, 2025
Wilmington, Delaware

/s/ Brendan J. Schlauch
**RICHARDS, LAYTON & FINGER, P.A.**
Kevin Gross (No. 209)
Paul N. Heath (No. 3704)
Brendan J. Schlauch (No. 6115)
Robert C. Maddox (No. 5356)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
gross@rlf.com
heath@rlf.com
schlauch@rlf.com
maddox@rlf.com

-and-

**WHITE & CASE LLP**
J. Christopher Shore (admitted pro hac vice)
Brian D. Pfeiffer (admitted pro hac vice)
Colin West (admitted *pro hac vice*)
Ashley R. Chase (admitted pro hac vice)
Brett L. Bakemeyer (admitted pro hac vice)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
cshore@whitecase.com
brian.pfeiffer@whitecase.com
cwest@whitecase.com
ashley.chase@whitecase.com
brett.bakemeyer@whitecase.com

*Attorneys for Plaintiffs*