## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, and<br>FTX DIGITAL MARKETS, LTD., | |
| Plaintiffs, | |
| - against - | |
| BINANCE HOLDINGS LIMITED,<br>BINANCE CAPITAL MANAGEMENT CO.<br>LTD., BINANCE HOLDINGS (IE)<br>LIMITED, BINANCE (SERVICES)<br>HOLDINGS LIMITED, CHANGPENG<br>ZHAO, DINGHUA XIAO, SAMUEL<br>WENJUN LIM, and DOES 1-1000, | Adv. Pro. No. 24-50222 (KBO) |
| Defendants. | |

## THE FOREIGN BINANCE DEFENDANTS' REPLY
## MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

Samson A. Enzer[*]
Herbert S. Washer[*]
Edward N. Moss[*]
Joel H. Levitin[*]
Gregory Mortenson[*]
32 Old Slip
New York, NY 10005
(212) 701-3000
SEnzer@cahill.com
HWasher@cahill.com
EMoss@cahill.com
JLevitin@cahill.com
GMortenson@cahill.com
[*] admitted pro hac vice

**CAHILL GORDON & REINDEL LLP**
Gregory Strong (No. 4664)
221 W. 10th Street, 3rd Floor
Wilmington, DE 19801
(302) 884-0001
GStrong@cahill.com

*Attorneys for Defendants Binance Holdings
Limited, Binance Holdings (IE) Limited, and
Binance (Services) Holdings Limited*

Dated:  September 12, 2025

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

ARGUMENT .......................................................................................... 2

    I.     PLAINTIFFS HAVE NOT ESTABLISHED A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION OVER THE BHL DEFENDANTS ...................... 2

         A.    Plaintiffs Fail to Plead Personal Jurisdiction ................................ 3

         B.    The Court Should Not Permit Jurisdictional Discovery ............................ 9

    II.    PLAINTIFFS' AVOIDANCE CLAIMS REGARDING THE JULY 2021 TRANSFERS (COUNTS 1-5) STILL FAIL ....................................... 10

         A.    Plaintiffs' Constructive Fraudulent Transfer Claims Are Barred by the Section 546(e) Safe Harbor ................................................. 11

         B.    Plaintiffs' Constructive Fraudulent Transfer Claims Fail for Other Reasons ................................................................................. 13

         C.    Plaintiffs' Actual Fraudulent Transfer Claims Fail Because the Complaint Does Not Sufficiently Plead that the Debtors Had the Requisite Intent ...................................................................... 17

    III.    PLAINTIFFS' STATE LAW CLAIMS CONCERNING THE NOVEMBER 2022 TWEETS ALSO FAIL (COUNTS 6-9) .............................. 20

         A.    The Court Lacks Subject Matter Jurisdiction as to Plaintiffs' State Law Claims ........................................................................ 20

         B.    The Tweets Are Not Adequately Alleged to be False or Misleading ....... 22

         C.    The Doctrine of *In Pari Delicto* Bars Plaintiffs' State Law Claims ......... 23

         D.    Plaintiffs' State Law Claims Rely on Impermissible Group Pleading .................................................................................. 25

         E.    Plaintiffs Fail to State a Claim for Injurious Falsehood (Count 6) ........... 26

         F.    Plaintiffs Fail to Adequately Allege Fraud and Intentional Misrepresentation (Counts 7 and 8) ........................................... 26

         G.    Plaintiffs Fail to State a Claim for Unjust Enrichment (Count 9) ............. 27

    IV.    PLAINTIFFS' REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED ................................................................................... 28

CONCLUSION .................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Activision Publ'g, Inc.* v. *EngineOwning UG*,
   2023 WL 3272399 (C.D. Cal. Apr. 4, 2023) ...........................................................................8n

*Alameda Rsch. Ltd.* v. *Giles (In re FTX Trading Ltd.)*,
   2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024) ..................................................17, 18, 19n

*In re Allergan ERISA Litigation*,
   975 F.3d 348 (3d Cir. 2020).............................................................................................28

*In re American Intern. Group, Inc., Consol. Derivative Litigation*,
   976 A.2d 872 (Del. Ch. 2009)..........................................................................................24

*Aoki* v. *Benihana, Inc.*,
   839 F. Supp. 2d 759 (D. Del. 2012)..................................................................................26

*Asahi Metal Indus. Co.* v. *Superior Ct. of California, Solano Cnty.*,
   480 U.S. 102 (1987)............................................................................................................9

*Ashcroft* v. *Iqbal*,
   556 U.S. 662 (2009)..........................................................................................................16

*In re Bernard L. Madoff Inv. Sec. LLC*,
   773 F.3d 411 (2d Cir. 2014)..............................................................................................12

*Bristol-Myers Squibb Co.* v. *Superior Ct. of California, San Francisco Cnty.*,
   582 U.S. 255 (2017)............................................................................................................4

*Burtch* v. *Masiz (In re Vaso Active Pharms., Inc.)*,
   2012 WL 4793241 (Bankr. D. Del. Oct. 9, 2012) .............................................................19n

*Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P.* v. *Wood*,
   752 A.2d 1175 (Del. Ch. 1999).........................................................................................14

*Charys Liquidating Tr.* v. *Hades Advisors, LLC (In re Charys Holding Co., Inc.)*,
   2010 WL 2788152 (Bankr. D. Del. July 14, 2010)..............................................................13

*CNH Am. LLC* v. *Kinzenbaw*,
   2009 WL 3737653 (D. Del. Nov. 9, 2009) ..........................................................................5

*In re Cred Inc.*,
   650 B.R. 803 (Bankr. D. Del. 2023), *aff'd,* 658 B.R. 783 (D. Del. 2024)..............................13

*Deprenyl Animal Health, Inc.* v. *Univ. of Toronto Innovations Found.*,
   297 F.3d 1343 (Fed. Cir. 2002)............................................................................7

*Drivetrain, LLC* v. *X. Com., Inc.*,
   2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023) ...............................................18n

*Dunn as Tr. of GCX Liquidating Tr.* v. *Barney (In re GCX Ltd.)*,
   2024 WL 667366 (Bankr. D. Del. Feb. 16, 2024) ...................................................3

*Fatouros* v. *Lambrakis*,
   627 F. App'x 84 (3d Cir. 2015) ............................................................................8

*FrontPoint Asian Event Driven Fund, L.P.* v. *Citibank, N.A.*,
   2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017)........................................................4

*Fuld* v. *Palestine Liberation Org.*,
   606 U.S. 1 (2025).................................................................................................3n

*In re Genesis*,
   355 B.R. 438 (Bankr. D. Del. 2006) ...................................................................25

*Geron* v. *Central Park Realty Holding Corp. (In re Nanobeak Biotech Inc.)*,
   656 B.R. 350 (Bankr. S.D.N.Y. 2024)..................................................................18

*Golden* v. *Community Health Sys., Inc. (In re Quorum Health Corp.)*,
   2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023)...............................................11

*Gonzalez* v. *BAM Trading Services, Inc.*,
   2024 WL 4589791 (D.N.J. Oct. 28, 2024)..............................................................6

*Gourley* v. *United States*,
   2009 WL 2700206 (Fed. Cl. Aug. 26, 2009).........................................................16

*Grand Ent. Grp., Ltd.* v. *Star Media Sales, Inc.*,
   988 F.2d 476 (3d Cir. 1993)..................................................................................7

*Griswold* v. *Coventry First LLC*,
   762 F.3d 264 (3d Cir. 2014)................................................................................10n

*GSC Partners CDO Fund* v. *Washington*,
   368 F.3d 228 (3d Cir. 2004)................................................................................27

*Halperin* v. *Moreno (In re Greenfield Energy Servs., Inc.)*,
   2017 WL 6524525 (D. Del. Dec. 21, 2017)..........................................................21

*In re Health Mgmt., Inc. Sec. Litig.*,
   970 F. Supp. 192 (E.D.N.Y. 1997) .....................................................................25n

*In re Insilco Techs., Inc.*,
330 B.R. 512 (Bankr. D. Del. 2005), *aff'd*, 394 B.R. 747 (D. Del. 2008) .................................21

*IMO Indus., Inc.* v. *Kiekert AG*,
155 F.3d 254 (3d Cir. 1998) ..............................................................................................8

*Jalbert* v. *Flanagan (In re F-Squared Inv. Mgmt., LLC)*,
600 B.R. 294 (Bankr. D. Del. 2019) .................................................................................17

*In re Liberty State Benefits of Delaware, Inc.*,
541 B.R. 219 (Bankr. D. Del. 2015) .................................................................................24

*Malik* v. *Cabot Oil & Gas Corp.*,
2016 WL 2930511 (D.N.J. May 19, 2016), *aff'd*, 710 F. App'x 561 (3d Cir.
2017) ...........................................................................................................................4

*In re Maxus Energy Corp.*,
597 B.R. 235 (Bankr. D. Del. 2019) ...............................................................................21n

*MBIA Ins. Corp.* v. *Royal Indem. Co.*,
221 F.R.D. 419 (D. Del. 2004) ......................................................................................25

*Mellon Bank (E.) PSFS, Nat'l Ass'n* v. *Farino*,
960 F.2d 1217 (3d Cir. 1992) ...........................................................................................9

*Miller* v. *Mott*,
2023 WL 6467368 (Bankr. D. Del. Oct. 4, 2023) ...........................................................15n

*In re MPC Computers, LLC*,
465 B.R. 384 (Bankr. D. Del. 2012) .................................................................................21

*Nemec* v. *Shrader*,
991 A.2d 1120 (Del. 2010) .............................................................................................28

*In re Northstar Offshore Grp., LLC*,
616 B.R. 695 (Bankr. S.D. Tex. 2020) ...........................................................................14n

*Nystrom* v. *Vuppuluri (In re Essar Steel Minn. LLC)*,
2019 WL 2246712 (Bankr. D. Del. May 23, 2019) ..........................................................15n

*Off. Comm. of Unsecured Creditors of Arcapita* v. *Bahrain Islamic Bank*,
549 B.R. 56 (S.D.N.Y. 2016) ...........................................................................................7

*Off. Comm. of Unsecured Creditors* v. *R.F. Lafferty & Co.*,
267 F.3d 340 (3d Cir. 2001) ...........................................................................................24

*Opioid Master Disbursement Tr. II v. Coviden Unlimited Co. (In re Mallinckrodt
PLC)*, 2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) ..................................................12n

*Perlight Solar Co.* v. *Perlight Sales N. Am. LLC*,
  2015 WL 5544966 (D. Del. Sept. 18, 2015) ............................................................5

*Phar–Mor, Inc.* v. *Coopers & Lybrand*,
  22 F.3d 1228 (3d Cir. 1994) ................................................................................20

*Phunware, Inc.* v. *Excelmind Grp. Ltd.*,
  117 F. Supp. 3d 613 (D. Del. 2015) .......................................................................6

*Pinker* v. *Roche Holdings Ltd.*,
  292 F.3d 361 (3d Cir. 2002) ................................................................................8n

*In re Resorts Int'l, Inc.*,
  372 F.3d 154 (3d Cir. 2004) ................................................................................21

*In re Roco Corp.*,
  701 F.2d 978 (1st Cir. 1983) ...............................................................................16

*In re Samson Res. Corp.*,
  625 B.R. 291 (Bankr. D. Del. 2020) ....................................................................13n

*Sebastian Brown Prods.*, *LLC* v. *Muzooka Inc.*,
  2015 WL 1467255 (D. Del. Mar. 30, 2015) .............................................................7

*In re Sharp Int'l Corp.*,
  403 F.3d 43 (2d Cir. 2005) ..................................................................................18

*Sierra* v. *Trafigura Trading LLC*,
  2024 WL 3823018 (D. Del. Aug. 14, 2024) ...........................................................10

*Solmonese* v. *Shyamsundar* (*In re AmCad Holdings, LLC*),
  2016 WL 3412289 (Bankr. D. Del. June 14, 2016) ................................................22

*In re Stone & Webster, Inc.*,
  367 B.R. 523 (Bankr. D. Del. 2007) .....................................................................20

*In re SunEdison, Inc.*,
  620 B.R. 505 (Bankr. S.D.N.Y. 2020) ..................................................................12

*In re TC Liquidations LLC*,
  463 B.R. 257 (Bankr. E.D.N.Y. 2011) .................................................................19n

*Theseus Strategy Group LLC* v. *Barsa* (*In re Old Bpsush, Inc.*),
  2021 WL 4453595 (D. Del. Sept. 29, 2021) ..........................................................23

*Torre* v. *Kardooni*,
2022 WL 17813069 (D.N.J. Nov. 29, 2022), *R&R adopted*, 2022 WL
17812193 (D.N.J. Dec. 19, 2022) ........................................................................8

*In re Trib. Co. Fraudulent Conv. Litig.*,
946 F.3d 66 (2d Cir. 2019) ..............................................................................11

*In re Trib. Co. Fraudulent Conv. Litig.*,
2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019), *aff'd*, 10 F.4th 147 (2d Cir.
2021) .............................................................................................................13n

*In re Trib. Co. Fraudulent Conv. Litig.*,
10 F.4th 147 (2d Cir. 2021) ............................................................................18

*In re Uni-Marts, LLC*,
404 B.R. 767 (Bankr. D. Del. 2009) ................................................................6n

*In re W.J. Bradley Mortgage Capital, LLC*,
598 B.R. 150 (Bankr. D. Del. 2019) ...............................................................27

*Walden* v. *Fiore*,
571 U.S. 277 (2014)............................................................................................6

*Wellness Publ'g* v. *Barefoot*,
128 F. App'x 266 (3d Cir. 2005) .....................................................................8n

*In re Winstar Commc'ns, Inc.*,
554 F.3d 382 (3d Cir. 2009)............................................................................19

*Zausner Foods Corp.* v. *ECB USA, Inc.*,
2022 WL 609110 (D. Del. Jan. 31, 2022), *R&R adopted*, 2022 WL 884235
(D. Del. Mar. 25, 2022)....................................................................................10

*In re Zawawi*,
644 B.R. 907 (Bankr. M.D. Fla. 2022) ............................................................6n

*Zazzali* v. *Hirschler Fleischer, P.C.*,
482 B.R. 495 (D. Del. 2012)............................................................................24

*Zippo Mfg. Co.* v. *Zippo Dot Com, Inc.*,
952 F. Supp. 1119 (W.D. Pa. 1997).................................................................8n

**Statutes**

11 U.S.C. § 101(22A)(A)....................................................................................11n

11 U.S.C. § 546(e) ........................................................................................10, 11

11 U.S.C. § 548(a)(1)(A) ....................................................................................17

11 U.S.C. § 550(a) ...................................................................................................14

11 U.S.C. § 741(7)(A)(i) ..........................................................................................11n

**Other Authorities**

Am. Compl., *Alameda Rsch. Ltd.* v. *Giles (In re FTX Trading Ltd.)*, No. 23-50380
    (Bankr. D. Del. Dec. 17, 2024), D.I. 369 ..............................................................18n

Creditor Matrix, *In re FTX Trading Ltd.*, No. 22 Bk. 11068 (Bankr. D. Del. Jan.
    25, 2023), D.I. 574 .................................................................................................9n

Fed. R. Civ. P. 9(b) ..................................................................................................25

Fed. R. Civ. P. 12(b)(6).............................................................................................13

Notice of Ch. 11, *In re FTX Trading Ltd.*, No. 22 Bk. 11068 (Bankr. D. Del. Nov.
    29, 2022), D.I. 171 .................................................................................................9n

Second Amended Joint Chapter 11 Plan of Reorganization, *In re FTX Trading
    Ltd.*, No. 22 Bk. 11068 (Bankr. D. Del. Oct. 8, 2024), D.I. 26404-1) ..................21n

U.S. Const. Amend. V ...............................................................................................3n

U.S. Const. Amend. XIV ...........................................................................................3n

## PRELIMINARY STATEMENT[1]

Plaintiffs' Opposition brief (D.I. 106 ("Opp.")) only confirms that their efforts to lay blame for FTX's collapse at the BHL Defendants' feet are legally meritless, and thus, their Complaint should be dismissed.  Plaintiffs seek to (i) unwind a transaction that occurred *16 months* prior to FTX's collapse, and (ii) blame that collapse on a handful of disparate Tweets rather than on the massive fraud that FTX's principals themselves perpetrated.  Both theories fail as a matter of law.

*First*, as a threshold matter, this Court lacks personal jurisdiction over the BHL Defendants because Plaintiffs cannot satisfy the minimum contacts or effects tests.  As for the former, Plaintiffs' Complaint lacks any allegation that the foreign entities that they are trying to haul into this U.S. bankruptcy litigation had any suit-related contacts with the U.S.  Plaintiffs primarily rely on regulatory settlements that at best show generic contacts with the U.S. unrelated to the claims in this case, which comes nowhere close to satisfying the test for specific jurisdiction.  As for the effects test, Plaintiffs have not plausibly pled that the BHL Defendants aimed any relevant conduct towards the U.S., or even that the brunt of the harm was felt in the U.S.  Because Plaintiffs have not made a facially plausible showing of personal jurisdiction, their request for jurisdictional discovery should be denied and dismissal should be granted.

*Second*, Plaintiffs' fraudulent transfer claims—concerning Debtors' July 2021 repurchase of FTX and WRS securities (Counts 1-5)—all fail.  To begin, the Bankruptcy Code's safe harbor forecloses Plaintiffs' constructive fraud claims (as Debtors' filings with this Court confirm).  Moreover, Plaintiffs have not plausibly alleged (i) that FTX was insolvent as of July 2021—which

---

[1] Capitalized but undefined terms have the meaning provided in the BHL Defendants' Memorandum of Law in Support of its Motion to Dismiss the Complaint (D.I. 67 ("Br." or "Opening Brief")).  Unless otherwise noted, all emphasis is added and all internal citations and quotations are omitted.

was *16 months* prior to its collapse—or (ii) a lack of reasonably equivalent value, given that FTX's market valuation (*i.e.*, the value of the repurchased shares) climbed significantly after the deal. Nor have Plaintiffs sufficiently alleged that the BHL Defendants—none of whom were parties to the transactions—were transferees.  In addition, the intentional fraudulent transfer claims fail to plausibly allege fraudulent intent or indicia of fraud given that the arms-length transaction occurred between two competitors, and there are no allegations of fraud with respect to the transfer itself.

*Third*, Plaintiffs' state law claims concerning the November 2022 Tweets and collapse of FTX (Counts 6-9) all fail for the threshold reason that they are collateral, and not sufficiently "related to," this post-confirmation bankruptcy proceeding.  In any event, even if the Court considers them, they fail because none of the Tweets were false or misleading.  Nor can Plaintiffs avoid application of the *in pari delicto* doctrine:  in light of the massive, criminal fraud at FTX, Plaintiffs bear at least "substantially equal" fault (and, in reality, all of the fault) for FTX's collapse.  Finally, the Complaint fails to plead the necessary elements for the various state law claims for several reasons, including its reliance on impermissible group pleading.

*Finally*, Plaintiffs cannot plead around these fatal flaws (and they have not even tried to explain how they could).  As a result, the Court should deny Plaintiffs' request to amend the Complaint.

## ARGUMENT

### I.   PLAINTIFFS HAVE NOT ESTABLISHED A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION OVER THE BHL DEFENDANTS

As explained in our Opening Brief, Plaintiffs have failed to establish a *prima facie* case of personal jurisdiction over the BHL Defendants because none of the BHL Defendants are at home in the U.S., and Plaintiffs do not point to any suit-related conduct by the BHL Defendants in the U.S.  (Br. at 7-12).  In response, Plaintiffs fail to invoke any valid jurisdictional hook, instead

resorting to non-suit-related contacts that cannot support jurisdiction.  Plaintiffs' proposal for a jurisdictional discovery fishing expedition should be denied.

### A. Plaintiffs Fail to Plead Personal Jurisdiction

Plaintiffs can point to no basis for personal jurisdiction over the BHL Defendants under either the "minimum contacts" or "effects" tests.  (Opp. at 7-28).[2]

### i.   The Minimum Contacts Test Is Not Satisfied

The minimum contacts analysis focuses on a defendant's own contacts with the forum, which must relate to the specific claims at issue.  (Br. at 8-12).  Plaintiffs were required to allege that (i) their claims "arise out of or relate to" the BHL Defendants' contacts with the forum, (ii) the BHL Defendants "purposefully avail[ed]" themselves of the forum, and (iii) the BHL Defendants should have "reasonably anticipate[d] being haled into court" in the forum. *See Dunn as Tr. of GCX Liquidating Tr.* v. *Barney (In re GCX Ltd.)*, 2024 WL 667366, at *6, *8-9 (Bankr. D. Del. Feb. 16, 2024).  As the BHL Defendants demonstrated, Plaintiffs cannot meet this test because the July 2021 transfers (to which the BHL Defendants were not even a party) are overwhelmingly foreign in nature (Br. at 11-12), and the November 2022 Tweets were not targeted to the U.S. but instead shared with a worldwide social media audience and concerned the affairs of FTX, a global exchange.  *(Id.* at 8-9).  Plaintiffs' Opposition does nothing to change this analysis.

---

[2] The parties agree the Court should apply the minimum contacts test.  Even though the Supreme Court held in *Fuld* v. *Palestine Liberation Org.* that the Fourteenth Amendment's "minimum contacts" standard is not incorporated into the Fifth Amendment, the Court nevertheless recognized "a similar inquiry into the reasonableness of the assertion of jurisdiction in the particular case" and reiterated that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."  606 U.S. 1, 18-19, 23 (2025). Accordingly, *Fuld* does not change the analysis or outcome here.

Plaintiffs rely principally on agreements to settle unrelated regulatory proceedings, which included allegations that Binance sought and allowed U.S. users on its platform. (Opp. at 10-13). Plaintiffs argue that these regulatory settlements show that Binance had a presence in the U.S. sufficient to support personal jurisdiction here. (*Id.* at 11-13). But Plaintiffs' reliance on general U.S. contacts erroneously conflates general "doing business" jurisdiction with specific jurisdiction based on suit-related conduct in the forum. *Bristol-Myers Squibb Co.* v. *Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 264 (2017) ("[A] corporation's continuous activity of some sorts within a state" is "not enough to support the demand that the corporation be amenable to suits unrelated to that activity."). More to the point, Plaintiffs' claims in this case—concerning a July 2021 share transfer and November 2022 Tweets—have no nexus whatsoever to the regulatory settlements or the alleged U.S. contacts underlying them.

Plaintiffs argue that the claims in this case "arise out of or relate to" Binance's U.S. contacts because Binance was aware that FTX had a U.S. customer base that Binance wanted to "absorb." (*See* Opp. at 16, 22). This is grasping at straws. The mere fact that both companies operated in the U.S., plus Plaintiffs' speculation that Binance was motivated by a desire to grow its U.S. business, does not come close to providing the required nexus. Even if true, these facts fall far short of suit-related forum contacts. *See Malik* v. *Cabot Oil & Gas Corp.*, 2016 WL 2930511, at *4 (D.N.J. May 19, 2016), *aff'd*, 710 F. App'x 561 (3d Cir. 2017) (finding no nexus where the purported in-forum activities, including "advertising [to] and recruiting [forum] residents," bears "no relationship to [p]laintiff's" cause of action). At best, all Plaintiffs have demonstrated is that the BHL Defendants sought and allowed U.S. users to transact prior to the resolutions, which is insufficient. *See FrontPoint Asian Event Driven Fund, L.P.* v. *Citibank, N.A.*, 2017 WL 3600425, at *7 (S.D.N.Y. Aug. 18, 2017) ("Plaintiffs must *do more than infer that the [defendants] likely*

*were participants in the U.S. [] market.*  They must allege specific facts that plausibly suggest [that the alleged U.S. connections] had a nexus to the [] manipulation at issue in this lawsuit.").  Neither category of Plaintiffs' claims sufficiently alleges specific jurisdiction.

With respect to the July 2021 transfer claims, Plaintiffs try to get around the fact that none of the BHL Defendants were party to the July 2021 Share Transfer Agreements by arguing that all the "Binance Defendants" can somehow be lumped together—or, as Plaintiffs euphemistically put it, "treated, at least at the motion to dismiss stage, as the initial transferees of the consideration" (Opp. at 18)—for purposes of the jurisdictional analysis.  That argument fails.  Absent robust allegations to support veil piercing, the jurisdictional standard demands that forum contacts be established on a defendant-by-defendant basis.  *Perlight Solar Co.* v. *Perlight Sales N. Am. LLC*, 2015 WL 5544966, at *3-5 (D. Del. Sept. 18, 2015) (dismissing claims for lack of personal jurisdiction and denying jurisdictional discovery where plaintiff's conclusory allegations regarding alter ego factors did not suggest "with reasonable particularity the possible existence of the requisite contacts"); *CNH Am. LLC* v. *Kinzenbaw*, 2009 WL 3737653, at *1 (D. Del. Nov. 9, 2009) (personal jurisdiction lacking where plaintiff failed to allege sufficient facts to support alter ego and "plead[ed] no other basis for the exercise of personal jurisdiction").

Even if the BHL Defendants were parties to the July 2021 Share Transfer Agreements (and they were not), those agreements were clearly designed to ***avoid*** any U.S. nexus.  (Br. at 11-12 (noting, among other features, Hong Kong choice-of-law and arbitration provisions, and the predominance of foreign parties)).  Plaintiffs try to make much of the fact that shares of WRS, a U.S. company, were involved in the July 2021 transaction and speculate that the BHL Defendants received payment for the shares.  (*See* Opp. at 18).  But this comes nowhere close to establishing specific jurisdiction because Plaintiffs do not show that the account (*i.e.*, the wallet address) that

received the payment had any connection to the U.S.  Moreover, Plaintiffs concede that the transferor of the funds at issue was a non-U.S. company.  (*Id.* at 22).[3]

Faced with the fact that the BHL Defendants themselves have no suit-related U.S. contacts, Plaintiffs suggest that Plaintiffs' own contacts should somehow factor into the specific jurisdiction analysis.  (Opp. at 18-23).  But whether the BHL Defendants knew that (i) FTX had U.S.-based counsel, (ii) the BUSD token they purportedly requested would be minted by a company registered in New York, or (iii) Alameda had a U.S.-based parent company, has nothing to do with whether ***the BHL Defendants*** purposefully availed themselves of the forum.  *See Gonzalez* v. *BAM Trading Services, Inc.*, 2024 WL 4589791, at *8 (D.N.J. Oct. 28, 2024) ("[A]llegations concern[ing] Plaintiff's unilateral activity, rather than that of any" Defendant "do not support specific jurisdiction.").  It is a bedrock principle of the specific jurisdiction analysis that the relevant forum contacts are those of the defendant, not those of the plaintiff.  *Walden* v. *Fiore*, 571 U.S. 277, 284-85 (2014) ("[The] 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, ***not the defendant's contacts with persons who reside there***.");  *Phunware, Inc.* v. *Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 631 n.27 (D. Del. 2015) (purposeful availment focuses on "***defendant's contacts*** with the forum state itself, not the defendant's contacts with the persons who reside there").

---

[3] Plaintiffs' cited authority is once again inapposite because Plaintiffs do not allege that the BHL Defendants had any sort of role with WRS aside from holding its shares as a speculative investment.  *Cf. In re Zawawi*, 644 B.R. 907, 916 (Bankr. M.D. Fla. 2022) (foreign defendants held stock in a U.S. company with extensive U.S. operations and held management and directorial roles for many years); *In re Uni-Marts, LLC*, 404 B.R. 767, 777 (Bankr. D. Del. 2009) (defendant directed the debtor to provide fraudulent profit and loss statements and breach contracts with Pennsylvania-based corporation).

This case is nothing like the cases Plaintiffs rely upon, all of which involve suit-related contacts in the forum by the ***defendant***.  (*See* Opp. at 20-21):

- In *Off. Comm. of Unsecured Creditors of Arcapita* v. *Bahrain Islamic Bank*, 549 B.R. 56 (S.D.N.Y. 2016), defendant banks "*actively directed*" funds received from the debtor pre-petition into correspondent bank accounts in New York, and thus made the "deliberate choice to utilize" the services of "New York's and the United States's banking system." *Id*. at 67-71 (emphasis in original).

- In *Grand Ent. Grp., Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476 (3d Cir. 1993), the foreign defendants engaged with forum-based parties to negotiate an agreement creating ongoing "rights and obligations among citizens of the forum and contemplated significant ties with the forum," since it concerned licensing rights to distribute films in the forum.  *Id*. at 482-83.

- Likewise, in *Deprenyl Animal Health, Inc.* v. *Univ. of Toronto Innovations Found.*, 297 F.3d 1343 (Fed. Cir. 2002), the foreign defendant traveled twice to the forum to negotiate a licensing agreement for technology protected by a U.S. patent, which the Court found showed "additional purposeful availment of the benefits of United States patent law."  *Id*. at 1352-53.

None of those cases apply to the BHL Defendants.  Here, by contrast, Plaintiffs claim the BHL Defendants might have known that the July 2021 transfers involved some U.S. touchpoints ***on FTX's side***.  It simply does not follow that those contacts can be imputed to the BHL Defendants—who were not even parties to the Share Transfer Agreements.

As for the November 2022 Tweets, as our Opening Brief explains, it is black-letter law that simply having a worldwide social media audience, some of whom may be located in the forum, is insufficient to support purposeful availment in the forum.  (Br. at 8-9); *see Sebastian Brown Prods.*, *LLC* v. *Muzooka Inc.*, 2015 WL 1467255, at *3 n.4 (D. Del. Mar. 30, 2015) (explaining that the mere fact of having Twitter followers located in the forum does not support the conclusion that "defendants have targeted [forum] residents").  Recognizing the weakness of their theory, Plaintiffs recycle their theory on the share transfers and attempt to tie the Tweets to Binance's purported desire for U.S. customers (*see* Opp. at 22-24).  But none of the cases they cite support

this novel theory; all are readily distinguishable.[4]  The Tweets do not support jurisdiction because

they concern the affairs of FTX, an international exchange, and do not mention the U.S. or U.S.

users at all.  (Br. at 9); *see Fatouros* v. *Lambrakis*, 627 F. App'x 84, 87-88 (3d Cir. 2015) (finding

online posts accessible in the forum over the Internet did not support *prima facie* case of purposeful

availment).

ii.   The Effects Test Is Not Satisfied

Nor is the effects test met here because Plaintiffs have not shown that they suffered the

"brunt" of their alleged harm in the U.S. or that the BHL Defendants "expressly aimed" any

allegedly tortious conduct at the U.S.  (Br. at 9).  The July 2021 transfers are not subject to the

"effects" analysis because Plaintiffs do not allege an intentional tort.  But even if they did, Plaintiffs

do not provide any explanation for how the "brunt" of the alleged harm arising from the  transfers

occurred in the U.S.  And, as discussed above, the global nature of the November 2022 Tweets

means Plaintiffs do not get past the starting gate.  *See IMO Indus., Inc.* v. *Kiekert AG*, 155 F.3d

254, 267 (3d Cir. 1998) (defendant did not "expressly aim" conduct at forum despite numerous

letters and phone calls); *Torre* v. *Kardooni*, 2022 WL 17813069, at *7 (D.N.J. Nov. 29, 2022)

(social media posts "placed on the Internet, without more, is never sufficient to subject that

individual to the personal jurisdiction of the court of the forum state"), *R&R adopted*, 2022 WL

---

[4] Unlike here, all of Plaintiffs' cited cases involve suit-related forum contacts.  *See Activision Publ'g, Inc.* v. *EngineOwning UG,* 2023 WL 3272399, at *10-12 (C.D. Cal. Apr. 4, 2023) (foreign defendant's U.S. contacts—maintaining a website selling software to cheat video games which had its largest market in the U.S. and hosted two U.S. servers—directly related to harm caused to U.S.-based video game producer); *Wellness Publ'g* v. *Barefoot*, 128 F. App'x 266, 269-70 (3d Cir. 2005) (national advertising campaign actively "induced viewers" to place orders, which defendant shipped to forum residents); *Pinker* v. *Roche Holdings Ltd.*, 292 F.3d 361, 371 (3d Cir. 2002) (defendant "directly solicited investment from the American market"); *Zippo Mfg. Co.* v. *Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1127 (W.D. Pa. 1997) (trademark infringement and dilution occurred directly through in-forum commercial activities).

17812193 (D.N.J. Dec. 19, 2022).   Moreover, Plaintiffs do not and could not contend that the

Tweets caused the "brunt" of their supposed harm to Debtors in the U.S.  Plaintiffs argue that some

unspecified "number of U.S. customers and other creditors" "relied on and/or were affected by"

the Tweets (Opp. at 28), but fail to show that ***Debtors' own*** alleged harm centered in the U.S.,

particularly given that the FTX exchange had customers and creditors worldwide and that many

of its associated entities are foreign.[5]

  iii. <u>The Exercise of Personal Jurisdiction Would Not Be Consistent with Fair Play and
Substantial Justice</u>

As our Opening Brief shows, the circumstances at issue in this case are overwhelmingly

foreign, and any U.S. contacts are attributable to Plaintiffs alone.  (Br. at 8-12).  It was Plaintiffs

who unilaterally decided to file a bankruptcy petition in the U.S.—and the burden on the BHL

Defendants to litigate in the U.S. would be great.  *See Asahi Metal Indus. Co.* v. *Superior Ct. of*

*California, Solano Cnty.*, 480 U.S. 102, 114 (1987) (recognizing "unique burdens placed upon one

who must defend oneself in a foreign legal system").  Simply put, it would not be fair or reasonable

to subject the foreign BHL Defendants to personal jurisdiction where Plaintiffs have not alleged

***any*** suit-related U.S. contacts ***by the BHL Defendants***, in a bankruptcy that is proceeding in the

U.S. on Plaintiffs' own accord.

**B.  The Court Should Not Permit Jurisdictional Discovery**

Despite relying on facially insufficient jurisdictional allegations, Plaintiffs request

jurisdictional discovery.  (Opp. at 29).  In this District, however, a plaintiff must establish a *prima*

*facie* basis for personal jurisdiction ***before*** it can obtain jurisdictional discovery.  *See, e.g.*, *Mellon*

---

[5] For example, over 70% of the 101 debtor entities listed in the Notice of Chapter 11 are foreign, *In re FTX Trading Ltd.*, No. 22 Bk. 11068 (Bankr. D. Del. Nov. 29, 2022), D.I. 171, while the Creditor Matrix lists several hundred foreign creditors, *id.* (Jan. 25, 2023), D.I. 574.

*Bank (E.) PSFS, Nat'l Ass'n* v. *Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (to make a *prima facie* showing of personal jurisdiction, the plaintiff must "establish[] with reasonable particularity sufficient contacts between the defendant and the forum state"); *Zausner Foods Corp.* v. *ECB USA, Inc.*, 2022 WL 609110, at \*11 n.16 (D. Del. Jan. 31, 2022) ("[T]he relevant law does not allow for a scenario where a party has failed to make out a *prima facie* showing of personal jurisdiction, but still somehow has made out a sufficient showing to warrant obtaining jurisdictional discovery."), *R&R adopted*, 2022 WL 884235 (D. Del. Mar. 25, 2022); *Sierra* v. *Trafigura Trading LLC*, 2024 WL 3823018, at \*14 (D. Del. Aug. 14, 2024) ("[I]f a party fails to make out a *prima facie* showing of personal jurisdiction, then the party is not entitled to take jurisdictional discovery."). Here, Plaintiffs have not even bothered to articulate what information they might seek to support their theories of personal jurisdiction, making clear that they really contemplate an open-ended fishing expedition. Plaintiffs have not made a *prima facie* showing of personal jurisdiction, and jurisdictional discovery should be denied.

## II. PLAINTIFFS' AVOIDANCE CLAIMS REGARDING THE JULY 2021 TRANSFERS (COUNTS 1-5) STILL FAIL[6]

Counts 1-5 of the Complaint allege that the July 2021 transfers of cryptocurrency in exchange for shares of FTX Trading and WRS were fraudulent. (Compl. ¶¶ 80-128). As demonstrated in our Opening Brief (at 13-15), Plaintiffs' constructive avoidance claims are barred by Section 546(e)'s safe harbor. Additionally, the Complaint fails to plausibly allege that the July

---

[6] In our Opening Brief, the BHL Defendants adopted and incorporated by reference Defendant Digital Anchor Holdings Limited's argument that Plaintiffs' fraudulent transfer claims must be arbitrated. (*See* Br. at 13 n.8). To the extent Plaintiffs assert otherwise (Opp. at 38-44), the arbitration clauses included in the July 2021 Share Transfer Agreements may be invoked by the BHL Defendants since Plaintiffs' "claims [are] intimately founded in and intertwined with the underlying contract obligations." *Griswold* v. *Coventry First LLC*, 762 F.3d 264, 272 (3d Cir. 2014).

2021 transfers were either actually or constructively fraudulent.  (Br. at 16-22).  Plaintiffs'

Opposition fails to save these claims.

### A.  Plaintiffs' Constructive Fraudulent Transfer Claims Are Barred by the Section 546(e) Safe Harbor

The safe harbor prohibits avoidance of transfers (i) by a "financial participant"[7] (ii) made

"in connection with a securities contract."[8]  11 U.S.C. § 546(e); (Br. at 13).  The safe harbor bars

Plaintiffs' constructive fraudulent transfer claims because (i) Alameda is a financial participant;

and (ii) the transfers were made "in connection with" the Share Transfer Agreements.  (Br. at 13-

15).

***Alameda is a financial participant.***  In the Opposition, Plaintiffs argue that a safe harbor

defense should not be decided at the motion to dismiss stage.  (Opp. at 75).  That is not the law.

*See Golden* v. *Community Health Sys., Inc. (In re Quorum Health Corp.)*, 2023 WL 2552399, at

*7-8 (Bankr. D. Del. Mar. 16, 2023) (resolving Section 546(e) determination at the motion to

dismiss stage); *see also In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 77 (2d Cir. 2019)

(finding, at the pleadings stage, payments to shareholders subject to safe harbor).

Plaintiffs also contend that the BHL Defendants "misapprehend" which agreements or

transactions may be considered in assessing whether an entity is a financial participant.  (Opp. at

76).  Plaintiffs are wrong again.  The agreements and transactions the BHL Defendants point to

---

[7] A financial participant includes an entity that "has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more" such "agreements or transactions" (*i.e.*, those transactions or agreements listed in Section 561(a)(1)-(6)) with "any other entity[.]"  11 U.S.C. § 101(22A)(A).

[8] The term "securities contract" means, in relevant part, "a contract for the purchase, sale, or loan of a security[.]"  11 U.S.C. § 741(7)(A)(i).

are qualifying "securities contracts" under Section 741.[9]  "Securities contract" is a term of "extraordinary breadth" which includes "any agreements that are *similar* or *related to* contracts for the purchase or sale of securities."  *See In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 417-18 (2d Cir. 2014); *see also In re SunEdison, Inc.*, 620 B.R. 505, 515 (Bankr. S.D.N.Y. 2020) ("The term 'security' includes 'stock,' as well as any 'other claim or interest commonly known as 'security.''").  Here, Plaintiffs are forced to argue that—what Debtors themselves characterize in the Statement and Schedules Summary as Alameda's $631 million "equity and fund investments, as well as equity and fixed income securities," (*see* Br. at 14)—are not securities contracts.  Of course, Plaintiffs do not purport to say what these might be if they are not securities contracts, offering nothing more than a conclusory assertion that some or all of the "equity and fund investments, as well as equity and fixed income securities" might not qualify as securities contracts.  (Opp. at 76-77).  But a detailed breakdown of the percentages of Alameda's assets is not required.  (Br. at 14).  Given the breadth of the definition, the only plausible reading in the context of this case is that Alameda has admitted to hundreds of millions of dollars in securities contracts, plainly rendering it a financial participant.

Plaintiffs also argue the Court should not even consider the Statement and Schedules Summary—which shows that the contracts at issue are securities contracts—even though it is the very same document that Debtor's counsel themselves prepared and filed.[10]  However, Delaware courts may judicially notice a "debtor's schedules and statements" at the motion to dismiss stage.

---

[9] *See* n.8, *supra*.

[10] Plaintiffs cite *Opioid Master Disbursement Tr. II* v. *Coviden Unlimited Co. (In re Mallinckrodt PLC)* for the proposition that the Court should not judicially notice the Statement and Schedules Summary (Opp. at 77), but that case concerned whether the court could judicially notice statements made in SEC filings to "establish the existence and the value" of specific agreements.  2024 WL 206682, at *15-16 (Bankr. D. Del. Jan. 18, 2024).  *In re Mallinckrodt* is thus inapposite.

(Br. at 14 n.9). This is consistent with the broader principle that courts can and frequently do take judicial notice of judicial admissions—*i.e.*, a party's own statements to the Court. *See Charys Liquidating Tr.* v. *Hades Advisors, LLC* (*In re Charys Holding Co., Inc.)*, 2010 WL 2788152, at *5 n.3 (Bankr. D. Del. July 14, 2010) ("The Court can take judicial notice of public records to resolve a Rule 12(b)(6) motion" including a "debtor's schedules and statements.").[11]

     ***The transfers were made "in connection with a securities contract."*** Plaintiffs do not dispute that the July 2021 Share Transfer Agreements were securities contracts. Although they suggest the Share Transfer Agreements are not "qualifying transactions" (Opp. at 75) they never explain why. Instead, their Opposition focuses exclusively on the "financial participant" prong discussed immediately above. (*See* Opp. at 75-76). Because the July 2021 transfers were made by Alameda in connection with the purchase of FTX and WRS shares, the Share Transfer Agreements are quintessential "securities contracts." (*See* Br. at 14-15).

     Accordingly, the Court should find the safe harbor applies here and bars the constructive fraudulent transfer claims.

### B. Plaintiffs' Constructive Fraudulent Transfer Claims Fail for Other Reasons

     To plead a constructive fraudulent transfer claim, Plaintiffs were required to allege that (i) the debtor either was insolvent on the date of the transfers or became insolvent as a result, and (ii) the debtor received less than reasonably equivalent value in exchange. *In re Cred Inc.*, 650 B.R. 803, 835 (Bankr. D. Del. 2023), *aff'd,* 658 B.R. 783 (D. Del. 2024). A debtor may only recover

---

[11] The Court should ignore Plaintiffs' invitation for the Court to find that a debtor cannot qualify as a financial participant (Opp. at 77 (citing *In re Tribune Co. Fraudulent Conv. Litig.*, 2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019), *aff'd*, 10 F.4th 147 (2d Cir. 2021)), because *Tribune* is at odds with the law of this Circuit. *See In re Samson Res. Corp.,* 625 B.R. 291, 299 (Bankr. D. Del. 2020) (rejecting *Tribune* and holding that "[a] natural reading of th[e] language supports a broad interpretation that allows debtors to be included in the definition").

the transferred property from "(1) the initial transferee" or "the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee" of the initial transferee. 11 U.S.C. § 550(a). Here, Plaintiffs' constructive fraudulent transfer claims fail because the Complaint fails to allege (i) that the BHL Defendants were transferees, (ii) that the Debtors were insolvent in July 2021, and (iii) that the Debtors did not receive reasonably equivalent value for the July 2021 transfers. (Br. at 16-20).

*First*, Plaintiffs cannot allege that any of the BHL Defendants were transferees of the July 2021 transfers. Plaintiffs point to allegations that "consideration was paid to the Binance.com platform" and "to Binance," and claim these are sufficient to survive a motion to dismiss.[12] (Opp. at 48). Not so. Conflating entities is impermissible in this context for the reasons stated in our Opening Brief. (*See* Br. at 16-17). Tacitly recognizing as much, Plaintiffs go to great lengths to argue that pleading standards should be relaxed and that their "Binance is Binance" pleading should be accepted despite its complete failure to engage with the fact that distinct corporate entities are indisputably involved. Here again, Plaintiffs argue that regulatory settlements referring to a complex corporate structure can help salvage their deficient pleading. (Opp. at 48-49). But Plaintiffs' reference to a conclusion in regulatory settlements is no substitute for the kind of robust veil-piercing allegations that might permit Plaintiffs to ignore corporate separateness. *Cf. Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P.* v. *Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (under Delaware law, a veil-piercing claim will not survive dismissal unless it alleges (i) a relationship of "complete domination and control" between entities, and (ii) that "use of the

---

[12] Plaintiffs offer a single out-of-circuit cite for support. (Opp. at 48-49 (citing *In re Northstar Offshore Grp., LLC,* 616 B.R. 695, 723 (Bankr. S.D. Tex. 2020)). But the *Northstar* court expressly declined to decide whether the trustee had adequately alleged that the defendant entities were transferees. *Id.* at 730.

corporate structure cause[s] fraud or similar injustice").  Plaintiffs simply fail to allege that the BHL Defendants were transferees of the funds in dispute.

>     ***Second***, Plaintiffs have not plausibly alleged that the Debtors were insolvent at the time of the July 2021 transfers.  The Debtors were publicly valued in the tens of billions of dollars at the time of, and in the months following, the July 2021 transfers.  (Br. at 17-19).  And they continued as a going concern for ***16 months*** after the date of transfer.  (*Id.*).  Plaintiffs' Opposition ignores these public valuations entirely.  (Opp. at 48, 55).  Incredibly, despite attaching 17 exhibits spanning over 250 pages to their Opposition brief (*see* D.I. 108), Plaintiffs offer nothing beside their conclusory say-so to support their key insolvency assertion.

>     Plaintiffs' silence on this critical issue speaks volumes.  Any inference of insolvency as of July 2021 is simply implausible given the several subsequent multi-hundred million dollar fundraising rounds, not to mention that FTT (Debtors' principal asset (Compl. ¶ 45)) skyrocketed after the July 2021 transfers.  (Br. at 18).  Then there is Caroline Ellison's own testimony (on which Plaintiffs heavily rely) that FTX was worth roughly $20 billion in July 2021.  (*Id.* at 19).  Once again, Plaintiffs try to excuse their deficient allegations by arguing for a permissive pleading standard (Opp. at 48), but none of the cases Plaintiffs cite involved a complaint alleging an unsubstantiated theory of insolvency entirely at odds with accepted fair market value and undisputed valuations.[13]  (*Id.* at 55-56).  To be sure, the BHL Defendants are not seeking a factual

---

[13] *Miller* v. *Mott*, 2023 WL 6467368, at *6 n.41 (Bankr. D. Del. Oct. 4, 2023) (trustee pled that "[b]ased on the Debtor's books and records and information obtained by the Trustee through discovery" that "the Debtor was balance sheet insolvent in that the sum of the Debtor's debts was greater than all of the Debtor's property, ***at a fair valuation***"); *Nystrom* v. *Vuppuluri (In re Essar Steel Minn. LLC)*, 2019 WL 2246712, at *5 (Bankr. D. Del. May 23, 2019) (debtor had debts "greater than all of . . . [its] property, ***at a fair valuation***" where trustee alleged that debtor was "completely new," "had assumed billions of dollars in debt to support construction of a plant that never became operational," and "lacked a meaningful revenue stream") (alteration in original).

finding of solvency at this stage; instead, they seek to hold Plaintiffs to their Supreme Court-mandated burden of pleading a facially plausible claim of insolvency as of July 2021 to survive dismissal. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (while the court accepts as true all factual allegations in the pleading, it is "not bound to accept as true [any] legal conclusion couched as a factual allegation"). In short, the Court should not credit Plaintiffs' conclusory and facially illogical allegations of July 2021 insolvency.

**Third**, Plaintiffs also have not plausibly alleged that they received less than reasonably equivalent value in exchange for the July 2021 transfers. Plaintiffs argue that the Complaint establishes a lack of reasonably equivalent value, once again relying on a conclusory assertion that both FTX Trading and WRS "were balance-sheet insolvent at the time." (Opp. at 47). But, as noted, FTX completed multiple equity fundraising rounds in excess of $100 million after the July 2021 transfers. (*See* Br. at 17-19; Strong Decl., Exs. A-E). Plaintiffs ask this Court to ignore FTX's public valuations simply because they allege in conclusory fashion—without a shred of support—that the FTX and WRS shares had "no value" even as early as July 2021. (Opp. at 47).

Plaintiffs attempt to argue for a bright-line rule that "a Company's repurchase of its stock provides no 'value' as a matter of law" (Opp. at 47), but Plaintiffs' principal authority explicitly rejected such a bright-line rule and is, in any event, factually distinguishable. *See In re Roco Corp.*, 701 F.2d 978, 982 (1st Cir. 1983) (no reasonably equivalent value where debtor transferred a $300,000 note and security interest to its sole shareholder in exchange for the shareholder's redemption of all of the corporation's outstanding stock). It is entirely appropriate for the Court to consider the market value of the shares in assessing whether Debtors received reasonably equivalent value. *Cf. Gourley* v. *United States*, 2009 WL 2700206, at *6 (Fed. Cl. Aug. 26, 2009) ("Even when the corporation engages in a deliberate, massive fraud that conceals the true

circumstances of the business, the price at which the stock could be bought and sold on a public exchange on the valuation date remains the fair value of the stock[.]").

Plaintiffs' argument also asks the Court to ignore their own allegation that Debtors received intangible value for the July 2021 transfers—specifically through the repudiation of several agreements, including the "right of first refusal with respect to any new FTX Trading securities issued," (Compl. ¶¶ 35, 37). *See Jalbert* v. *Flanagan (In re F-Squared Inv. Mgmt., LLC)*, 600 B.R. 294, 309 (Bankr. D. Del. 2019) (under Section 548, there is "value where there is any benefit, direct or indirect, tangible or intangible"). Plaintiffs have failed to plausibly allege that they were insolvent as of July 2021.

## C. Plaintiffs' Actual Fraudulent Transfer Claims Fail Because the Complaint Does Not Sufficiently Plead that the Debtors Had the Requisite Intent

To allege an actual fraudulent transfer claim, a plaintiff must plead that transfers were made by a debtor with the "actual intent to hinder, delay, or defraud" creditors (11 U.S.C. § 548(a)(1)(A)), which can be shown through direct evidence or by pleading badges of fraud. *See Alameda Rsch. Ltd.* v. *Giles (In re FTX Trading Ltd.)*, 2024 WL 4562675, at *7 (Bankr. D. Del. Oct. 23, 2024). Here, the Complaint fails to allege either.

Plaintiffs argue that the July 2021 transfers: (i) were completed in order "to convey confidence and strength to the market" and (ii) were a "critical component" of SBF's fraud involving the unauthorized use of FTX customer deposits. (Opp. at 51-52). Both theories fail.

As to the former, Plaintiffs' argument is implausible in the context of obvious business purposes accomplished by the transaction. Plaintiffs' primary case is readily distinguishable because the court in that case concluded that the transactions served no purpose other than to

perpetrate a fraud.[14]  Indeed, Plaintiffs' allegations are on all fours with those previously rejected

by this Court in *Giles*, 2024 WL 4562675, at *8 (rejecting allegations that SBF entered into Embed

transaction in order to paint a false picture with Alameda's lenders, and that, once the Embed

acquisition was finalized, SBF "ensured that the Embed acquisition received ample press coverage

to further the façade").[15]

As to the latter, Plaintiffs' allegations at most suggest fraud in how SBF obtained the funds

he used to pay for the July 2021 transfers, but do not suggest any ***fraud involving the transfers***

***themselves***, which is fatal to Plaintiffs' claim.  *See Geron* v. *Central Park Realty Holding Corp.*

*(In re Nanobeak Biotech Inc.)*, 656 B.R. 350, 365-66 (Bankr. S.D.N.Y. 2024) (an actual fraudulent

transfer is not adequately pled where "the fraud or dishonesty" concerns "not [the] transfer [itself]"

but "*the manner in which*" the transferor's money is obtained) (emphasis in original); *In re Tribune*

*Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 159-60 (2d Cir. 2021) ("The alleged fraud must

relate to the specific payment or transfer the plaintiff is seeking to avoid, rather than to the overall

course of business."); *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (same).

Plaintiffs also fail to point to any badges of fraud.  As shown in our Opening Brief, the

Complaint alleges only insolvency and lack of fair value, (Br. at 22), which have not been

adequately pled for the reasons stated above (in Section II.B, *supra*).  Plaintiffs attempt to salvage

this claim by arguing in the Opposition that the BHL Defendants were—somehow—"insiders" of

---

[14] *Cf. Drivetrain, LLC* v. *X. Com., Inc.*, 2023 WL 1804627, at *1, 3-4 (Bankr. D. Del. Feb. 7, 2023) (debtor entered into a series of contracts in order to generate fraudulent revenue reports to use as "proof" to "trick investors"—in other words, the contracts "served no other purpose but to allow [debtor's principal] . . . to perpetuate fraud").  Here, by contrast, the July 2021 transfers served multiple business purposes, most notably removing certain competitors' rights in the Debtors.  (*See* Compl. ¶ 47; Br. at 21-22).

[15] *See* Am. Compl. ¶¶ 51-52, 65, *Alameda Rsch. Ltd.* v. *Giles (In re FTX Trading Ltd.)*, No. 23-50380 (Bankr. D. Del. Dec. 17, 2024), D.I. 369.

the Debtors, despite the glaring inconsistency with the Complaint's own allegations that SBF and Mr. Zhao were active "rivals" and "competitors" who "set out to destroy" one another. (*See, e.g.*, Compl. ¶ 7). The relationship between the BHL Defendants and the Debtors here is a world away from the typical "insider" fact pattern that might support a claim of actual fraud.[16] The Complaint alleges no facts whatsoever to permit an inference that the BHL Defendants either controlled the Debtor entities or had a relationship with the Debtors that would warrant close scrutiny. *In re Winstar*, 554 F.3d at 396-97.

Plaintiffs also allege that the Debtors transferred a significant portion of their estates by using $1 billion of FTX customer deposits to fund the July 2021 transfers. (Opp. at 56). Plaintiffs place outsized weight on FTX fraud co-conspirator Ellison's speculative testimony to suggest that $1 billion was "likely more than [Alameda] could afford" (*id.*), but ignore Ellison's testimony that FTX had an equity value of around $20 billion at this time. (*See* Br. at 19).[17] Plaintiffs' failure to contest the remaining badges confirms they have not pled them. (*See id.* at 22).

---

[16] Plaintiffs' own cites show that the level of closeness typically needed to plausibly allege insider status is far greater than what is alleged to have existed here. *Burtch* v. *Masiz* (*In re Vaso Active Pharms., Inc.*), 2012 WL 4793241 (Bankr. D. Del. Oct. 9, 2012) (insider was former CEO of debtor entity who stepped down following a settlement with the SEC and was thereafter hired as a "strategic advisor" paid at the same rate, and who oversaw the debtor entity's day-to-day operations, and who was the majority shareholder of related corporation that controlled 77 percent of voting interest of debtor); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382 (3d Cir. 2009) (insider was creditor of debtor and a "much larger company [that] bullied and threatened the smaller [debtor entity] into taking actions that were designed to benefit the larger at the expense of the smaller"); *In re TC Liquidations LLC*, 463 B.R. 257 (Bankr. E.D.N.Y. 2011) (insiders were children of original owners of company who, together, owned the entire stock of the corporation, and who were officers of the corporation).

[17] As Judge Dorsey noted, the debtors' estates here must be analyzed on a consolidated basis. *Giles*, 2024 WL 4562675, at *12 n.32.

## III.    PLAINTIFFS' STATE LAW CLAIMS CONCERNING THE NOVEMBER 2022 TWEETS ALSO FAIL (COUNTS 6-9)

Plaintiffs invoke state law to try to recover damages allegedly caused by Tweets published in the days following a bombshell *CoinDesk* article that blew the lid off the fraudulent FTX enterprise.    As demonstrated in our Opening Brief, these claims cannot proceed for multiple reasons, including lack of subject matter jurisdiction (Br. at 23-24); the statements at issue are not false or misleading (*id.* at 24-28); the claims are barred by the doctrine of *in pari delicto* (*id.* at 28-29); Plaintiffs rely on impermissible group pleading (*id.* at 29-30); and Plaintiffs' claims otherwise fail to state a claim (*id.* at 30-36).    Plaintiffs' Opposition does not and cannot overcome any of these fatal defects.

### A.    The Court Lacks Subject Matter Jurisdiction as to Plaintiffs' State Law Claims

***These claims do not "arise under" Title 11.***    The only connection Plaintiffs' state law claims have to Title 11 is that they were asserted in the context of a bankruptcy proceeding, which is plainly insufficient.    (Br. at 23).    In Opposition, Plaintiffs make the circular argument that the state law claims "arise under" Title 11 because they are "core" claims of the "estate"—and that they must be "core" claims because they could theoretically enhance the value of the estate.    (*See* Opp. at 29-32).    If so, all debtor claims would be "core" claims arising under Title 11 because all of them might enhance the estate's value.    Unsurprisingly, Plaintiffs cite zero authority for their illogical position.    (*See id.*).    Nor could they, because it is not the law.    *See Phar–Mor, Inc.* v. *Coopers & Lybrand*, 22 F.3d 1228, 1239 n. 19 (3d Cir. 1994) (finding that a pre-petition breach of contract claim that could bring property into the estate was "precisely the type of proceeding that is non-core and outside the power of the bankruptcy court to adjudicate"); *see also In re Stone & Webster, Inc.*, 367 B.R. 523, 527 (Bankr. D. Del. 2007) (explaining that the Third Circuit does

not consider "proceedings having the effect of bringing property into the estate of the debtor [as] core proceedings as defined by section 157(b)").[18]

**_The claims are not "related to" this post-confirmation Chapter 11 case._**  As shown in our Opening Brief (at 24), the Court's "related to" subject matter jurisdiction is limited to claims that "affect an integral aspect of the bankruptcy process" because the reorganization plan has already been confirmed in this case.  *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004).  There can be no serious dispute that these state law claims do not "affect the interpretation, implementation, consummation, execution or administration of the confirmed plan."  *Halperin* v. *Moreno* (*In re Greenfield Energy Servs., Inc.*), 2017 WL 6524525, at *4 (D. Del. Dec. 21, 2017). The mere possibility that claims could increase the size of an estate is not enough post-confirmation.  (Br. at 24 (citing *In re Insilco Techs., Inc.*, 330 B.R. 512, 524-26 (Bankr. D. Del. 2005), *aff'd*, 394 B.R. 747 (D. Del. 2008))).

In Opposition, Plaintiffs argue that their state law claims are "logically linked to the Debtor's prepetition losses" and "were contemplated by the Plan."  (Opp. at 32-33).  This argument fails.  The state law claims were not "contemplated by the Plan" in any meaningful way as the Plan makes no specific mention of them.[19]  A generalized preservation clause (*see* Plan § 5.17) and wholesale assignment (*see id.* § 2.1.27) are insufficient.  *Compare In re MPC Computers, LLC*, 465 B.R. 384, 392-93 (Bankr. D. Del. 2012) (close nexus between the non-bankruptcy claims and

---

[18] Plaintiffs' reliance on *In re Maxus Energy Corp.*, 597 B.R. 235, 244 (Bankr. D. Del. 2019) is misplaced.  That case merely held that claims of unjust enrichment, alter ego, and conspiracy were "core" where "they ar[o]se under the same events as the [fraudulent transfer claims] and [we]re intimately connected to them."  *Id.*  That is not the case here, where the purportedly fraudulent July 2021 transfers is not alleged to have anything to do with the November 2022 events underlying the state law claims.

[19] *See* Second Amended Joint Chapter 11 Plan of Reorganization, *In re FTX Trading Ltd.*, No. 22 Bk. 11068 (Bankr. D. Del. Oct. 8, 2024), D.I. 26404-1 (the "Plan").

bankruptcy plan where the third-party defendant's actions which gave rise to the claim were **expressly referenced** in the bankruptcy plan's preservation of actions against customers for accounts receivable) *with Solmonese* v. *Shyamsundar* (*In re AmCad Holdings, LLC*), 2016 WL 3412289, at *2 (Bankr. D. Del. June 14, 2016) (no close nexus where causes of action at issue were not defined in the Plan; "a wholesale assignment of claims to a post-confirmation trust is insufficient to establish a close nexus with respect to any individual claim").  In addition, the fact that this Plan is a "liquidating plan" (Opp. at 34-35) should not direct the outcome, as this theory has not been recognized in the Third Circuit and case law in Delaware is mixed.  (*Id.*).

### B.  The Tweets Are Not Adequately Alleged to be False or Misleading

As we showed in our Opening Brief, Counts 6-9 all fail because Plaintiffs fail to adequately allege that any of the statements challenged by those counts were false or misleading, and, to the contrary, the record the Court can consider on this motion shows they were true.  (*See* Br. at 24-28).  In response, Plaintiffs merely rehash the same conclusory allegations that the Tweets are actionable because Mr. Zhao and the "@binance" account failed to disclose that they were motivated by a purported desire to "destroy" FTX.  (Opp. at 61-65).  Plaintiffs' bare conclusions should not be credited.

With respect to the November 6 Tweets—involving indisputably truthful statements that Binance intended to liquidate its remaining holdings of FTT—Plaintiffs rely solely on the self-serving speculation of a currently incarcerated felon (Ellison), as well as an unnamed FTX investor whose credibility cannot be evaluated, and on this basis ask the Court to infer that the Tweets must have been intended to destroy FTX.  (*Id.* at 62-63).  But this sheer speculation about the motivation for the statements cannot render true statements actionable as fraud.  (Br. at 25).  Such speculative and conclusory allegations and arguments are properly disregarded on a motion to dismiss.

*Theseus Strategy Group LLC* v. *Barsa (In re Old Bpsush, Inc.)*, 2021 WL 4453595, at *9 (D. Del. Sept. 29, 2021).

Similarly, with respect to the November 8 & 9 Tweets, both the statements and the LOI on their face (*see* Chase Decl., Ex. 9) make clear that the LOI was non-binding, gave Binance discretion to withdraw, and was subject to due diligence. (Br. at 27). Plaintiffs' claims are based on speculation that the LOI was a ruse all along because SBF and Mr. Zhao allegedly had a single phone call during which SBF disclosed some unspecified extent of mishandled customer funds. (Opp. at 63-64). But even accepting Plaintiffs' allegation for present purposes, this does not remotely call into question the veracity of the Tweet where Binance explained why it pulled out of the deal—not only because of its own due diligence, but also in light of to "***the latest news reports regarding mishandled customer funds and alleged US agency investigations***." (*See id.* at 63). Furthermore, Plaintiffs' own timeline confirms that any inkling SBF gave Mr. Zhao about mishandled customer funds in a phone call early in the morning of November 8 would only have encouraged Binance to take a more careful look at the nature and scope of the issue once due diligence actually got under way.[20] In short, Plaintiffs ask the Court to infer bad faith and ignore the obvious (good faith) explanation that FTX's problems were much more dire than SBF had disclosed in a single alleged phone call in which he was asking a competitor to bail out his floundering enterprise. Plaintiffs' facially implausible speculation cannot save these claims.

## C.  The Doctrine of *In Pari Delicto* Bars Plaintiffs' State Law Claims

Plaintiffs' state law claims put the reasons for FTX's ultimate collapse at issue and are therefore barred by the *in pari delicto* doctrine because Plaintiffs are wholly at fault for that

---

[20] *See* Compl. ¶ 65 (alleging that after the purported phone call between SBF and Mr. Zhao, SBF "reflected to the FTX team that Zhao 'seemed receptive' but needed to consider the proposal").

collapse.  (Br. at 28).  Plaintiffs' argument that *in pari delicto* is inappropriate for decision on a motion to dismiss (Opp. at 77-78) is contrary to Third Circuit authority.  *See, e.g.*, *Off. Comm. of Unsecured Creditors* v. *R.F. Lafferty & Co.*, 267 F.3d 340, 360 (3d Cir. 2001) (affirming district court's dismissal of claims on *in pari delicto* grounds); *Zazzali* v. *Hirschler Fleischer, P.C.*, 482 B.R. 495, 512 (D. Del. 2012) (barring trustee from asserting various claims under the doctrine of *in pari delicto* on motion to dismiss).  And Plaintiffs are incorrect that the analysis focuses on the specific claims as opposed to the broader concept of fault for the harm underlying the claims. *Zazzali*, 482 B.R. at 512 ("Under the doctrine of *in pari delicto*, a plaintiff is barred from asserting a claim if the plaintiff participated in the wrongdoing that was a substantial cause of the alleged damages."); *see also In re American Intern. Group, Inc., Consol. Derivative Litigation*, 976 A.2d 872, 883 (Del. Ch. 2009) ("[U]nder the *in pari delicto* doctrine, a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in."). Here, the crux of Plaintiffs' damages, *i.e.*, the "destroyed value" of FTX (Opp. at 79), was entirely caused by SBF and the massive, criminal fraud he led.  (*See* Br. at 28-29).

In addition, Plaintiffs' invocation of the "adverse interest" exception (Opp. at 78) is of no moment because Plaintiffs acknowledge that SBF's misconduct benefited FTX and Alameda, rather than SBF exclusively.  *See In re Liberty State Benefits of Delaware, Inc.*, 541 B.R. 219, 235 (Bankr. D. Del. 2015) ("If a corporation receives any sort of benefit from the fraud, no matter how small that benefit might be, the trustee may not assert [the adverse interest exception]."); *see also Zazzali*, 482 B.R. at 513 (holding that "[w]hile the decision of the insiders to steal" money "may have harmed the corporation, this does not alter the fact that the insiders still conferred some benefit on [the corporation]" such as bringing in revenue to the company for "general corporate purposes").

### D.  Plaintiffs' State Law Claims Rely on Impermissible Group Pleading

Plaintiffs do not dispute that the Complaint relies on group pleading.  Instead, they argue that their group pleading should be allowed, pointing to inapplicable case law.  (Opp. at 58-59).  For example, in *MBIA Ins. Corp.* v. *Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004), the court permitted group pleading where an individual defendant was allegedly 100% owner of certain defendant-entities, officer and director of all three defendant-entities, and used the entities to perpetrate a Ponzi scheme.  In *In re Genesis*, 355 B.R. 438, 457 (Bankr. D. Del. 2006), the court found that plaintiffs "***successfully identified the roles of the different defendants*** within the alleged scheme and made enough ***individualized allegations*** to meet the relaxed Rule 9(b) standard[.]"[21]

In this case, unlike the cases Plaintiffs rely upon, the Complaint is devoid of allegations that corporate formalities were ignored or that purported complexities of Binance's corporate structure were used to perpetrate any wrong on Plaintiffs.  Instead, Plaintiffs apparently just ask for a "pass" on adequately pleading their claims as to the BHL Defendants because they think it seems complicated to figure out whether the BHL Defendants actually had anything to do with the alleged wrongdoing.  This comes nowhere near pleading "individualized allegations" against any of the BHL Defendants or the role that the BHL Defendants purportedly played in connection with the statements underlying the state law claims.  *In re Genesis*, 355 B.R. at 457.

---

[21] *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192 (E.D.N.Y. 1997)—an out-of-circuit case in the context of securities litigation—is inapplicable because the securities laws specifically extend liability to "those who had knowledge of the fraud and assisted in its preparation."  *Id.* at 209 (finding that plaintiffs had adequately alleged detailed and specific "facts implicating [two individuals] in the 'in-transit' inventory portion of the overall fraudulent scheme to impart to the investment community an artificial earnings statement.").

### E.  Plaintiffs Fail to State a Claim for Injurious Falsehood (Count 6)

As shown in our Opening Brief, Plaintiffs fail to adequately allege that the BHL Defendants made false and/or misleading statements, or that such statements were made with actual malice, and that these statements, as opposed to other reasons, caused their losses.  (Br. at 30-33).  Plaintiffs argue that actual malice can be inferred because neither Mr. Zhao nor @binance had any obligation to issue the Tweets, and because Binance purportedly sought to gain market share.  (Opp. at 66).  Plaintiffs' position defies common sense.  If the goal was to obtain market share, Binance could have proceeded with the LOI and obtained 100% of FTX's business.  In any event, Plaintiffs plead no facts to support an inference of actual malice.  The allegations they point to in Opposition all rest on rank speculation.  This is not enough.  *Aoki* v. *Benihana, Inc.*, 839 F. Supp. 2d 759, 763, 771 (D. Del. 2012) (allegations must rise "above the speculative level").

Plaintiffs also fail to allege causation.  They cannot point to a "direct, foreseeable connection" between the November 2022 Tweets, third-party reliance, and Plaintiffs' purported damages.  (Br. at 31).  Plaintiffs argue that the Tweets triggered withdrawals and FTX's collapse, but this ignores that FTX was already in freefall due to the *CoinDesk* article exposing FTX's massive fraud.  (*Id.* at 31-33).

### F.  Plaintiffs Fail to Adequately Allege Fraud and Intentional Misrepresentation (Counts 7 and 8)

Plaintiffs also fail to allege that the BHL Defendants made false statements with scienter or intent to induce reliance, or that reliance caused damages.  (Br. at 33-35).

*No actionable statements*.  As discussed above (in Section III.B), none of the cited statements are actionably false.

*No scienter or intent*.  The Opposition confirms that Plaintiffs offer only conclusory assertions that Binance intended to induce withdrawals and block financing.  (*See* Opp. at 69-70).  Plaintiffs argue that "motive and opportunity" allegations suffice, but courts routinely reject

market share or profit motives as adequate to plead scienter.  *See, e.g.*, *GSC Partners CDO Fund*

v. *Washington*, 368 F.3d 228, 237-38 (3d Cir. 2004) (allegation that the defendants had a motive

to "reap financial benefits" is insufficient to plead scienter).

      *No reliance*.   Plaintiffs argue, again in conclusory fashion, that the statements were

"intended to cause customer reliance."  (Opp. at 69-72).  But this argument cannot be squared with

the fact that customers already knew of FTX's fraud from the *CoinDesk* article (and were grappling

with the market chaos that article unleashed).  In any event, whatever weight FTX customers may

or may not have given the statements cannot show that Plaintiffs themselves relied on them.

Although Plaintiffs cite to the exclusivity provision in the LOI, (*id.* at 71), they have no response

to the point that Binance withdrew from the LOI mere hours after signing, rendering any

exclusivity provision void.

      *No causation*.  Plaintiffs offer no plausible theory linking the alleged misstatements to

damages.  *See* Section III.E, *supra*.

### G. Plaintiffs Fail to State a Claim for Unjust Enrichment (Count 9)

      Plaintiffs cannot allege: (i) a direct relationship between the BHL Defendants' enrichment

and their losses; (ii) wrongdoing supporting "absence of justification"; or (iii) lack of an adequate

legal remedy.  (Br. at 35-36).  In their Opposition (Opp. at 73), Plaintiffs cite *In re W.J. Bradley*

*Mortgage Capital, LLC*, 598 B.R. 150 (Bankr. D. Del. 2019) to support the "direct relationship"

prong, but that case is inapposite.  There, the acquisition of a third party's interest caused

insolvency.  *Id.* at 177.  Here, Plaintiffs themselves allege FTX was insolvent by July 2021—16

months before the alleged statements.  (Compl. ¶ 1).  Plaintiffs also argue the "absence of a

remedy" prong does not apply, (Opp. at 74), ignoring *W.J Bradley*, which expressly addressed it.

598 B.R. at 178.  In any event, the unjust enrichment claim fails because Plaintiffs have asserted

multiple overlapping claims (Counts 6-8) that could provide a remedy if they were adequately

pleaded (which they are not).  *Nemec* v. *Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (rejecting unjust enrichment claim where other remedies were available).

## IV.   PLAINTIFFS' REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED

This Court should deny Plaintiffs' request for leave to amend because Plaintiffs cannot plead around the Complaint's fatal flaws.  Indeed, Plaintiffs offer no indication as to how they could even begin to cure the fundamental deficiencies of their legal theories and the pleading failures of the Complaint.  *See In re Allergan ERISA Litigation*, 975 F.3d 348, 358 (3d Cir. 2020) (upholding district court's denial of request for leave to amend where plaintiffs "failed to say anything at all about how they intended to amend their pleading").

## CONCLUSION

For the reasons set forth above, the Court should dismiss the Complaint against the BHL Defendants with prejudice.

Dated: September 12, 2025

CAHILL GORDON & REINDEL LLP

*/s/ Gregory Strong*

Samson A. Enzer[*]
Herbert S. Washer[*]
Edward N. Moss[*]
Joel H. Levitin[*]
Gregory Mortenson[*]
32 Old Slip
New York, NY 10005
(212) 701-3000
SEnzer@cahill.com
HWasher@cahill.com
EMoss@cahill.com
JLevitin@cahill.com
GMortenson@cahill.com
[*] *admitted pro hac vice*

Gregory Strong (No. 4664)
221 W. 10th Street, 3rd Floor
Wilmington, DE 19801
(302) 884-0001
GStrong@cahill.com

*Attorneys for Defendants Binance Holdings Limited, Binance Holdings (IE) Limited, and Binance (Services) Holdings Limited*