## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, FTX DIGITAL MARKETS, LTD. | Adv. Pro. No. 24-50222 (KBO) |
| Plaintiffs, | **Re: Adv. D.I. 1, 104** |
| v. | |
| BINANCE HOLDINGS LIMITED., BINANCE CAPITAL MANAGEMENT CO. LTD, BINANCE HOLDINGS (IE) LIMITED, BINANCE (SERVICES) HOLDINGS LIMITED, CHANGPENG ZHAO, DINGHUA XIAO, SAMUEL WENJUN LIM, and DOES 1-1000 | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO CHANGPENG ZHAO'S MOTION TO DISMISS THE COMPLAINT

Dated: September 18, 2025

**RICHARDS, LAYTON & FINGER, P.A**.
Kevin Gross (No. 209)
Paul N. Heath (No. 3704)
Brendan J. Schlauch (No. 6115)
Robert C. Maddox (No. 5356)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of reorganized debtor entities (the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), a complete list of the Reorganized Debtors' last four digits of their federal tax identification numbers is not provided herein, but may be obtained on the website of the Reorganized Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Facsimile: (302) 651-7701
gross@rlf.com
heath@rlf.com
schlauch@rlf.com
maddox@rlf.com

-and-

**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Brian D. Pfeiffer (admitted *pro hac vice*)
Colin West (admitted *pro hac vice*)
Ashley R. Chase (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
Loredana B. Miranda (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
cshore@whitecase.com
brian.pfeiffer@whitecase.com
cwest@whitecase.com
ashley.chase@whitecase.com
brett.bakemeyer@whitecase.com
loredana.miranda@whitecase.com

*Attorneys for Plaintiffs*

ii

**TABLE OF CONTENTS**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................... 1

BACKGROUND AND SUMMARY OF ARGUMENT ........................................... 2

ARGUMENT .............................................................................. 5

I. PLAINTIFFS PROPERLY SERVED CZ AND HE WAIVED ALL SERVICE
   DEFENSES ........................................................................... 5

II. THIS COURT HAS PERSONAL JURISDICTION OVER CZ. ........................................ 6

   A. Relevant Standards ............................................................... 6

   B. The Traditional Test Is Satisfied Here. ........................................... 11

      1. CZ's Purposeful Activity in the U.S. Easily Establishes the Requisite Minimum
         Contacts ..................................................................... 11

      2. The Claims Arise out of or Relate to CZ's Contacts with the U.S. ............... 14

         a. The Fraudulent Conveyance Claims' U.S. Connections. ....................... 17

         b. The Predatory Acts Claims' U.S. Connections ............................... 21

      3. CZ Has Sufficient Minimum Contacts with the U.S. Such That Exercising Personal
         Jurisdiction Over Him Will Not Offend Due Process. ........................... 23

   C. The Effects Test is Also Satisfied. ............................................... 25

   D. If this Court Finds That Plaintiffs Have Not Made a Prima Facie Showing of Personal
      Jurisdiction, Plaintiffs Are Entitled to Jurisdictional Discovery. .............. 26

III. THE COMPLAINT ADEQUATELY PLEADS THE FRAUDULENT CONVEYANCE
     CLAIMS AGAINST CZ. ............................................................... 26

   A. Delaware Law Applies to the State Law Fraudulent Conveyance Claims (Counts II and
      IV). ............................................................................ 27

   B. Plaintiff Sufficiently Alleged CZ is a Transferee and/or a Transfer Beneficiary. ... 29

   C. Plaintiff Has Adequately Pled a Claim for Constructive Fraudulent Transfer (Counts I
      and II). ........................................................................ 31

   D. Plaintiff Has Adequately Pled a Claim for Actual Fraudulent Transfer (Counts III and
      IV). ............................................................................ 32

IV. CZ'S ADDITIONAL arguments for DISMISSal OF The fraudulent conveyance claims
    ARE NOT APPROPRIATE GROUNDS FOR DISMISSAL. ....................................... 34

   A. The Fraudulent Conveyance Claims Are U.S. Transactions and Sections 544, 547 And

iii

548 of the Bankruptcy Code Applies Extraterritorially. ................................................. 34

    1.   The 2021 Fraudulent Transfers Were Centered In the U.S. ....................................... 35

    2.   Congress Intended Sections 544, 548, and 550 To Apply Extraterritorially. ............... 36

  B.   The Fraudulent Conveyance Claims Are Not Barred by the Safe Harbor Defense......... 37

V.   THE COMPLAINT ADEQUATELY PLEADS the Predatory Acts Claims. ...................... 38

  A.   Plaintiffs Have Plausibly Alleged That the Binance False Statements Were False or Misleading. .................................................................................................................... 39

  B.   Plaintiffs Have Adequately Pled a Claim for Injurious Falsehood (Count VI). ............... 42

  C.   Plaintiffs Have Adequately Pled a Claim for Fraud (Count VII) and Intentional Misrepresentation (Count VIII). ..................................................................................... 47

  D.   Plaintiffs Have Adequately Pled a Claim for Unjust Enrichment (Count IX). ................. 53

VI.   ALTERNATIVELY, ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE ........ 54

RLF1 33802269v.1

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Activision Publ'g, Inc. v. EngineOwning UG*,
2023 WL 3272399 (C.D. Cal. Apr. 4, 2023) ........................................................22

*In re Agriprocessors, Inc.*,
2012 WL 4059897 (Bankr. N.D. Iowa Sept. 14, 2012) .....................................30

*Alameda Rsch. Ltd. v. Platform Life Scis. Inc.*,
2023 WL 8814216 (Bankr. D. Del. Dec. 20, 2023)...............................................7

*In re Am. Bus. Fin. Servs., Inc.*,
362 B.R. 149 (Bankr. D. Del. 2007) ...................................................................51

*Aoki v. Benihana Inc.*,
839 F. Supp. 2d 759 (D. Del. 2012)....................................................................39

*In re APF Co.*,
308 B.R. 183 (Bankr. D. Del. 2004) ...................................................................33

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................39

*In re Bernard L. Madoff Inv. Sec. LLC*,
418 B.R. 75 (Bankr. S.D.N.Y. 2009)..................................................................25

*In re Bernard L. Madoff Inv. Sec. LLC*,
440 B.R. 274 (Bankr. S.D.N.Y. 2010).................................................................24

*In re BLMIS*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018) ........................................................ 14, 31

*Buck v. Hampton Twp. Sch. Dist.*,
452 F.3d 256 (3d Cir. 2006)................................................................................11

*Burger King Corp. v. Rudzewicz*,
471 U.S. 477 (1985).............................................................................................23

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)..............................................................................48

*Calder v. Jones*,
    465 U.S. 783 (1984) ..................................................................................................... 25

*Cantor v. Perelman*,
    414 F.3d 430 (3d Cir. 2005) ........................................................................................ 45

*In re Capmark Fin. Grp. Inc.*,
    479 B.R. 330 (Bankr. D. Del. 2012) ............................................................................ 24

*Carteret Sav. Bank, FA v. Shushan*,
    954 F.2d 141 (3d Cir. 1992) ........................................................................................ 23

*In re Charys Holding Co.*,
    2010 WL 2774852 (Bankr. D. Del. July 14, 2010) ...................................................... 33

*In re Citadel Watford City Disposal Partners, L.P.*,
    2018 WL 6841361 (Bankr. D. Del. Dec. 17, 2018) ...................................................... 50

*Contant v. Bank of Am. Corp.*,
    385 F. Supp. 3d 284 (S.D.N.Y. 2019) .......................................................................... 11

*In re Cred Inc.*,
    650 B.R. 834 (Bankr. D. Del. Apr. 13, 2023) .............................................................. 33

*Creditors' Committee of Essex Builders, Inc. v. Farmers Bank*,
    251 A.2d 546 (Del. 1969) ............................................................................................ 54

*Danziger & De Llano, LLP v. Morgan Verkamp LLC*,
    948 F.3d 124 (3d Cir. 2020) ........................................................................................ 14

*In re DBSI, Inc.*,
    445 B.R. 344 (Bankr. D. Del. 2011) ............................................................................ 32

*In re DBSI, Inc.*,
    451 B.R. 373 (Bankr. D. Del. 2011) ............................................................................ 24

*In re DBSI, Inc.*,
    467 B.R. 309 (Bankr. D. Del. 2012) ............................................................................ 24

*Denoble v. Dupont Merck Pharm. Co.*,
    703 A.2d 643 (Del. 1997), *aff'd* 1997 WL 35410094 (1997) ........................ 43, 44

*Drivetrain, LLC v. X. Com., Inc.*,
    2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023) ....................................................... 33

RLF1 33802269v.1

*Emerald Cap. Adv. v. Bayerische Moteren Werke Aktiengesellschaft (In re FAH Liq. Corp.),*
  572 B.R. 117 (Bankr. D. Del. 2017) .....................................................35, 36, 37, 38

*In re Emoral, Inc.,*
  740 F.3d 875 (3d Cir. 2014).................................................................51

*Ephoca Inc. v. Olimpia Splendid USA, Inc.,*
  2024 WL 687840 (Del. Super. Feb. 20, 2024).......................................44

*ev3, Inc. v. Lesh,*
  114 A.3d 527 (Del. 2014) ....................................................................52

*In re Fairfield Sentry Ltd.,*
  2025 WL 2203142 (Bankr. S.D.N.Y. Aug. 1, 2025) ..........................11

*Finjan LLC v. Trustwave Holdings, Inc.,*
  2021 WL 5051147 (D. Del. Oct. 29, 2021) ...........................................8

*Fisker Auto Holdings, Inc. S'holder Litig.,*
  2015 WL 6039690 (D. Del. Oct. 15, 2015) ...........................................9

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,*
  592 U.S. 351 (2021).............................................................................14

*In re French,*
  440 F.3d 145 (4th Cir. 2006) .........................................................35, 36

*FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC),*
  595 B.R. 686 (Bankr. D. Del. 2018) ....................................................32

*In re FTX Trading Ltd.,*
  2024 WL 4562675 (2024).....................................................................49

*Fuld v. Palestine Liberation Org.,*
  606 U.S. 1 (2025)......................................................................... 1, 9, 10

*Gaffin v. Teledyne, Inc.,*
  611 A.2d 467 (Del. 1992) ....................................................................48

*In re GBG USA Inc.,*
  666 B.R. 115 (Bankr. S.D.N.Y. 2024)..................................................26

*In re Genesis Health Ventures, Inc.,*
  355 B.R. 438 (Bankr. D. Del. 2006) ................................... 30, 39, 49, 50

vii

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ................................................................. 15

*Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*,
    988 F.2d 476 (3d Cir. 1993) ..................................................... 20

*In re Green Field Energy Servs., Inc.*,
    594 B.R. 239 (Bankr. D. Del. 2018) ............................... 30, 31

*Gurmessa v. Genocide Prevention in Ethiopia, Inc.*,
    2022 WL 608924 (D. Del. Feb. 23, 2022) ........................ 7, 11

*Hasson v. FullStory, Inc.*,
    114 F.4th 181 (3rd Cir. 2024) ........................................ 12, 15

*In re HRB Winddown Inc.*,
    2024 WL 1099724 (Bankr. D. Del. Mar. 13, 2024)........... 51, 53

*Incyte Corp. v. Flexus Biosciences, Inc.*,
    2017 WL 7803923 (Del. Super. Ct. Nov. 1, 2017) .............. 44

*ING Bank v. PNC Fin. Servs. Grp.*,
    629 F. Supp. 2d 356 (D. Del. 2009) ....................... 39, 40, 41, 42

*In re Int'l Mgmt. Assoc.*,
    399 F.3d 1288 (11th Cir. 2005) ................................................ 31

*In re Live Well Financial, Inc.*,
    652 B.R. 699 (Bankr. D. Del. 2023) ....................................... 33

*Loc. 875 I.B.T. Pension Fund v. Pollack*,
    992 F. Supp. 545 (E.D.N.Y. 1998) ......................................... 20

*In re Lyondell Chemical Company*,
    543 B.R. 151 (Bankr. S.D.N.Y. 2016) .................................... 37

*In re Mallinckrodt plc*,
    2024 WL 206682 (Bankr. D. Del. 2024) ................................ 33

*Marino v. Cross Country Bank*,
    2003 WL 503257 (D. Del. Feb. 14, 2003) .............................. 44

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) ....................................... 37

RLF1 33802269v.1

*McClanahan v. Anti-Defamation League*,
 2023 WL 8704258 (W.D. Mo. Dec. 15, 2023) ..................................................... 45

*Metcalfe v. Renaissance Marine, Inc.*,
 566 F.3d 324 (3d Cir. 2009) ................................................................................... 8

*Miller Yacht Sales, Inc. v. Smith*,
 384 F.3d 93 (3d Cir. 2004) ............................................................................... 7, 25

*Morrison v. Nat'l Australia Bank Ltd.*,
 561 U.S. 247 (2010) ............................................................................................. 37

*In re MortgageAmerica Corp.*,
 714 F.2d 1266 (5th Cir. 1983) ............................................................................. 38

*NACCO Indus., Inc. v. Applica Inc.*,
 997 A.2d 1 (Del. Ch. 2009) .................................................................................. 50

*In re Nat'l Collegiate Student Loan Trusts Litig.*,
 2020 WL 3960334 (Del. Ch. July 13, 2020) .................................................. 43, 44

*In re Nat'l Serv. Indus., Inc.*,
 2015 WL 3827003 (Bankr. D. Del. June 19, 2015) ............................................. 33

*Nationwide Mut. Ins. Co. v. Buffetta*,
 230 F.3d 634 (3d Cir. 2000) ................................................................................ 43

*Nemec v. Shrader*,
 991 A.2d 1120 (Del. 2010) .................................................................................. 54

*Nicolet, Inc. v. Nutt*,
 525 A.2d 146 (Del. 1987) .................................................................................... 48

*In re Northstar Offshore Grp., LLC*,
 616 B.R. 695 (Bankr. S.D. Tex. 2020) ................................................................ 30

*O'Connor v. Sandy Lane Hotel Co., Ltd.*,
 496 F.3d 312 (3d Cir. 2007) ........................................................................... 14, 23

*Off. Comm. of Unsecured Creditors of Arcapita, Bank v. Bahrain Islamic Bank*,
 549 B.R. 56 (S.D.N.Y. 2016) ............................................................................... 20

*Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*,
 2025 WL 2613530 (S.D.N.Y. Sep. 10, 2025) ..................................................... 10

ix

*Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*,
 710 F. Supp. 2d 458 (D. Del. 2010) ................................................ 28, 39, 43, 44

*In re PennySaver USA Publishing LLC*,
 587 B.R. 445 (Bankr. D. Del. July 11, 2018) ............................................... 33

*In re Physiotherapy Holdings*,
 2017 WL 5163515 (Bankr. D. Del. Nov. 6, 2017) ............................................ 29

*Pinker v. Roche Holdings, Inc.*,
 292 F.3d 361 (3d Cir. 2002) .................................................. 8, 10, 23, 25

*Quantum Loyalty Sys., Inc. v. TPG Rewards, Inc.*,
 2009 WL 5184350 (D. Del. Dec. 23, 2009) ..................................................... 8

*Ramada Inns, Inc. v. Dow Jones & Co.*,
 543 A.2d 313 (Del. Super. Ct. 1987) ..................................................... 43, 44

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
 311 F.3d 198 (3d Cir. 2002) ............................................................ 49

*In re Roco Corp.*,
 701 F.2d 978 (1st Cir. 1983) ........................................................... 32

*In re Rosetta Genomics, Inc.*,
 2025 WL 1942378 (Bankr. D. Del. July 14, 2025) ............................................ 10

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
 624 F.3d 123 (2d Cir. 2010) ........................................................... 12

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
 480 B.R. 501 (Bankr. S.D.N.Y. 2012) ................................................ 18, 37

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
 647 B.R. 42 (Bankr. S.D.N.Y. 2022) ...................................................... 18

*In re Tandycrafts, Inc. v. Salci*,
 317 B.R. 287 (Bankr. D. Del. 2004) ...................................................... 9

*Toys "R" Us, Inc. v. Step Two, S.A.*,
 318 F.3d 446 (3d Cir. 2003) ............................................................. 8

*Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*,
 318 A.3d 450 (Del. Ch. 2024) .......................................................... 50

x

*TriStrata Tech., Inc. v. Emulgen Lab'ys, Inc.*,
   537 F. Supp. 2d 635 (D. Del. 2008) ..................................................................24

*U.S. Bank National Assoc. v. Bank of Am. N.A.*,
   916 F.3d 143 (2d Cir. 2019)..............................................................................20

*In re U.S. Mortg. Corp.*,
   492 B.R. 784 (Bankr. D.N.J. 2013) ...................................................................30

*In re UD Dissolution Corp.*,
   629 B.R. 11 (Bankr. D. Del. 2021) ....................................................................13

*In re Uni-Marts, LLC*,
   399 B.R. 400 (Bankr. D. Del. 2009) ..................................................................10

*In re Uni-Marts, LLC*,
   404 B.R. 767 (Bankr. D. Del. 2009) .............................................................19, 26

*In re W.J. Bradley Mortgage Capital, LLC*,
   598 B.R. 150 (Bankr. D. Del. 2019) ..................................................................54

*Wellness Publ'g v. Barefoot*,
   128 F. App'x 266 (3d Cir. 2005).......................................................................22

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)............................................................................................7

*In re Zawawi*,
   644 B.R. 907 (Bankr. M.D. Fla. 2022) .........................................................17, 18

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,
   952 F. Supp. 1119 (W.D. Pa. 1997)..................................................................23

*In re Zohar III Corp.*,
   631 B.R. 133 (Bankr. D. Del. 2021) .........................................................30, 31, 32

**Statutes**

11 U.S.C. § 108(a) ..................................................................................................45

11 U.S.C. § 544........................................................................................*passim*

11 U.S.C. § 546(e) ..................................................................................................38

11 U.S.C. § 548........................................................................................*passim*

RLF1 33802269v.1

xii

11 U.S.C. § 550 ....................................................................................................... 30, 35

11 U.S.C. § 550(a)(1) .................................................................................................. 31

**Federal Rules**

Fed. R. Bankr. P. 7004 ............................................................................................ 8, 9, 10

Fed. R. Bankr. P. 7009 ................................................................................................ 49

Fed. R. Bankr. P. 9024 ................................................................................................. 6

Fed. R. Civ. P. 4(f)(3) .................................................................................................. 6

Fed. R. Civ. P. 9(b) ..................................................................................................... 49

Fed. R. Civ. P. 60 ......................................................................................................... 6

Fed. R. Evid. 201 ......................................................................................................... 11

**Other Authorities**

Restatement (First) of Restitution § 112 (1937) ......................................................... 54

Restatement (Second) of Torts § 531 (1977) ............................................................... 50

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiffs FTX Recovery Trust[1] and FTX Digital Markets Ltd. ("**FTX DM**" and collectively, the "**Plaintiffs**") submit this memorandum of law (the "**Memorandum**") in opposition to Changpeng Zhao's ("**Zhao**" or "**CZ**") motion to dismiss [Adv. D.I. 104-05] (the "**Motion**") the complaint [Adv. D.I. 1] (the "**Complaint**")[2] filed in the above-captioned adversary proceeding.[3]  Plaintiffs respectfully state as follows:

1.       This Memorandum represents Plaintiffs' final response to the Defendants' *seriatim* motions to dismiss the Complaint, and now the motion sequence is in sync.[4]  Many arguments raised by CZ are identical to, or variants of, arguments raised by some or all of the other six defendants.  Those arguments are addressed in full below or, as applicable, through the incorporation by reference of portions of Plaintiffs' earlier opposition briefs.  CZ does, however, advance certain new arguments not raised by any of the other defendants:

2.       *First*, CZ contends that service upon him was not proper, but in the stipulation attached as **Exhibit 2** to the Third Chase Declaration (as defined herein), he expressly waived the defense of service of process.[5]

3.       *Second*, like the other Defendants, CZ contends that this Court lacks personal jurisdiction, but CZ uniquely relies on *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 6 (2025).

---

[1]   This Court substituted the Consolidated Wind Down Trust (the "**FTX Recovery Trust**") as the plaintiff for certain Debtors in the above-captioned adversary proceeding (the "**Adversary Proceeding**") on February 11, 2025.  Case No. 22-11068 [D.I. 29554].

[2]   Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Complaint.

[3]   CZ seeks (improperly) to incorporate by reference every argument asserted in the *other* Defendants' motions to dismiss the Complaint.  *See* Mot. at 1. Plaintiffs request that this Court deny CZ's requests.

[4]   Because Defendants unhelpfully refused to accept service or consolidate their responses in one brief, their responsive dates to answer or move on the Complaint were staggered depending on when service was eventually effectuated.

[5]   CZ waived service of process defenses in the negotiated scheduling stipulation (the "**Scheduling Stipulation**"), which this Court entered on June 24, 2025. [Adv. D.I. 82-1].

CZ's novel argument is based on a misreading of *Fuld*, which, if anything, creates a standard for personal jurisdiction in cases brought under federal jurisdictional statutes that is even more expansive than the Fourteenth Amendment's "minimum contacts" test.

4. ***Third***, CZ, unlike all six other defendants, argues that to hold him liable under Counts I-V would be an unlawful extraterritorial application of the Bankruptcy Code's fraudulent transfer provisions. As set forth herein, however, the application of the Bankruptcy Code here would not be extraterritorial and, in any event, courts in this district, and the only circuit court to consider the issue, have unanimously held that the Bankruptcy Code's fraudulent transfer provisions apply extraterritorially.

5. For these reasons, the reasons set forth below, and, where appropriate, prior submissions on other Defendants' motions to dismiss, this Court should, under existing well-settled precedent, deny the Motion and allow this Adversary Proceeding to proceed to discovery. Alternatively, any dismissal in whole or in part should be without prejudice and should permit Plaintiffs to file a motion to amend the Complaint within thirty days of such decision.

## BACKGROUND AND SUMMARY OF ARGUMENT

6. Plaintiffs bring two categories of claims against CZ in this Adversary Proceeding. In Counts I through V, the FTX Recovery Trust seeks to avoid the $1.76 billion-dollar fraudulent transfer the Debtors made, in part to CZ, in exchange for the Defendants' equity stake in FTX Trading and West Realm Shires ("**WRS**"), which occurred while FTX was, as properly alleged, balance-sheet insolvent (collectively, the "**Fraudulent Conveyance Claims**"). In Counts VI through IX, Plaintiffs seek redress for a series of false and misleading tweets published by Binance and its founder, majority equity holder, director, and then-CEO, CZ, which were intended to, and indeed did, trigger a market panic and a "run" on FTX, leading to its immediate collapse in 2022

2

(collectively, the "**Predatory Acts Claims**" and, together with the Fraudulent Conveyance Claims, the "**Claims**").

7.      The Fraudulent Conveyance Claims against CZ are supported by a plain statement of well-supported facts alleged in good faith, which need not be repeated here in full.  *See* Compl. ¶¶ 34-51.  In short, prior to the collapse of FTX, Binance, owned and operated by CZ, was the largest cryptocurrency exchange in the world by trading volume.  *Id.* ¶ 29.  CZ was much more than Binance's owner, founder, CEO, director, and majority shareholder—he "exercised day-to-day control over [Binance's] operations."  *See* CZ Plea Agreement ¶ 9.d.[6]  While CZ was exercising such control, in 2019, Binance purchased an equity stake in FTX Trading.  Compl. ¶ 34.  Thereafter, in 2020, CZ purchased, in his personal capacity, shares in WRS, a U.S. company created to be FTX's U.S.-based exchange platform.  *Id.* ¶¶ 36-37.  Then, in 2021, Binance, CZ, and two other Binance executives (Defendants Xiao and Lim) exited their investments in FTX due to, among other things, CZ's purported grievances against FTX's founder and then-CEO, Samuel Bankman-Fried ("**Bankman-Fried**" or "**SBF**").  *Id.* ¶¶ 3-4.  Specifically, in July 2021, CZ and the other Binance shareholders disengaged via a share repurchase transaction whereby FTX bought back what were worthless shares in FTX Trading and WRS in exchange for $1.76 billion in valuable cryptocurrency paid to, or for the benefit of, each of the Defendants. Compl. ¶ 39.[7]  This 2021 Share Repurchase is plausibly alleged to be a constructive fraudulent transfer under section

---

[6]     *Plea Agreement*, *U.S. v. Zhao*, 23-cr-0179RAJ, [D.I. 31] (W.D. Wash. Nov. 21, 2023) (the "**CZ Plea Agreement**"), attached as Exhibit 1 to the Third Chase Declaration. Binance (Services) Holdings Limited, ("**Binance Services**"), Binance Holdings Limited, d/b/a Binance.com ("**Binance Holdings**"), Binance Holdings (IE) Limited ("**Binance IE**" and, together with Binance Services and Binance Holdings, "**BHL**") also entered into a separate plea agreement with the U.S. Department of Justice (the "**Binance Plea Agreement**"), which is attached as Exhibit 16 to the First Chase Declaration. *See Plea Agreement*, *U.S. v. Binance Holdings Ltd., d/b/a Binance.com*, 23-cr-0178RAJ, Attach. A, Statement of Facts [D.I. 23] (W.D. Wash. Nov. 21, 2023).

[7]     While the 2021 Share Repurchase was purportedly funded by FTX's Alameda Research division, FTX had in fact used customer funds from its trading platform. Compl. ¶¶ 109, 119.

3

548(a)(1)(B) of the Bankruptcy Code. Compl. ¶ 88. Likewise, because the fraudulent transfers were made in furtherance of Bankman-Fried's scheme, as specifically pled in the Complaint, the 2021 Share Repurchase was also an intentional fraudulent transfer under section 548(a)(1)(A) of the Bankruptcy Code. Compl. ¶¶ 47-48. CZ does not contend that the transfers occurred or that these facts are unclear or ambiguous. *See generally* Mot. Rather, he quibbles with the identities of the exact transferees with the Binance's enterprise, which was entirely controlled by CZ. In attempts to characterize the 2021 Share Repurchase as "business divorce," and makes other arguments that are not based on the actual law or are premature at this stage.

8.   The Predatory Acts Claims against CZ are also well-supported with plain statements of facts alleged in good faith in the Complaint. *See* Compl. ¶¶ 52-77. Specifically, after CZ divested himself of his equity stake in FTX, he (and his affiliates) set out to destroy his (now) unaffiliated competitor. *Id.* ¶¶ 52-55. In November 2022, CZ and Binance intentionally and maliciously publicly launched a series of false and misleading tweets to destroy FTX, knowing that FTX's customers and creditors would suffer the consequences in the U.S. and elsewhere. *See, e.g.*, Compl. ¶¶ 56, 58, 60, 68, 70. At the same time, CZ signed the Letter of Intent to "acquire" FTX even though he had no intention of performing, thereby preventing FTX from receiving third-party rescue funding during its time of crisis. *Id.* ¶ 67. CZ's false tweets and the Letter of Intent triggered the proverbial run on the bank that CZ knew or should have known would cause FTX to collapse. *Id.* ¶ 73. Collectively and individually, these false public statements destroyed value that otherwise would have been recoverable by FTX's stakeholders. *Id.* ¶¶ 62-63. All of this is in the Complaint in plain English, and CZ does not contend that any of these allegations are unclear or ambiguous. *See generally* Mot. Instead, he contends (incorrectly) that the well-pled facts fail to state a cognizable claim under any law. Mot. at 8-29. Even more brazen, CZ attempts to

4

analogize his malicious conduct against his competitor for his direct benefit[8] with that of a "whistleblower." *Id.* But, as alleged, CZ's conduct was malicious and calculated solely to inflict maximum harm on his competitor for his own personal benefit. Compl. ¶ 7. Plaintiffs have adequately pled claims based on CZ's false statements under Delaware law, and these claims too should proceed to discovery.

9.      The Motion is predicated on a panoply of flawed arguments as to why the facts, even if true, do not support a valid claim for relief against him in this Court.  Those arguments are addressed in turn below.

<u>**ARGUMENT**</u>

I.      **PLAINTIFFS PROPERLY SERVED CZ AND HE WAIVED ALL SERVICE DEFENSES.**

10.      CZ's first misguided attempt to evade this Court's jurisdiction is his argument that service of process was "improper and ineffective." Mot. at 1-3.  As an initial matter, CZ waived service of process defenses in the Scheduling Stipulation, which this Court entered. Scheduling Stip. ("In view of the service discussed in Section 2 above, [CZ] waives the defense of sufficiency of service of process.").  In the Scheduling Stipulation, CZ also "waived service through the means articulated in the Service Plan and accepted service through its counsel in this Adversary Proceeding." *Id.*  This waiver is dispositive.

11.      Independently, CZ's attempts to relitigate whether "service on lawyers of a foreign person" satisfies rule 4(f)(3) of the Federal Rules of Civil Procedure (the "**Federal Rules**") should

---

[8]    CZ is reportedly worth an estimated $70 billion and is now the richest person in the cryptocurrency industry. Kenneth P. Vogel & David Yaffe-Bellany, *Flattery, Lobbyists, and a Business Deal: Crypto's Richest Man Campaigns for a Pardon*, N.Y. TIMES (Aug. 9, 2025), https://www.nytimes.com/2025/08/09/us/politics/changpeng-zhao-pardon-trump.html.

be disregarded.[9] *See* Mot. at 2.[10] This Court specifically allowed service through CZ's U.S. counsel [Adv. D.I. 79] after thorough briefing on this specific issue, during which Plaintiffs showed that "alternate service on a foreign defendant through its U.S. counsel is permitted under Rule 4(f)(3)." Reply at ¶ 16. Therefore, Plaintiffs properly served CZ.

## II. THIS COURT HAS PERSONAL JURISDICTION OVER CZ.

12. CZ's argument that this Court cannot properly exercise personal jurisdiction over him should be rejected. Mot. at 3-7. This Court has specific personal jurisdiction over CZ because he has purposefully availed himself of the U.S. such that he "should reasonably anticipate being haled into court []here." *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

### A. Relevant Standards. [11]

13. *First*, CZ misstates the standard regarding the parties' respective burdens in connection with personal jurisdiction, arguing that the Complaint must be dismissed because of Plaintiffs' purported failure to allege facts in the Complaint that would establish personal jurisdiction. *See* Mot. at 3-4. But Federal Rule 8 "does not require a plaintiff to set forth in the

---

[9] CZ's argument attempts to set aside this Court's alternative service order. Mot. at 1-3. Any request for relief from that order requires a motion and a showing that at least one of six enumerated reasons apply. *See* Fed. R. Civ. P. 60; Fed. R. Bankr. P. 9024. For the avoidance of doubt, none of the six justifications to set aside an order apply here.

[10] Plaintiffs' successful arguments regarding alternate service are set forth in the *Memorandum in Support of Plaintiffs' Ex Parte Motion to (A) Serve the Individual Defendants by Alternative Means and (B) Set a Scheduling Conference with All Defendant* [Adv. D.I. 16, 20], and the *Plaintiffs' Omnibus Reply in Support of Plaintiffs' Ex Parte Motion To (A) Serve the Individual Defendants by Alternative Means and (B) Set A Scheduling Conference With All Defendants* [Adv. D.I. 52] (the "**Reply**").

[11] Plaintiffs incorporate by reference their *own* arguments asserted in the *Plaintiffs' Omnibus Memorandum of Law in Opposition of the Binance Defendants' Motion to Dismiss the Complaint* [Adv. D.I. 106] (the "**First Opposition**") and the *Plaintiffs' Omnibus Memorandum of Law in Opposition of the Binance Defendants' Motion to Dismiss the Complaint* [Adv. D.I. 114] (the "**Second Opposition**"), as applicable herein. Plaintiffs have fully set forth the relevant standards applicable for personal jurisdiction in the First Opposition. First Opp. Sec. I.A.

complaint 'the grounds upon which the court has personal jurisdiction over the defendant.'" *Gurmessa v. Genocide Prevention in Ethiopia, Inc.*, 2022 WL 608924, at *1 (D. Del. Feb. 23, 2022) (citation omitted); *see also Alameda Rsch. Ltd. v. Platform Life Scis. Inc.*, 2023 WL 8814216, at *1 (Bankr. D. Del. Dec. 20, 2023) ("Rule 8 does not require a plaintiff to set forth in the complaint the grounds upon which the court has personal jurisdiction over the defendant . . .") (internal quotations and citations omitted). Plaintiff only has the burden of proof "[o]nce the defense has been raised," such that the Court's determination of a motion to dismiss for lack of personal jurisdiction "inherently . . . requires [the] resolution of factual issues outside the pleadings." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 101 n.6 (3d Cir. 2004) (citations omitted). A plaintiff can satisfy this burden by establishing jurisdictional facts through affidavits or other competent evidence showing with reasonable particularity the sufficient minimum contacts between the forum and the defendant. *See Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330–31 (3d Cir. 2009) (holding plaintiffs submitted affidavits and documentary evidence to support personal jurisdiction). Even then, Plaintiffs need only make a *prima facie* showing that personal jurisdiction exists at the motion to dismiss stage. *Finjan LLC v. Trustwave Holdings, Inc.*, 2021 WL 5051147, at *4 (D. Del. Oct. 29, 2021).[12] Moreover, "[i]t is well established that in deciding a motion to dismiss for lack of [personal] jurisdiction" under Federal Rule 12(b)(2), a "court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003) (citing *Pinker v. Roche Holdings, Inc.*, 292 F.3d 361, 368 (3d Cir. 2002)).

---

[12]   CZ did not submit an affidavit to rebut any of the personal jurisdiction allegations in the Complaint. As such, this Court is required accept all of Plaintiffs' allegations as true. *Quantum Loyalty Sys., Inc. v. TPG Rewards, Inc.*, 2009 WL 5184350, at *2 (D. Del. Dec. 23, 2009) ("[A] defendant must provide an affidavit contradicting the jurisdictional allegations made by the plaintiff[,]" as absent submission "the court must accept the plaintiff's pleadings as true, regardless of what the plaintiff submits in support.").

7

14.     Here, even though they were not obligated to do so, Plaintiffs have alleged sufficient facts in the Complaint to establish specific personal jurisdiction over CZ.  *See generally* Compl.  In any event, as supported by the additional facts set forth in the Chase Declarations (and as set forth in more detail below),[13] Plaintiffs easily satisfy their burden to make a *prima facie* showing of personal jurisdiction over CZ.

15.     ***Second***, CZ also misreads the applicability of a recent Supreme Court case, *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), to this Court's personal jurisdiction analysis.  *See* Mot. at 3-7.  CZ makes the novel argument that, after *Fuld*, a court's exercise of personal jurisdiction based on Rule 7004(f) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") (or its equivalent, Federal Rule 4(k)(2)) is inherently unconstitutional.  *Id. Fuld*, however, provides no support whatsoever for this argument, which would overturn decades of precedent applying those statutes to find personal jurisdiction.  Indeed, *Fuld* only discussed the constitutionality of a conferral of personal jurisdiction under a specific anti-terrorism statute—an issue distinct from that presented by this Adversary Proceeding.[14]  As courts have repeatedly held, Bankruptcy Rule 7004(f), a federal long-arm statute, provides a basis for personal jurisdiction, under which personal jurisdiction must comport with the Fifth Amendment.[15]  *See* Fed. R. Bankr.

---

[13]   "**Chase Declarations**" collectively refers to the *Declaration of Ashley Rona Chase in Support of Omnibus Memorandum of Law in Opposition of Binance Defendants' Motions to Dismiss Complaint* [Adv. D.I. 107-08] ("**First Chase Declaration**"), which Plaintiffs refer to and incorporate fully herein; *Declaration of Ashley Rona Chase in Support of Omnibus Memorandum of Law in Opposition of Management Defendants' Motions to Dismiss Complaint*, [Adv. D.I. 115] ("**Second Chase Declaration**"), which Plaintiffs refer to and incorporate fully herein; and *Declaration of Ashley Rona Chase in Support of Plaintiff's Memorandum of Law in Opposition to Changpeng Zhao's Motion to Dismiss the Complaint* (the "**Third Chase Declaration**"), filed contemporaneously herewith and incorporated by reference.

[14]   In *Fuld*, the Supreme Court held that the personal jurisdiction provision of the Promoting Security and Justice for Victims of Terrorism Act does not violate the Fifth Amendment's Due Process Clause because the statute appropriately links the assertion of personal jurisdiction to conduct involving the U.S. and to foreign policy concerns. *Fuld*, 606 U.S. at 18–19.

[15]   CZ attempts to apply *Fuld*'s analysis for statutory conferral of personal jurisdiction to Bankruptcy Rule 7004, Mot. at 5-6, but Bankruptcy Rule 7004 is not a federal statute that authorizes jurisdiction based on "specific and

8

P. 7004(f); *In re Uni-Marts, LLC*, 399 B.R. 400, 406 (Bankr. D. Del. 2009); *Fisker Auto Holdings, Inc. S'holder Litig.*, 2015 WL 6039690, at *21 (D. Del. Oct. 15, 2015) (explaining that "a court must examine the relationship among the defendants, the forum, and the litigation . . . [to] satisfy the requirements of the Due Process Clause of the Fifth Amendment") (internal quotations and citations omitted); *In re Tandycrafts, Inc. v. Salci*, 317 B.R. 287, 289 (Bankr. D. Del. 2004) ("Where service is made under Rule 7004(d), the defendant 'need only have minimum contacts with the United States to satisfy Fifth Amendment due process.'") (citation omitted).   In their Fifth Amendment due process analysis, courts in the Third Circuit have applied the same "minimum contacts" test applicable under the Fourteenth Amendment, except that such minimum contacts must be with the U.S. as a whole, rather than any particular state. *Tandycrafts*, 317 B.R. at 289 (collecting cases).

16.     In *Fuld*, the Supreme Court held that the Fifth Amendment does not impose the same jurisdictional limitations as the Fourteenth Amendment, but declined "to delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U. S. courts" and stated that "the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *See Fuld*, 606 U.S. at 16–18.  Thus, if anything, the Supreme Court suggested a more flexible personal jurisdiction standard under the Fifth Amendment than the Fourteenth Amendment's minimum contacts test. *Id*. at 18; *see also  Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 2025 WL 2613530, at *11 (S.D.N.Y. Sep. 10, 2025) (agreeing that Fuld has "broadened  the due-process inquiry" and that "the Due Process Clause of

---

narrow conduct that directly implicates" defendants' "relationships with the United States." *Fuld*, 606 U.S. at 17.

9

the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority") (internal quotations omitted).

17.    What *Fuld* does *not* say is anything that would support CZ's argument that Bankruptcy Rule 7004(f) is somehow no longer a valid jurisdictional statute after *Fuld.* CZ's primary argument seems to be that Bankruptcy Rule 7004(f) is a procedural rule that cannot modify substantive rights. *See* CZ Mot. at 6.  But CZ does not cite any case holding that Bankruptcy Rule 7004(f) (or its equivalent, Federal Rule 4(k)(2)) impermissibly modifies substantive rights, and, more importantly, it is unclear what this argument has to do with *Fuld*, which does not mention either rule.  *See id.* CZ also argues that, under *Fuld*, Bankruptcy Rule 7004(f) is not "suitably limited" to the federal interest furthered by the jurisdictional statute. CZ Mot. at 7. But Zhao ignores that *Fuld* applied this "suitably limited" test to ensure that that the jurisdictional provision of the anti-terrorism statute at issue in that case did not transgress the Constitution's limits on personal jurisdiction. *Fuld*, 606 U.S. at 18-19.  Here, Bankruptcy Rule 7004(f) *by definition* does not transgress such constitutional limits, as it provides that valid service of a summons (or waiver of such service) establishes personal jurisdiction as long as it is "consistent with the United States Constitution and its laws."  Fed. Bank. R. P. 7004(f).  Zhao likewise ignores that the Supreme Court's weighing of the respective interests of the parties in *Fuld* is already built into the minimum contacts test discussed below, which, again, is *more* restrictive than the Fifth Amendment test applicable here.  *See Fuld*, 606 U.S. at 16-18.

18.    Indeed, so long as the defendant has minimum contacts with the U.S. as a whole, *Fuld* does not limit the scope of personal jurisdiction in cases where the Fifth Amendment applies. *See Pinker*, 292 F.3d at 369.  In fact, bankruptcy courts post-*Fuld* continue to apply the "minimum contact" standard as "any defendants that have sufficient minimum contacts with the forum *would*

10

*also satisfy* the more flexible personal jurisdictional standards set forth in *Fuld*." *In re Fairfield Sentry Ltd.*, 671 B.R. 404, 418 (Bankr. S.D.N.Y. 2025) (applying the traditional test and explaining that unlike "the effect of the Supreme Court's ruling in *Fuld* in cases that do not involve a specific statutory conferral of personal jurisdiction will be developed over time"); *see also In re Rosetta Genomics, Inc.*, 2025 WL 1942378, at *7-8 (Bankr. D. Del. July 14, 2025) (holding the Court had personal jurisdiction over the defendants after applying the traditional test).[16]  This traditional test compels a three-step inquiry to determine whether the plaintiff has established that: (1) the defendant has "minimum contacts with the forum such that it purposefully availed itself of the privilege of conducting activities within the forum and invoked the benefits and protections of the forum's laws"; (2) plaintiff's claims "arise out of or relate to at least some of those contacts"; and (3) "the exercise of jurisdiction over the defendant . . . comport[s] with traditional notions of fair play and substantial justice such that the defendant should reasonably anticipate being haled into court in that forum." *Hasson* v. *FullStory, Inc.*, 114 F.4th 181, 186 (3rd Cir. 2024).

**B.      The Traditional Test Is Satisfied Here.**

**1.      CZ's Purposeful Activity in the U.S. Easily Establishes the Requisite Minimum Contacts.**

19.      At the outset, CZ's protests to this Court that he has no ties to the U.S. fundamentally mischaracterize the reality of his activities in the U.S. during the relevant period based on his own words in separate on-the-record sworn statements to other U.S. courts.  *See generally* CZ Plea Agreement; *see also* CFTC Consent Ord. These unequivocal admissions establish that: (1) CZ, as the CEO and owner, had ultimate control over the Binance enterprise and

---

[16]      Even if, *arguendo*, the minimum contacts test does not apply, *Fuld* suggests a more flexible approach, which would certainly be satisfied here.

was responsible for all major strategic, business, and management decisions; (2) under CZ's control, the Binance enterprise had vast connections with the U.S., whose citizens conducted *trillions* of dollars in transactions on the Binance platform; and (3) CZ was aware of Binance's substantial U.S. customer base and deliberately prioritized Binance's growth over compliance with U.S. law. *See generally* CFTC Consent Ord.; CZ Plea Agreement.[17]  This Court should reject CZ's attempt to rewrite history. *See* Mot. at 3-5.

20.    In the CFTC Consent Order,[18] CZ consented to the entry of, and did not deny, findings of facts stating that "[CZ] has directly or indirectly owned and controlled dozens of corporate entities . . . that operate the Binance platform as a common enterprise . . . . At times, at least certain of those entities, including [the three BHL defendants] have commingled funds, relied on shared technical infrastructure, and engaged in activities to collectively advertise and promote the Binance brand."  CFTC Consent Ord. ¶ 23; *see also* Compl. ¶ 24.  The CFTC Consent Order further states that "Binance's reliance on a maze of corporate entities to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and location of the Binance platform" and that "[a]s founder and CEO of Binance, [CZ was] responsible for all major strategic decisions, business development, and management of the Binance enterprise." *See* CFTC Consent

---

[17]    As noted, *supra* ¶ 13, this Court can look outside the pleadings to determine the bona fides of CZ's jurisdictional defenses. This Court can, in any event, take judicial notice of court filings like those discussed herein.  Rule 201 of the Federal Rules of Evidence (the "**Federal Evidence Rules**") authorizes a court to "judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned ... at any stage in the proceeding," including on a motion to dismiss.  Fed. R. Evid. 201; *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 294 n.3 (S.D.N.Y. 2019) (noting that in ruling on a motion to dismiss, "[t]he Court may take judicial notice of the CFTC Order, DOJ plea agreement[,] and similar public documents such as consent orders" and it may consider these documents in deciding a Rule 12(b)(2) motion); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (stating that in evaluating a motion to dismiss, the Court may consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" (citations omitted).

[18]    *Consent Ord. for Permanent Injunction*, *CFTC v. Zhao*, Case No. 1:23-cv-cv-01887, [D.I. 80] (N.D. Ill. Dec. 14, 2023) (the "**CFTC Consent Order**"), attached as Exhibit 17 to the First Chase Declaration.

12

Ord. ¶¶ 24-25; *see also* Compl. ¶ 25.  Binance, in turn, admitted that it "operated a cryptocurrency exchange [Binance.com] wholly or in substantial part in the United States" on which U.S. customers conducted "trillions of dollars in transactions" during the time period relevant to this Complaint.  Binance Plea Agreement, Ex. A ¶¶ 1, 4, 48.  CZ also admitted that he was "aware that a meaningful percentage of Binance's billions of dollars in revenue was derived from digital asset derivative transactions entered into by U.S. customers."  CFTC Consent Ord. ¶ 31.  Given these admissions, Plaintiffs have plausibly established that CZ controlled and operated the Binance platform, which substantially operated in, and profited from, the U.S. market.  *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138-39 (2d Cir. 2010) (holding that the Court had personal jurisdiction over the defendant because "[t]he factual allegations in [plaintiff's] complaint, supported by declarations and deposition testimony, constituted a specific averment of facts that, if credited, would suffice to show that all of the [defendant]—owned entities operate as a single economic unit and that [defendant] dominates and controls the [defendant] entities."); *In re UD Dissolution Corp.*, 629 B.R. 11, 27-28 (Bankr. D. Del. 2021) (finding personal jurisdiction proper over two defendants when the complaint made allegations against them as a group because "each took actions as Directors of [the Company]…that were directed [towards an entity] in the United States with knowledge that the brunt of the injury would be felt in the United States").

21.     Indeed, the CZ Plea Agreement and the Binance Plea Agreement establish CZ's and his Binance enterprise's sweeping connections to the U.S., as well as his elaborate efforts to conceal those connections. *See generally* Washington State Plea Agreement.  CZ admitted, among other things, that:

a)     "Binance was a foreign-located [money services business] that did business in the United States, including by providing services to a substantial number of U.S. customers."  CZ Plea Agreement, ¶ 9.b.

13

b) "[CZ] founded Binance in June 2017, and as its chief executive officer, exercised day-to-day control over its operations." *Id.* at 9.d.

c) "According to Binance's own transaction data, U.S. users conducted trillions of dollars in transactions on the platform between August 2017 and October 2022—transactions that generated approximately $1,612,031,763 in profit for Binance." Binance Plea Agreement, ¶ 48.

d) "[CZ] prioritized Binance's growth and profits over compliance with U.S. law, telling Binance employees that it was 'better to ask for forgiveness than permission' . . . [CZ] knew that U.S. users were essential for Binance to grow, were a significant source of revenue, and had a substantial network effect." CZ Plea Agreement, at 9.f.

e) Binance's chief compliance officer warned CZ "that there were users from sanctioned countries on Binance's exchange and about the U.S. legal risks associated with transactions involved such customers." *Id.* at 9.k.

f) Under CZ's direction and because of his decision to prioritize growth over compliance with U.S. law, Binance allowed U.S. customers to use the Binance exchange without providing the legally required information, and "profited significantly from its violations of law." *Id.* at 9.m-p.

These admissions demonstrate CZ's minimum contacts with this forum because, at CZ's direction and knowledge, Binance operated a *multi-trillion-dollar* cryptocurrency platform *in the U.S.  See generally* CZ Plea Agreement; Binance Plea Agreement; *see also* Consent Ord. ¶ 30.

### 2. The Claims Arise out of or Relate to CZ's Contacts with the U.S.

22.    Plaintiffs also satisfy the relation prong of the traditional test because both sets of claims "arise out of or relate to at least some" of CZ's vast U.S. contacts. *See Hasson*, 114 F.4th at 186, 193 ("The degree of relatedness required in a given case is inversely proportional to the overall intensity of the defendant's forum contacts.'") (quoting *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 320 (3d Cir. 2007)); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (courts need only find "an affiliation between the forum and the underlying controversy") (internal citations omitted).[19]

---

[19]    *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359–60 (2021) (citation modified) (explaining that the contracts must "show that the defendant deliberately reached out beyond its home – by, for

14

23.     At its heart, the Complaint alleges that CZ, and the company he controlled, (1) invested in his company's competitor, FTX, and its new U.S. exchange platform; (2) cashed out of that investment when FTX was insolvent; and (3) deliberately engaged in conduct to bring about the destruction of FTX, Binance's then-largest competitor, for Binance's (and ultimately CZ's) benefit and growth. *See generally* Compl.  There is also no question that CZ benefited from U.S. laws – included through the CZ Plea Agreement itself – enough "to make the burden of facing litigation there proportional to those benefits." *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 130 (3d Cir. 2020).  At all relevant times, as set forth above, CZ and his enterprise were reliant on U.S. customers to fuel the growth of the Binance enterprise, both in the U.S. and abroad. *See generally* Compl.  As CZ commented, "[i]f we blocked US users from day 1, Binance will be not [sic] as big as we are today. We would also not have had any US revenue we had for the last 2 years. And further, we would not have had additional revenue resulted from the network effect . . . better to ask for forgiveness than permission. . . ." Binance Plea Agreement, Attach. A ¶ 31 (internal quotations omitted).  In short, CZ knew that the U.S. market—and particularly his ability to attract U.S. based "VIP users"—were critical to the success of his Binance enterprise. *See id.* ¶ 18.  At the same time, CZ was aware that FTX was also heavily connected to the U.S. market and also had a substantial U.S. customer base.  For example, in the immediate aftermath of certain of the Tweets giving rise to the Predatory Acts Claims, CZ and SBF had an exchange of direct messages. *See* First Chase Decl. Ex. 11 (showing a screenshot of messages between SBF and CZ on November 7, 2022).  In that exchange, CZ criticized SBF for an earlier Tweet in which SBF questioned CZ's ability to travel to Washington D.C. because he

example, exploit[ting] a market in the forum State or entering a contractual relationship there.").

15

might face potential regulatory or criminal liability in the U.S. Addressing that Tweet, CZ messaged SBF: "[W]hy would I want to visit DC? Unlike FTX, Binance.US is a separate entity." *Id.* That is, CZ claimed (falsely, as is now known from, *inter alia*, the Binance Plea Agreement) that Binance had actually segregated its U.S. based activity into Binance.US, which purported to comply with U.S. regulations, as distinct from its main platform Binance.com. Binance Plea Agreement, Attach. A ¶¶ 31-32. This was, according to CZ, "[u]nlike FTX." *See* First Chase Decl. Ex. 11. In other words, CZ was well aware that *FTX Trading,* the theoretically non-U.S. entity whose shares were sold in the 2021 Share Repurchase, was in fact substantially engaged in the U.S. market, attracting and servicing U.S. customers—the very same activity that CZ had acknowledged had launched Binance enterprises' success. *See id.*; Binance Plea Agreement, Attach. A ¶ 18; CZ Plea Agreement, ¶ 9.m-p. CZ's knowledge of FTX's U.S. connections and customer base is not surprising, given that, until the 2021 Share Repurchase, Binance was a 20% shareholder and CZ, in his personal capacity, was also a shareholder of WRS—indeed, insiders— of FTX. Compl. ¶ 34. And indeed, in the aftermath of FTX's collapse, the extent of FTX's connections to the U.S. quickly became clear to the world, with U.S. based creditors constituting 25 percent of all creditors whose country of residence is known (169,183 creditors)—representing the largest amount for any individual country. *See generally* KROLL, *FTX Recovery Trust - FTX Trading Ltd.* Case No. 22-11068, https://restructuring.ra.kroll.com/ftx/Home-ClaimInfo (last visited Sept. 18, 2025).

24.     In short, CZ was aware that the company transferring $1.76 billion to Binance to repurchase its shares as part of the 2021 Share Repurchase had a massive base of U.S. customers—the same customers who would ultimately become creditors in these Chapter 11

16

Cases. *See id.* Similarly, CZ was aware that the competitor he sought to—and did—destroy with the conduct underlying the Predatory Acts Claims had a large base of U.S. customers who would be—and were—harmed by that conduct. *See* Compl. ¶ 75 ("FTX.US experienced a significant increase in gross and net withdrawals following the November 6 False Tweets."); FTX Creditor Matrix [D.I. 574]. And, given CZ's admissions regarding the importance of U.S. customers to the growth of his Binance business, it is reasonable for this Court to infer that CZ and Binance were particularly interested in harming the U.S. portion of SBF's FTX enterprise in order to absorb these critical U.S. customers. *See* Binance Plea Agreement, Attach. A ¶ 18; CZ Plea Agreement ¶ 9. As set forth in the Complaint, Binance's official blog described it as "[t]he biggest winner in 2022," having "gained nearly 20% market share." Compl. ¶ 79.

25. All of this by itself would suffice to establish the necessary "affiliation" or "close connection" between CZ's U.S. contacts and the Claims. But CZ's suit-related contacts with the U.S. go much deeper.

a. **The Fraudulent Conveyance Claims' U.S. Connections.**

26. In addition to the suit-related contacts described above, the Fraudulent Conveyance Claims against CZ arise from numerous additional contacts between CZ and the U.S. **First**, as discussed *supra*, as part of the 2021 Share Repurchase, CZ himself sold the shares of a Delaware corporation, WRS (also known as "FTX US") back to the other owners of that Delaware corporation. *See* Compl. ¶¶ 15, 38-40; *See In re BLMIS*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) (holding that foreign defendants were subject to specific jurisdiction where trustee sought to avoid and recover payments received from investments arising out of defendants' contacts with New York); *In re Zawawi*, 644 B.R. 907, 915-16 (Bankr. M.D. Fla. 2022) (denying defendants' motion to dismiss and holding that defendants' contacts with the U.S. were based on, in part, in

17

their ownership of shares in a U.S. corporation and such contacts directly related to plaintiffs' claims, which "concern the ownership and/or transfer" of the U.S company); *Sec. Inv. Prot. Corp v. Bernard L. Madoff Inv. Sec. LLC*, 647 B.R. 42, 58-59 (Bankr. S.D.N.Y. 2022) (defendant subject to jurisdiction when it took actions abroad with the intent of profiting from investments in forum); *see also In re Uni-Marts, LLC,* 404 B.R. 767, 777 (Bankr. D. Del. 2009) (holding defendant had more than merely entered into a contract with a forum resident, he had "extensive contacts with the U.S.… and remained engaged" through the contracts of the disputed transaction).   Therefore, just as in *Zawawi*, CZ's contacts with the U.S., through, among other things, his sale of a U.S. entity's shares to that entity's other shareholders, are directly related to the Fraudulent Conveyance Claims. *See Zawawi*, 644 B.R. at 915-16.   Moreover, the evidence is clear that the entire 2021 Share Repurchase would not have happened but for the agreement to include the WRS shares. Chase Decl., Ex. 4 (SBF stating, "I do think it's important to include FTX US here; that's being included in this raise, and is relevant to where the combined valuation is coming from. The raise would be meaningfully different without it, and likely at a lower valuation.").

27.     ***Second***, under CZ's control and direction, Binance insisted that $1.1 billion of the total $1.7 billion of consideration in the 2021 Share Repurchase take the form of Binance's proprietary "stablecoin," known as "**BUSD**."  *See* Compl. ¶¶ 31, 41; First Chase Decl., Ex. 6 ("Hon [Binance's General Counsel] had mentioned we would settle entirely with BUSD instead of 50% with USD and 50% with BUSD").  As a stablecoin, BUSD is pegged to the U.S. dollar. *Id.*  In order to "mint" BUSD, as CZ was well-aware, a party would have to transfer U.S. dollars to a New York Trust called "**Paxos**,"[20] which would hold the U.S. dollars in trust in U.S. banks to "back"

---

[20]   Paxos partnered with Binance in 2019. *See* Paxos, *Binance Partners with Paxos to Launch USD-Backed Stablecoin 'BUSD'* (Sept. 4, 2019), https://www.paxos.com/newsroom/binance-partners-with-paxos-to-launch-

the BUSD.[21] *See* Compl. ¶ 43. And FTX indeed did so, transferring at least $721 million to Paxos in New York and receiving the equivalent amount of BUSD, which it then transferred to Binance to complete the 2021 Share Repurchase.  Compl. ¶ 43.  Denominating the consideration in BUSD through a New York Trust (as opposed to say, U.S. dollars) benefitted Binance (and ultimately CZ as owner) by increasing the market share of BUSD, raising its, and Binance's, profile in the crypto industry and earning millions in interest from the reserves that backed the BUSD.[22]  *See* Compl. ¶ 41; Paxos Audit Report at 3.

28.     The U.S. contacts associated with the use of BUSD to consummate the 2021 Share Repurchase cannot be overstated. The minting of BUSD goes far beyond merely routing funds through a U.S. financial institution to complete a transaction—a fact which itself would weigh in favor of personal jurisdiction in the U.S. *See* Compl. ¶ 43; *Off. Comm. of Unsecured Creditors of Arcapita, Bank v. Bahrain Islamic Bank*, 549 B.R. 56, 67-71 (S.D.N.Y. 2016) (holding that the defendants' selection and use of correspondent bank accounts in New York provided a sufficient basis to assert personal jurisdiction over them); *Loc. 875 I.B.T. Pension Fund v. Pollack*, 992 F.Supp. 545, 559 (E.D.N.Y. 1998) (explaining that defendant's knowledge that the disputed funds

---

usd-backed-stablecoin-busd, attached as Ex. 1 to the First Chase Decl.; *see also* Michele Toh, *BUSD: US regulator orders Paxos to Halt New Issues of Binance-branded Stablecoin*, CNN (Feb. 14, 2023), https://www.cnn.com/2023/02/14/investing/paxos-binance-busd-halt-order-us-intl-hnk  (quoting  Binance's statements: "Binance licenses its brand to Paxos for use with BUSD, which is entirely owned by Paxos and regulated"), attached as Ex. 14 to the First Chase Decl.

[21]    *See e.g.*, Compl. ¶ 43; *see also* Paxos, *Paxos Will Halt Minting New BUSD Tokens* (Feb. 13, 2023), https://www.paxos.com/newsroom/paxos-will-halt-minting-new-busd-tokens, attached as Ex. 13 to the First Chase Decl. Paxos' independent accountant's report as of July 30, 2021—the closest in time to the 2021 Share Repurchase—indicate that Paxos held $12.2 billion in reserves to back the 12.2 billion of BUSD then in circulation. *See* Withum Audit Tax Advisory, *Paxos Trust Company, LLC Examination of Management Assertions Reserve Accounts Report –BUSD Token*, Paxos , at 3 (July 30, 2021) https://www.paxos.com/busd-transparency#busd-attestations (the "**Paxos Audit Report**"), attached as Ex. 8 to the First Chase Decl.

[22]    Leo Schwartz, *Binance Aggressively Converted Rivals' Stablecoins in a Massive Cash Grab. It Didn't Always Tell its Customers*, FORTUNE (Feb. 22, 2023), https://fortune.com/crypto/2023/02/22/binance-stablecoin-cash-grab-customers-funds/, attached as Ex. 15 to the First Chase Decl.

19

originated from the forum is one factor favoring personal jurisdiction); *U.S. Bank National Assoc. v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019) ("We have found that a claim arises out of forum contacts when defendant's allegedly culpable conduct *involves at least in part* financial transactions that touch the forum.") (emphasis added). Here, the BUSD that the Debtors needed to complete the 2021 Fraudulent Transfers, was created and issued in the U.S. and by a U.S. entity partnered with Binance to facilitate the very transfer that gives rise to the Fraudulent Conveyance Claims. *See* Toh, *supra* ¶ 27 n.20; *see also* Compl. ¶ 41.

29.   ***Third***, FTX used U.S. based counsel, including Daniel Friedberg ("**Friedberg**") and Fenwick & West LLP ("**Fenwick**"), to negotiate the 2021 Share Repurchase. *See* First Chase Decl., Exs. 4, 5. In fact, Friedberg and Fenwick were listed in the notice section of the Series A Preferred Shares Agreement and FTX Executives Share Transfer Agreements, *with their U.S. addresses listed.*[23] *Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) ("[C]ontract negotiations with forum residents can empower a court to exercise personal jurisdiction over persons outside the forum."). Similarly, Bankman-Fried and the other FTX executives purchasing WRS shares were listed as notice parties in FTX Executives Share Transfer Agreements–which CZ executed in his personal capacity–with their Berkeley, California address.[24] That FTX's professionals negotiated the 2021 Share Repurchase with CZ in the U.S. further weighs in favor of specific personal jurisdiction.[25]

30.   ***Fourth***, CZ must have known that the transfer was made not from the FTX Trading silo of the FTX enterprise, but from the Alameda silo. *See e.g.*, First Chase Decl., Ex. 5 (showing

---

[23]   *See* King Decl. Ex. 1 at 6 (listing Fenwick's Seattle office address at 1191 Second Ave, 10th floor).
[24]   King Decl., Ex. 2 at 4, Ex. 3 at 4, and Ex. 4 at 4.
[25]   The 2019 Share Transfer, which CZ executed on Binance's behalf, was also negotiated by U.S. counsel. First Chase Decl., Ex. 2.

email communications between Binance's general counsel and FTX stating that the purchaser was a subsidiary of Alameda Research LLC). Alameda Research LLC ("**Alameda**"), the parent of that silo, was a Delaware corporation. *See Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], at Ex. B; First Chase Decl., Ex. 5. And although the direct transferor was the non-US subsidiary of Alameda, Alameda Ltd., the consideration paid would ultimately deplete the assets and liquidity available to Alameda as parent. *See* Compl. ¶¶ 41, 45-47. SBF confirmed that the parties understood payment came from Alameda in his comments to a Forbes reporter shortly after the 2021 Share Repurchase that "[t]he purchase was entirely from Alameda. Yeah, it had a good last year :P" (*i.e.*, an emoji for a tongue sticking out). *See id*. ¶ 48.

### b.      The Predatory Acts Claims' U.S. Connections.

31.      Similarly, the Predatory Acts Claims "arise under or relate to" CZ's contacts with the U.S. As set forth above, at the time, CZ was aware that FTX Trading had a substantial U.S. customer base and that FTX had *not* segregated its U.S. and non-U.S. businesses between FTX Trading and FTX US. *See supra* ¶ 23. Thus, the business that CZ was attempting to destroy with his tweets was substantially a U.S. business, and the customers that CZ was attempting to attract with his tweets were substantially U.S. customers. *Id.* These facts alone establish the requisite affiliation between CZ's contacts with the U.S. and the Predatory Acts Claims. *See Activision Publ'g, Inc. v. EngineOwning UG*, 2023 WL 3272399, at *10-11 (C.D. Cal. Apr. 4, 2023) (explaining that foreign defendant purposely targeted a U.S. company and U.S. users because, among other things, 27.86% of the defendant's website traffic came from U.S. users). CZ was also aware from previous dealings that FTX negotiated its transactions from the U.S., an inference that can be drawn with regard to negotiations of the Letter of Intent. *See supra* ¶ 21; *see also* Compl.

¶ 69.  The general counsel of FTX.US, who was located in the U.S. at the time, participated in these negotiations.  Compl. ¶ 69.  Moreover, in connection with the Letter of Intent, Binance, purportedly at CZ's direction, engaged a PR company in New York and held a call with FTX and a representative of the PR company on November 8, 2022.  *See* First Chase Decl., Ex. 10.

32.    Moreover, the November 8 Tweets (regarding the underlying transaction from the Letter of Intent) were made by CZ's official "X" account (@cz_binance) and the November 9 Tweets were made by Binance's official "X" account (@binance)—accounts directed, in part, at U.S. investors.[26]  Compl. ¶¶ 68, 70; *supra* ¶¶ 22.  Although the @binance "X" account, likely under CZ's "direction and control" along with the rest of the business (CFTC Consent Ord. ¶ 26), could have carved out U.S. customers from its target audience as it does for U.K. customers, it chose not to.[27]  *See, e.g.*, *Wellness Publ'g v. Barefoot*, 128 F. App'x 266, 269-70 (3d Cir. 2005) (finding specific jurisdiction over certain defendants because those defendants had launched an infomercial that, although had a national scope, induced forum residents to call and place orders); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1125-26 (W.D. Pa. 1997) (holding that the defendant's operation of a website that had commercial contacts with the forum residents constituted purposeful business activity).  CZ's internet activity, thus, supports this Court's exercise of personal jurisdiction over them as he solicited U.S. investors through the internet, including through the tweets that give rise to the Predatory Acts Claims.  *See* Compl. ¶¶ 56-71; *Pinker*, 292 F.3d at 371-72 ("[P]ersonal jurisdiction [is] appropriate where a foreign corporation

---

[26]    For instance, this account repeated Tweeted regarding CZ's appearance in U.S. news outlets.  *See, e.g.*, Changpeng Zhao (@cz_binance), X (Mar. 4, 2022, at 1:17 ET), https://x.com/cz_binance/status/1499811164368343043 (stating that Zhao went live on Fox News); Changpeng Zhao (@cz_binance), X (July 29, 2022, at 3:41 ET), https://x.com/cz_binance/status/1553103504889225216 (sharing a news video where CZ appeared as a guest on CNBC).

[27]    *See* X, (@binance), x.com/binance?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor (accessed on Jul 30, 2025) ("Posts are not directed towards UK users.").

22

has directly solicited investment from the American market" even if the complaint does not "allege that the fraudulent [statements] were specifically directed to American investors").

3.    **CZ Has Sufficient Minimum Contacts with the U.S. Such That Exercising Personal Jurisdiction Over Him Will Not Offend Due Process.**

33.    "The existence of minimum contacts makes jurisdiction presumptively constitutional," *O'Connor*, 496 F.3d at 324, at which point the heavy burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992) (citation omitted).  CZ's only attempt to establish the third prong of the traditional test—*i.e.*, that this Court exercising jurisdiction will not be fundamentally fair—lies in his allegation that there would be no "fairness" because CZ "has no ties and would suffer practical hardship."  Mot. at 7.  CZ, however, has more than the requisite minimum contacts with the U.S. such that exercising jurisdiction over them will not offend due process and CZ has failed to satisfy his burden in showing otherwise.  *O'Connor*, 496 F.3d at 324.  All five factors[28] that Courts evaluate for the third prong weigh in Plaintiffs' favor, as follows:

a)    **Burden on Defendant of Litigation in the U.S.**  CZ will not be burdened by litigating in the U.S. so as to "rise to a level of constitutional concern."  *See In re DBSI, Inc.*, 467 B.R. 309, 315 (Bankr. D. Del. 2012) (quotations omitted). Courts have only found this burden to weigh in favor of a defendant in "highly unusual cases," especially "in this age of instant communication and transportation, [where] the burden of litigating in a distant forum have lessened. *Id.* (citations and internal quotations omitted). This Court's exercise of jurisdiction over CZ—with him having already entered into the CFTC Consent Order and CZ Plea Agreement— would not make it "so gravely difficult and inconvenient that [Defendant] [is] at a severe disadvantage in comparison to [Plaintiffs]." *Id.* CZ has also retained U.S. counsel and Plaintiffs is willing to accommodate him through remote discovery and litigation, as appropriate. *See* [Adv. D.I. 22]; *TriStrata Tech., Inc. v. Emulgen Lab'ys, Inc.*, 537 F. Supp. 2d 635, 642 (D. Del. 2008) (holding that litigating in

_____

[28] *See Carteret*, 954 F.2d at 150; *Burger King Corp. v. Rudzewicz*, 471 U.S. 477.

23

Delaware would not substantially burden defendant based on among other things, retention of counsel) (quotation omitted).

b)   **The Interest of the U.S. in Adjudicating the Dispute**. The U.S. has a strong interest in applying its laws, including overseeing the Fraudulent Conveyance Claims arising under the U.S. Bankruptcy Code or U.S. state law, especially in a high-profile case, such as this, in which U.S. based FTX customers and creditors have suffered extensive losses. *See*, *e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010); Compl. Counts I-IX. This Court also has a strong interest in allowing the litigation to continue in this forum as "[t]he federal bankruptcy system was designed to provide 'one forum for adjudicating almost all disputes arising in or out of a particular case.'" *In re Capmark Fin. Grp. Inc.*, 479 B.R. 330, 341 (Bankr. D. Del. 2012) (citation omitted).

c)   **Plaintiff's Interest in Obtaining Convenient and Effective Relief.** As discussed herein, CZ has engaged in substantial business activities throughout the U.S. *See*, *supra*, ¶¶ 23-24. The substantial core of the activities at issue in the Complaint indisputably involve actions taken at the U.S. or involve the assets of the Reorganized Debtors. *See generally* Compl. It is also in Plaintiff FTX Recovery Trust's interest and "in furtherance of its duty to act for the benefit of creditors, to avoid wasting resources associated with litigating in multiple forums." *Capmark*, 479 B.R. at 341 (holding that litigation in another forum would waste estate resources and needlessly require a foreign court to be educated on U.S. fraudulent conveyance law). Requiring CZ to litigate in this Court is the most efficient and convenient way to resolve the action; in fact, litigating these same issues in foreign courts would needlessly waste the Reorganized Debtors' and their creditors' resources.[29]

d)   **National Interest in Furthering the Policies of the Laws.**[30] It is clear that "the most efficient resolution of the controversy would be in the United States," which is the location of Plaintiffs' "inextricably-related" bankruptcy, where this case has been pending for years and this Court is well-acquainted with the parties and issues.[31] *In re Bernard L. Madoff Inv. Sec. LLC*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009) (citation omitted). Moreover, CZ "purposefully avail[ed] [himself] of the

---

[29]   *See Tristrata Tech., Inc.*, 537 F. Supp. 2d at 642 ("[T]he judicial system's interest in the efficient resolution of [Plaintiff's] claims against [Defendant] and its co-defendants in a single action before this Court beg the Court's conclusion that the assertion of personal jurisdiction over [Defendant] will comport with fair play and substantial justice"); *In re DBSI, Inc.*, 451 B.R. 373, 378 (Bankr. D. Del. 2011) (finding that, even if litigating in the forum would impose a burden on the foreign defendant, it would avoid the expense of "duplicative litigation [that] would be borne by the creditors for whose benefit the fraudulent transfers actions are meant to serve").

[30]   "In the federal court context, the inquiry will be slightly different, taking less account of federalism concerns [factors (iv) and (v)], and focusing more on the national interest in furthering the policies of the law(s) under which the plaintiff is suing." *Pinker,* 292 F.3d at 370-71 (finding personal jurisdiction over a Swiss corporation when the corporation sponsored a U.S. financial instrument that was traded by American investors).

[31]   Although Honorable Judge John T. Dorsey presided over the bankruptcy cases, this Court continues to have jurisdiction and has overseen all of the adversary proceedings.

24

American securities market" and the Fraudulent Conveyance Claims arise under the U.S. Bankruptcy Code. *See Pinker*, 292 F.3d at 372-73.

34.     In short, CZ has not shown that *any* of the relevant factors are satisfied, and thus, he has failed to rebut the presumption that the exercise of personal jurisdiction would comport with traditional notions of fair play and substantial justice.

### C.     The Effects Test is Also Satisfied.

35.     While Plaintiffs' satisfaction of the "traditional test" is sufficient to establish specific personal jurisdiction, Plaintiffs also independently satisfy the alternative "effects test" for the Predatory Acts Claims, which allege intentional torts by CZ (and if applicable, the Fraudulent Conveyance Claims). *Calder v. Jones*, 465 U.S. 783, 789, 791 (1984).[32]   *First*, the Complaint alleges that CZ committed intentional torts (*e.g.*, injurious falsehood, fraud, and intentional misrepresentation) by making the Binance False Statements.[33]  *See* Compl. ¶¶ 129-40.

36.     *Second*, CZ "expressly aimed" his wrongful conduct at the U.S., where he knew FTX had a significant presence, and where he knew his tweets would cause damage.  *See supra* ¶ 24; *see also In re Uni-Marts, LLC,* 404 B.R. at 777 (finding that even if the defendant was directing his tortious activity from outside the U.S., he directed it at the plaintiff inside the U.S., and hence was subject to personal jurisdiction).  As set forth above, CZ knew how much his actions affected FTX in the U.S.  Moreover, as further discussed, *supra*, CZ "expressly aimed" his conduct at the U.S. when he bought shares of a U.S. company and intended consideration for the 2021 Share Repurchase to be "minted" from a New York Trust. *See supra* ¶ 27.

---

[32]     Under the "effects test," a court may exercise jurisdiction over a non-resident defendant when: (1) "the defendant committed an intentional tort"; (2) "the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort"; and (3) "the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *Miller Yacht Sales*, 384 F.3d at 108 n.10 (citations omitted).

[33]     The Complaint also alleges Fraudulent Conveyance Claims against CZ. *See* Compl. ¶¶ 105-128.

25

37.     *Third*, Plaintiffs "felt the brunt of the harm" of CZ's intentional torts in the U.S. The Binance False Statements led to the "run on the bank" on FTX, which caused a significant increase in gross and net withdrawals in FTX.com and FTX.US.  *See* Compl. ¶¶ 75-76.[34]  As discussed above, FTX had a large number of U.S. customers and other creditors that relied on and/or were affected by the Binance False Statements.  *See* FTX Creditor Matrix [D.I. 574] (showing U.S. creditors located across the U.S. in various states).[35]   Moreover, FTX.US "experienced a significant increase in gross and net withdrawals following the November 6 False Tweets."  Compl. ¶ 75.  FTX was also not able to seek third-party rescue funding and ultimately filed for bankruptcy in this Court.  *Id*. ¶¶ 74, 77.  CZ's actions, including the tweets encompassing the Binance False Statements, were intended to harm FTX by targeting U.S. cryptocurrency users and investors, causing harm to those users in the U.S.  *Id*. ¶ 74.

**D.     If this Court Finds That Plaintiffs Have Not Made a Prima Facie Showing of Personal Jurisdiction, Plaintiffs Are Entitled to Jurisdictional Discovery.**

38.     As set forth more fully in the First Opposition, if this Court finds that Plaintiffs have not met their burden of establishing a *prima facie* showing of jurisdiction over CZ, this Court should permit Plaintiffs to take jurisdictional discovery. *See* First Opp. Sec. I.D.

**III.     PLAINTIFF FTX RECOVERY TRUST ADEQUATELY PLEADS THE FRAUDULENT CONVEYANCE CLAIMS AGAINST CZ.**

39.     CZ next contends that the Fraudulent Conveyance Claims should be dismissed for failure to state a claim based on a plethora of unfounded assertions, including that Plaintiff FTX

---

[34]   Customer net withdrawals went from averaging $18 million per hour over the period from October 31, 2022 to November 6, 2022 (prior to the November 6 False Tweets) to around $150 million per hour from November 6, 2022 to November 7, 2022 (after the November 6 False Tweets).  Compl. ¶ 59.

[35]   *See also In re GBG USA Inc*., 666 B.R. 115, 136-38 (Bankr. S.D.N.Y. 2024) (holding that defendants' knowledge that their actions would be to the detriment of U.S. creditors was a factor supporting an exercise of personal jurisdiction).

26

Recovery Trust has not adequately alleged: (1) a basis to bring a claim under Delaware law; (2) that CZ was a transferee; (3) that Debtors did not receive reasonable equivalent value and were insolvent in July 2021; and (4) fraudulent intent. *See* Mot. at 10-17. He is wrong on all grounds.[36]

A. **Delaware Law Applies to the State Law Fraudulent Conveyance Claims (Counts II and IV).**

40. CZ argues that Delaware law does not apply to Counts II and IV because the 2021 Share Repurchase was a "foreign transaction involving foreign persons." Mot. at 11-12. As an initial matter, CZ's argument is premised on at least two clear factual errors. *First*, CZ asserts that "the principal share purchase between FTX and Binance occurred in 2019, before FTX determined to open a United States-based exchange platform in 2020". Mot. at 11 (internal quotation omitted). CZ ignores that Counts II and IV are based on a share repurchase in 2021, well *after* FTX opened its U.S. exchange and, indeed, involved CZ selling his shares in WRS, a Delaware corporation commonly known as "FTX US." *See* Compl. ¶¶ 16, 38. *Second*, CZ asserts that the 2021 Fraudulent Transfers were made "using the Binance.com exchange, which is not based in the United States." Mot. at 12 (internal citations omitted). CZ ignores that, as set forth above, Binance admitted in connection with its criminal proceedings the Binance.com exchange was substantially operated in the U.S. *See supra*, ¶ 20.

41. Thus, the 2021 Share Repurchase generally, and CZ's own sale of WRS shares specifically, had a substantial relationship with the U.S. The only question is which state law constitutes the "applicable law" under section 544(b) of the Bankruptcy Code. Under the "most significant relationship" test, Delaware courts consider four factors: (1) the place where the injury

---

[36] The threshold for establishing failure to state a claim under Federal Rule 12(b)(6) is set forth in the First Opposition. *See* First Opp. Sec. IV.

27

occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where any relationship between the parties is centered. *Pennsylvania. Emp. Benefit Tr. Fund v. Zeneca, Inc.*, 710 F.Supp.2d 458, 467–68 (D. Del. 2010). These factors are to be "evaluated according to their relative importance with respect to the particular issue." *Id.* at 468. Here, the factors weigh heavily in favor of applying Delaware's Uniform Fraudulent Transfer Act ("**UFTA**") to Counts II and IV. In *Physiotherapy Holdings,* the Court determined that the following facts all favored applying Delaware law under the most significant relationship test: (1) the assets sold were of a Delaware corporation; (2) many of the debtors were Delaware corporations; (3) the debtors' bankruptcy was filed in Delaware; and (4) the plaintiff litigation trust was formed in Delaware. *In re Physiotherapy Holdings, Inc.*, 2017 WL 5163515, at *3 (Bankr. D. Del. Nov. 6, 2017). *Every single one* of those facts is present here. *First*, the 2021 Share Repurchase involved the sale of shares of WRS, a Delaware corporation, and those were the shares that CZ personally sold. Compl. ¶¶ 15, 38. *Second*, in addition to WRS, many other Debtors were incorporated in Delaware, including Alameda LLC, the parent entity of the Alameda silo from which relevant transfers originated. *See Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92]; *see also* Compl. ¶¶14, 45. *Third*, the Debtors' bankruptcy was filed in Delaware. *See generally* FTX Recovery Trust, Case No. 22-11068. Fourth, Plaintiff FTX Recovery Trust was formed in Delaware. *Id.*

42.     In addition, the injuries are related to Delaware through, *i.e.*, FTX's bankruptcy and the Alameda silo's depletion of funds through the fraudulent conveyance. *See* Compl. ¶¶4 3, 77. And while CZ argues that the location of the "injury" is the Bahamas because FTX DM "is deemed to own customers' claims," *see* Mot. at 11-12, CZ ignores that FTX DM is not a plaintiff with

28

respect to the Fraudulent Conveyance Claims.  The sole plaintiff with respect to Counts I-V is the FTX Recovery Trust, which was formed in Delaware, and which brings claims on behalf of the estates of the Debtors, many of which are Delaware entities.  *See Notice of Filing of Second Amended Plan Supplement* [D.I. 26226-3].  Therefore, the claims' "most significant relationship" is with Delaware.

> **B.      Plaintiff FTX Recovery Trust Sufficiently Alleges That CZ is a Transferee and/or a Transfer Beneficiary.**

43.      FTX Recovery Trust plausibly alleges that CZ is a transferee and/or transfer beneficiary in connection with the 2021 Fraudulent Transfers.  *See generally* Compl.[37]  The Complaint alleges that the consideration was transferred to the Binance platform, which CZ controlled and owned. Compl. ¶¶ 24-25 (citing CFTC Consent Order), 41, 43, 82.  And, despite CZ's protests of "group pleading" and that he did not have "dominion" over the transferred cryptocurrency or benefit from the transfers, the Complaint plausibly alleges that CZ was a transferee as he "directly or indirectly owned the scores of entities that collectively operate the Binance platform . . . ."  Compl. ¶¶ 25; *see In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 723 (Bankr. S.D. Tex. 2020) (in denying defendant's motion to dismiss fraudulent transfer claims, rejecting defendant's argument that plaintiff had impermissibly "group pleaded" because "[w]here more than one defendant allegedly committed the same act together, a complaint is not defective for the reason that it asserts that all defendants committed the same act, without identifying each individual defendant.") (internal quotations and citation omitted).  In any event, the question of

---

[37]   *See In re Zohar III Corp.*, 631 B.R. 133, 170 (Bankr. D. Del. 2021) ("To adequately plead an actual fraudulent transfer claim against multiple defendants, Federal Rule 9(b) requires that a complaint provide notice to each defendant of 'the circumstances surrounding the fraudulent conduct with which he is individually charged' sufficient 'to allow each defendant to prepare an effective answer or defense.'") (quotations omitted); *see also In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 455 (Bankr. D. Del. 2006).

"dominion and control" under section 550 of the Bankruptcy Code is a factual issue that is not appropriately determined at the motion to dismiss stage. *See In re U.S. Mortg. Corp.*, 492 B.R. 784, 818-19 (Bankr. D.N.J. 2013) (holding that plaintiff sufficiently plead an actual fraudulent transfer claim even if "it is unclear at this stage what degree of 'dominion and control' [the defendant] had over the Transfers"); *In re Agriprocessors, Inc.*, 2012 WL 4059897, at *9 (Bankr. N.D. Iowa Sept. 14, 2012) ("[I]n order to ultimately determine if the Trustee has proven Defendant was the initial transferee or had dominion or control, the context and additional facts are required. This is not an issue properly determined at the motion to dismiss stage of the proceedings.").[38]

44.     More directly, CZ ignores that *he was the actual seller* in the WRS prong of the 2021 Share Repurchase. Compl. ¶ 38. At a minimum, these facts sufficiently allege that CZ was a "[person] for whose benefit [the] transfer was made" under section 550(a)(1) of the Bankruptcy Code, as it is reasonable to infer, at the pleading stage, that the actual seller of the WRS shares benefitted from the consideration paid for those shares, especially when he paid for the WRS shares themselves in 2020. *See* 11 U.S.C. § 550(a)(1); Second Chase Decl. Ex. 2.  In fact, CZ cites no case where the named counterparty to a transfer successfully disclaimed transferee status, let alone at the pleading stage.

---

[38]   CZ's reliance on *Green Field Energy* is unpersuasive. *See* Mot. at 13 (citing *In re Green Field Energy Servs., Inc.*, 594 B.R. 239, 287-88 (Bankr. D. Del. 2018)). First, *Green Field Energy* is procedurally distinguishable as it was adjudicated after an evidentiary trial. 594 B.R. at 246-47.  Here, the Adversary Proceeding is only at the motion to dismiss stage, which requires this Court to accept all factual allegations as true. *Zohar*, 631 B.R. at 155. Second, the *Green Field Energy* Court held that the defendant, Moreno, was not a transferee because he had no access to the transferred funds and did not receive an actual benefit. 594 B.R. at 288.  The Court explained that the evidence at trial showed that the entities that received the transferred funds were special purposes vehicles ("**SPVs**"), but there was no evidence that Moreno received any profit, salary, or distribution from the SPVs or that Moreno had access to the funds as he was not employed by the SPVs. *Id.* at 288-89. Here, the Complaint alleges that CZ had the ultimate control of the Binance platform that received the transferred funds, as he was not just the owner and majority shareholder of Binance, but he was also responsible in overseeing all of Binance's operations. *See* Compl. ¶ 25; CFTC Consent Ord. ¶ 25.  Likewise, *Int'l Mgmt. Assoc.*, was also adjudicated after an evidentiary trial. *See* Mot. at 13 (citing *In re Int'l Mgmt. Assoc.*, 399 F.3d 1288, 1291-93 (11th Cir. 2005)).

**C.      Plaintiff FTX Recovery Trust Has Adequately Pled a Claim for Constructive Fraudulent Transfer (Counts I and II).**

45.      CZ misstates the pleading standard in arguing that Counts I and II are not adequately pled because there is no "inference" that the Debtors received less than reasonable equivalent value or were insolvent in July 2021. Mot. at 17-18. But these arguments merely raise factual issues to be determined at a later stage in the proceedings.

46.      As set forth in the First Opposition, Plaintiff FTX Recovery Trust has sufficiently alleged that the Debtors did not receive reasonably equivalent value for the 2021 Fraudulent Transfers. *See* First Opp. Sec. IV; Compl. ¶ 39, 40, 42, 45-46; *In re DBSI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011); *In re Roco Corp.*, 701 F.2d 978, 982 (1st Cir. 1983). CZ's argument is premised entirely on his theory – entirely unsupported by any authority – that a company's balance sheet insolvency is irrelevant to the fair market value of its stock and CZ's speculation about how the shares of FTX (a non-public company) "would have traded." Mot. at 18. CZ is certainly free at the appropriate stage to argue that the purchase price in the 2021 Share Repurchase is "presumptively" the fair market value, but this is clearly a fact-intensive question not appropriate for the dismissal stage. *See, e.g.*, *FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, 595 B.R. 686 (Bankr. D. Del. 2018) (finding a constructive fraudulent conveyance and rejecting defendant's theory that the arms'-length purchase price was a fair reflection of fair market value).

47.      Likewise, the Complaint alleges that the Debtors were insolvent at the time of the 2021 Fraudulent Transfers through the following allegations: (1) the Debtors had overvalued FTT and other cryptocurrencies held by Debtors that were closely tied to FTX and Bankman-Fried; (2) the Debtors did not have the financial resources to satisfy all customer deposits; (3) FTX would not have been able to continue to operate as a business had customers attempted to withdraw their

31

RLF1 33802269v.1

deposits because the Debtors concealed and misrepresented material facts about their business; (4) the Debtors had accrued large and unaccounted for regulatory liabilities; and (5) Caroline Ellison prepared a balance sheet just prior to the 2021 Fraudulent Transfers showing that the transferor, Alameda, had a net asset value that was approximately negative $2.7 billion with liabilities of $9.4 billion. Compl. ¶¶ 45-46. As such, Plaintiff FTX Recovery Trust at this stage has sufficiently alleged insolvency at the time of the 2021 Fraudulent Transfers. *See Zohar*, 631 B.R. at 173-74 ("Insolvency is a fact-intensive inquiry and precise calculations are not needed for [the motion to dismiss] stage.").

> **D.     Plaintiff FTX Recovery Trust Has Adequately Pled a Claim for Actual Fraudulent Transfer (Counts III and IV).**

48.     CZ further argues that Plaintiff's actual fraudulent transfer claims do not satisfy the elevated pleading standards of Federal Rule 9(b). *See* Mot. at 14.[39] He is wrong. As an initial matter, while actual fraudulent transfer claims generally must meet the elevated pleading standards of Federal Rule 9(b), "the requirements of Rule 9(b) are to be interpreted liberally where the claim is asserted by a trustee or trust." *In re Cred Inc.*, 650 B.R. at 834 (citing *In re Charys Holding Co.*, 2010 WL 2774852, at *3 (Bankr. D. Del. July 14, 2010)); *In re Nat'l Serv. Indus., Inc.*, 2015 WL 3827003, at *4 (Bankr. D. Del. June 19, 2015) (same); *In re APF Co.*, 308 B.R. 183, 188 (Bankr. D. Del. 2004) (same).

---

[39]     CZ concedes that the Complaint alleges fraudulent intent from SBF, the transferor, and only states that there is no fraudulent intent from CZ or "anybody else." *See* Mot. at 14 n.5. As courts have repeatedly held, the only relevant intent is that of the transferor. *See* 5 Collier on Bankruptcy ¶ 548.04 (16th ed. 2025) (citing cases); *In re Live Well Financial, Inc.*, 652 B.R. 699, 704-05 (Bankr. D. Del. 2023); *In re PennySaver USA Publishing LLC*, 587 B.R. 445, 461 (Bankr. D. Del. July 11, 2018). As set forth *supra*, the Complaint amply alleges, with factual support evidencing direct and circumstantial fraudulent intent, that SBF made the decision to enter into the transactions constituting the 2021 Fraudulent Transfers "with the actual intent to hinder, delay, or defraud" creditors. *See* 11 U.S.C. § 548(a)(1)(A); *see also Drivetrain, LLC v. X. Com., Inc.*, 2023 WL 1804627, at *4 (Bankr. D. Del. Feb. 7, 2023).

32

49.     Regardless, the actual fraudulent transfer claims are pled with sufficient particularity even if the Plaintiff were not a liquidating trust. *See* Compl. ¶¶ 38-43.  As fully set forth in the First Opposition, the Complaint adequately pleads facts establishing multiple forms (as supported by direct and circumstantial evidence) of fraudulent intent with particularity in connection with the 2021 Fraudulent Transfers.  *See* First Opp., Sec. IV.B.;[40] *In re Mallinckrodt plc*, 2024 WL 206682, at *24 (Bankr. D. Del. 2024) (holding actual fraudulent intent is satisfied through direct evidence of intent, or through circumstantial evidence of intent).  ***First***, as to the direct evidence, the Complaint alleges, among other things, that: (1) the 2021 Share Repurchase was in furtherance of Bankman-Fried's fraud insofar as it was used "to convey confidence and strength to the market at a time when the Debtors were insolvent and secretly reliant on FTX Trading's cash and crypto from customer deposits for liquidity" (Compl. ¶ 48); (2) in reference to the 2021 Share Repurchase, Bankman-Fried emailed a *Forbes* reporter that "[t]he purchase was entirely from Alameda. Yeah, it had a good last year :P" (*i.e.*, an emoji for a tongue sticking out)" (*Id.*); (3) Bankman-Fried ran a scheme "to hide the vulnerability of the exchange to a run on the institution by customers seeking to reclaim their assets deposited on the exchange" (*Id.*); and (4) the "2021 Share Repurchase was a critical component of Bankman-Fried's pervasive fraud involving the unauthorized use of FTX customer deposits," as shown by the testimony of Caroline Ellison (*Id.* ¶¶ 46-48).  These allegations alone are sufficient to plead actual fraudulent transfer.

50.     ***Second***, as to the ample circumstantial evidence, the Complaint properly alleges, among other things, that: (1) CZ was an insider at the time of the 2021 Fraudulent Transfers as he was part of a small coterie of private shareholders of FTX Trading and WRS, (*id.* at ( ¶¶ 34, 37-

---

40     Plaintiffs incorporate by reference the arguments made in Section IV.B. of the First Opposition.

33

38); (2) Debtors were insolvent at the time of the 2021 Fraudulent Transfers (*see supra*, ¶ 47); (3) Debtors transferred a significant portion of their estates while CZ was still an insider shareholder; and (4) Debtors received no value, (*see supra*, ¶ 46).[41]

51.     Together, these details are easily sufficient at the pleading stage to allege that the transfers were made "with actual intent to hinder, delay, or defraud" FTX's existing and future creditors, which included their existing and future customers. *See* 11 U.S.C. § 548.

## IV.    CZ'S ADDITIONAL ARGUMENTS FOR DISMISSAL OF THE FRAUDULENT CONVEYANCE CLAIMS ALSO FAIL.

52.     As a last resort, CZ invites this to Court dismiss the 2021 Fraudulent Transfers because (i) Sections 544, 548 and 550 cannot be exercised extraterritorially, and (ii) the safe harbor affirmative defense under Section 546(e) applies. Mot. at 8-10, 16-17. This Court should decline both invitations.

### A.    The Fraudulent Conveyance Claims Are U.S. Transactions and Sections 544, 547 And 548 of the Bankruptcy Code Applies Extraterritorially.

53.     "Courts engage in a two-step inquiry when determining whether to apply the presumption against extraterritoriality." *Emerald Cap. Adv. v. Bayerische Moteren Werke Aktiengesellschaft (In re FAH Liq. Corp.)*, 572 B.R. 117, 123 (Bankr. D. Del. 2017). In the context of Sections 544, 548, and 550 of the Bankruptcy Code, courts first consider whether the transfers underpinning the Fraudulent Transfer Claims were extraterritorial. *Id.* at 123-24. Then, courts consider whether Congress intended Sections 544, 548 and 550 to apply to extraterritorial transfers. *Id.* at 124-25.

---

[41]     CZ's unfounded arguments that the badges of fraud do not support fraudulent intent, including his principal argument that Bankman-Fried "was not incentivized to overpay the Binance Defendants or do anything but the bare minimum to be rid of them" are contradicted by the allegations in the Complaint. Mot. at 15.

**1.     The 2021 Fraudulent Transfers Were Centered in the U.S.**

54.     To determine whether the Fraudulent Transfer Claims were extraterritorial, "courts apply a 'center of gravity' test, examining the facts of the case to see whether they have a center of gravity outside of the U.S. *Id.* at 124 (citing *In re French*, 440 F.3d 145, 149 (4th Cir. 2006)). This is a "flexible" approach, allowing courts to consider all aspects of the transfer at issue, including "whether the participants, acts, targets, and effects involved in the transaction are primarily foreign or primarily domestic." *Id.* (quoting *In re French*, 440 F.3d at 150).

55.     Despite CZ's protests that the 2021 Share Repurchase occurred "overseas," the 2021 Fraudulent Transfers' center of gravity is the U.S.  *See* Mot. at 8-10. At its core, the Complaint alleges that CZ invested in FTX's new U.S. exchange platform and cashed out of that investment as part of the 2021 Share Repurchase. *See* Compl. ¶¶ 36-43. And the Fraudulent Transfer Claims are directly related to CZ's investment activities with WRS, a U.S. company. This alone establishes that the "center of gravity" of the Fraudulent Transfer Claims is the United States. As discussed *supra*, however, the 2021 Fraudulent Transfers have ample additional U.S. connections, including; (1) the consideration for the the 2021 Share Repurchase took the form of "BUSD," which was pegged to the U.S. dollar, and the minting of such coins required a party to transfer U.S. dollars to Paxos, a New York trust; (2) the 2021 Repurchase was negotiated, in part, by U.S. based counsel, and such parties (in addition to certain of the sellers) were listed with their U.S. addresses in the notice section of the relevant agreements; (3) the 2021 Fraudulent transfers were made from the Alameda silo of the FTX enterprise, the parent corporation of which was a Delaware corporation. *Supra* ¶¶ 25-30.

RLF1 33802269v.1

**2.   Congress Intended Sections 544, 548, and 550 To Apply Extraterritorially.**

56.     Even if the 2021 Share Repurchase were a foreign transaction (it is not), courts in this district have held that avoidance statutes, including those forming the basis for the Fraudulent Transfer Claims, cover "extraterritorial conduct." *In re FAH Liq.*, 572 B.R. at 124.  In fact, CZ does not cite to *one* case in this circuit that holds otherwise. Mot. at 8-10. Courts in this district and the only circuit court that has considered this issue have unanimously rejected CZ's argument. *See In re French*, 440 F.3d 145, 152 (4th Cir. 2006) (holding that Congress intended the international application of U.S. fraudulent transfer law); *In re FAH Liq.*, 572 B.R. at 125 (same); *In re Maxus Energy Corp.*, 641 B.R. 467, 562 (Bankr. D. Del. 2022) (holding that a trustee can still recover fraudulent transfers even if no relevant conduct occurred in the U.S.).

57.     In *FAH*, the Court observed that "although '[t]he text of section 548 does not contain any express language or indication that Congress intended the statute to apply extraterritorially … courts may look to "context," including surrounding provisions of the Bankruptcy Code, to determine whether Congress nevertheless intended that statute to apply extraterritorially.'" *In re FAH Liq.*, 572 B.R. at 125 (quoting *In re Lyondell Chem. Co.*, 543 B.R. 127, 151 (Bankr. S.D.N.Y. 2016)); *see also Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010) ("Assuredly context can be consulted as well" in evaluating Congressional intent for extraterritorial application).  Examining the relevant context, the *FAH* Court found:

> [S]ection 541(a)(1)(3) of the Bankruptcy Code supports a finding that Congress intended section 548 to extend extraterritorially. Section 541(a)(3) provides that any interest in property that the trustee recovers under section 550 becomes property of the estate. Section 550 authorizes a trustee to recover transferred property to the extent that the transfer is avoided under either section 544 or 548. It would be inconsistent (such that Congress could not have intended) that property located anywhere in the world could be property of the estate once recovered under section 550, but that a trustee could not avoid the fraudulent transfer and recover

36

that property if the center of gravity of the fraudulent transfer were outside of the United States.

*In re FAH Liq.,* 572 B.R. at 125-26 (quoting and agreeing with *Lyondell,* 543 B.R. at 154-55); *see also Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 480 B.R. 501, 527 (Bankr. S.D.N.Y. 2012) (holding that Congress clearly intended for the extraterritorial application of section 550 (and related provisions)).

58.     Thus, not only does *FAH* hold that the fraudulent transfer provisions of the Bankruptcy Code apply extraterritorially, but it also repudiates CZ's argument that "[p]roperty alleged to be fraudulently transferred is not part of the bankruptcy estate."[42] *In re FAH Liq.,* 572 B.R. at 125-26; *see also In re MortgageAmerica Corp.*, 714 F.2d 1266, 1277 (5th Cir. 1983) (holding that the debtor retained an equitable interest in fraudulently transferred property based on its reading of the legislative history of § 541(a)(1)).

## B.     The Fraudulent Conveyance Claims Are Not Barred by the Safe Harbor Defense.

59.     CZ urges this Court to dismiss the constructive fraudulent transfer claims under bankruptcy and state law based on the affirmative defense of safe harbor under section 546(e) of the Bankruptcy Code by making an argument identical to that made by the BHL defendants in their motion to dismiss. *See* Mot. at 16-17. As set forth in the First Opposition, however, Delaware courts have consistently held that determinations regarding the safe harbor defense under section 546(e) of the Bankruptcy Code are intensely fact-dependent and inappropriate for resolution at the motion to dismiss stage. Further, like the BHL defendants, CZ apparently misreads the definition of "financial participant" and makes no effort to explain how the investments he cites qualify as

---

[42]     Mot. at 9 n.3.

the type of "agreements or transactions" referenced in that definition.  *See* 11 U.S.C. § 101(22A).

FTX Recovery Trust incorporates by reference its argument made in the First Opposition regarding

the inapplicability of the safe harbor defense to the constructive fraudulent transfer claims.  First

Opp. Sec. VI.A.

## V.   THE COMPLAINT ADEQUATELY PLEADS THE PREDATORY ACTS CLAIMS.

60.     CZ next argues that the Predatory Acts Claims are not adequately pled.  Mot. at 18-

30. Like the rest of his motion, CZ employs a scattershot approach, arguing that: (1) the injurious

falsehood tort does not exist in Delaware, and even if it does, it is barred by the statute of

limitations; (2) the Binance False Statements were not false or misleading; and (3) Plaintiffs did

not plead certain elements of the Predatory Acts Claims.[43]  *Id.*  To the contrary, Delaware caselaw

has established the existence of the injurious falsehood tort[44] and the Complaint easily satisfies the

standards of (1) Federal Rule 8(a)(2) with respect to the injurious falsehood and unjust enrichment

claims, and (2) Federal Rule 9(b) with respect to the fraud and intentional misrepresentation

claims.  *See generally* Compl.  In short, Plaintiffs' allegations raise numerous well-pled factual

allegations that cannot be resolved at the pleading stage, particularly with respect to CZ's motive,

---

[43]     CZ also argues that the Predatory Act Claims do not belong in this Court based on the arguments advanced by the BHL defendants in their motion. Mot. at 20. The First Opposition details in depth the reasons why such claims do belong in this Court and Plaintiffs incorporate by reference such arguments. First Opp. Sec. II.

[44]     The Complaint brings the Predatory Acts Claims under "applicable law" – here, Delaware. *See* Compl., Counts VI-IX. Delaware law applies to the Predatory Acts Claims under the "most significant relationship" test employed by Delaware courts. *See Pennsylvania Emp. Benefit Tr. Fund*, 710 F. Supp. 2d at 467-68.  This case is unique because of the lack of a single U.S. state that can be identified as the center of the parties' relationship, the lack of any overlap between the places of incorporation of both companies (however, certain Plaintiffs were incorporated in Delaware), and the fact that the harmful conduct took place over the internet harming U.S. creditors.  Therefore, the most relevant state jurisdiction is the place where the injury, *i.e.*, FTX's bankruptcy, took place—Delaware.

warranting further development through discovery, not premature dismissal. *See Genesis Health Ventures*, 355 B.R. at 459.

> ### A. Plaintiffs Have Plausibly Alleged That the Binance False Statements Were False or Misleading.

61. Contrary to CZ's assertions that his statements were true and that he was merely a "whistleblower," (Mot. at 19-20), Plaintiffs have adequately pled that the Binance False Statements were false and misleading, whether under the Federal Rule 8(a)(2) standard applicable to Count VI (injurious falsehood), or under the Federal Rule 9(b) standard applicable to Counts VII (fraud) and VIII (intentional misrepresentation). *See Aoki v. Benihana Inc.*, 839 F.Supp.2d 759, 763 (D. Del. 2012) (establishing a low threshold under Federal Rule 8(a)(2) intended to screen out pleadings that contain only "labels and conclusions, and a formulaic recitation of a cause of action's elements"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (clarifying that Federal Rule 8(a)(2) "does not impose a probability requirement at the pleading stage"); *ING Bank v. PNC Fin. Servs. Grp.*, 629 F.Supp.2d 351, 356–357 (D. Del. 2009) (finding counterclaim was alleged with sufficient particularity under Federal Rule 9(b) because it identified a statement and alleged the particular way in which the statement was false).

62. Plaintiffs here have set out an extensive narrative of the alleged fraudulent and wrongful conduct, which they expressly incorporate into each of their claims for relief and are far from simply a "formulaic recitation" of claim elements. Compl. ¶¶ 37, 39-41. That narrative is supported by factual allegations of a tumultuous relationship between CZ and Bankman-Fried, CZ's long-standing scheme to destroy FTX, the use of social media platforms to cause a bank run on FTX, and CZ's bad faith in entering into the Letter of Intent. *Id.* ¶¶ 52-79. The relative merit

39

RLF1 33802269v.1

of Plaintiffs' and CZ's theories surrounding the Binance False Statements is a factual issue to be determined at trial. *See ING Bank*, 629 F. Supp. at 356-57.

63.     The first category of false statements, the November 6 False Tweets, encompass CZ's statements that: (1) Binance's sale of FTT was not a "move against a competitor," (2) Binance would try to liquidate FTT in a way that would minimize market impact; and (3) liquidating FTT was "just post-exit risk management." Compl. ¶¶ 56-57.  As alleged in the Complaint, these statements were false—*i.e.*, the sale was in fact a move against a competitor, CZ had no intention of trying to liquidate FTT in a way that would minimize market impact, and liquidating FTT was not simply a "post-exit risk management." *Id.* ¶¶ 56-63.  In establishing that CZ's true motive was to destroy FTX, *id.*, Plaintiffs rely not only on sworn testimony from a former FTX insider at the trial of Bankman-Fried, but also upon internal FTX communications and observations around the time of CZ's tweets, and testimony at a Senate Hearing from an FTX investor. *See id.* ¶ 57.  Plaintiffs also point to the fact that CZ had already sold a large amount of FTT before the November 6 False Tweets as demonstrating that the subsequent statements were knowingly false because, again, it demonstrates that the public statements announcing a future sale were gratuitous and only designed to harm FTX. *Id.* ¶ 58.  Most importantly, as explained in the Complaint, falsity of these statements is reasonably inferred from the circumstances, including the fact that the public announcement of the sale of FTT made no commercial sense except to the extent it was done to maximize market impact and harm a competitor, belying the statements in the November 6 False Tweets. *Id.* ¶¶ 57-58.  CZ ignores all these key allegations, which easily clear the low bar of plausibility under both Federal Rule 8(a)(2) and the particularity standard under Federal Rule 9(b).

40

64.     The second category of statements encompass the Letter of Intent, the November 8 Tweets, and November 9 Tweets regarding the Letter of Intent.  As alleged, the Letter of Intent provided, and CZ publicized, that Binance intended to acquire FTX Trading subject to due diligence.  *Id.* ¶¶ 67-68.  Binance, under CZ's control, pulled out of the acquisition the following day, announcing that it did so "[a]s a result of corporate due diligence as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations[.]".  *Id.* ¶ 70. The Complaint adequately alleges that, when these public statements were made, CZ intended to create the impression that he had seen something in the "due diligence" regarding FTX's finances that was even worse than what the public already knew.  *Id.* ¶ 73. But, as alleged, CZ (1) did not receive any new material information that might constitute "corporate due diligence" causing Binance to withdraw from the acquisition, and (2) knew of the mishandled customer funds *prior to* executing the Letter of Intent.  *Id.* ¶¶ 65, 72-73. The Complaint provides a detailed timeline supporting these facts:

a)     <u>November 8, 2022</u>:

   i)     "Around 1 a.m. . . . Bankman-Fried called [CZ]. Upon information and belief, during this phone call, Bankman-Fried informed [CZ] that FTX would soon find itself unable to satisfy customer withdrawal requests, in part because Alameda had been borrowing large amounts from FTX.com customer deposits, necessitating the emergency financing that Bankman-Fried was requesting from [CZ]. Bankman-Fried reflected to the FTX team that [CZ] 'seemed receptive' but needed to consider the proposal." *Id.* ¶ 65.

   ii)    "[A]round 2:30 a.m [CZ] confirmed the '[r]ough proposal from us would be: we do a full take over, cover all user asset shortage, to minimize damage to the market and the user . . . . [W]e can move quickly.'" *Id.* ¶ 66.

   iii)   Later that day, "Bankman-Fried and [CZ] executed a letter of intent on behalf of their respective companies." *Id.* ¶ 67.

41

b)      November 9, 2022:

   i)      "Binance sent over a revised due diligence request around 12:00 p.m. . . . ." *Id.* ¶ 69.

   ii)     "Around the same time, FTX employees and Binance employees started having kick-off calls to determine the scope of the due diligence." *Id.*

   iii)    "The general counsel of FTX.US wrote on November 9, 2022, '[s]poke to the Binance legal this morning as a diligence kick-off call. Was very high level and they said they would follow-up. . . .'" *Id.* .

   iv)     "At 3:00 p.m. . . . while FTX employees were still working on the Binance's updated diligence requests and despite [CZ]'s warning that there was 'a lot to cover and [the deal] will take some time,' Binance published a tweet threat announcing that it was backing out 'as a result of corporate due diligence. . . .'" *Id.* ¶ 70.

65.     Given this sequence, the Complaint sufficiently alleges that Binance and CZ never intended to consummate the acquisition of FTX Trading when they signed the Letter of Intent, but instead sought to convey to the market the false impression that Binance had received diligence materials showing that situation was worse than already known and to prevent FTX from seeking alternative financing. *Id.* ¶¶ 7, 73, 131, 135, 139.  Before they ever executed the Letter of Intent, they knew of the very conduct—the customer withdrawals—on which they justified their termination. *Id.* ¶ 65.

**B.      Plaintiffs Have Adequately Pled a Claim for Injurious Falsehood (Count VI).**

66.     As an initial matter, CZ's unfounded argument that the injurious falsehood tort does not exists under Delaware law is legally incorrect. *See* Mot. at 20-21.  Notably, CZ does not cite to a single Delaware case that supports his proposition; indeed, the two cases he cites show the opposite. *Id.* (citing *In re Nat'l Collegiate Student Loan Trusts Litig.*, 2020 WL 3960334, at *4 (Del. Ch. July 13, 2020) (examining the pleading standard for an injurious falsehood claim under Delaware law); *Ramada Inns, Inc. v. Dow Jones & Co.*, 543 A.2d 313, 328 (Del. Super. Ct. 1987)

42

(recognizing that injurious falsehood is a tort widely accepted at common law and allowing a plaintiff to pursue a claim for injurious falsehood under Delaware law).[45]

67.    CZ argues that the Court should ignore these trial court decisions, however, because "[t]he Delaware Supreme Court has never recognized the tort of injurious falsehood" and "[t]here is no reason to guess the Delaware Supreme Court would recognize an injurious falsehood tort." Mot. at 20-21.  But CZ is apparently unaware that the Delaware Supreme Court indeed recognized the existence of the claim when it affirmed a lower court's decision awarding summary judgment to a defendant on such a claim "on the basis of and for the reasons *stated in the well-reasoned decision of Superior Court*."  *DeNoble v. Dupont Merck Pharm. Co.*, 703 A.2d 643 (Del. 1997) *aff'g* 1997 WL 35410094, at *5 (Del. Super. Ct. Apr. 11, 1997) (emphasis added).  The "well-reasoned decision" of the Delaware Superior Court, for its part, carefully walked through the elements of an injurious falsehood claim (citing to the Restatement (Second) of Torts) and explained why those elements were not met. *See DeNoble*, 1997 WL 35410094, at *5.  Under these circumstances, it is simply incorrect to say that the Delaware Supreme Court has not recognized such a claim, let alone that there is no basis to predict that it would do so.

68.    Indeed, numerous Delaware courts, following the Restatement (Second) of Torts, have explained that for an injurious falsehood claim, a plaintiff must establish that the defendant (1) made a false statement "about the plaintiff, his property, or his business," (2) intended for

---

[45]    CZ's reliance on *Nationwide* to argue that decisional law of lower state courts is "not conclusive" in guiding federal courts is misplaced.  Mot. at 20-21 (citing *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000)). In *Nationwide*, the Third Circuit reviewed the District Court's interpretation a state law statute because there was no reported decision in any Pennsylvania Court addressing the issue before it. *See id.* ("In [interpreting state law], *a federal court can also give due regard*, but not conclusive effect, to the decisional law of lower state courts.") (emphasis added). The Third Circuit explicitly stated that in "predicting how the highest court of the state would resolve the issue, we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending to convincingly show how the highest court in the state would decide the issue at hand." *Id.*

43

"publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so," and (3) knew that "the statement is false or act[ed] in reckless disregard of its truth or falsity."[46] *See, e.g.*, *Nat'l Collegiate*, 2020 WL 3960334, at * 4; *see also Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *7 (Del. Super. Ct. Nov. 1, 2017) ("The Restatement explains that trade libel is a type of injurious falsehood, *a tort that is recognized by Delaware courts*.") (emphasis added) (citing *Ramada*, 543 A.2d at 328). Federal courts in Delaware have also recognized this claim under Delaware law.[47] *See Marino v. Cross Country Bank*, 2003 WL 503257, at *7 (D. Del. Feb. 14, 2003) (holding plaintiff alleged all elements of an injurious falsehood claim under Delaware law).[48]

69. Adding to the kitchen sink approach of his Motion, CZ next argues that the injurious falsehood claim is barred by the statute of limitations. Mot. at 22. Again, CZ is incorrect. When the statute of limitations for a claim under applicable non-bankruptcy law has not run as of the bankruptcy petition date, section 108(a) of the Bankruptcy Code provides that the limitations period is the *later* of (1) the original limitations period or (2) two years *after* the "order for relief" – i.e., the petition date. *See* 11 U.S.C § 108(a); *Cantor v. Perelman*, 414 F.3d 430, 440 (3d Cir. 2005). The injurious falsehood claim in the Complaint is based on statements made between November 6, 2022, and November 9, 2022. *See* Compl. Count VI. Therefore, the statute of

---

[46] Furthermore, "[t]here must be a direct, foreseeable connection between the false statement, a third person's reliance and harm to the plaintiff's interests." *Id.* at *6.

[47] CZ argues that the "traditional test" for product disparagement under New Jersey law applies to the injurious falsehood tort. Mot. at 23. But, as shown herein, Delaware courts have already established a test for injurious falsehood, which this Court should follow. *See Nat'l Collegiate*, 2020 WL 3960334, at * 4.

[48] Claims for injurious falsehood only need to meet the less stringent Federal Rule 8(b) pleading standard. *See Marino*, 2003 WL 503257, at *2 (applying the Federal Rule 9(b) standard to plaintiff's fraud claim, and not his injurious falsehood claim); *Ephoca Inc. v. Olimpia Splendid USA, Inc.*, 2024 WL 687840, at *2-4 (Del. Super. Feb. 20, 2024) (holding that the parallel rule 9(b) in the Delaware Rules of Civil Procedure does not apply to injurious falsehood claims). Plaintiffs' allegations are thus sufficient under Federal Rule 8(b) (and Federal Rule 9(b), if applicable).

44

limitations had clearly not expired by the Debtors' petition date on November 11, 2022, *see, e.g.*, D.I. 1, and the injurious falsehood claim was timely filed on November 10, 2024, within two years of the petition date. *See generally* Compl.

70.     Turning to CZ's substantive arguments, he then claims that the injurious falsehood claim is not adequately pled.  *See* Mot. at 23-24.  But the Complaint plausibly alleges all elements for an injurious falsehood claim*. See generally* Compl.  ***First***, as discussed *supra*, Plaintiffs have adequately alleged that CZ made false and/or misleading statements about (1) the reasons for CZ's liquidation of FTT, (2) CZ's intention to acquire FTX Trading "subject to due diligence," and (3) the reasons for Binance and CZ's decision not to acquire FTX Trading. *See supra*, Sec. V.A. Likewise, CZ's argument that it would have been impossible to make any false disparaging statement about FTX because it was a "fraudulent enterprise" is nonsensical on its face and, in any event, unmoored from the law.  Mot. at 23.[49]  CZ also mischaracterizes the Complaint by arguing that Plaintiffs merely allege a bad-faith motive for true statements.  *Id.* at 23-24.  To the contrary, Plaintiffs clearly allege that CZ made *false* statements about, among other things, his motive *for selling FTT*.[50] The Court should reject CZ's misleading and superficial conflation.

71.     ***Second***, the Complaint plausibly alleges malice in that CZ actually intended to destroy his arch-competitor FTX. Compl. ¶ 73. For example, Plaintiffs point to the fact that the public announcement of the sale of FTT supported the inference that such sale was intended to cause market panic and a decline in the price of FTT and the ultimate destruction of FTX—which

---

[49]   Citing to defamation caselaw, CZ argues that the "motive for telling the truth" is irrelevant to an injurious falsehood claim. Mot. at 23-24 (citing *McClanahan v. Anti-Defamation League*, 2023 WL 8704258, at \*4 (W.D. Mo. Dec. 15, 2023) ("Thus, for the purposes of defamation, it does not matter whether a statement was made in bad faith, so long as it was true.").  In this regard, CZ's argument simply mischaracterizes Plaintiffs' claims, which clearly spell out the *falsity* of CZ's and Binance's statements.

[50]   CZ's citation to defamation case law for the proposition that truth is a complete defense, regardless of motive, is thus irrelevant.  Mot. at 23-24.

45

it did.  *Id.* ¶¶ 58-59.  The plausibility of these inferences is not a post-hoc invention of Plaintiffs for purposes of the Complaint.  Rather, these are common-sense inferences that were widely understood, with one FTX investor testifying in a Senate hearing: "All of a sudden, in social media, CZ is asking for another $500 million. He wants to do a block trade of FTT, or the proprietary token of FTX.  He wants to convert it back to fiat.  Why would you put that out there? You know it is going to push down the value of that coin dramatically, and that is exactly what happened.'"  *Id.* ¶ 58.[51]  CZ and Binance (a private enterprise) were also under no obligation—legally or otherwise—to disclose via tweets (1) that they were selling FTT, (2) that they were potentially acquiring FTX Trading and executing the Letter of Intent, or (3) their reasoning for withdrawing from the potential acquisition.  *See id.* ¶¶ 56-72.[52]  In this context, the fact that Binance's market share grew after FTX's collapse is not "irrelevant," but rather confirms that CZ and his companies indeed benefitted from the market panic it caused, further supporting the plausibility of the inferences of malice. *Id.*

72.     ***Third***, Plaintiffs have adequately demonstrated a direct, foreseeable connection between the Binance False Statements, third parties' reliance on such statements, and the resulting harm to Plaintiffs' interests. As shown in the Complaint, Plaintiffs' allegations demonstrate that customers relied on CZ's false statements by (1) rapidly selling off their FTT and (2) withdrawing funds from the FTX platform *en masse*—the "run on the bank."  Compl. ¶¶ 58-59.[53]  Moreover,

---

[51]   Likewise, a former FTX insider testified in Bankman-Fried's trial that "if [CZ] really wanted to sell his FTT, he wouldn't preannounce to the market that he was going to sell it . . . his real aim in that tweet, as I saw it, was not to sell his FTT, but to hurt FTX and Alameda." Compl. ¶ 57.

[52]   Plaintiffs have uncovered no instance from June 1, 2021 through November 11, 2022, where @binance or @cz_binance announced entering into any transaction or the sale of any of its third-party tokens. *See* @binance, X (last visited Sept. 3, 2025), https://x.com/binance; @cz_binance, X (last visited Sept. 3, 2025), https://x.com/cz_binance.

[53]   "As the Examiner in the above-captioned chapter 11 cases reported, CZ's announcement that Binance would be liquidating its sizeable FTT holdings . . . caused a rapid sell off of FTT. Customer net withdrawals went from

the Complaint specifically alleges that customers would not have panicked if they had known the truth: that (1) the Binance False Statements "were motivated by a personal and professional feud between SBF and CZ and not by sincere concerns about 'risk management' or 'recent revelations,'" and (2) CZ never intended to acquire FTX and he did not withdraw from the Letter of Intent because of what he had seen in diligence. *Id.* ¶¶ 62, 73-74.  Plaintiffs also allege that the Binance False Statements were the partial basis for the Securities Commission of The Bahamas seeking a winding up order for FTX DM.  *Id.* ¶ 131.

> **C.**      **Plaintiffs Have Adequately Pled a Claim for Fraud (Count VII) and Intentional Misrepresentation (Count VIII).**

73.      CZ prefaces his attempt to dismiss the fraud claims and misrepresentation against him with a nonsensical and legally unsupported argument:  because FTX defrauded its customers, it is impossible for CZ also to have committed fraud.  Mot. at 25.  CZ also argues – again without any legal or logical support – that because FTX would have collapsed "sooner or later," it is impossible for CZ's statements to have harmed FTX and its customers.  *Id.*  In so arguing, CZ simply fails to address the actual theory and allegations underpinning Plaintiffs' claims sounding in fraud.  *See* Compl. ¶¶ 52-79.  Plaintiffs' actual fraud theory, as clearly spelled out in the Complaint with detailed factual support, is that notwithstanding FTX's misrepresentations, CZ independently made his own false statements that were calculated to, and did, inflict the maximum possible pecuniary harm upon FTX and its customers – more harm than would have occurred had he not made those statements (even if FTX had otherwise filed for bankruptcy when it did).  *See*

---

averaging $18 million per hour over the period from October 31, 2022 and November 6, 2022 (prior to the November 6 False Tweets) to around $150 million per hour from November 6, 2022 and November 7, 2022 (after the November 6 False Tweets)." Compl. ¶ 59.

*id.* CZ is certainly free to contest the factual basis for this theory at the appropriate time, but this Court should reject CZ's efforts to mischaracterize what Plaintiffs have actually alleged.

74. Turning to the actual substance of CZ's arguments, CZ incorrectly argues that Plaintiffs' fraud and intentional misrepresentation claims fail mainly because the Complaint does not adequately allege the intent and reliance elements. *See* Mot. at 25-26. Again, he is wrong. *See generally* Compl. As a preliminary matter, although it is true that fraud and intentional misrepresentation claims require a heightened pleading standard – requiring plaintiffs to plead with particularity the circumstances of the fraud – the particularity rule is relaxed where, as in the present case, "the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). In any event, Plaintiffs have met this heightened pleading standard for these claims.[54]

75. ***First***, as detailed *supra*, Plaintiffs have sufficiently alleged that CZ made the Binance False Statements with the requisite intent or scienter. *See supra*, Sec. V.A.[55] While Rule 9(b) requires fraud claims to be pled with particularity, intent, and knowledge may be alleged generally. *See* Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009; *In re FTX Trading Ltd.*, 2024 WL 4562675, at *7 (Bankr. D. Del. Oct. 23, 2024). Further, scienter "may be adequately alleged by setting forth facts establishing a motive and an opportunity to commit fraud, or by setting forth

---

[54] A fraud claim requires "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless disregard of the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992). Similarly, a claim for intentional misrepresentation requires "(1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) Defendants' acting with scienter; (3) An intent to induce plaintiff's reliance upon the concealment; (4) Causation; and (5) Damages resulting from the concealment." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987). Plaintiffs have adequately alleged claims for both common law fraud and intentional misrepresentation here.

[55] CZ's argument that "no factfinder could sort among [CZ]'s motives, and a different statement of motive would have made no difference", lacks legal support (as provided herein) and is contradictory to the allegations in the Complaint. *See* Mot. at 27.

facts that constitute circumstantial evidence of either reckless or conscious behavior." *Genesis Health Ventures*, 355 B.R. at 459. Plaintiffs have met this standard. *See supra*, Sec. V.B. Plaintiffs have pled various factual allegations that support the inference that the Binance False Statements were knowingly false and intended to cause customer reliance. *See supra*, Sec. V.A. For example, as discussed *supra*, Plaintiffs allege that CZ's public announcement of the sale of FTT made no sense except to the extent it was done to maximize market impact and harm a competitor, which would mean CZ's statements were materially false. Compl. ¶ 57. Indeed, as alleged, CZ (and Binance) were under no obligation—legally or otherwise—to disclose any of their actions (*i.e.*, selling FTT, potentially acquiring FTX Trading, executing the Letter of Intent, and their reasoning for withdrawing from the potential acquisition). *See* Compl. ¶¶ 56-72. Similarly, the falsity of CZ's statements concerning the Letter of Intent – that Binance intended to acquire FTX but withdrew from the transaction as a result of due diligence – is also apparent from the circumstances. *Id.* ¶¶ 72-73. Plaintiffs have thus adequately pled fraudulent intent, which is supported by "factual allegations that make their theoretically viable claim plausible." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). These allegations establish both "a motive and an opportunity to commit fraud." *Genesis Health Ventures*, 355 B.R. at 459.

76.     **Second**, Plaintiffs have adequately pled that FTX and its customers justifiably relied on the Binance False Statements. Compl. ¶¶ 59, 62-63, 73. CZ does not dispute that the Complaint alleges that he induced customers to withdraw their funds or that a defendant may be liable to third-parties in certain circumstances, but rather argues that a fraud or intentional misrepresentation claim requires him to have induced Plaintiffs to take "action detrimental to

49

themselves." *See* Mot. at 26. CZ induced both FTX and its customers, thus, Plaintiffs have satisfied this element. *See* Compl. ¶¶ 69, 73-74, 131.

77.     Delaware law requires that plaintiffs plead justifiable reliance in fraud and intentional misrepresentation claims by alleging facts "making it reasonably conceivable that the plaintiff acted based on the material representation or omission." *Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 465 (Del. Ch. 2024).[56]  But the author of a fraudulent representation is liable to "the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for . . . their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced." *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 29 (Del. Ch. 2009) (citing RESTATEMENT (SECOND) OF TORTS § 531); *see also In re Citadel Watford City Disposal Partners, L.P.*, 2018 WL 6841361, at *5 (Bankr. D. Del. Dec. 17, 2018) (finding plaintiff's fraud claim sufficiently alleged when the complaint stated that the debtor's investors justifiably relied on false representations made by the defendants because there was a fiduciary relationship between them); *In re Am. Bus. Fin. Servs., Inc.*, 362 B.R. 149, 156–57 (Bankr. D. Del. 2007) (declining to dismiss a trustee's fraud claim because the defendant intended to induce action on the part of the debtor even if the representations were not made directly to the debtor).

78.     The Binance False Statements were intended to and did induce the actions of FTX and its customers, a specific class of persons with whom Binance and CZ had reason to expect to have influenced by their statements—and on whose behalf the FTX Recovery Trust asserts these

---

[56]     Reliance, however, is a "context-dependent inquiry that takes into account the plaintiff's knowledge and experience," making the issue "not generally suitable for resolution on a motion to dismiss" unless the fraud claims focus on a contract with an explicit anti-reliance provision. *Trifecta Multimedia Holdings Inc.*, 318 A.3d at 465.

50

claims. *See* Compl. ¶¶ 57, 62, 73-74, 131. The fraud and intentional misrepresentation claims are plainly "estate claims" (*i.e.*, claims of a generalized harm of the Debtors' creditors). *See In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (explaining that "after a company files for bankruptcy, creditors lack standing to assert claims that are property of the estate."); First Opp. Sec. II.A. Thus, the FTX Recovery Trust is the only party entitled to prosecute these claims, and the creditors under the Plan will be bound by the results. Therefore, the customers' reliance on the Binance False Statements is undisputed and the FTX Recovery Trust is correctly bringing these claims on their behalf. *See HRB Winddown Inc.*, 2024 WL 1099724, at *13–14 (Bankr. D. Del. Mar. 13, 2024) (holding that the plan conferred standing on a trustee to bring fraud claims for the benefit of creditors, and that the trustee adequately pled the reliance element at the motion to dismiss stage by alleging that creditors relied on the misrepresentations).

Moreover, the Complaint alleges that not only the customers relied on CZ's false statements, which caused the "run on the bank" at FTX, but Plaintiffs also relied on CZ's false statements when it was forced to liquidate assets at discounted prices to generate liquidity to address the crisis created after the November 6 False Tweets. *Id.* ¶¶ 63-64. CZ solely focuses on the November 6 False Tweets in arguing that Plaintiffs were not induced by CZ's false statements, *see* Mot. at 26, and ignores the November 8 Tweets (announcing Binance's intent to acquire FTX.com) and November 9 Tweets (withdrawing from the Letter of Intent), which show Plaintiffs' reliance. Compl. ¶¶ 68-73.

79. As to the Letter of Intent specifically, Plaintiffs do not allege (as CZ suggests, Mot. at 28) that CZ was somehow obligated to close on the contemplated transaction, or that anyone relied on a certainty that CZ (through Binance) would close on such transaction. Rather, Plaintiffs allege that FTX and customers relied on CZ's false statements that it genuinely intended to acquire

51

FTX. Compl. ¶ 74. Had FTX and customers in fact known that the Letter of Intent, and surrounding statements were in fact a ruse to (1) create the impression that CZ had seen something in the diligence to cause it to withdraw from the acquisition, and (2) to cause FTX to cease seeking alternate financing, they would not have relied on those statements in the midst of a severe liquidity crisis, as Plaintiffs allege that they did. *See id.* ¶¶ 69, 73-74, 131. CZ's claims that the "due diligence explanation is as obvious as it gets" because "Bankman-Fried's fraud was so pervasive that the Binance's due diligence team must have found it immediately" is contrary to the well-pleaded allegations in the Complaint. *See* Mot. at 28. As stated *supra*, the Complaint alleges that CZ and Binance (1) did not receive any new material information that might constitute "corporate due diligence" causing Binance to withdraw from the acquisition, and (2) knew of the mishandled customer funds *prior to* executing the Letter of Intent. Compl. ¶¶ 65, 72-73. And with respect to FTX's cessation of seeking alternative financing specifically, it is clear that FTX actually relied on the exclusivity provision as binding on FTX and it is plausible that, but for the Letter of Intent, FTX could have received alternate financing. *Id.* ¶¶ 69, 74. *See ev3, Inc. v. Lesh*, 114 A.3d 527, 530-32 (Del. 2014), *as revised* (Apr. 30, 2015) (explaining that while a letter of intent may contain non-binding commitments relating to the execution of a financial transaction, certain provisions relating to "restrictions on the ability of [a party] to engage in discussions with other potential buyers" may be binding and are often expected to be so throughout negotiations). At this stage, that is all that is required.

80. **_Third_**, as set forth in Section V.C, *supra*, Plaintiffs adequately allege, with supporting facts, that CZ made false representations sufficient to support common law fraud and intentional misrepresentation claims. These false representations (*i.e.*, the Binance False Statements) include the November 6 False Tweets, November 8 Tweets, the November 9 Tweets,

52

and the Letter of Intent.  Compl. ¶ 131. Plaintiffs sufficiently allege that, in making the Binance False Statements, CZ (and Binance) concealed facts that the representations were made in a deliberate attempt to destroy FTX, their competitors, and that CZ never intended to acquire FTX after entering into the Letter of Intent.  *Id.* ¶¶ 60-61, 73, 139; *see supra*, Sec. V.A.

81.     ***Lastly***, Plaintiffs have adequately pled loss causation for both the fraud and intentional misrepresentation claims.  Loss causation under Delaware law requires "a causal connection between defendant's [false representations] and the subsequent decline in the value of the [object at issue]." *In re HRB Winddown Inc.*, 2024 WL 1099724, at *15 (Bankr. D. Del. Mar. 13, 2024) (quotations omitted). Importantly, loss causation is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Id.*  In any event, as set forth *supra*, Plaintiffs have adequately alleged that there was a direct, foreseeable connection between, on the one hand, the Binance False Statements, the rapid withdrawal of FTT that ensued and the consequent value destruction, FTX's cessation of its efforts to seek alternative financing, and the winding up order for FTX DM. *See supra*, Sec. V.B.

**D.     Plaintiffs Have Adequately Pled a Claim for Unjust Enrichment (Count IX).**

82.     The only legal argument CZ makes against the unjust enrichment claim is that there is no relation between the enrichment and the impoverishment.[57] Mot. at 29-30. But Plaintiffs have alleged a clear relationship between CZ's (owner, founder, and CEO of Binance) enrichment and Plaintiffs' impoverishment.  *See In re W.J. Bradley Mortgage Capital, LLC*, 598 B.R. 150, 177-78 (Bankr. D. Del. 2019) (finding that Trustee stated a plausible claim for unjust enrichment and

---

[57]     To establish a claim for unjust enrichment, plaintiffs must show (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

53

alleged facts "showing a relation between the enrichment and impoverishment as the Defendants' acquisition of [a third party]'s 65% interest in the Debtors led to the Debtors' insolvency"). For example, the Complaint shows that CZ and Binance falsely represented to Plaintiffs (through the Binance False Statements) their intention to acquire FTX Trading to, among other things, diminish Plaintiffs' efforts to seek third-party financing and destroy FTX. Compl. ¶¶ 65-73. Plaintiffs acted for CZ's benefit in numerous ways, including by executing the Letter of Intent and by ceasing their communications with other potential acquirers and investors. Compl. ¶ 67. As a result, when CZ and Binance announced they were no longer pursuing the acquisition, Plaintiffs were significantly harmed by the continued run on the bank,[58] as well as the provisional liquidation of FTX DM, while, as a direct and predictable consequence of the destruction of a major competitor, Binance experienced a surge in new users, trading volume, liquidity, and market share, which benefited CZ as he was the owner of the Binance platform. *See* Compl. ¶¶ 25, 79; CFTC Consent Ord. ¶ 23.[59]

## VI.    ALTERNATIVELY, ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE

83.    For the reasons set forth in the First Opposition, in the alternative and to the extent this Court dismisses the Complaint in whole or in part, Plaintiffs respectfully request that dismissal be without prejudice and that Plaintiffs be granted thirty days to file a motion to amend the Complaint, together with a proposed amended Complaint. *See* First Opp. Sec. VII.

### CONCLUSION

---

[58]    The Complaint alleges that after the November 6 False Tweets, customer net withdrawals went from averaging $18 million to around $150 million per hour. Compl. ¶ 59.

[59]    Contrary to CZ's assertion, CZ's benefit is not "incidental," *see* Mot. at 30 (citing *Creditors' Committee of Essex Builders, Inc. v. Farmers Bank*, 251 A.2d 546, 549 (Del. 1969)), because there is evidence in the Complaint of "mistake, coercion, or request." *Creditors' Committee*, 251 A.2d at 549; RESTATEMENT (FIRST) OF RESTITUTION § 112 (1937) ("[A] person is entitled to restitution for a benefit conferred as the result of mistake including fraud . . ., or of coercion, whether caused by duress or the necessity of protecting the transferor's interests  . . ., or of an agreement by the transferee. . . .").

RLF1 33802269v.1

**WHEREFORE**, for the reasons stated above, Plaintiffs respectfully request that this Court (1) deny the Motion, and (2) grant such other relief as is proper.  Alternatively, should the Court grant the Motion in whole or in part by dismissing the Complaint in whole or in part, Plaintiffs respectfully request that any such dismissal be without prejudice and grant Plaintiffs thirty days from the date of the dismissal order to seek leave to amend the Complaint pursuant to Federal Rule 15.

RLF1 33802269v.1

Dated: September 18, 2025
Wilmington, Delaware

/s/ Brendan J. Schlauch
**RICHARDS, LAYTON & FINGER, P.A**.
Kevin Gross (No. 209)
Paul N. Heath (No. 3704)
Brendan J. Schlauch (No. 6115)
Robert C. Maddox (No. 5356)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
gross@rlf.com
heath@rlf.com
schlauch@rlf.com
maddox@rlf.com

-and-

**WHITE & CASE LLP**
J. Christopher Shore (admitted pro hac vice)
Brian D. Pfeiffer (admitted pro hac vice)
Colin West (admitted *pro hac vice*)
Ashley R. Chase (admitted pro hac vice)
Brett L. Bakemeyer (admitted pro hac vice)
Loredana B. Miranda (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
cshore@whitecase.com
brian.pfeiffer@whitecase.com
cwest@whitecase.com
ashley.chase@whitecase.com
brett.bakemeyer@whitecase.com
loredana.miranda@whitecase.com

*Attorneys for Plaintiffs*

56

RLF1 33802269v.1